LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Telephone: (702) 382-1170
Facsimile: (702) 382-1169

Proposed Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.: BK-S-13-17588-LED |
| | Chapter 11 |
| WESTERN FUNDING INCORPORATED, | (Jointly Administered) |
| Debtor. | |
| In re: | Case No.: BK-S-13-17586-LED |
| | Chapter 11 |
| WESTERN FUNDING INC. OF NEVADA, | |
| Debtor. | |
| In re: | Case No.: BK-S-13-17589-LED |
| | Chapter 11 |
| GLOBAL TRACK GPS, LLC, | |
| Debtor. | Date: November 1, 2013 |
| | Time: 9:30 a.m. |

**DEBTORS' OMNIBUS OPPOSITION TO MOTION TO**
**DISMISS CHAPTER 11 CASE AND JOINDER THEREIN**

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

**Table of Contents**

I.      INTRODUCTION.................................................................................................3

II.     JURISDICTION...................................................................................................4

III.    SUMMARY OF ARGUMENT ...........................................................................4

IV.     STATEMENT OF FACTS ...................................................................................5

    A.     Overview of Corporate Structure.................................................................5

    B.     WFI's Sale to Harbor in 2010.....................................................................7

    C.     The Coopers' Attempts to Finance WFI and Interference by the B
        Members ......................................................................................................8

    D.     The BMO Harris Obligation and B Members' Deeds of Trust on
        the Real Property........................................................................................10

    E.     The Litigation Among Harbor's Members and WFI's Deterioration ...................11

    F.     The Asserted Defaults on the BMO Obligation and Events Prior to
        the Petition Date.........................................................................................13

    G.     The Dismissal Motion and Other Relevant Proceedings in WFI's
        Bankruptcy Case ........................................................................................15

V.      LEGAL ANALYSIS ..........................................................................................18

    A.     The Authority to File Bankruptcy .............................................................18

    B.     The B Parties Lack Standing to Challenge WFI Bankruptcy Filing
        as Unauthorized .........................................................................................19

    C.     The Bylaw Amendment Is Invalid and Unenforceable .............................20

    D.     The B Parties Should be Estopped from Relying on the Bylaw
        Amendment................................................................................................22

    E.     Dismissal Pursuant to 11 U.S.C. § 305(a) is Not Warranted................................26

    F.     Dismissal for "Bad Faith" Pursuant to 11 U.S.C. § 1112(b) is Not
        Warranted...................................................................................................29

    G.     Even if the Authority to File Resides at the Harbor Level, Such an
        Issue Would Require a Membership Vote, and the Coopers Have a
        Majority.....................................................................................................31

VI.     CONCLUSION...................................................................................................32

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

# I. INTRODUCTION

1.       Western Funding Incorporated, a California corporation ("WFI"), Western Funding Inc. of Nevada, a Nevada corporation ("WFIN"), and Global Track GPS, LLC, a Delaware limited liability company ("GPS" and together with WFI and WFI, the "Debtors"), debtors and debtors-in-possession, by and through their proposed counsel, the law firm of Larson & Zirzow, LLC, hereby submit their omnibus opposition (the "Opposition") to the *Motion to Dismiss Chapter 11 Case* (the "Motion" or "Dismissal Motion") [ECF No. 57] filed by the group calling themselves the Class B Members (collectively, the "B Members")[1] of Harbor Structured Finance, LLC, a Delaware limited liability company ("Harbor"), and the *Joinder* therein [ECF No. 202] filed by Mark Finston ("Mr. Finston") and James B. Hadden ("Mr. Hadden"), in their capacity as two of the four managers of Harbor (collectively, the "B Managers" and together with the B Members, the "B Parties").

2.       This Opposition is made and based on the points and authorities herein, the *Omnibus Declaration of Frederick A. Cooper in Support of Debtors' Initial Emergency Motions and Related Relief* (the "Omnibus Declaration") [ECF No. 53],[2] the *Declaration of Frederick A. Cooper in Support of Debtors' Omnibus Opposition to Motion to Dismiss Chapter 11 Case and Joinder Therein* (the "F. Cooper Declaration"), and the *Declaration of Katherine H. Cooper in Support of Debtors' Omnibus Opposition to Motion to Dismiss Chapter 11 Case and Joinder Therein* (the "K. Cooper Declaration"), as well as the pleadings, papers and other records contained in the Court's file, judicial notice of which is requested, and any evidence or oral argument presented at the time of the hearing on these matters.

---

[1] As of the filing of this Opposition, neither the B Members nor the B Managers have complied with the disclosure requirements in Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and in spite of prior demand having been made [ECF No. 153, p. 2 n.1] and assurances that such disclosures would be provided [ECF No. 164, p. 2 n.1]. As a result, Bankruptcy Rule 2019(e) authorizes the Court to prohibit further proceedings and other appropriate relief unless and until such disclosure requirements are met.

[2] Unless otherwise indicated, all capitalized terms shall have the same meaning as in the Omnibus Declaration.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

## II. JURISDICTION

3.      On September 4, 2013 (the "Petition Date"), Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing their respective bankruptcy cases (collectively, the "Chapter 11 Cases"). Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Debtors' Chapter 11 Cases are being jointly administered and an Official Committee of Unsecured Creditors (the "Committee") has been appointed and retained proposed counsel.

4.      The Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Pursuant to LR 9014.2, Debtors consent to the entry of final orders and judgments by the bankruptcy judge. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. SUMMARY OF ARGUMENT

5.      The B Parties' attempt to short circuit WFI's reorganization via the Dismissal Motion and Joinder must be denied for numerous reasons. First, the B Members of Harbor, the parent holding company and sole shareholder of WFI, lack standing to challenge the authority of WFI to file for bankruptcy because they are only creditors of WFI (and significantly disputed ones at that), not shareholders.[3] Likewise, the B Managers of Harbor lack standing to challenge the authority of WFI to file for bankruptcy because they are also not shareholders of WFI, and they lack the requisite corporate authority, standing by themselves, to speak for Harbor in Harbor's capacity as WFI's sole shareholder.

6.      Second, the purported Bylaw Amendment upon which the B Parties premise their entire argument is not enforceable or effective as a matter of California law, because a corporation must at all times have a board of directors consisting of individual persons, and the Coopers were and thus remain WFI's sole directors.

7.      Third, even assuming the B Parties can avoid all of the previous issues herein,

---

[3] All capitalized terms in this summary section shall have the meanings as ascribed to them hereinafter.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

1   they have waived, ratified, and/or must be estopped from disputing that the Coopers are WFI's

2   sole directors because all outward manifestations were that the Coopers were the *de facto*

3   directors of WFI, and the B Members declined to be listing in a director capacity.

4       8.      Finally, the B Members' Motion must be denied because they are "out of the

5   money" equity holders of Harbor, WFI's parent holding corporation, and thus are seeking to

6   dismiss WFI's bankruptcy case for the improper purposes of:  (a) maintaining control over their

7   derivative claims pending against the Coopers in their pending Ohio Action, which derivative

8   claims would otherwise be property of the bankruptcy estate and administered by Debtors or the

9   Committee for the benefit of all unsecured creditors, and (b) avoiding the likely challenge to their

10  Deeds of Trust on WFI's Real Property that secures their preferred equity return in Harbor from

11  potential attack under chapter 5 of the Bankruptcy Code, including claims for fraudulent transfer,

12  recharacterization and/or equitable subordination, some of which claims may not be available

13  outside of bankruptcy, and which encumbrances, if allowed to remain, would have the effect of

14  allowing the B Members (who are really just equity holders in WFI's parent holding company) to

15  "jump ahead" of WFI's legitimate unsecured creditors in priority of distribution.  According to

16  substantial case law, such economic realities must not be ignored merely to preserve the legal

17  form of corporate entities, especially where such legal formalism will disadvantage the vast

18  majority of creditors, and such factors allow the Court to disregard such formalities in

19  appropriate circumstances such as when the party seeking dismissal has improper motives.

## IV.  STATEMENT OF FACTS

20

21  **A.      Overview of Corporate Structure**

22      9.      WFI is a specialized consumer finance company providing automobile financing

23  to borrowers with limited access to traditional credit.  Specifically, WFI acquires and services

24  installment loan contracts originated by its national, network of automobile dealers.  WFI's

25  corporate headquarters and principal place of business are 3915 E. Patrick Lane, Las Vegas,

26  Nevada.  WFI is a California corporation incorporated on January 16, 1962.  WFI is a wholly-

27  owned subsidiary of Harbor.  As such, Harbor is WFI's sole shareholder.

28      10.     Frederick A. Cooper ("Mr. Cooper") is the Chief Executive Officer and a director

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

1 of WFI, and the President and a director of WFIN. Mr. Cooper founded Harbor's predecessor in

2 2005. Prior to its acquisition of WFI as hereinafter described, Harbor performed venture capital

3 due diligence reviews of sub-prime auto finance companies for investment purposes in addition

4 to advising on auto finance industry-specific issues, trends and performance. Harbor also

5 acquired discrete pools of sub-prime auto loans for investors and performed the collection work,

6 reporting, and cash management. Harbor also guided clients on consumer portfolio acquisitions,

7 pricing, future loss probability, and other important investment issues. From 1992 to 2004, Mr.

8 Cooper served as the President, Chief Executive Officer and director of SeaWest Financial

9 Corporation, based in Los Angeles, California, which he founded and grew to $250,000,000 in

10 receivables, 230 employees, and an approved dealer network in excess of 1,000 dealers in 48

11 states.

12      11.     Katherine H. Cooper ("Mrs. Cooper" and together with Mr. Cooper, the

13 "Coopers"), is Mr. Cooper's wife and is WFI's President, Chief Operating Officer, Secretary, and

14 Treasurer, and is also its only other director. Mrs. Cooper is also the Secretary and Treasurer of

15 WFIN, and its only other director. Mrs. Cooper has over twelve years of experience in

16 overseeing and managing vital company operations within the financial services industry,

17 including the evaluation and acquisition of indirect sub-prime auto finance portfolios and the

18 management of related functions. Prior to her tenure with WFI, Mrs. Cooper held similar

19 responsibilities with various other financial companies.

20      12.     Harbor is a parent holding company of WFI and managed by a Board of

21 Managers. Harbor has four (4) total managers on its board, who are presently the following: Mr.

22 Cooper, Mrs. Cooper, Mr. Finston, and Mr. Hadden. The Coopers own 55% of the membership

23 interests in Harbor as Class A members, and thus are the majority members of Harbor. The

24 Coopers have selected themselves as their two manager selections for Harbor's board.

25      13.     Philipp D. Nick ("Mr. Nick"), Ellen H. Hardymon, the Suzanne H. Nick

26 Irrevocable Family Trust One, the Suzanne H. Nick Irrevocable Family Trust Two, the Thomas

27 F. Havens Irrevocable Family Trust One, the Thomas F. Havens Irrevocable Family Trust Two,

28 all together either directly or indirectly own or control 45% of the membership interests in

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Harbor as B Members, and thus are minority members of Harbor. Presumably, some or all of the foregoing parties comprise the B Members group that has filed the Dismissal Motion. The B Members presently have selected the B Managers (*i.e.*, Mssrs. Finston and Hadden) as their two manager selections on Harbor's board.

**B.    WFI's Sale to Harbor in 2010**

14.    Preceding 2010, and for nearly four years prior, the Coopers were the 100% owners of Harbor Auto Finance, LLC, a successful car-loan business that sought to provide automobile financing to high-risk borrowers with limited access to traditional credit lines. Having worked in the auto-loan industry for nearly twenty years, the Coopers have significant experience in developing and managing car-loan businesses. In an effort to expand their business and life-work, the Coopers created Harbor, a holding company, in 2007 to help facilitate future acquisitions. During their tenure, the Coopers sought to acquire WFI, which provided them an opportunity to expand their business.

15.    In searching for potential funding and investment sources to facilitate the acquisition of WFI, the Coopers, with the aid of Houlihan Smith & Company ("Houlihan Smith"), an investment banking firm, contacted multiple potential investment sources including both private investors and banks. Given the Coopers' significant background at successfully managing auto-loan businesses, a number of eager investors were serious in funding Harbor's acquisition of WFI. In addition to seeking funding from private investors, the Coopers worked diligently to secure a credit facility in conjunction with the acquisition of and for the beneficial use of WFI. The Coopers ultimately secured a credit facility with Bank of America, N.A. ("Bank of America").

16.    On August 13, 2010, WFI and C.S.C. Investments, LLC, a Nevada limited liability company ("CSC"), as principal sellers, and Harbor, as purchaser, entered into a Share Purchase Agreement (as amended, the "Share Purchase Agreement") with E. Dwight Cope ("Mr. Cope"), a representative of the sellers. Mr. Cope's father was the founder of WFI in 1962. The Share Purchase Agreement provided that the principal sellers and various additional sellers collectively owned all of the outstanding Class A common stock of WFI, and were selling their

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

shares to Harbor.

17. The Share Purchase Agreement also provided that certain of the sellers and certain other persons who had previously loaned money to WFI would have, effective as of the closing, in the aggregate $6,706,000 in principal amount of subordinated debentures of WFI (the "Subordinated Debt" and the holders thereof, the "Subordinated Debt Holders") as a portion of the purchase price they would have otherwise received. Approximately $4,000,000 of this debt is owed to Cope Family Ventures, LP, a Nevada limited partnership, over which Donnella M. Cope serves as manager, and $1,950,000 of this debt is owed to Timothy J. Salas and Adrianna Merrell, in their capacity as trustees of various trusts. The remaining Subordinated Debt is held by approximately eleven (11) other holders in various sums ranging from $12,000 to $250,000.

18. The Subordinated Debt Holders all executed Subordination Agreements, thereby irrevocably subscribing for the junior subordinated debentures issued by WFI and agreeing that such debt would be subordinate to Bank of America, as administrative agent for WFI's then existing lenders. The purchase price paid by Harbor included repaying certain notes with an aggregate principal balance of approximately $3,992,400 held by certain then existing noteholders, as well as additional consideration.

19. The group that was later to become the B Members of Harbor also provided some of the financing to fund Harbor's purchase of WFI.

**C.      The Coopers' Attempts to Finance WFI and Interference by the B Members**

20. From and after the closing of the Harbor transaction, the Coopers and their management team assumed control of the day-to-day operations of WFI. The B Members, by contrast, have always been in the nature of "passive" investors, thus leaving control of day-to-day operations in the Coopers' experienced hands. There is no dispute that the Coopers are the sole officers of WFI and have always had day-to-day management and control over WFI's operations, as they reside in Las Vegas and work and maintain their offices in WFI's headquarters.

21. During the spring of 2011, Mr. Nick contacted certain representatives of Bank of America and allegedly disparaged the Coopers, openly stating to the bank's representatives that the Coopers were engaged in dishonest and criminal enterprises, that the bank should not be

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

1    extending credit to persons such as the Coopers or to entities controlled by the Coopers and that

2    the bank should otherwise terminate its credit facility with WFI.

3          22.    Contemporaneously with Mr. Nick's disparaging and false communications with

4    Bank of America, the B Members' attorney also contacted Bank of America and made similarly

5    false and disparaging statements to certain bank representatives stating that the Coopers were

6    engaged in dishonest and criminal enterprises, that the bank should not be extending credit to

7    persons such as the Coopers or to entities controlled by the Coopers, and that the bank should

8    otherwise terminate its credit facility with WFI.

9          23.    Immediately thereafter, and undoubtedly as a direct result of the disparaging and

10   knowingly false statements made by Mr. Nick and his counsel, Bank of America's relationship

11   with WFI deteriorated.  Specifically, the bank began to take an adversarial role against WFI and,

12   ultimately, terminated the credit facility.  The impact of these defamatory statements regarding

13   the Coopers and their business practices spread to other investment banking firms and to other

14   board members.  Eventually, Bank of America withdrew its funding consideration of WFI,

15   crippling the corporation, leaving it with inadequate capital, and artificially reducing its expected

16   share price.

17         24.    After Bank of America withdrew its funding consideration, the Coopers

18   scrambled to secure additional funding for WFI's business operations in order to preserve the

19   companies' value.  The Coopers thereafter sought to secure a new credit facility with BMO

20   Harris Bank, N.A. ("BMO Harris"), however, because Harbor was proposed to be a guarantor

21   thereof (with WFI as the principal borrower), it also required the approval of B Members, which

22   they failed to provide during multiple Harbor Board meetings.

23         25.    During the summer of 2011, and after B Members successfully disrupted any and

24   all funding sources for WFI, Mr. Nick sought to control WFI's customer list at the exclusion of

25   the Coopers by holding the company's hardware system hostage, and even threatening employees

26   that sought to retrieve the system with criminal trespass.  This hardware system, the sole property

27   of WFI, contained confidential and sensitive information of customers.  The private information

28   included customer social security numbers, driver's license numbers, and credit card numbers, all

1    of which are protected from disclosure by various state and federal laws.  Because Mr. Nick, on

2    behalf of all B Members, subjected the companies to imminent customer-finance litigation that

3    would have damaged the business, the Coopers, in their capacity as officers of WFI and

4    managers of Harbor, were forced to expend significant resources to retrieve Harbor's property

5    and to prevent imminent litigation.

6        26.    On November 29, 2011, WFI engaged Greif & Co. ("Greif") based in Los

7    Angeles, California as the company's financial advisor to assist in raising financing for the

8    company.  Greif thereafter assisted WFI in generating and circulating a Private Placement

9    Memorandum, and assisted in identifying and contacting potential accredited senior debt,

10   subordinated debt, and equity capital sources to ascertain their interest in lending or investing

11   capital in WFI, however, such efforts were ultimately unsuccessful.

12   **D.    The BMO Harris Obligation and B Members' Deeds of Trust on the Real Property.**

13       27.    On March 14, 2012, WFI, as borrower, and BMO Harris, as administrative agent

14   for various lenders, entered into a Credit Agreement (the "Credit Agreement") for a total

15   commitment of up to $40,000,000 (the "BMO Obligation").  Harbor, WFIN, and GPS all

16   guaranteed the BMO Obligation.  The BMO Obligation is secured and perfected in substantially

17   all of Debtors' assets other than three (3) parcels of real property located in Las Vegas, Nevada;

18   San Jose, California; and Houston, Texas respectively (collectively, the "Real Property").

19       28.    In connection with the loan transaction with BMO Harris, the B Members of

20   Harbor required the Class A Members (the Coopers) to agree to a First Amendment to the

21   Amended and Restated Operating Agreement of Harbor (the "Harbor First Amendment"), which,

22   among other matters, provided for the payment to the B Members of the Class B Preferred

23   Return, provided that such a payment would not violate a restriction in the Credit Agreement

24   with BMO Harris.

25       29.    Additionally, in the event payment by Harbor was not made as a result of the

26   restriction in the Credit Agreement, the B Members required the Class A Members to enter into a

27   Guaranty and Reimbursement Agreement (the "Guaranty Agreement") in favor of the B

28   Members, thereby personally guaranteeing full payment to the B Members of any amounts

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

required to be distributed to the B Members as a Class B Preferred Return pursuant to the Harbor First Amendment, and which exceed the amounts permitted to be paid pursuant to the Credit Agreement Restriction, such that the full payment of Class B Preferred Returns is made in accordance with the Harbor First Amendment.

30.     Finally, the B Members of Harbor required the Class A Members to enter into a First Amendment to Letter Agreement (the "Letter Agreement Amendment"), which agreed to amend and waive certain terms and conditions of their original Letter Agreement. Specifically, the Letter Agreement Amendment provided that, among other matters, that Harbor would cause WFI to execute and deliver three (3) deeds of trust (collectively, the "Deeds of Trust") on WFI's three parcels of Real Property to secure payment of their preferred equity return from Harbor.

31.     In March 2012, the B Members of Harbor caused to be recorded the Deeds of Trust on WFI's Real Property pursuant to the Letter Agreement Amendment in order to secure their preferred equity return from Harbor. True and correct copies of the B Members' Deeds of Trust are attached to the F. Cooper Declaration as **Exhibits 1-3** thereto.

E.     **The Litigation Among Harbor's Members and WFI's Deterioration**

32.     During the spring and summer of 2012, the Coopers undertook a "roadshow" to find additional funding and capital to further expand WFI's business. The Coopers engaged multiple potential funding sources including private parties and banks. These efforts to secure additional funding and capital were well received and the Coopers were on the verge of obtaining additional funding as a direct result of their efforts. The B Members were aware both of the Coopers' financing efforts as well as the imminent potential of WFI's and Harbor's success in obtaining additional funding.

33.     Because success in this area would have been counter-productive to the goals of Mr. Nick and the remaining B Members to wrest control of the companies from the Coopers and to artificially drive down the companies' value, the B Members undertook with renewed vigor their efforts to besmirch the Coopers and use any means necessary to pursue their own, illegitimate goals. The B Members launched additional, illegitimate and intentionally deceptive attacks on the Coopers and their management of the companies in order to accomplish their goal.

The B Members took these actions with the knowledge and understanding that the prospective funding sources then considering funding the companies would be scared or "run off" by the Class B allegations, regardless of merit or truth, and would not provide the funding that was otherwise imminent.

34.    Indeed, in July and August 2012, Mr. Nick and the remaining B Members caused their counsel to submit to the company two so-called derivative letters containing misstatements of fact, falsehoods, and misleading and deceptive allegations of misconduct and mismanagement against the Coopers. The B Members knew that during the course of due diligence and review of the companies' operations, the prospective funding sources would inevitably learn of these letters and the allegations contained therein. In fact, when this did occur, all prospective funding sources immediately withdrew their interest in the companies and their proposed funding. The withdrawal of prospective funding for the companies thwarted the Coopers' efforts to manage and grow the companies, resulting to harm in the companies and all of the members.

35.    On October 9, 2012, B Members filed an action in the Court of Common Pleas, Franklin County, Ohio, Civil Division, as Case No. 12 CV 012749 (the "Ohio Action") against the Coopers, which alleged claims for breach of fiduciary duty as to WFI and Harbor, breach of contract for alleged breaches of Harbor's operating agreement, fraud, and civil conspiracy.

36.    On December 10, 2012, as later amended on December 24, 2012, the Coopers filed an action in the Eighth Judicial District Court, Clark County, Nevada as Case No. A-12-673394 against the B Members, which was later removed to the United States District Court for the District of Nevada on January 10, 2013 as Case No. 2:13-cv-00036-JCM-GWF (the "Nevada Action"). The Coopers' Complaint, as amended, asserted claims against one or all of the B Members for conversion, breach of fiduciary duties, intentional interference with contractual relations, intentional interference with prospective economic advantage, civil conspiracy, fraudulent inducement, defamation, defamation *per se*, business disparagement, abuse of process, declaratory relief, and injunctive relief.

37.    The Coopers' Nevada Action alleged that within months of becoming invested in Harbor and the acquisition by Harbor of WFI, the B Members, led by Mr. Nick, commenced a

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

calculated effort both to drive down artificially the value of the companies and to take control of Harbor's Board of Managers. Specifically, the Nevada Action alleged that Mr. Nick's plan, approved by and implemented in conjunction with the other B Members, involved two primary steps. One step included the B Members' intent to artificially and temporarily reduce the value of the companies by manufacturing financial crises that would temporarily depress the companies' ability to maintain its credit facility and to secure alternative funding. The second step included the Members manufacturing bogus claims of improprieties on the part of the Coopers. The Coopers alleged that the B Members' plan was implemented for the sole purpose of trying to wrest control and majority ownership of the companies from the Coopers, thereby directly impacting and harming the Coopers' interest in the companies.

38.    On May 20, 2013, and after significant negotiations and a prior settlement agreement, Harbor, WFI, GPS, the Coopers, and the B Members entered into an Amended and Restated Settlement Agreement (the "Settlement Agreement"). Subject to the terms and conditions therein, and contingent on a closing occurring (which as of the Petition Date has not occurred), the B Members agreed to sell their interests in Harbor back to Harbor for a buyout payment, including a cash payment and the transfer to them of WFI's Las Vegas and Houston real properties, with WFI leasing back the Las Vegas property on a triple net basis for six years at a set monthly lease rate. The B Members also agreed to release their deed of trust on WFI's San Jose property contingent on the closing and the buyout payment actually occurring. The parties further agreed to a temporary standstill of their pending litigations, and, subject to a closing occurring by an outside date of July 31, 2013, the parties further agreed to a dismissal with prejudice of all their pending litigation and mutual general releases. WFI did not have the funds on hand to fund the proposed buyout payment, and thus the Settlement Agreement provided that a Special Buyout Committee of Harbor's board, consisting of the Coopers, was to identify and negotiate a transaction by which the Buyout Payment could be funded and presented back to Harbor for final approval and consummation of the Settlement Agreement.

F.    **The Asserted Defaults on the BMO Obligation and Events Prior to the Petition Date**

39.    On April 23, 2013, BMO Harris delivered to WFI a written notice of defaults and

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

a reservation of rights (the "Notice of Default") under the Credit Agreement due to various asserted defaults thereunder.

40.     Thereafter, beginning in May 2013, the parties to the Credit Agreement entered into a series of forbearance agreements. Specifically, on May 29, 2013, the parties to the Credit Agreement entered into a Forbearance Agreement and Second Amendment to Credit Agreement (the "Forbearance Agreement"), that was later by amendments dated June 18, 2013, July 1, 2013, July 15, 2013, and August 5, 2013.

41.     Given the value of WFI and its portfolio and Real Property as compared with the BMO Obligation in senior secured position, and the amount owing to the Subordinated Debt and the claims of other general unsecured creditors, Harbor's equity in WFI is clearly "out of the money" and to a significant degree. Given the foregoing economic reality, and contrary to their fiduciary duties, the actions of the B Members and their representatives on the Harbor Board (the B Managers) in seeking to dismiss WFI's bankruptcy case is clearly motivated toward preventing their Deeds of Trust on WFI's Real Property from being avoided, as those encumbrances are the only possible way they could ever realize any recovery from their failed equity investment in Harbor at this point, and clearly not toward maximizing the value of WFI for the benefit of unsecured creditors.

42.     Instead, the only "solution" ever offered by the Class B Parties was to replace the Coopers and without ever offering any legitimate proposal to deal with WFI's most pressing issue: finding a transaction or financing to deal with its defaulted senior secured credit facility with BMO Harris. Attached to the F. Cooper Declaration as **Exhibits 4-8** are true and correct copies of the dialogue on the B Members' alleged proposal to take control of WFI, which was not even remotely viable, definite or realistic.

43.     On August 13, 2013, BMO Harris sent Debtors a Notice of Acceleration and Demand for Payment, which indicated that any remaining standstills and forbearances had expired and declaring the principal and all accrued interest of the BMO Obligation was accelerated and immediately due and payable.

44.     On August 16, 2013, counsel for the B Members of Harbor sent a letter to WFI

14

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

giving notice of an alleged default under B Members' Deeds of Trust and further purporting to accelerate all of WFI's obligations thereunder and immediately due and payable. A true and correct copy of the foregoing letter is attached to the F. Cooper Declaration as **Exhibit 9** thereto.

45. On August 20, 2013, BMO Harris filed a *Complaint* in the Eighth Judicial District Court, Clark County, Nevada (the "Nevada State Court"), thereby commencing case number A-13-687299-B (the "State Court Case") and asserting claims for declaratory relief for the appointment of a receiver, breach of the Credit Agreement, and breach of the covenant of good faith and fair dealing.

46. On August 21, 2013, BMO Harris filed a *Petition for the Appointment of a Receiver on Order Shortening Time* (the "Receiver Petition") in the State Court Action, thereby seeking the appointment of a receiver over Debtors' business, which the Nevada State Court set for hearing on September 3, 2013.

47. Debtors opposed the Receiver Petition, however, on September 4, 2013, the Nevada State Court entered an *Order Appointing Receiver* (the "Receiver Order"). The Receiver Order did not make any findings of fraud, malfeasance or mismanagement; rather, the Nevada State Court simply found that a receiver was necessary to preserve the status quo.

48. On September 4, 2013, and given the imminent potential takeover by the receiver, who had no experience operating the Debtors' business and would have undoubtedly compromised significant value of the company, Debtors were left with no choice but to file their respective voluntary petitions, thereby commencing the Chapter 11 Cases.

49. On the Petition Date, WFI's *Voluntary Petition* [ECF No. 1] had attached to it a copy of a resolution by unanimous written consent, which stated that the Coopers were all of the members of the board of directors of WFI, and that in that capacity they authorized WFI's bankruptcy filing.

**G.    The Dismissal Motion and Other Relevant Proceedings in WFI's Bankruptcy Case**

50. On September 16, 2013, the B Members filed their Dismissal Motion. The Motion argues that WFI's bankruptcy case should be dismissed pursuant to either section 305(a)(1) of the Bankruptcy Code because the interests of creditors and the debtor would

1    allegedly be better served by such dismissal, or pursuant to section 1112(b) of the Bankruptcy

2    Code "for cause" because the bankruptcy filing was not authorized, and because the filing is

3    "suspect" or in bad faith because it was filed within hours after the Nevada State Court entered

4    the Receiver Order.  The Dismissal Motion also "reserves" the issue of sanctions as against the

5    Coopers and WFI's counsel as a result of the allegedly unauthorized bankruptcy filing of WFI.

6        51.    The B Members' Motion had eight (8) exhibits attached to it.  Additionally, the B

7    Members filed a *Declaration of Phillip D. Nick in Support of Motion to Dismiss Chapter 11*

8    *Case* (the "Nick Declaration") [ECF No. 58].  Mr. Nick is one of the B Members, but is not a

9    manager of Harbor or a shareholder in WFI.  The Nick Declaration purports to authenticate four

10   (4) of the exhibits attached to the B Members' Motion with the statement that they are the

11   "business records of the Class B Members and they are kept by me, a Class B Member, in the

12   ordinary source of my business with Harbor and WFI and in the business of the Class B

13   Members."

14       52.    The B Members also sought to have their Motion heard on shortened time

15   pursuant to an *ex parte* application [ECF No. 59], however, the Court refused to have such a

16   case-defining motion decided without appropriate briefing time, and thus set the matter for

17   hearing in the ordinary course.  [ECF No. 79].

18       53.    On October 1, 2013, which was more than two (2) weeks after the B Members

19   filed their Dismissal Motion, and only a few days before oppositions to the Motion were due, the

20   B Members filed the *Declaration of James B. Hadden in Support of Motion to Dismiss Chapter*

21   *11 Case* (the "Hadden Declaration") [ECF No. 133].

22       54.    On October 3, 2013, which was the afternoon before oppositions to the Dismissal

23   Motion were due at that time, the B Members filed the *Declaration of Mark Finston in Support*

24   *of Motion to Dismiss Chapter 11 Case* (the "Finston Declaration") [ECF No. 146] and the

25   *Supplemental Declaration of Philipp D. Nick in Support of Motion to Dismiss Chapter 11 Case*

26   (the "Supplemental Nick Declaration") [ECF No. 147].

27       55.    On October 10, 2013, the Court entered an *Order Granting Debtors' Motion for*

28   *Extension of Time to File Opposition to Motion to Dismiss Chapter 11 Case, and Modifying*

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

*Briefing Schedule and Hearing Date* [ECF No. 168], which allowed Debtors additional time to file their opposition to the Dismissal Motion in light of the

56.     Also on October 10, 2013, Debtors attended their first meeting of creditors pursuant to section 341(a) of the Bankruptcy Code and their representative, Mr. Cooper, was questioned extensively by counsel for the B Managers, who has since filed a notice of appearance in the case. See ECF No. 195.

57.     On October 15, 2013, which was the day before Debtors' opposition to the Dismissal Motion was due, the B managers filed their Joinder.  The Joinder makes the same factual allegations and similar arguments as the B Members' Motion.  The Joinder, similar to the Dismissal Motion, "reserves" the issue of sanctions as against the Coopers as a result of their participation in the allegedly unauthorized bankruptcy filing of WFI.[4]

58.     On October 16, 2013, Debtors filed a *Motion for Order Approving Stipulation Authorizing Debtors to Use Cash Collateral, Granting Adequate Protection and Granting Relief From the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362 and 363* [ECF No. 204], which seeks approval of a consensual cash collateral stipulation (the "Cash Collateral Stipulation") with BMO Harris pursuant to various terms and conditions.  Among other matters, the Cash Collateral Stipulation requires that Debtors have a letter of intent in hand from a potential purchaser by no later than October 25, 2013 and, if proceeding with a proposed plan of reorganization, file such plan by no later than October 25, 2013, or, if proceeding with a motion to sell substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code, have such a motion on file by not later than November 11, 2013.  In short, by the time of the hearing on the Dismissal Motion, Debtors anticipate that they will have made substantial progress in their Chapter 11 Cases toward a transaction for the company to achieve a meaningful recovery for general unsecured creditors. Although Debtors believe there will be a distribution to unsecured creditors in this case,

---

[4] To the extent the Court deems it appropriate to engage in any sanctions analysis as allegedly "reserved" in the B Parties' filings, Debtors and their proposed counsel request the opportunity to brief such issues separately because that issue involves a different analysis and standards. See, e.g., In re So. Cal. Sound Systems, Inc., 69 B.R. 893, 901 (Bankr. S.D. Cal. 1987); Marsch, 36 F.3d at 831 n.2.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

including from the sale of its business and/or the Real Property (once the B Members' Deeds of Trust thereon are avoided), under no realistic scenario do Debtors expect any recovery for Harbor, its sole equity security holder, from the Chapter 11 Cases.

59.    Also on October 16, 2013, and in light of the B Managers' filing of their Joinder just one day prior to the date then set for Debtors' opposition to the Dismissal Motion, the parties entered into a stipulation [ECF No. 208] that was later approved by the Court [ECF No. 212], which, in light of the B Managers' late-filed Joinder, provided Debtors an additional few days to file a consolidated opposition to both filings by the B Parties.

## V. LEGAL ANALYSIS

### A.    The Authority to File Bankruptcy

60.    As the movants seeking to dismiss the bankruptcy case as an unauthorized filing, the B Parties have the burden of proving that the filing was unauthorized. See In re Player Wire Wheels, Ltd., 421 B.R. 864, 868-69 (Bankr. N.D. Ohio 2009).

61.    A person filing a voluntary petition for bankruptcy on behalf of a business entity must be duly authorized to do so. Price v. Gurney, 324 U.S. 100, 106 (1945). If the person lacks authority, the court has no alternative but to dismiss the petition. Id. State law generally determines who has authority to file a bankruptcy petition. Id. at 106-07. In the absence of a state statute or bylaw regulating the subject, the authority to authorize a bankruptcy filing resides in the corporation's board of directors. See Rudebeck v. Sanderson (In re Nonpareil Consol. Copper Co.), 227 F. 575, 577 (9th Cir. 1915); In re N2N Commerce, Inc., 405 B.R. 34, 41-42 (Bankr. D. Mass. 2009) (collecting cases); Cal. Corp. Code § 300(a) (exception for certain limited exceptions not relevant here, "the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the board. The board may delegate the management of the day-to-day operation of the business of the corporation to a management company or other person provided that the business and affairs of the corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the board.").

**B.** **The B Parties Lack Standing to Challenge WFI Bankruptcy Filing as Unauthorized**

62.     Only <u>shareholders</u> of a debtor have the legal standing to contest the filing of a bankruptcy petition as unauthorized. <u>Tally v. Fox Film Corp. (In re Fox W. Coast Theatres)</u>, 88 F.2d 212, 224-25 (9th Cir. 1937) (citing numerous cases, including <u>Royal Indemnity Co. v. American Bond & Mortg. Co.</u>, 289 U.S. 165 (1933)). By contrast, <u>creditors</u> of a debtor lack standing to challenge a bankruptcy filing as unauthorized. <u>Royal Indem. Co.</u>, 289 U.S. at 171; <u>In re Gucci</u>, 174 B.R. 401, 412 (Bankr. S.D.N.Y. 1994) (collecting cases).

63.     In the case at hand, neither the B Members nor the B Managers are shareholders of WFI; rather, <u>Harbor</u> is the sole shareholder of WFI. At best, the B Members are <u>creditors</u> of WFI pursuant to their Deeds of Trust on WFI's Real Property, not shareholders, and thus lack the standing to challenge WFI's filing as unauthorized. The B Members ignore this obvious issue by assuming that their minority membership interest in Harbor, the parent holding company of WFI (not WFI itself), is sufficient to confer standing (or somehow also make them shareholders of WFI), when, in fact, conferring such standing would disregard the separate corporate status of Harbor and WFI as two different entities.

64.     Additionally, the B Members are not authorized to speak for Harbor because they are not managers of Harbor (let alone a majority of Harbor's members or acting pursuant to a validly taken corporate action or resolution of Harbor). As a result, the Court must deny the B Members' Dismissal Motion for lack of standing because minority members of a <u>parent holding company of a debtor</u> are not shareholders of the debtor, and it is only shareholders <u>of the debtor itself</u> who have legal standing to challenge that debtor's filing as unauthorized.

65.     Similarly, the B Managers are also not shareholders of WFI; rather, they are fifty percent (50%) of the managers of WFI's parent holding company, Harbor. Moreover, the B Managers, standing by themselves, are not a majority of Harbor's board of managers, and thus lack the requisite corporate authority to speak on behalf of Harbor. Indeed, neither the Dismissal Motion nor the Joinder can point to any valid corporate resolution of Harbor voting either for or against WFI's bankruptcy filing as there is none. Although the topic of Harbor also filing for bankruptcy along with WFI was discussed at Harbor's board of managers meetings, no official

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

1  vote authorizing (or refusing) a filing of Harbor was ever taken, as it was clear from the

2  discussions that the Harbor Board was "deadlocked" on this issue—with the A Managers (the

3  Coopers) supporting a bankruptcy filing of Harbor, and the B Managers of Harbor (Mssrs.

4  Finston and Hadden) refusing to support a bankruptcy filing of Harbor.  Harbor did not and need

5  not have ever authorized WFI's bankruptcy filing; rather, that authority lies solely with WFI's

6  board of directors.  As a result, the Court must deny the B Managers' Joinder for lack of standing

7  because a minority of the managers of a parent holding company of a debtor are not shareholders

8  of that subsidiary debtor, and it is only shareholders of the debtor itself that have standing to

9  challenge a filing as unauthorized.

10        66.    Because only Harbor, as the sole shareholder of WFI, is the only party that has the

11  legal standing to challenge WFI's bankruptcy filing as unauthorized—and only if Harbor itself

12  has adopted such a position pursuant to a validly authorized corporate action, not the unilateral

13  and unauthorized positions of a minority of its managers or a minority of its members like in the

14  case at hand—neither the B Managers nor the B Members have the legal standing to challenge

15  WFI's bankruptcy filing as unauthorized.

16        67.    The B Parties' confusion and mistake is best illustrated by the many cases they

17  cite in their pleadings, all of which involve situations where the debtor-corporation had a 50-50

18  split in its own shareholders, and one of the shareholders of that debtor-corporation challenges

19  the filing as unauthorized.  This is not the situation in the case at hand because there is no 50-50

20  split of the shareholders with the debtor-corporation (WFI); rather, the split is at the parent

21  holding company level (Harbor) and with its board of managers.  Moreover, WFI has its own

22  directors that did authorize WFI's bankruptcy filing.  As such, given the foregoing distinctions,

23  the authority cited by the B Parties has little relevance to the situation presented in the case at

24  hand.

25  **C.    The Bylaw Amendment Is Invalid and Unenforceable**

26        68.    The B Parties' argument for an unauthorized filing is premised solely on the

27  theory that pursuant to an Amendment to the Amended and Restated Bylaws of WFI (the "Bylaw

28  Amendment"), WFI has no board of directors, and that Harbor (the entity), as the sole

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

1    shareholder, is deemed to be the "director" of WFI.  The Bylaw Amendment is purportedly

2    attached to the Dismissal Motion as Exhibit 10.[5]  The version of the Bylaw Amendment attached

3    to the B Parties' various pleadings and declarations, however, is undated and has no effective

4    date.

5         69.    The Bylaw Amendment is ineffective because even though WFI is a wholly-

6    owned subsidiary of Harbor, WFI, as a separate corporation, must have at least one director of its

7    own.  See Cal. Corp. Code § 300(a) (as previously quoted herein, vesting all management and

8    corporate powers under the ultimate discretion of a corporation's board of directors); id. § 212(a)

9    ("The number or minimum number of directors shall not be less than three; provided, however,

10   that (1) before shares are issued, the number may be one, (2) before shares are issued, the number

11   may be two, (3) so long as the corporation has only one shareholder, the number may be one, (4)

12   so long as the corporation has only one shareholder, the number may be two, and (5) so long as

13   the corporation has only two shareholders, the number may be two.").

14        70.    Second, it is clear that directors of a California corporation must be actual live

15   individuals, not a corporate entity.  See Cal. Corp. Code § 164 ("'Directors' means natural

16   persons designated in the articles as such or elected by the incorporators and natural persons

17   designated, elected or appointed by any other name or title to act as directors, and their

18   successors.") (emphasis added); see also Cal. Corp. Code § 309(c) ("A person who performs the

19   duties of a director in accordance with subdivisions (a) and (b) shall have no liability based upon

20   any alleged failure to discharge the person's obligations as a director.") (emphases added); id. §

21   302 ("The board may declare vacant the office of a director who has been declared of unsound

22   mind by an order of court or convicted of a felony.").  As such, the Bylaw Amendment's attempt

23   to "deem" Harbor as the director does not work.

24        71.    Third, applicable California case law also holds that the duties of directors cannot

25   be delegated or surrendered as they purport to be in the Bylaw Amendment.  See Smith v. Cal.

26

27   ───────────────
     [5] This same exhibit is also attached as Exhibit 1 to the Hadden Declaration, and as Exhibit D to the Supplemental
28   Nick Declaration.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

1  Thorn Cordage, 18 P.2d 393 (Cal. 1933) (holding that directors cannot abandon their duties and

2  functions by an arrangement with shareholders or outsiders that limits or influences their

3  discretion to act for the corporation; holding that a contract, by which complete charge of the

4  finances of the corporation were placed in the hands of a finance committee composed of

5  creditors and stockholders was held void as contrary to public policy); Kennerson v. Burbank

6  Amusement Co., 260 P.2d 823 (Cal. 1953) (holding that a corporation whose sole asset was a

7  theater building could not by contract give a party complete control over bookings, personnel,

8  and fiscal policies and impose on him only the duty to make periodic reports to the board;

9  contract held invalid as a divestment of the board's functions).

10  **D.    The B Parties Should be Estopped from Relying on the Bylaw Amendment**

11        72.    The B Parties have ratified, waived and/or should be estopped from denying that

12  the Coopers are the sole directors of WFI, because all outward manifestations have always been

13  that the Coopers are WFI's sole directors. In fact, the B Members expressly declined to be listed

14  as directors of WFI on various filings because of the financial disclosure and administrative

15  hassle and paperwork involved with that designation. The B Parties should not be permitted to

16  assert a directorship structure in WFI only when it is convenient—such as trying to manufacture

17  a way to block a bankruptcy for a company when it is undoubtedly needed—and ignore it when it

18  is inconvenient—such as when needed for state regulatory compliance paperwork in the

19  operation of the company's business.

20        73.    As explained by the Court in In re American Globus Corp., 195 B.R. 263 (Bankr.

21  S.D.N.Y. 1996):

22              [A] bylaw serves as a binding contract between the corporation and
                its shareholders, and between its shareholders *inter se*. However,
23              like a contract, modification or abrogation of a bylaw may be
                accomplished by acts or conduct on the part of stockholders.
24              Nonuser of a bylaw, continuing for a considerable length of time,
                and acquiescence therein, may work its abrogation. In addition, the
25              determination as to whether to honor corporate formalities is an
                equitable one, and courts should not sanction a perversion of the
26              privilege to do business in a corporate form.

27

28  Id. at 265 (emphases added).

22

74.    In <u>American Globus Corp.</u>, a 30% shareholder in a debtor sought the dismissal of a chapter 11 petition filed on behalf of the debtor by a 70% shareholder on the grounds that it violated a unanimous voting requirement to authorize a filing set forth in the debtor's bylaws. <u>Id.</u> at 264-65.  Although the Court noted that the bankruptcy filing was in violation of the unanimous authorization provision in the company's corporate bylaws, the Court also noted that the objecting shareholder had himself showed little interest in respecting corporate formalities, and thus that the dissenting shareholder "cannot ignore all corporate formalities and then successfully argue that the remaining shareholder's attempt to salvage the business through bankruptcy is untenable because he did not have the consent of the very shareholder who ignored corporate formalities . . ." <u>Id.</u> at 266.  Given such a situation, the Court denied the shareholder's motion to dismiss the bankruptcy case as an unauthorized filing.

75.    On a related point, as a matter of California corporate law, even if a person is not a director *de jure* of corporation, the court could still find the person to be a *de facto* director under appropriate circumstances, such that the objecting party should be estopped from denying such *de facto* directors are the true directors and that their actions are not authorized.  <u>See Beijing Tong Ren Tang (USA) Corp. v. TRT USA Corp.</u>, No. C-09-00882, 2010 WL 2228568, at *6-7 (N.D. Cal. June 2, 2010) (looking to the annual corporate registration statements and noting that the party claiming to be a director was never listed as such therein, but also noting that there was some evidence that the alleged director participated in director meetings; holding that a genuine issue of material fact existed as to whether the party was a director, and thus denying partial summary judgment as a result); <u>FTC v. Data Med. Capital, Inc.</u>, No. SA-CV-99-1266, 2010 WL 1049977, at *20 (C.D. Cal. Jan. 15, 2010) (holding that a party was the *de facto* principal of a corporation because he controlled the operations); <u>John Paul Lumber Co. v. Agnew</u>, 270 P.2d 1044, 1048 (Cal. 1954) ("A *de facto* officer of a private corporation is defined as being one who has the reputation of being the officer he assumes to be in the exercise of the functions of the office, and yet is not a good officer in point of law; and as one who is in possession of an office and discharging its duties under color of authorities."); <u>Clark v. Oceano Beach Resort Co.</u>, 289 P. 946, 947 (Cal. 1930) (holding that an individual was a *de facto* director where his predecessor

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

has attempted to resign, although arguably ineffectively, and thereafter did not participate in any meetings of the board, such individual entered upon the discharge of his duties as a director and participated as such in the conduct of the business of the board); <u>Consumers Salt Co. v. Riggins</u>, 282 P. 954, 955 (Cal. 1929) (holding that where there was a deficient appointment of a person to be an officer and director, if no stockholder objects or takes legal proceedings to test the right to the office, and such person is allowed to perform the duties of such office, he becomes an officer and/or director *de facto* and may bind the corporation; holding that the de facto doctrine applies to disputes between a corporation and its shareholders, including internal corporate affairs such as an assessment or the appointment of an agent); <u>Sears v. Stelzner (In re Globe Drug Co.)</u>, 104 F.2d 114, 117-118 (9th Cir. 1939) (holding that a party would be estopped from asserting that he was not a director because he was a *de facto* director, and thus he "may not assume the office, and at the same time shed his duties and liabilities"); <u>Sherwood v. Wallin</u>, 99 P. 191, 193-94 (Cal. 1908) (holding that because certain parties assumed the office of directors was acquiesced in by all of the stockholders, and thus they must be held to have been possessed of all the power of *de facto* directors; that such a *de facto* board may legally perform such acts as are within the scope of the corporation's business; and that "such acts are deemed valid in respect to third persons, the corporation, the shareholders, and the directors themselves").

76.     As applied in the case at hand, the foregoing authority provides grounds to estop the B Parties from arguing that Harbor's or the B Parties' consent was required to authorize WFI's bankruptcy filing, and further provides grounds for the Court to find that the Coopers were the *de facto* directors of WFI and thus authorized to file the bankruptcy case on that company's behalf.  As detailed hereinafter, there are numerous significant filings illustrating that all parties, with the full knowledge and consent of the B Parties, dealt with and understood the Coopers as WFI's sole directors.

77.     First, the Written Consent of the Board of Directors of WFI (the "<u>Written Consent</u>") that WFI executed in order to authorize it to enter into the $40,000,000 Credit Agreement with BMO Harris was executed by the Coopers as the sole directors of WFI.  A true and correct copy of the Written Consent is attached to the F. Cooper Declaration as **Exhibit 10.**

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

78.     Second, the annual lists of officers and directors filed with both the California and Nevada Secretaries of State, which are WFI's states of incorporation and principal place of business, respectively, have provided for years that the Coopers are the sole officers and directors of WFI.   True and correct copies of the foregoing annual lists are attached to the F. Cooper Declaration as **Exhibits 11 and 12**, respectively.

79.     Third, WFI operates in approximately thirty (30) states, all or nearly all of which require, at a minimum, registration to do business and/or business license in those states.  All of these state business filings universally have provided for years that the Coopers are the sole officers and directors of WFI.  For example, true and correct copies of WFI's state business registration filings in Arizona, Florida, Idaho, Illinois, Indiana, Kansas, Louisiana, Mississippi, Nebraska, Oregon, Tennessee, Utah, Virginia, Washington, and West Virginia are attached to the K. Cooper Declaration as **Exhibits 1-15**, respectively.

80.     The foregoing filings are critical because Mr. Nick, as lead representative of the B Members, specifically and repeatedly declined to be listed as a director of WFI in these filings, and instead allowed the Coopers only to be listed as directors, because such a designation would have required him to engage in substantial financial disclosures in many of the states in which WFI operates, and this was something he was unwilling to do.

81.     In sum, a directorships structure is not a malleable mere matter of convenience that can be asserted when convenient and disregarded when not.  By course of practice and operation, and with the full knowledge and consent of Harbor and the B Parties, the Coopers have always been the sole *de facto* directors of WFI.  As such, the B Parties should not be heard to now complain, now that they do not like what the *de facto* directors of WFI have authorized in the form of the entity's bankruptcy filing.  As such, even if the Court somehow finds that the Coopers were not the directors *de jure* of WFI, it can still find that they were the *de facto* directors, and that the B Members have waived, acquiesced and/or should be estopped from denying that the Coopers were the sole directors of WFI.

82.     Additionally, the Court in <u>American Globus Corp.</u> also quoted an earlier decision holding that "dismissal of a bankruptcy proceeding, for non-compliance with corporate bylaws or

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

state law upon the motion of a stockholder who holds what otherwise might be a preferential transfer, would be unjustified in both law and equity." Id. (quoting In re Autumn Press, Inc., 20 B.R. 60, 61 (Bankr. D. Mass. 1982)).  "The vast weight of the case law requires that economic realities must not be ignored merely to preserve the legal form of corporate entities, most particularly where such legal formalism will disadvantage the vast majority of creditors . . . ." Id. (quoting In re Drexel Burnham Lambert Grp., Inc., 138 B.R. 723, 765 (Bankr. S.D.N.Y. 1992)).

83.    As applied in the case at hand, the foregoing principal clearly indicates why WFI's bankruptcy case is in the best interests of the great majority of unsecured creditors, not simply BMO Harris as Debtors' senior secured creditor, who was seeking to foreclose on substantially all of WFI's assets pre-petition.  Likewise, as previously noted, the B Members' equity investment in Harbor is now worthless, and thus they have an interest in avoiding the bankruptcy in order to preserve the Deeds of Trust, which are the only means by which they will ever be able to obtain any recovery from their otherwise failed equity investment.  Given that the B Members' actions, including specifically the Motion and the attempt therein to thwart the bankruptcy case at its inception, it is clear that the B Members are simply looking to preserve their mechanism to jump ahead of general unsecured creditors with respect to WFI's Real Property and the proceeds therefrom.  Similarly, the B Members are also clearly trying to protect their Ohio Action and the derivative claims asserted therein against the Coopers, when such claims are clearly property of the estate.  In sum, the foregoing assets could otherwise provide a meaningful recovery for unsecured creditors, and thus the B Parties are clearly seeking to dismiss the bankruptcy cases for their own benefit and are at complete cross purposes to the vast majority of creditors in the case. Given such improper motives, the foregoing is reason alone to deny the B Parties dismissal request and even if they are otherwise correct that one or more of their consent(s) were required to authorize WFI's bankruptcy filing.

**E.    Dismissal Pursuant to 11 U.S.C. § 305(a) is Not Warranted**

84.    The B Members' Motion (but not the B Managers' Joinder) references section 305(a) of the Bankruptcy Code in passing, see Motion, ¶ 5, but fails to provide any substantive discussion of that subsection or the applicable caselaw applying it whatsoever.  Section 305(a) of

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

the Bankruptcy Code provides, in pertinent part, that "[t]he court, after notice and a hearing, may

dismiss a case under this title . . . at any time if--(1) the interests of creditors and the debtor

would be better served by such dismissal . . . ." 11 U.S.C. § 305(a).

85.    The moving party bears the burden to demonstrate that dismissal or suspension

pursuant to section 305(a) of the Bankruptcy Code benefits the debtor and its creditors. See In re

RHTC Liquidating Co., 424 B.R. 714, 720-21 (Bankr. W.D. Pa. 2010); In re Monitor Single Lift

I, Ltd., 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008).

86.    Critically, section 305(a) of the Bankruptcy Code requires that the interests of

both the creditors and the debtor be "better served" by dismissal or suspension. See RHTC

Liquidating Co., 424 B.R. 720-21; Eastman v. Eastman (In re Eastman), 188 B.R. 621, 624-25

(B.A.P. 9th Cir. 1995) (reversing order dismissing case under section 305(a)(1) because the

lower court employed a balancing test and failed to determine that dismissal was in the interest of

debtor as well as creditors); In re Aerovias Nacionales de Colum. S.A. Avianca, 303 B.R. 1

(Bankr. S.D.N.Y. 2003) (holding that there was no basis to dismiss to suspend proceedings

because the debtor would not be "better served" and the bulk of the creditors were well served by

the bankruptcy proceeding). In other words, if relief is not in the best interests of the debtor, then

relief under section 305(a)(1) is inappropriate.

87.    The central purpose of the Bankruptcy Code "is to provide a procedure by which .

. . debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity

in life with a clear field for future effort, unhampered by the pressure and discouragement of

preexisting debt.'" Grogan v. Garner, 498 U.S. 279, 286 (1991). When a debtor has commence

a bankruptcy case, demonstrated a need for reorganization, and dismissal or suspension of the

case would primarily serve the interests of a mortgagee seeking possession of the debtor's

property in state court, section 305(a)(1) relief is inappropriate. See In re RCM Global Long

Term Capital Appreciation Fund, Ltd., 200 B.R. 514, 524 (Bankr. S.D.N.Y. 1996) (refusing to

grant section 305(a) motion because "[m]ovant has not shown how any party in interest other

than [itself] would be benefitted by a dismissal"); In re Bellevue Place Assocs., 171 B.R. 628,

633 (Bankr. N.D. Ill. 1994) (denying section 305(a)(1) relief when "abstention would serve only

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

the interests of one mortgagee"); <u>Foundry of Barrington P'ship v. Barrett (In re Foundry of Barrington P'Ship)</u>, 129 B.R. 550, 555 (Bank. N.D. Ill. 1991) (denying section 305(a)(1) request because it was only in the interests of the mortgagee, and "[d]ebtor would lose its interest in the property through foreclosure," and "other creditors of the debtor would have no remedy in the foreclosure proceedings"); <u>In re Justus Hospitality Props., Ltd.</u>, 86 B.R. 261, 266 (Bankr. M.D. Fla. 1988) (denying dismissal motion because it would result in a "race to the courthouse and a subsequent dismantling of the [debtor's] operations to the detriment of all parties"). WFI should be permitted an opportunity to reorganize and section 305(a)(1) of the Bankruptcy Code is not a basis for impinging upon or abridging that right.

88.    Moreover, a state court receivership does not preclude a debtor from seeking bankruptcy protection. <u>See</u> <u>In re Orchards Vill. Inv., LLC</u>, 405 B.R. 341 (Bankr. D. Ore. 2009); <u>In re Corporate and Leisure Event Prod., Inc.</u>, 351 B.R. 724 (Bankr. D. Ariz. 2006). As such, the Nevada State Court's entry of the Receiver Order does not preclude a bankruptcy filing or require relief under section 305 of the Bankruptcy Code. In fact, in the case at hand, the proposed receiver did not even begin his duties as WFI filed for bankruptcy within only a few hours of the Receiver Order being entered.

89.    It cannot seriously be doubted that WFI had a legitimate bankruptcy purpose in filing its Chapter 11 Case. The filing was to avoid the adverse consequences of a receivership in aid of collection pending BMO Harris' forthcoming UCC Article 9 foreclosure sale over substantially all of Debtors' personal property. Such a foreclosure would have allowed BMO Harris to enjoy any surplus in collection over the value of its debt, which the Chapter 11 Cases are attempting to preserve by allowing time for a transaction for the company in excess of the BMO Obligation, and thus allow that surplus to accrue to the benefit of unsecured creditors. Likewise, the Chapter 11 Cases will provide an expeditious forum to discover and unlock any other potential assets for the benefit of unsecured creditors. For example, the bankruptcy case can serve as a forum for litigation claims and avoidance actions, including but not limited to a likely potential avoidance action or other challenge to the B Members' Deed of Trust recorded on WFI's Real Property, which encumbrances, if avoided, would result in excess of $1-2 million

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

1    dollars of unencumbered real property for the benefit of unsecured creditors.  Indeed, the B

2    Members' arguments in this regard only highlight its ulterior motives in seeking to dismiss these

3    cases that are contrary to the interests of unsecured creditors.

4    **F.      Dismissal for "Bad Faith" Pursuant to 11 U.S.C. § 1112(b) is Not Warranted.**

5        90.      Section 1112(b) of the Bankruptcy Code provides, in pertinent part, as follows:

6           (b)(1) Except as provided in paragraph (2) and subsection (c), on
7           request of a party in interest, and after notice and a hearing, the
            court shall convert a case under this chapter to a case under chapter
8           7 or dismiss a case under this chapter, whichever is in the best
            interests of creditors and the estate, for cause unless the court
9           determines that the appointment under section 1104(a) of a trustee
            or an examiner is in the best interests of creditors and the estate.
10

11          (2) The court may not convert a case under this chapter to a case
            under chapter 7 or dismiss a case under this chapter if the court
12          finds and specifically identifies unusual circumstances establishing
            that converting or dismissing the case is not in the best interests of
13          creditors and the estate, and the debtor or any other party in interest
            establishes that—
14

15              (A) there is a reasonable likelihood that a plan will be
            confirmed within the timeframes established in sections 1121 (e)
16          and 1129 (e) of this title, or if such sections do not apply, within a
            reasonable period of time; and
17

18              (B) the grounds for converting or dismissing the case
            include an act or omission of the debtor other than under paragraph
19          (4)(A)—

20                  (i) for which there exists a reasonable justification
21              for the act or omission; and

22                  (ii) that will be cured within a reasonable period of
23              time fixed by the court.

24    11 .S.C. §§ 1112(b)(1) and (2).

25        91.      As the movant seeking to dismiss WFI's bankruptcy case as a "bad faith" filing,

26    the B Parties have the burden of proof.  In re Products Int'l Co., 395 B.R. 101, 109 (Bankr. D.

27    Ariz. 2008).  A motion to dismiss or convert a Chapter 11 case pursuant to section 1112(b) of the

28    Bankruptcy Code requires a two-step analysis: first, whether cause exists to dismiss or convert

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

29

1    the Chapter 11 case; and second, which option (conversion or dismissal) is in the "best interests

2    of the creditors and the estate." In re AVI, Inc., 389 B.R. 721, 729 (B.A.P. 9th Cir. 2008).

3        92.    Section 1112(b)(4) of the Bankruptcy Code lists several examples of "cause" to

4    convert or dismiss a bankruptcy case, however, these statutorily-enumerated grounds are not

5    exclusive. See 11 U.S.C. § 102(3). A lack of good faith in the filing of a Chapter 11 petition,

6    although not enumerated in the statute, also constitutes cause to dismiss or convert a case

7    pursuant to section 1112(b) of the Bankruptcy Code. See Marsch v. Marsch (In re Marsch), 36

8    F.3d 825, 828 (9th Cir. 1994) (per curiam); Idaho v. Arnold (In re Arnold), 806 F.2d 937 (9th

9    Cir. 1986).

10        93.    "The test [of good faith] is whether a debtor is attempting to unreasonably deter

11    and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis."

12    Marsch, 36 F.3d at 828. "The existence of good faith depends on an amalgam of factors and not

13    upon a specific fact. The bankruptcy court should examine the debtor's financial status, motives,

14    and the local economic environment." Arnold, 806 F.2d at 939 (citation omitted).

15        94.    As explained by the U.S. Bankruptcy Appellate Panel of the Ninth Circuit:

16            If it is obvious that a debtor is attempting unreasonably to deter and
17            harass creditors in their bona fide efforts to realize upon their
            securities, good faith does not exist. But if it is apparent that the
18            purpose is not to delay or defeat creditors but rather to put an end
            to long delays, administration expenses . . . to mortgage
19            foreclosures, and to invoke the operation of the [bankruptcy law] in
            the spirit indicated by Congress in the legislation, namely, to
20            attempt to effect a speedy efficient reorganization, on a feasible
21            basis . . . good faith cannot be denied.

22    In re Thirtieth Place, Inc., 30 B.R. 503, 505 (B.A.P. 9th Cir. 1983) (quoting In re Loeb

23    Apartments, Inc., 89 F.2d 461, 463 (7th Cir. 1937)). "Good faith is lacking only when the

24    debtor's actions are a clear abuse of the bankruptcy process." Arnold, 806 F.2d at 939 (emphasis

25    added).

26        95.    As applied in the case at hand, and similar to the analysis under section 305 of the

27    Bankruptcy Code, it cannot seriously be doubted that WFI had a legitimate bankruptcy purpose

28    in filing its Chapter 11 Case, and that its bankruptcy filing is not in bad faith. The filing was to

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

1  avoid the adverse consequences of a receivership in aid of collection pending BMO Harris'

2  forthcoming UCC Article 9 foreclosure sale over substantially all of Debtors' personal property.

3  Such a foreclosure would have allowed BMO Harris to enjoy any surplus in collection over the

4  value of its debt, which the Chapter 11 Cases are attempting to preserve by allowing time for a

5  transaction for the company in excess of the BMO Obligation, and thus allow that surplus to

6  accrue to the benefit of unsecured creditors. Likewise, the Chapter 11 Cases will provide a

7  forum to discover and unlock any other potential assets for the benefit of unsecured creditors. As

8  such, the B Parties' request to dismiss WFI's bankruptcy case as a bad faith filing must be denied

9  because the bankruptcy case was commenced for an eminently proper purpose. See United

10  States v. Whiting Pools, 462 U.S. 198, 204 (1983) ("By permitting reorganizations, Congress

11  anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to

12  produce a return for its owners," as well as maximize the value of the bankruptcy estate).

13  **G.   Even if the Authority to File Resides at the Harbor Level, Such an Issue Would**
14  **Require a Membership Vote, and the Coopers Have a Majority.**

15  96.    Finally, even if the B Parties are correct that a bankruptcy filing would have

16  required a vote of Harbor, they incorrectly assume that such a decision would necessarily be left

17  only to Harbor's managers. Instead, given the gravity of such a decision at the Harbor level (*i.e.*,

18  whether to authorize a bankruptcy filing of its sole asset, sole operating company, and its wholly-

19  owned subsidiary), such a decision would necessarily reside with Harbor's members, which the

20  Coopers maintain a majority position in and which they could thus can vote to authorize or ratify

21  the filing after the fact. In short, the minority stake of the B Members in Harbor could be

22  outvoted, and by the Coopers as majority members who do consent to and authorize WFI's

23  bankruptcy filing.

24  . . .

25  . . .

26  . . .

27

28

31

## VI. CONCLUSION

WHEREFORE, Debtors respectfully request that the Dismissal Motion and Joinder be denied, and that the Court grant them such other and further relief as is just and proper.

Dated:  October 18, 2013.

LARSON & ZIRZOW, LLC

By: _____
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101

Proposed Attorneys for Debtors
and Debtors in Possession

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169