1  LARSON & ZIRZOW, LLC
   ZACHARIAH LARSON, ESQ.
2  Nevada Bar No. 7787
   E-mail: zlarson@lzlawnv.com
3  MATTHEW C. ZIRZOW, ESQ.
   Nevada Bar No. 7222
4  E-mail: mzirzow@lzlawnv.com
   810 S. Casino Center Blvd. #101
5  Las Vegas, Nevada 8 9101
   Telephone: (702) 382-1170
6  Fascimile: (702) 382-1169

7
   Attorneys for Debtors
8

9              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEVADA
10

11 | In re:                          | Case No.: BK-S-13-17588-LED
                                      | Chapter 11
12 | WESTERN FUNDING INCORPORATED,    | (Jointly Administered)

13 |          Debtor.

14 |_____
   | In re:                          | Case No.: BK-S-13-17586-LED
15 |                                 | Chapter 11
   | WESTERN FUNDING INC. OF NEVADA,
16 |
   |          Debtor.
17 |
18 |_____
   | In re:                          | Case No.: BK-S-13-17589-LED
19 |                                 | Chapter 11
   | GLOBAL TRACK GPS, LLC,
20 |
   |          Debtor.                | Date:  OST PENDING
21 |_____| Time:  OST PENDING

22     **MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105(a), 363, 365, 503**
       **AND 507 OF THE BANKRUPTCY CODE AND RULES 2002, 6004, 6006, 9007, 9008 AND**
23     **9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING AND**
       **AUTHORIZING (A) BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF**
24     **SUBSTANTIALLY ALL OF THE OPERATING ASSETS OF DEBTORS; (B) FORM AND**
       **MANNER OF NOTICE OF THE SALE HEARING; AND (C) RELATED RELIEF**
25

26

27

28

Western Funding Incorporated, a California corporation ("WFI"), Western Funding Inc. of Nevada, a Nevada corporation ("WFIN"), and Global Track GPS, LLC, a Delaware limited liability company ("GPS" and together with WFI and WFIN, the "Debtors"), debtors and debtors in possession, by and through their proposed counsel, Larson & Zirzow, LLC, hereby submit this motion (the "Motion") pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002, 6004 and 9014 of the Local Rules of Bankruptcy Practice for the United States District Court for of the United States Bankruptcy Court for the District of Nevada (the "Local Rules"); for entry an order (the "Bidding Procedures Order") approving and authorizing (a) bidding procedures (the "Bidding Procedures") in connection with the sale of substantially all of the operating assets of Debtors, (b) the form and manner of notice of the sale hearing (the "Sale Notice"), and (c) other related relief. This Motion includes the disclosures required by Local Rule 6004(b).

Debtors further request that, at the conclusion of the Sale Hearing, the Court enter an order (the "Sale Order"), substantially in the form attached hereto as Exhibit F, authorizing Debtors to (a) sell the Assets free and clear of all liens, claims, encumbrances and other interests to the Stalking Horse or any other Successful Bidder, on substantially similar terms as those set forth in the that certain Stock Purchase Agreement (the "Stalking Horse Agreement") or as further modified by the Successful Bidder; (b) assume and assign the Assumed Contracts (as defined herein); and (c) enter into and perform the obligations under the Stalking Horse Agreement.

This Motion is based upon the following memorandum of points and authorities, the *Declaration of Frederick A. Cooper filed in Support of Motion for Entry of an Order Pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code and Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure Approving and Authorizing (A) Bidding Procedures in Connection With the Sale of Substantially all of the Operating Assets of Debtors; (B) Form and Manner of Notice of the Sale Hearing; and (C) Related Relief* (the "Cooper Declaration"), filed concurrently herewith and incorporated for all purposes herein by this reference, the previously filed *Declaration of Frederick A. Cooper in Support of Debtors' Motion Pursuant to*

*Sections 105(a), 363 and 503(b) of the Bankruptcy Code and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure for an Order Approving Break-Up Fee and Expense Reimbursement Payments to Plan Sponsor* [ECF No. 276], the papers and pleadings on file with the Court in the Chapter 11 Case and any oral argument presented to the Court at a hearing on this Motion. Further, the following documents accompany this Motion:[1] Exhibit A - Local Rule 6004 Disclosures, Exhibit B - Bidding Procedures, Exhibit C - Sale Notice, Exhibit D - Contract Notice, Exhibit E - Bidding Procedures Order, Exhibit F - Sale Order, and Exhibit G - Stalking Horse Agreement.

The form of Stalking Horse Agreement attached hereto is a draft only, is not in final form, and is subject to further negotiation and approvals, although Debtors believe it is reasonably close to final such that it provides sufficient notice to parties of the proposed transaction. Debtors will supplement this Motion with an executed version of the Stalking Horse Agreement prior to the hearing on the Motion.

Concurrently herewith, Debtors have also filed an application to have the Motion heard on shortened time. The Court has already reserved November 25, 2013 at 3:00 p.m. as the hearing on a proposed disclosure statement, and December 20, 2013 at 9:30 a.m. as a potential confirmation hearing on a Plan, and thus Debtors request that this Motion be heard in conjunction with approval of the proposed Disclosure Statement, and that the Sale Hearing be heard in conjunction with the proposed confirmation hearing on the Plan.

## **Background**

1.      On September 4, 2013 (the "Petition Date"), Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing their respective bankruptcy cases (collectively, the "Chapter 11 Cases"). Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Debtors' Chapter 11 Cases are being jointly administered and an Official Committee of Unsecured Creditors (the "Committee") has been appointed and retained counsel.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to

---

[1] Each of the attached Exhibits are part of this Motion and are fully incorporated herein by reference.

1  28 U.S.C. § 157(b)(2).  Pursuant to Local Rule 9014.2, Debtors consent to the entry of final orders

2  and judgments by the bankruptcy judge.

3        3.     The statutory predicates for the relief requested herein are sections 105(a), 363, 365,

4  503 and 507 of the Bankruptcy Code, and Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the

5  Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

6        4.     WFI is a specialized consumer finance company providing automobile financing to

7  borrowers with limited access to traditional credit.  Additional information regarding Debtors'

8  businesses, capital structure, and the circumstances leading to these Chapter 11 Cases is contained

9  in the *Omnibus Declaration of Frederick A. Cooper in Support of Debtors' Initial Emergency*

10  *Motions and Related Relief* (the "Omnibus Declaration") [ECF No. 53].

11  **Jurisdiction**

12        5.     The Court has subject matter jurisdiction to consider and determine this matter

13  pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

14  Pursuant to Rule 9014.2 of the Local Rules of Bankruptcy Practice for the U.S. District Court for the

15  District of Nevada (the "Local Rules"), Debtors consent to the entry of final orders and judgments

16  by the bankruptcy judge.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

17  **Statement of Facts**

18  **A.**    **Sale Process**

19        6.     Commencing in or about May 2013, Debtors considered competing restructuring,

20  investment, and/or acquisition proposals from certain of their parent company's equity owners,

21  various third parties, and Carfinco Financial Group, Inc., a Canadian public company, and its

22  subsidiary, Western Acceptance Inc., or an affiliate thereof (collectively "Carfinco").  Carfinco is a

23  leading company in the automotive finance sector, whose core business is indirect originations and

24  servicing of auto loans.  Carfinco is headquartered in Edmonton, Alberta, Canada.  Carfinco is not

25  an "insider" of Debtors as that terms is defined in section 101(31) of the Bankruptcy Code.

26        7.     Carfinco was first approached to consider a possible transaction involving WFI on or

27  about November 2012.  In June and July of 2013, Carfinco submitted various letters of intent for a

28  share purchase of WFI or an asset purchase and negotiated extensively with Debtors and BMO.

1   BMO did not approve of Debtors entering into any transactions contemplated by those letters of

2   intent.

3           8.      After lengthy negotiations, and the filing of these bankruptcy cases and the terms and

4   conditions of the Cash Collateral Stipulation, Debtors selected the latest proposal by Carfinco as

5   being in the best interests of their creditors and other constituencies.  Under the proposal, Carfinco

6   will acquire all of the new equity ownership interests of the reorganized WFI and GPS, free and clear

7   of all liens, claims and encumbrances in accordance with a confirmed plan of reorganization (the

8   "Plan") and an accompanying stock purchase agreement to be negotiated between the parties (the

9   "Definitive Agreement")  in consideration for cash.  The Plan and and accompanying disclosure

10  statement are being filed contemporanesouly herewith.

11  **B.      The Cash Collateral Stipulation**

12          9.      On October 18, 2013, the Court entered an interim order approving a *Stipulation*

13  *Authorizing Debtors to Use Cash Collateral, Granting Adequate Protection and Granting Relief*

14  *from the Automatic Stay Pursuant to 11 U.S.C. § 361, 362 and 363* (the "Cash Collateral

15  Stipulation"), which was approved on a final basis by order entered on October 24, 2013 [ECF No.

16  237].  The Cash Collateral Stipulation provided that Debtors were authorized on a limited basis to

17  use BMO's Collateral, including the Cash Collateral, but only in strict accordance with the terms and

18  conditions provided in the Cash Collateral Stipulation and Budget and only until the occurrence of a

19  Termination Event (as hereinafter defined).  Debtors were also permitted to use Cash Collateral to

20  buy a limited amount of new finance receivables, but prohibited from using any Cash Collateral to

21  pay or fund dealer reserves, or to pay any amounts owed to or by WFI, Global Track, or Harbor.

22          10.     The Cash Collateral Stipulation also provided for the occurrence various events of

23  termination (the "Termination Events"), including but not limited to the following:  (1) failure of the

24  Debtors to deliver to BMO by no later than October 25, 2013, a letter of intent, in a form and

25  substance acceptable to BMO, from a non-insider to provide sufficient financing to fund a

26  confirmable reorganization involving a transaction to pay BMO Harris Bank in full; (2) failure of the

27  Debtors to timely comply with at least one of the following: (i) file a Plan in these Cases on or before

28  October 25, 2013 or (ii) file a motion seeking Court approval to establish bidding procedures for and

to sell substantially all of the Collateral with the consent of BMO pursuant to section 363 of the Bankruptcy Code (a "363 Sale") on or before November 11, 2013, in either case acceptable in form and substance to BMO, or that otherwise fails to provide BMO with its full credit bid rights pursuant to section 363(k) of the Bankruptcy Code; (3) failure of Debtors to obtain the entry by this Court of an order, acceptable in form and substance to BMO approving a disclosure statement or approving bidding procedures for the 363 Sale that preserve BMO's rights to credit bid without limitation, on or before November 25, 2013; (4) failure of the Debtors to obtain the entry by this Court of an order on or before December 23, 2013, acceptable in form and substance to BMO either confirming a Plan or approving a 363 Sale; (5) failure of the Debtors to effect the confirmed Plan or to close the 363 Sale on or before January 4, 2014. The foregoing deadlines are subject to a five (5) day cure period.

11. On November 1, 2013, Debtors and BMO Harris filed a *First Stipulated Amendment* (the "Cash Collateral Amendment") to the Cash Collateral Stipulation, which provides, among other matters, the following: (1) after entry of the Cash Collateral Amendment, Debtors would pay BMO Harris an additional adequate protection payment of $500,000; (2) after approval of a transaction or sale for substantially all of Debtors' business, Debtors would immediately transfer all cash collateral then held or controlled by Debtors; and (3) Debtors would continue and finalize their efforts to return all pre-petition retainers, and imposed other limitations with respect to the retainer being held by Debtors' general reorganization counsel. The Cash Collateral Amendment has not yet been approved by the Court, however, Debtors are intending to file a motion for approval thereof shortly.

**C. The Letter of Intent with Cafinco**

12. The underlying premise for Debtors' Plan will be the Definitive Agreement as outlined in the Letter of Intent. As noted above, Debtors sought out and considered numerous restructuring proposals. After lengthy negotiations and evaluation of all competing opportunities, Debtors, in consultation with their senior secured creditor, BMO Harris Bank, N.A. (the "Secured Lender"), selected Carfinco's proposal as providing the highest and best recoveries for its undisputed secured and unsecured creditors. Given the milestones established under the Cash Collateral Stipulation, Carfinco has and will continue to expend significant resources on due diligence, the negotiation of the Definitive Agreement, the Disclosure Statement, the Plan and

ancillary documents necessary to effectuate the Plan. Of significance is that Carfinco must retain specialized counsel to file and pay filing fees for notices, requests and applications with numerous governmental authorities including state licensing departments for permits, licenses and notices of change of ownership applicable to consumer credit transactions, state retail installment and motor vehicle retail installment sales acts and other consumer credit laws and equal credit opportunity and disclosure laws. These actions, which would normally be conditions precedent to closing after execution of a Definitive Agreement and satisfaction of all other conditions, must begin in earnest prior to the drafting of the Definitive Agreement, any auction, and confirmation of the Plan in order to satisfy the closing milestone set forth in the Cash Collateral Stipulation.

13.    The Letter of Intent also requires that within five (5) business days after execution of its execution, Debtors must file a motion seeking an order of the Bankruptcy Court approving the Disclosure Statement to accompany the plan as containing adequate information pursuant to section 1125 of the Bankruptcy Code, the Bid Procedures, scheduling the Auction, and scheduling a hearing to approve the result of the Auction and the Definitive Agreement.

14.    On November 1, 2013, Debtors filed a *Notice of Execution of Letter of Intent* [ECF No. 265], thereby giving notice of their execution of a letter of intent for a definitive transaction with Carfinco Financial Group, Inc. ("Carfinco"), and providing a copy of an executed and detailed Letter of Intent (the "Letter of Intent") with Carfinco, along with full disclosure and notice to all parties several weeks before filing the instant Motion of the terms and conditions of the offer, the proposed procedures and related matters.

**D.    The Expense Reimbursement and Break-Up Fee to Carfinco**

15.    On November 13, 2013, the Court entered an *Order Pursuant to Sections 105(a), 363 and 503(b) of the Bankruptcy Code and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure for an Order Approving Break-Up Fee and Expense Reimbursement Payments to Plan Sponsor* (the "Expense Reimbursement Motion") [ECF No. 304]. Given the significant time, expense, and effort of Carfinco to date in this process and anticipated to consummate the Plan, as well as the fact that Carfinco's proposal is subject to higher and better offers, the Letter of

Intent provides for a break-up fee equal to $365,000.00, which is approximately 1.5% of the total of the Purchase Price (with the Purchase Price being determined as of a projected closing, and all defined terms having the meaning ascribed thereto in the Letter Agreement) (the "Break-Up Fee") and the reimbursement for its documented reasonable out-of-pocket costs and expenses (including reasonable legal, accounting and other consultant fees and expenses and fees and expenses to obtain permits from government authorities) incurred in connection with the Chapter 11 Cases, the Definitive Agreement, due diligence and the transactions contemplated thereby, up to a maximum of $450,000.00 (the "Expense Reimbursement"). The Break-Up Fee and Expense Reimbursement shall be entitled to superpriority administrative claim treatment, senior to all superpriority claims; *provided, however*, that such Break-Up Fee and Expense Reimbursement shall be payable only in the event that (i) Carfinco is not in material default of the Definitive Agreement, (ii) the Companies consummate an Alternative Transaction and (iii) the Pre-Petition Obligations and Adequate Protection Claims of BMO (as such terms are defined in the Cash Collateral Stipulation) are paid in full in cash, and shall be payable from the proceeds of the sale to such other bidder; *provided, further*, that if there is a successful credit-bid by BMO, no Break-Up Fee shall be payable and the Expense Reimbursement shall not exceed $350,000.

**E.      The Definitive Agreement.**

16.      Set forth below is a summary of the material terms of the Definitive Agreement, however, this description is intended as a summary of certain salient terms only, and is qualified in its entirety by reference to the Definitive Agreement. Capitalized terms used but not defined in this have the meaning given them in the Definitive Agreement.

a.      Purchase Price. The Purchase Price for the New Shares shall be an amount equal to (i) 70% of the Net Finance Receivables as of the date immediately prior to the Closing Date plus (ii) the aggregate amount of pre-petition or post-petition costs and expenses that are due and payable as of the Closing and that are required under the Confirmation Order to be paid as Cure Costs pursuant to Bankruptcy Code § 365 to cure any and all monetary defaults as of the Closing under any and all Assumed Contracts up to a maximum aggregate amount of $200,000 in Cure COsts; provided that the Purchase Price shall be reduced by the aggregate amount of Cure Costs up to and including $100,000.

b.      Closing. The Closing of the purchase and sale of the New WFI Shares and New Global Track Shares hereunder shall take place on the date that is two Business Days

8

following the satisfaction or waiver by the requisite Parties of various enumerated conditions, including principally that all right, title and interest of each Debtor in, to or under all of the Debtor Assets shall vest in the Reorganized Debtors, free and clear of all Claims and Liens other than Permitted Post-Closing Liens; and each Reorganized Debtor, Buyer and its Subsidiaries and their respective Representatives shall be fully released and discharged with respect to any and all Claims and Liens relating to or arising under any Debtor Assets, other than Permitted Post-Closing Liens, as of the Closing.

c.      Good Faith Deposit.  No later than one (1) Business Day after the Disclosure Schedules are delivered, Buyer shall deposit with Escrow Agent in cash $2,400,000.00, which Deposit shall be held and released by the Escrow Agent in accordance with the provisions of the Escrow Agreement, among other matters.

d.      Representations and Warranties of Seller.  Each of WFI and Global Track, jointly and severally, represents and warrants to Buyer, as of the date thereof and as of the Closing Date, that:  (1) it has the requisite corporate existence, power and authorization to enter into and consummate the Transactions contemplated, subject to approval of the Bankruptcy Court; (2) the execution, delivery and performance of the Transactions contemplated will not require any governmental authorization other than as specified; (3) subject to various items, the entry into the transactions will not contravene or otherwise cause any conflict with any Organizational Document, orders of the Bankruptcy Court, Contracts or Permits affecting or relating to Debtors, among other matters; (4) matters concerning Debtors' capitalization, subsidiaries, financial statements, undisclosed liabilities, Contracts, Litigation, compliance with other laws, Real property, financing programs, insurance coverage, licenses and permits, employees, employee benefit matters, environmental matters, taxes, intellectual property, books and records, contracts involving Harbor, disclosures and schedules.

e.      Representations and Warranties of Buyer.  Buyer represents and warrants to Debtors, as of the date hereof and as of the Closing Date, that: (1) it has the requisite corporate existence, power and authorization to enter into and consummate the Transactions contemplated; (2) the execution, delivery and performance of the Transactions contemplated will not require any governmental authorization other than as specified; (3) subject to various items, the entry into the transactions will not contravene or otherwise cause any conflict with any Organizational Document, orders of the Bankruptcy Court, Contracts or Permits affecting or relating to Debtors, among other matters; (4) matters concerning Buyer's Litigation and whether any matters are pending or threatened that may affect its ability to close and consummate the transactions; matters concerning Buyer's Financing, including that if Buyer entered into the Exit Financing Facility it will have sufficient cash or credit to perform all of its obligations; and that there are no finders' fees, or related items owing other than with respect to William Blair, and for which Debtors shall not be responsible.

f.      Covenants of Debtors.  From the date of the agreement through the closing, various covenants regarding the conduct of the business, additional financial information, assumption and rejection of various executory contracts and unexpired leases, access to information, updating of the Schedules attached to the agreement, delivery of a statement regarding the Net Finance Receivables being purchased immediately prior to the Closing, and the use of commercially reasonable efforts and other further assurances.

g.      Conditions to Obligations of Buyers and Debtors to Closing. The obligations of each Party to consummate the Closing are subject to the satisfaction (or waiver by each Party) of numerous conditions at or prior to the Closing, including but not limited to the following: (a) consummation of the Transactions shall not have been restrained, enjoined or otherwise prohibited or made illegal by any Applicable Law; (b) all of the conditions to the effectiveness of the Plan shall have been satisfied such that the Plan shall have become effective or shall become effective simultaneously with the Closing; (c) no Proceeding instituted by any Governmental Authority shall be pending and no Order of any Governmental Authority, which seeks to or does, as applicable, restrain, enjoin or otherwise prohibit the consummation of the Plan or the Transactions or which would cause the Transactions to be rescinded following the Closing.

h.      Conditions to Obligations of Debtors to Close. The obligation of each Debtor to consummate the Closing is subject to the satisfaction (or waiver by such Debtor) of the following further conditions, among other matters: (i) Buyer shall have performed in all material respects all of its covenants and other obligations hereunder required to be performed by it on or prior to Closing and (ii) the representations and warranties of Buyer set forth in this Agreement or any other Transaction Document shall be true and correct.

i.      Conditions to Obligation of Buyer to Close. The obligation of Buyer to consummate the Closing is subject to the satisfaction (or waiver by Buyer) of numerous further conditions, including but not limited to:  (a) (i) each Debtor shall have performed in all material respects all of its covenants and other obligations under the Agreement and each of the other Transaction Agreements required to be performed by it on or prior to Closing and (ii) the representations and warranties of each Debtor or any other Transaction Document shall be true and correct; (b) the Bid Procedures Order, the Expense Reimbursement Order, the Disclosure Statement Order and the Confirmation Order shall have been entered by the Bankruptcy Court, each such order shall be in form and substance acceptable to Buyer and each such order shall be a Final Order and in full force and effect; (c) all Licensing Approvals shall have been received; (d) all actions by or in respect of or filings with any Governmental Authority required to permit the consummation of the Transactions shall have been taken, made or obtained; (e) the Liquidating Trustee shall have executed and delivered the Liquidating Trust Agreement, and the Liquidating Trust Agreement shall be in full force and effect; (f) the aggregate amount of Cure Costs shall not exceed $200,000; (g) WFI shall have purchased new Retail Contracts in an amount not less than the permitted amount set forth in, and consistent with, the Budget, from the date of interim Bankruptcy Court approval of the Budget through Closing; (h) as of the Closing, all Assumed Contracts shall have been assumed by the Debtors, and all other Contracts of the Debtors shall have been rejected by the Debtors or assigned to the Liquidating Trust; (i) Reorganized Debtors shall have, pursuant to the Plan, entered into an exit financing facility with a lender designated by Buyer (which facility shall have been sourced and negotiated by Buyer) on terms and conditions satisfactory to Buyer for a principal amount equal to at least the Purchase Price; (j) all Debtor Assets (other than the Excluded Assets and the Trust Assets) shall be free and clear of any Liens and Claims (other than Permitted Post-Closing Liens), including the termination of any and all security interests granted against any such assets and (ii) Buyer shall have received evidence thereof in form and substance satisfactory to it; (k) Buyer shall have conducted such due diligence on the Debtors and the WFI Subsidiary (including in respect of their respective assets and Liabilities) within the scope set forth in Schedule A of their letter of intent, and shall deem appropriate and Buyer shall be satisfied with the results of such diligence in its

10

sole discretion; and (l) the Bankruptcy Court shall have approved the sale of the Las Vegas Property to the successful bidder in the Las Vegas Property Auction, and in the event such successful bidder is the Buyer, the consummation of the sale of the Las Vegas Property to the Buyer in accordance with the relevant purchase agreement between Buyer and WFI relating to the purchase and sale of the Las Vegas Property substantially at the same time as the Closing.

j.      Termination.  The Agreement may be terminated at any time prior to the Closing for the following, among other reasons: (a) by mutual written agreement of WFI, Global Track and Buyer; (b) by any of WFI, Global Track or Buyer if the Closing and the effective date of the Plan shall not have occurred by January 4, 2014 subject to extension to January 8, 2014 if the Secured Lender and the Buyer reach an agreement on sharing of certain expenses duing the extension period; and (c) by any of WFI, Global Track or Buyer if there shall be any Applicable Law that makes consummation of the Transactions illegal or otherwise prohibited or if consummation of the Transactions would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction.

k.      The Agreement may be terminated by Buyer if:   (a) the Expense Reimbursement Order, in form and substance reasonably acceptable to Buyer, shall not have been entered on or before November 13, 2013; (b) the Bid Procedures Order, in form and substance reasonably acceptable to Buyer, shall not have been entered on or before November 27, 2013; (c) the Disclosure Statement shall not have been approved by the Bankruptcy Court on or before November 27, 2013; (d) the Debtors shall not have filed a motion to determine Cure Costs for Assumed Contracts on or before November 27, 2013; (e) the Confirmation Order shall not have been approved by the Bankruptcy Court on or before December 23, 2013; (f) the Bankruptcy Court shall have approved any Alternative Transaction, or either WFI or Global Track have entered into any definitive agreement with respect to any Alternative Transaction which agreement has been approved by the Bankruptcy Court; (g) WFI or Global Track shall have breached any of its respective representations and warranties, or shall have failed to perform or comply with any of its respective covenants and agreements, contained in this Agreement or any Transaction Document, such that the condition shall not be satisfied, which breach or failure remains uncured (if capable of cure in Buyer's reasonable discretion) for 2 Business Days following written notice thereof from Buyer; (h) if the Debtors shall not have filed the motion seeking Bankruptcy Court approval of the Las Vegas Property Bid Procedures Order on or before November 20, 2013.

l.      The Agreement may be terminated by WFI or Global Track if:   (a) the Bankruptcy Court shall have approved any Alternative Transaction, or WFI or Global Track shall have entered into any definitive agreement with respect to any Alternative Transaction which agreement has been approved by the Bankruptcy Court; (b) Buyer shall have breached any of their respective representations or warranties or failed to perform or comply with any of their respective covenants or agreements contained in the Agreement; (c) any condition shall have become incapable of being satisfied by the Outside Date; or (d) Buyer shall not have deposited the Deposit with the Escrow Agent within two (2) Business Day after the date of execution of this Agreement.

**Assets To Be Sold**

17.     Debtors are offering substantially all of their assets for sale.  The Sale does **not** include any real properties owned by Debtor located at (i) 2202 Stevens Creek Boulevard, San Jose, California 95127, (ii) 9905 Gulf Freeway, Houston, Texas 77034, and (iii) 3915 East Patrick Lane, Las Vegas, Nevada 89120 (the "Excluded Real Property").  The Sale **may** include the "Excluded Retail Contracts" which are Retail Contracts (i) that have been in default for at least 90 days, (ii) where the Retail Contracts have been charged off of the books and records of WFI, and (iii) where the customer of the financed vehicle has commenced a case, or a case has been commenced against such customer, under the Bankruptcy Code.

**Relief Requested**

**A.     The Bidding Procedures**

18.     Debtors propose to follow and, once approved by this Court, be bound by the Bidding Procedures annexed hereto as **Exhibit B**.   The proposed Bidding Procedures were developed following consultation with Debtors' legal and financial professionals.  Debtors believe that the adoption of the Bidding Procedures will provide interested parties with ample opportunity to formulate bids for the Assets and will facilitate the solicitation, submission and evaluation of significant bids for the Assets in a manner that will maximize the value of the Assets for Debtors' estates.

19.     The Bidding Procedures constitute a reasonable and effective method of maximizing a return on the Assets through a competitive sale process.  The Bidding Procedures fully describe, among other things, the Assets to be auctioned, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders and Qualified Bids, respectively, the receipt and negotiation of bids received, the ability of a Qualified Bidder to credit bid, the conduct of any subsequent Auction, the ultimate selection of the Successful Bidder, and the Bankruptcy Court's approval thereof, among other aspects of the Auction process.  Debtors intend for the Bidding Procedures to control the Auction process, subject to the interpretation or application of the Bidding Procedures by the Bankruptcy Court in the event of a dispute.

12

20.     With the exception of the Stalking Horse Bidder, no person or entity shall, pursuant to the Bidding Procedures or otherwise, be entitled to any expense reimbursement, break-up fees, "topping," termination or other similar fee or payment in connection with the sale of the Acquired Assets.

21.     As described in the Bidding Procedures, if Debtors do not receive any Qualified Bids other than from the Stalking Horse Bidder pursuant to its Stock Purchase Agreement, Debtors will not hold the Auction, the Stalking Horse Bidder will be named the Successful Bidder and Debtors will seek approval of the Stalking Horse Agreement in connection with the hearing on confirmation of the Plan.  If one or more Qualified Bidders timely submits a Bid (other than the Stalking Horse Bidder) in accordance with the Bidding Procedures, Debtors may conduct the Auction.

22.     If the Auction is conducted, each Qualified Bidder participating in the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding process or the Sale, the Auction will be conducted openly and the Auction shall be transcribed or videotaped.

23.     If the Stalking Horse Bidder has an allowed secured claim at the time of the Auction, the Stalking Horse Bidder is authorized to make one or more credit bids at the Auction equal to any or all of the Stalking Horse Bidder's allowed secured claims to the full extent permitted by section 363(k) of the Bankruptcy Code.  For purposes of this Motion and as part of the Bidding Procedures, and subject only to the Committee's investigation rights as set forth in the Cash Collateral Stipulation, Debtors acknowledge and stipulate that the Secured Lender had and has an allowed secured claim in the principal amount as set forth on Schedule C of the Amended Schedules filed by WFI [ECF No. 393], together with any further accruing interest and allowed and reasonable costs and attorneys' fees incurred by Secured Lender.

24.     If either the Secured Lender or its assignee, or any other Qualified Bidder has an allowed secured claim at the time of the Auction (each a "Credit Bidder"), such Credit Bidder is authorized to make one or more credit bids at or prior to the Auction equal to any or all of such party's allowed secured claims to the full extent permitted by section 363(k) of the Bankruptcy Code. In the event any portion of the claims that are credit bid are determined by the Court to be unsecured, the applicable Credit Bidder will pay the amount determined to be unsecured to Debtors in cash.  The

Credit Bidder will also have to pay the portion of the Bidding Protections applicable to such Credit Bidder.

25.    Debtors request authority to modify the Bidding Procedures in their reasonable discretion, and to the extent practicable, in consultation with the Committee, the Secured Lender, and subject to and with the consent of the Stalking Horse Bidder, in any manner that they determine will best promote the goals of the bidding process and maximize the value of Debtors' assets, including to extend any of the deadlines set forth in the Bidding Procedures and/or to impose, at or before the Auction, additional reasonable terms and conditions on the Sale.

26.    Within two (2) business days after the conclusion of the Auction, if any, Debtors will file with the Bankruptcy Court a notice of the Debtors' selection of the Successful Bidder(s).

**B.    Bid Protections**

27.    Debtors request authority to pay any and all amounts owing to the Stalking Horse Bidder on account of the Bid Protections in accordance with the terms of the Stalking Horse Agreement, and as previously approved by the Court in the Expense Reimbursement Motion.

28.    No person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, break-up fee, "topping", termination or other similar fee or payment.

**C.    Assumption and Assignment and Notice of Proposed Cure Payments**

29.    In connection with the Sale, Debtors will sell, assume and assign certain executory contracts and unexpired leases. To facilitate the Sale and assumption and assignment of all executory contracts and unexpired leases proposed to be assumed by Debtors pursuant to section 365(b) of the Bankruptcy Code or assumed and assigned to the Stalking Horse Bidder (or other Successful Bidder (or Successful Bidders) following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code under the Stalking Horse Agreement (collectively, the "Assigned Contracts"), Debtors propose the following procedures:

a.    Designation Deadline. In its discretion by written notice to Debtors, (i) the Stalking Horse Bidder, in accordance with the Stalking Horse Agreement, at any time prior to the Closing Date as defined in the Stalking Horse Agreement, may (a) exclude from being assigned any Contracts or Leases, and such Contracts or Leases shall not constitute Assumed Contracts or Assumed Leases, and the Stalking Horse Bidder shall not acquire any rights or assume any Liabilities with respect thereto, and (b) add any Contracts or Leases as assigned

14

Contracts or Leases, and such Contracts or Leases shall constitute Assumed Contracts or Assumed Leases and (ii) each Qualified Bidder at any time no later than *[December 19, 2013; one day before Sale Hearing]* shall identify the Contracts and Leases to be assigned Contracts and Leases.

b.     <u>Notices for Assigned Contracts</u>. As soon as practicable, Debtors shall serve on all non-Debtor counterparties (the "<u>Contract Notice Parties</u>") to any Contract or Lease that is capable of being assumed and assigned to a Successful Bidder, a "Contract Notice" in the form attached hereto as Exhibit D that identifies, to the extent applicable (a) the Contract or Lease that may be an Assigned Contract, (b) the name of the counterparty to such Contract or Lease, (c) any applicable cure amount for such Contract or Lease if it becomes an Assigned Contract, and (d) the deadline of *[December 17, 2013; three days before the Sale Hearing]* (prevailing Pacific Time) (the "<u>Contract Objection Deadline</u>") by which any such Contract or Lease counterparty must file a "Contract Objection" to the proposed assumption and assignment; *provided, however*, that the presence of a Contract or Lease on a Contract Notice does not constitute an admission that such Contract or Lease is an executory contract and does not bar any Qualified Bidder from excluding any such Contract or Lease from its list of Contracts and Leases to be assumed and assigned. Immediately following the conclusion of the Auction, Debtors shall file with the Court a notice (the "<u>Assumption Notice</u>") identifying the Successful Bidder and stating which Contracts or Leases will be Assigned Contracts, and no other or further notice will be required with respect to the Assigned Contracts.  If the Successful Bidder designates (or the Successful Bidders designate) any additional Contracts or Leases during the period between the Auction and the Sale Hearing pursuant to subsection (a) above, Debtors shall file with the Court a revised Assumption Notice.

30.     In the event that any Contract Notice Party does not timely file a Contract Objection, such Contract Notice Party shall be (i) forever barred and estopped from (a) objecting to the assumption and assignment of the Contracts and Leases, other than objecting to the ability of a Successful Bidder (or Successful Bidders), other than the Stalking Horse Bidder, to provide adequate assurance of future performance, or (b) asserting that any conditions to the assumption and assignment of any Contract or Lease must be satisfied under such Contract or Lease before such Contract or Lease may be assumed and assigned, or that any required consent to any such assignment has not been given, (ii) deemed to have consented to the applicable Cure Amount, if any, and bound to such corresponding Cure Amount, (iii) deemed to have agreed that all defaults under the applicable Contract or Lease arising or continuing prior to the effective date of the assignment have been cured.

31.     In the event a Contract Notice Party fails to object (a) prior to the Objection Deadline with respect to the Stalking Horse Bidder, or (b) at or prior to the Sale Hearing with respect to a Successful Bidder (or Successful Bidders) to a Bidder's ability to provide adequate assurance of

future performance, the Contract Notice Party shall be forever barred and estopped from asserting that the Stalking Horse Bidder or a Successful Bidder has (or Successful Bidders have) failed to provide adequate assurance of future performance.

32.    If any Contract Notice Party timely files a Contract Objection that cannot be resolved by Debtors and the Contract Notice Party, the Court shall resolve such Contract Objection at the Sale Hearing, and upon entry of an order by the Court resolving such Contract Objection, the assumption or assumption and assignment shall be deemed effective in accordance with the Sale Order.

**D.      The Sale Hearing**

33.    Debtors are requesting that the Sale Hearing take place in conjunction with confirmation of the Plan, which has a reserved confirmation hearing date of **December 20, 2013 at 9:30 a.m.**    At the Sale Hearing, Debtors will request entry of the Sale Order authorizing and approving the Sale to the Successful Bidder.  Debtors are aware that the Sale process, as proposed, is aggressively timed, but for the reasons set forth herein, Debtors believe that the process is reasonable, necessary and comports with the Bankruptcy Code and the Bankruptcy Rules.

34.    Debtors request the ability for the Sale Hearing (or any portion thereof) to be adjourned by this Court or Debtors from time to time without further notice other than by announcement in open court, on this Court's calendar or through the filing of a notice or other document on this Court's docket.  If there is no Auction, Debtors request that they and the Stalking Horse Bidder have the ability to seek confirmation of Debtors' proposed plan of reorganization including the stock purchase transaction contemplated by the Stalking Horse Agreement.

35.    Debtors further request that the Court establish a specific objection deadline (the "Sale Objection Deadline") for the relief requested in the Sale Order which is approximately three (3) days prior to the Sale Hearing (depending upon when the Sale Hearing is scheduled).  Objections, if any, must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) be filed with this Court and served so actually received no later than the Sale Objection Deadline by (A) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 and (B) the following parties (the "Notice Parties"):

| Debtors | Counsel to Debtors |
|---|---|
| Western Funding Incorporated<br>3915 E. Patrick Lane<br>Las Vegas, Nevada 89120<br>Attn: Frederick Cooper<br>E-mail: fcooper@westernfundinginc.com | Larson & Zirzow, LLC<br>810 S. Casino Center Blvd., Suite 101<br>Las Vegas, Nevada 89101<br>Attn:  Matthew C. Zirzow, Esq.<br>E-mail:  mzirzow@lzlawnv.com |
| **Counsel to Carfinco Financial Inc and Carfinco WFI Inc.** | **Counsel to the Secured Creditor, BMO Harris Bank N.A.** |
| Torys LLP<br>1114 Avenue of the Americas, 23rd Floor<br>New York, NY 10036-7703<br>Attn: Alison D. Bauer, Esq.<br>E-mail: abauer@torys.com<br><br>-and-<br><br>Fox Rothschild LLP<br>Wells Fargo Tower, Suite 500<br>3800 Howard Hughes Parkway<br>Las Vegas, Nevada 89169<br>Attn: Brett Axelrod, Esq.<br>E-mail:  baxelrod@foxrothschild.com | Chapman and Cutler LLP<br>111 West Monroe Street<br>Chicago, IL  60603-4080<br>Attn: David T.B. Audley, Esq.<br>Email: audley@chapman.com<br><br>and<br><br>Lionel Sawyer Collins<br>300 South Fourth Street, Suite 1700<br>Las Vegas, Nevada 89101<br>Attn: Rodney M. Jean, Esq.<br>E-mail: rjean@lionelsawyer.com<br>-and-<br>Attn: Ryan Andersen, Esq.<br>E-mail: randersen@lionelsawyer.com |
| **Counsel to the Official Committee of Unsecured Creditors** | **Office of the United States Trustee** |
| Schwartzer & McPherson Law Firm<br>2850 South Jones Boulevard, Suite 1<br>Las Vegas, Nevada 89146-5308<br>Attn: Jeanette E. McPherson, Esq.<br>E-mail: jmcpherson@s-mlaw.com | Office of The United States Trustee<br>300 Las Vegas Boulevard South, Suite 4300<br>Las Vegas, Nevada 89101<br>Attn: Edward M. McDonald, Jr., Esq.<br>Email: Edward.M.McDonald@usdoj.gov |

36.     Debtors request for the Court to order that the failure to timely file an objection by the Sale Objection Deadline shall forever bar the assertion of any objection to the Motion, entry of the Sale Order and/or consummation of the Sale other than those that pertain to Assumed Contracts and arise after the closing of the Sale, and the failure to timely file an objection shall be deemed to constitute any such party's consent to entry of the Sale Order and consummation of the Sale and all

1  transactions related thereto.

2       37.    Debtors further requests that the Court establish a specific reply deadline (the "Reply

3  Deadline") for Debtors, the Stalking Horse Bidder, and other parties in interest to file replies to any

4  timely-filed objection to entry of the Sale Order with this Court, which is approximately one (1) day

5  prior to the Sale Hearing (depending upon when the Sale Hearing is scheduled).

6       38.    Debtors request that the deadline by which all "Qualified Bidders" (as defined in the

7  Bidding Procedures) must submit Bids so as to be ***actually received*** by the parties specified in the

8  Bidding Procedures (the "Bid Deadline") be **December 13, 2013 at 5:00 p.m., prevailing Pacific**

9  **Time**.

10       39.    Debtors request that the date and time of the Auction, if one is needed, which will be

11  held at the offices of counsel to Debtors:  Larson & Zirzow, LLC, 810 S. Casino Center Blvd., Suite

12  101, Las Vegas, Nevada 89101, be **December 16, 2013 at 9:00 a.m., prevailing Pacific Time**.

13  **E.**    **Notice of the Sale Hearing and the Bidding Procedures**

14       40.    Within two (2) business days of the entry of the Bidding Procedures Order, Debtors

15  shall cause the Sale Notice to be served upon, without limitation, (i) the Office of the United Statres

16  Trustee; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to the Secured

17  Lender; (iv) counsel to the Stalking Horse Bidder (v) all taxing authorities having jurisdiction over

18  any of the Assets, including the Internal Revenue Service; (vi) all parties that have requested or that

19  are required to receive notice pursuant to Bankruptcy Rule 2002; (vii) all parties that are known or

20  reasonably believed to have expressed an interest in acquiring all or a substantial portion of the

21  Assets; (viii) all parties that are known or reasonably believed to have asserted any lien,

22  encumbrance, claim or other interest in the Assets; (ix) all governmental agencies that are an

23  interested party with respect to the Sale and transactions proposed thereunder; (x) all non-debtor

24  parties to the Assumed Agreements; and (xi) all other known creditors of Debtors.

25       41.    Debtors request that compliance with the foregoing notice provisions constitute

26  sufficient notice to all parties in interest, including those whose identities are unknown to Debtors,

27  of the Sale of the Assets, the contemplated assumption and assignment of the Assumed Agreements

28  and the cure amounts, and no additional notice of such contemplated transactions need be given.

**F.      Appointment of Privacy Ombudsman**

42.      The purchased Assets may include private information of certain financing consumers of Debtors, including but not limited to social security numbers, e-mail addresses, and birthdates. Debtors have a privacy policy that is under review, including specifically a privacy notice as required by Gramm-Leach-Bliley Act, also known as the Financial Services Modernization Act of 1999 (Pub.L. 106–102, 113 Stat. 1338, enacted November 12, 1999), and Debtors request that the Office of the United States Trustee be directed to appoint one (1) disinterested person to serve as the consumer privacy ombudsman in connection with the Sale(s) no later than seven (7) days before the Sale Hearing; *provided, however*, that if at the conclusion of the Auction(s), neither the Successful Bid(s) nor the Back-Up Bid(s), if any, includes personally identifiable information as part of the Assets to be purchased, then any consumer privacy ombudsman appointed under this provision be discharged forthwith upon the filing with the Court, with a copy to the U.S. Trustee, of a declaration or affidavit from Debtors that no personally identifiable information is included in the purchased Assets; provided, further, that if the consumer privacy ombudsman is discharged, he or she may seek compensation for any service performed until the date of such discharge.  The U.S. Trustee's Office has already made inquiries regarding this issue.

**Transferring The Assets Owned By Debtors**

43.      Except as otherwise provided in the Stalking Horse Agreement or another Successful Bidder's purchase agreement, the Assets that are the subject of the Successful Bid shall be sold by Debtors free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against pursuant to section 363 of the Bankruptcy Code.  This transfer is referred to herein from time to time as the "363 Sale," which is to be confirmed and implemented in accordance with the Bid Procedures, if approved by the Court.

**Basis For Relief**

**A.      The Court Has Authority to Approve the Bid Procedures.**

Section 363(b) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing," may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  A proposed use or sale of property pursuant to section 363(b) is

1  appropriate if "some articulated business justification" exists for the transaction.  See, e.g., Walter v.
2  Sunwest Bank (In re Walter), 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988) (quoting Institutional Creditors
3  of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.), 780
4  F.2d 1223, 1226 (6th Cir. 1986)).  Debtors seek approval of the Bid Procedures as a means to
5  maximize the value for its estate of the sale of the Assets.

6      The paramount goal in any proposed sale of property of the estate is to maximize the proceeds
7  received by the estate.  See Four B. Corp v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107
8  F.3d 558, 564-65 (8th Cir. 1997) ("a primary objective of the Code [is] to enhance the value of the
9  estate at hand.").  Applying Bankruptcy Code section 363, bankruptcy courts frequently have
10  considered and approved auction and bidding procedures in advance of a proposed sale of property
11  of the estate.  See, e.g. Doehring v. Crown Corp. (In re Crown Corp.), 679 F.2d 774, 775 (9th Cir.
12  1982) (noting that the district court had required specified minimum overbid amounts, deposits, and
13  the form of purchase agreement to be used by bidders); In re Crowthers McCall Pattern, Inc., 114
14  B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (noting that the bankruptcy court had entered an order
15  requiring that overbids be made in specified minimum increments with deposits); In re Table Talk,
16  Inc., 53 B.R. 937, 943 (Bankr. D. Mass. 1985) (noting that section 363 of the Bankruptcy Code
17  requires notice and a hearing prior to the establishment of bidding procedures for the sale of property
18  of the estate).

19      To that end, courts have recognized that establishing bid procedures in advance of a sale
20  hearing itself often facilitates the process and the debtor's ability to increase the value ultimately
21  realized by the estate through: (i) creating a well-defined and orderly forum in which potential bidders
22  are provided a fair opportunity to submit competing offers; (ii) ensuring fair comparability among the
23  competing bids received; and (iii) encouraging the originally proposed purchaser to proceed with its
24  proposed transaction by granting certain protections against the risk that party would otherwise bear
25  in its entirety by having its offer exposed to overbids.  See In re Fin. News Network, Inc., 126 B.R.
26  152, 156 (S.D.N.Y. 1991), appeal dismissed, 931 F.2d 217 (2d Cir. 1991); In re 995 Fifth Ave.
27  Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

28

Additionally, courts have made it clear that the debtor's business judgment is entitled to great deference with respect to procedures to be used in selling assets of the estate. Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures negotiated by the debtor in possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"), appeal dismissed 3 F.3d 49 (2d Cir. 1993). A debtor should be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and in connection with the confirmation of a plan of reorganization if it demonstrates a sound business purpose for doing so. See In re Fed. Mogul Global, Inc., 293 B.R. 124, 126 (D. Del. 2003) (finding that "a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction"); see also In re Montgomery Ward Holding Corp., 242 B.R. 147, 154 (D. Del. 1999) (finding that in evaluating business purpose of a sale, the bankruptcy court may consider the effect of a sale on the reorganization).

The Bid Procedures provide a framework for Debtors to sell the Assets to the Stalking Horse Bidder or, if Debtors receives bid(s), to conduct the Auction in a fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Bid Procedures also set forth a schedule for achieving these objectives on a cost-effective and expeditious manner.

To ensure that the estate maximizes its recovery, Debtors are affording all financially qualified potential bidders the opportunity to purchase the Assets in accordance with the Bid Procedures. Approving the Bid Procedures, including scheduling the date of the Auction and establishing deadlines related to the bidding process, will certainly increase the likelihood that Debtors will receive the greatest consideration possible for the Assets. Such procedures will facilitate a competitive and fair bidding process in several respects, including:

(a)    Debtors have committed to providing notice to (i) all parties known by Debtors and their advisors to have expressed an interest in a transaction involving the Assets, and (ii) all creditors,

1  all of whom will be notified of the Auction and provided with a fair opportunity to come forward with

2  qualifying bids and to participate in the Auction that will take place.

3    (b)    Pre-approval of the Bid Procedures will ensure fair comparability between competing

4  bids.  The Bid Procedures set forth in detail how bids must be submitted, what constitutes a Qualified

5  Bid, how and when incremental bids will be received and considered, as well as other relevant

6  "ground rules" respecting the Auction.  These "ground rules" are essential because potential bidders

7  need to know the components of the bid they are competing against.

8    (c)    Requiring that all bids be made in advance of the Auction will provide Debtors with

9  an opportunity to review and clarify bids received and give bidders an opportunity to improve their

10  current offers.

11    (d)    Requiring bidders to submit deposits with their bid, will ensure that only serious

12  bidders will participate in the bidding and will increase Debtors' chances of ultimately closing the

13  Sale.

14    Debtors believe that the Bid Procedures will increase the likelihood Debtors will receive the

15  greatest consideration possible for the Assets and will facilitate a competitive and fair bidding process.

16  Debtors believe that an Auction and the proposed Bid Procedures will promote active bidding from

17  seriously interested parties and will ultimately reveal the best and highest offer reasonably available

18  for the Assets.  The Bid Procedures will allow Debtors to conduct the Auction in a controlled, fair

19  and open fashion that will encourage participation by financially capable bidders who demonstrate

20  the ability to close a transaction, while also serving to discourage the participation of those bidders

21  Debtors reasonably believe to be unable or unlikely to close a transaction.  Debtors believe that the

22  Bid Procedures will encourage, rather than hinder, bidding for the Assets, that they are consistent

23  with other procedures previously approved by courts in this district, and are appropriate under the

24  relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

25  See In re Randall's Island Family Golf Ctrs., Inc., 261 B.R. 96 (Bankr. S.D.N.Y. 2001).

26  **B.    Sale of Assets Free and Clear of Liens, Claims and Encumbrances is Warranted.**

27

28

Pursuant to Bankruptcy Code section 363(f), a debtor-in-possession may sell property "free and clear of any interest in such property of an entity other than the estate," if any one of the following conditions is satisfied:

> (1)     applicable nonbankruptcy law permits the sale of such property free and clear of such interests;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Courts have interpreted the requirements of section 363(f) to be disjunctive. See, In re Wolverine Radio Co., 930 F.2d 1132 (6th Cir. 1991); In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002). As such, the sale is permissible if any one of the five conditions are met. In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988); see also In re Whittemore, 37 B.R. 93, 94 (Bankr. D. Or. 1984).

Section 363(f)(2) of the Bankruptcy Code is satisfied because Debtors' secured lender, BMO, consents, subject to its credit bid rights pursuant to section 363(k) of the Bankruptcy Code.

**C.    Assumption and Assignment of the Contracts and Leases is Authorized by the Bankruptcy Code.**

In connection with the sale of the Assets, Debtors seek assumption and assignment of all executory contracts and unexpired leases proposed to be assumed by Debtors or assumed and assigned to the Stalking Horse Bidder (or other Successful Bidder (or Successful Bidders). Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts in this jurisdiction and others apply a business judgment standard in determining whether to approve a debtor's request to assume or reject executory contracts and unexpired leases. See, e.g., In re Pomona Valley Med. Grp., Inc., 476 F.3d 665, 670 (9th Cir. 2007) ("In making its determination, a bankruptcy court need engage in 'only a cursory review of a [debtor-in-possession]'s decision to reject

the contract. Specifically, a bankruptcy court applies the business judgment rule to evaluate a [debtor-in-possession]'s rejection decision. . . .'") (citations omitted); In re MF Global Holdings Ltd., 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012) ("Courts generally will not second-guess a debtor's business judgment concerning whether the assumption or rejection of an executory contract or unexpired lease would benefit the debtor's estate"). In connection with the proposed Sale, Debtors will only assume and assign only those Contracts and Leases that the Stalking Horse or Successful Bidder has designated it wants to assume pursuant to the Stalking Horse Agreement or similar agreement. Debtors' assumption and assignment of the Contracts and Leases will be contingent upon payment of the required cure amounts by the Stalking Horse or Successful Bidder, and effective only upon the closing of the Sale.

Furthermore, section 363(k) of the Bankruptcy Code states that a debtor's assignment of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 363(k). As a result, following assumption and assignment of the Contracts and Leases to the Stalking Horse or Successful Bidder, Debtors and their estates will be relieved of any and all liability for such Contracts and Leases. As such, the assumption and assignment of the Contracts and Leases will be a valid exercise of Debtors' sound business judgment.

Section 365(b)(1) of the Bankruptcy Code requires that all outstanding defaults under contracts to be assumed must be cured or, in the alternative, that adequate assurance of future performance must be provided prior to assumption of the contract. 11 U.S.C. § 365(b)(1). Debtors have proposed notice procedures, in the form of the Sale Notice and Contract Notice, that make clear to all counterparties exactly how each Contract and Lease will be cured. Importantly, these procedures afford all Contract and Lease counterparties adequate time and an ample opportunity to object to both the proposed assumption and assignment of the Contract and Lease to the Stalking Horse or Successful Bidder, as well as the Proposed Cure Payment. The Stalking Horse or Successful Bidder shall be obligated to pay or cause to be paid any and all cure amounts with respect to the Contracts and Leases to be assumed. In the event of any dispute relating to a cure amount, the Successful Bidder shall only be obligated to pay or cause to be paid the cure amount finally

1  determined following the resolution of such dispute.

2      Accordingly, it is requested that the proposed assumption and assignment of the Contracts

3  and Leases be approved.

4  **D.      The Court Should Find that Any Purchaser is a Good Faith Purchaser for Value.**

5      Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in the event

6  a sale authorized under section 363(b) is later reversed or otherwise modified on appeal. See 11

7  U.S.C. § 363(m); see also Paulman v. Gateway Venture Partners III, L.P., 163 F.3d 570, 576 (9th Cir.

8  1998) ("When a sale of assets is made to a good faith purchaser, it may not be modified or set aside

9  unless the sale was stayed pending appeal."). Although "good faith" purchase is not defined in the

10  Bankruptcy Code, the Ninth Circuit "has defined a good faith purchaser as 'one who buys 'in good

11  faith' and 'for value.'"" In re Fearing, 2005 WL 1663143, *1 (9th Cir. July 18, 2005) (citing Ewell

12  v. Diebert, 958 F.2d 276, 281 (9th Cir. 1992) (further citations omitted). Specifically "lack of 'good

13  faith' is shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an

14  attempt to take grossly unfair advantage of other bidders.'" In re Fearing, at *1 (further citations

15  omitted).

16      The selection of the Stalking Horse is a result of good faith, arm's length negotiations among

17  the parties. In the event that there is an Auction, the Successful Bidder will occur following a

18  thorough and competitive selection process, and will be the ultimate result of good faith, arm's-length

19  negotiations among the parties. Further, the Bidding Procedures provide consultation rights to certain

20  of Debtors' key constituencies. Based upon the record to be made at the Sale Hearing, Debtors will

21  request a finding that the Stalking Horse or Successful Bidder is a good faith purchaser entitled to the

22  protections of section 363(m) of the Bankruptcy Code.

23  **E.      The Proposed Timing of the Sale Hearing and Objection Periods are Appropriate Under**
24  **the Circumstances and the Form and Manner of Sale Notice and Contract Notice are**
     **Appropriate Under Bankruptcy Rule 2002.**

25      As set forth above, the proposed timing of the Sale is expedited, however, the applicable

26  Bankruptcy Rules support the proposed timeframe within which Debtors seek approval of the Sale.

27  Bankruptcy Rule 6004 provides that "[n]otice of a proposed use, sale, or lease of property, other than

28

1    cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2),

2    (c)(1), (i), and (k) and, if applicable, in accordance with § 363(b)(2) of the [Bankruptcy Code]." Fed.

3    R. Bankr. P. 6004(a).  Subsections (a)(2), (c)(1), (i) and (k) of Bankruptcy Rule 2002, read together,

4    require Debtors to give all creditors and certain other parties "at least 21 days' notice by mail" of the

5    sale of the assets and the time and place of the auction. Fed. R. Bankr. P. 2002(a)(2), (c)(1), (i) and

6    (k).  Further, the Bankruptcy Code provides that sales free and clear of liens and other interests shall

7    include notices that specify the relevant objection deadlines.  Fed. R. Bankr. P 6004(b).  Debtors will

8    do so through the Sale Notice and the Contract Notice, and will request from this Court an objection

9    deadline for all relief requested which is approximately three (3) days before the Sale Hearing.

10         The process requested by Debtors through this Motion and the Bidding Procedures is within

11    the notice procedures mandated by the Bankruptcy Rules, as Debtors are proposing to provide the

12    required twenty one (21) days' notice (from entry of the Bidding Procedures Order to the date of the

13    Sale Hearing) to all creditors and other parties in interest, the Sale Notice includes, among other

14    information, the time and date of the Auction, and Debtors will fix the objection deadline as five (5)

15    days prior to the Sale Hearing.  Moreover, and perhaps most significantly, the proposed timeframe

16    for the Sale is designed to obtain the maximum recovery for creditors.  Finally, the expedited process

17    proposed by Debtors is essential in light of Debtors' cash collateral stipulation with BMO.

18         Debtors submit that the Sale Notice fully complies with Bankruptcy Rule 2002 and includes

19    pertinent information contained in the Bid Procedures necessary to enable interested parties to

20    participate in the Auction.  Debtors propose to make the Bid Procedures available to all interested

21    parties in a timely and responsive fashion.  Such access to the Bid Procedures ensures that they will

22    be disseminated in a manner that will reach the widest possible pool of potential bidders.

23         Debtors submit that the notice to be provided through the Sale Notice of the Bid Procedures

24    and the method of service proposed herein constitutes good and adequate notice of the Bid

25    Procedures, the other components of the Auction and the eventual sale of the Assets.

26                     **Request For Relief Pursuant To Bankruptcy Rules 6004 And 6006**

27         Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property

28    . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

1  Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an "order authorizing the

2  trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration

3  of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

4        Debtors respectfully submit that waiver of the stays under Bankruptcy Rules 6004(h) and

5  6006(d) is appropriate and justified for the Bidding Procedures Order, if applicable thereto, and the

6  Sale Order. The Bidding Procedures, and the related timeline and deadlines, balance the due process

7  protections of the Bankruptcy Code with the reality of Debtors' financial situation and their need to

8  quickly maximize and realize the value of their assets, as well as comply with the terms of their cash

9  collateral stipulation. As such, these stays should be waived, and Debtors should be authorized to

10  consummate the Sale as expeditiously as possible.

11  **Conclusion**

12        WHEREFORE, Debtors respectfully request that this Court enter an order, substantially in the

13  form as attached hereto as **Exhibit E**, thereby (a) approving and establishing the Bid Procedures,

14  attached hereto as **Exhibit B**, for the sale of the Assets; (b) scheduling the Auction; (c) approving

15  the form, manner and service of the Sale Notice attached hereto as **Exhibit C**; and (d) granting such

16  other and further relief as is just and proper.

17        DATED: November 15, 2013.

18                          LARSON & ZIRZOW, LLC

20                          By

21                          ZACHARIAH LARSON, ESQ.

                          Nevada Bar No. 7787

22                          MATTHEW C. ZIRZOW, ESQ.

                          Nevada Bar No. 7222

23                          810 S. Casino Center Blvd., Suite 101

                          Las Vegas, Nevada 89101

25                          Attorneys for Debtors