Jeanette E. McPherson, NV Bar No. 5423
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Attorneys for the Official Committee of Unsecured Creditors

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>**WESTERN FUNDING INCORPORATED,**<br>Debtor. | Case No. BK-S-13-17588-LED<br>Chapter 11<br>(Jointly Administered) |
| In re:<br>**WESTERN FUNDING INC. OF NEVADA,**<br>Debtor. | Case No. BK-S-13-17586-LED<br>Chapter 11 |
| In re:<br>**GLOBAL TRACK GPS, LLC,**<br>Debtor. | Case No. BK-S-13-17589-LED<br>Chapter 11<br>Date: November 25, 2013<br>Time: 3:00 p.m. |

**OPPOSITION TO MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105(A), 363, 365, 503 AND 507 OF THE BANKRUPTCY CODE AND RULES 2002, 6004, 6006, 9007, 9008 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING AND AUTHORIZING (A) BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE OPERATING ASSETS OF DEBTORS; (B) FORM AND MANNER OF NOTICE OF THE SALE HEARING; AND (C) RELATED RELIEF**

The Official Committee of Unsecured Creditors in the above-entitled case (the "Committee"), by and through its undersigned counsel, hereby files its Opposition To Motion For Entry Of An Order Pursuant To Sections 105(a), 363, 365, 503 And 507 Of The Bankruptcy Code And Rules 2002, 6004, 6006, 9007, 9008 And 9014 Of The Federal Rules Of Bankruptcy Procedure Approving And Authorizing (A) Bidding Procedures In Connection With The Sale Of Substantially All Of The Operating Assets Of Debtors; (B) Form And Manner Of Notice The Sale Hearing; And (C) Related Relief ("Opposition").

This Opposition is made and based upon 11 U.S.C. § 363, the Points And Authorities set forth herein, the pleadings on file of which the Committee respectfully requests that this Court take judicial notice, and any argument entertained at the time of the hearing on this Opposition.

## POINTS AND AUTHORITIES

### Factual Background

1. On September 2, 2013, Western Funding Incorporated ("WFI"), Western Funding Inc. of Nevada, and Global Track GPS, LLC (collectively, the "Debtors") filed for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date").

2. The Debtors and BMO Harris Bank N.A. ("BMO") entered into a Stipulation Authorizing Debtors to use Cash Collateral, Granting Adequate Protection And Granting Relief From the Automatic Stay Pursuant To Sections 361, 362 And 363 Of The Bankruptcy Code (Doc. # 204-1] (the "Cash Collateral Stipulation"). This Court approved the Cash Collateral Stipulation by interim order entered on October 18, 2013 [Doc. #220] and on a final basis by order entered on October 24, 2013 [Doc. #237].

3. On November 15, 2013, the Debtors filed their Motion For Entry Of An Order Pursuant To Sections 105(a), 363, 365, 503 And 507 Of The Bankruptcy Code And Rules 2002, 6004, 6006, 9007, 9008 And 9014 Of The Federal Rules Of Bankruptcy Procedure Approving And Authorizing (A) Bidding Procedures In Connection With The Sale Of Substantially All Of The Operating Assets Of Debtors; (B) Form And Manner Of Notice The Sale Hearing; And (C) Related Relief ("Bid Procedures Motion").

### Memorandum of Law

A. **Due Process Has Not Been Provided To The Committee And Other Parties In Interest And Request For Extension**

The Debtors filed their Bid Procedures Motion on November 15, 2013, along with a motion to approve a Disclosure Statement and requested a hearing on shortened time on both motions. This Court set a hearing for both matters for November 25, 2013, and ordered that any opposition be filed no later than November 20, 2013 at noon. The Committee was granted an extension by the Debtors so that a response is due no later than November 21, 2013 at 3 p.m. This

period of time is insufficient to afford any party sufficient due process to thoroughly review documents, let alone a document with exhibits that remain <u>incomplete</u> and total approximately 159 pages. While the Committee fully anticipates that the Debtors will argue that they are bound by the deadlines imposed in the cash collateral stipulation, it must be remembered that these are deadlines to which the Debtors agreed in the cash collateral stipulation and further, these deadlines cannot be used as an excuse for the Debtors to avoid complying with their fiduciary obligations to unsecured creditors. Thus, the Bid Procedures Motion must be continued. The Committee is informed from parties who have experience in finding interested buyers in the Debtors' industry that such time constraints are detrimental to finding potential buyers but that continuing the sales process from December for a mere 60 days will enable the best and highest bids and thus the maximization of value for creditors.

At a minimum, however, the deadlines proposed in the Bid Procedures should be continued to allow the maximum amount of time possible to allow for parties to review information regarding the Debtors, to submit their bids, and for the review of bids for BMO, the Committee and the Debtors to determine who are Qualified Bidders.

The Bid Procedures Motion contains the following key deadlines:

1) **December 13, 2013 by 5:00 p.m. Pacific Time**- all Qualified Bidders must submit bids

2) **December 16, 2013 at 9:00 a.m. PT**- Auction to be held, if necessary

3) **December 17, 2013**- notice due for assigned contracts

4) **December 20, 2013 at 9:30 PT**- Sale Hearing to be held

5) **December 20, 2013**- tentative confirmation hearing date

Based upon the circumstances in this case, including the **extremely** abbreviated time schedule and grave concerns, based upon information that it has received, that the Debtors' assets have not been thoroughly and properly marketed, these deadlines must be extended to allow the maximum amount of time possible, and at a minimum, should be extended within the deadline parameters imposed by BMO. Specifically, bidders should have the maximum amount of time to submit bids and this time could be continued from December 13, 2013 to December 19, 2013, allowing any interested parties more time to formulate the highest and best bid based upon

1  information that it will have more time to review. Notably, as discussed more fully below,
2  interested parties have been refused access to the Debtors' data room due to the "no shop" clause
3  in the Carfinco Letter of Intent [Doc. # 265] until **after** November 15, 2013, which is effectively,
4  at the earliest November 18, 2013 (due to the intervening weekend), and then such parties have
5  been forced to wait to further to gain access to the data room until the Debtors provide such
6  interested parties with a Non Disclosure Agreement.

7  Thus, as can be seen, very little time has been afforded to potential buyers, even if they
8  know of such potential asset sale, and still those parties who know of the sale have been afforded
9  very little time to review the information and submit a bid (this is true not even considering the
10 fact that the Thanksgiving holiday will likely limit access further). Consequently, to be afforded
11 any possible chance of obtaining any interested bidders and a fair and reasonable price for the
12 Debtors' assets, all time frames for bidding must be extended as far as possible to actually comply
13 with the purposes and policies of the Bankruptcy Code, providing value for creditors.

14 **B.     The Bid Procedures Motion Needs Clarification, Supplementation, Or Revision**

15 The Bid Procedures Motion must be clarified or supplemented as follows:

16 1. The Motion, at page 2, provides that it seeks a Sale Order, "authorizing Debtors to
17 (a) sell the Assets free and clear of all liens, claims, encumbrances and other interests to the
18 Stalking Horse or any other Successful Bidder, on substantially similar terms as those set forth in
19 the [sic] that certain Stock Purchase Agreement (the "Stalking Horse Agreement") or as further
20 modified by the Successful Bidder; (b) assume and assign the Assumed Contracts (as defined
21 herein); and (c) enter into and perform the obligations under the Stalking Horse Agreement.

22 This statement is inaccurate and misleading. The Debtors expressly represented at the
23 hearing on the motion to request a break-up fee and expense reimbursement that potential bidders
24 do not have to propose terms "substantially similar" to those in the Letter of Intent, or the Stock
25 Purchase Agreement. Second, the provision at (c) set forth above, assumes that the terms in the
26 Stalking Horse Agreement are those that reap the highest and best offer, when this may not be the
27 case. Thus, an order on the Bid Procedures Motion must make it very clear that a potential bidder is
28 not required to make an offer substantially similar in terms to the Carfinco offer.

4

2. In the Motion at page 3, the Debtors state that the form of the Stalking Horse Agreement is "a draft only [and] is not in final form, and is subject to further negotiation and approvals, although Debtors believe it is reasonably close to final such that it provides sufficient notice to parties of the proposed transaction." Because this agreement is not in final form, a party cannot adequately review it and determine how it should be "modified" for purposes of making a bid.

3. In the Motion, at page 18, paragraph 40, the Debtors state that they will notice various parties, including "all parties that are known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets." To satisfy their burden of demonstrating that their assets have been properly marketed, the Debtors must demonstrate that they have marketed the Debtors' Assets in a manner that satisfies their fiduciary obligations to creditors. As such, the Committee requests that the notice also be sent to the parties generally known in the marketplace to engage in the same business as the Debtors, including competitors, or those parties known in the industry to be a purchaser of assets similar to the Debtors' Assets.

4. In the Motion, at page 19, paragraph 42, the Debtors discuss the appointment of a Privacy Ombudsman. However, the Debtors do not disclose the source of payment for the consumer privacy ombudsman and whether such payment will be considered in connection with the bidding process.

5. In the Motion, Exhibit A at page 3, referring to LR 6004(b)(6)(C), there is a reference to Section 9.03 of the Stalking Horse Agreement. Section 9.03 of the Stalking Horse Agreement pertains to the conditions upon which the Stalking Horse receives its Break-Up Fee and Expense Reimbursement; however, Section 9.03 does not mirror the language contained in the Letter of Intent, which is the governing document under the Order granting the Break-Up Fee and Expense Reimbursement [Doc. #304]. Specifically, the Letter of Intent, also referred to as the Letter Agreement [Doc. #265], provides that the Break-Up Fee and Expense Reimbursement "shall be payable only in the event that (i) CARFINCO is not in material default of the Definitive Agreement, (ii) the Companies consummate an Alternative Transaction and (iii) the Pre-Petition Obligations and Adequate Protection Claims of BMO (as such terms are defined in the

1. Stipulation) are paid in full in cash, and shall be payable from the proceeds of the sale to such other bidder. . . ."

6. However, the Stalking Horse Agreement, at Section 9.03 provides that Carfinco is entitled to the Break-Up Fee and Expense Reimbursement if "the Pre-Petition Obligations and Adequate Protection Claims of BMO (as such terms are defined in the Stipulation) have not been paid in full in cash and (y) . . . ." Thus, the limiting language requiring that the BMO claims be paid in cash "from the proceeds of the sale to such bidder" has been improperly omitted. This issue may affect some bidders and how their bids are structured and must be clarified.

7. In the Motion, Exhibit A at page 4, there is a reference to LR 6004(b)(6)(D), that provides that the "Debtors have not entered into any agreement to not solicit competing offers for the Assets or to otherwise limit the marketing of the Assets." This statement is not true. Under the Letter of Intent [Doc. # 265], the "Exclusivity" provision restricted the Debtor from discussing any potential offer or providing access to the data room, and in accordance with this Letter of Intent, the Debtors did not solicit offers and also refused to allow any parties interested in potentially bidding on the Debtors' assets access to the data room until after November 15, 2013 passed.

8. In the Motion, Exhibit B (the Bidding Procedures) at page 2, there is a discussion regarding the Break-Up Fee and Expense Reimbursement awarded to Carfinco (the "Bid Protections"). Specifically, the Bidding Procedures provide that "[t]he Bid Protections shall be payable on the terms and conditions set forth in the Stalking Horse Agreement and the Bidding Protections Order. However, as previously stated, the Bidding Protections Order and the Stalking Horse Agreement do not contain the same language. The Bidding Protections Order provides that "the Debtors are authorized to pay the Break-Up Fee and Expense Reimbursement as set forth in, and conditioned upon the terms of, the Letter Agreement. . . ." The Stalking Horse Agreement does not contain this limiting language regarding payment to BMO in cash "payable from the proceeds of the sale to such other bidder." The Bidding Protections Order is controlling and therefore the reference to the Stalking Horse Agreement needs to be deleted.

9. In the Motion, Exhibit B (the Bidding Procedures) at page 2, there is a reference to

1  the "Assets to be Sold." As set forth in that paragraph, the procedures should provide that the sale
2  <u>may</u> include the real properties, just as the sale may include the Excluded Retail Contracts. If a
3  party is seeking to purchase the equity ownership of the reorganized Debtors, a party also may be
4  seeking to purchase the Debtors' real properties to enable it to conduct business and if not
5  afforded the opportunity, may decide not to bid. It should further be specified that a sale of the
6  real property may occur outside of this sale, as is proposed with Carfinco for the real property
7  located in Las Vegas, Nevada.
8       10. In the Motion, Exhibit B (Designation as Qualified Bidder) at page 4, the definition
9  of "Qualified Bidder" is set forth as a "Bidder that satisfies the Participant Requirements and that
10 the Debtors, in consultation with the Consultation Parties, determine has submitted by the Bid
11 Deadline a bona fide offer." The Committee and BMO, as Consultation Parties, must also be able
12 to determine who is a Qualified Bidder. Mere consultation is not sufficient for such a significant
13 determination, and avenue for bidders to be wrongfully excluded, thereby chilling the bidding
14 process. Thus, the determination of who is a Qualified Bidder must be determined by the Debtors
15 along with the Consultation Parties, and the Consultation Parties must agree to each determination
16 of who is or is not a Qualified Bidder.
17      11. In the Motion, Exhibit B (the Bidding Process) at page 5, there is a provision that
18 provides that the Debtors must act in consultation with the Consultation Parties (this type of
19 language is in general provisions) and provides "[w]ith respect to all material decisions that
20 Debtors have the power to make under these Bid Procedures, the Debtors will consult with the
21 committee with respect to any such decision." This provision is not sufficient. All material
22 decisions regarding the Bid Procedures must require the consent of the Consultation Parties, and
23 for instance, the Bidding Process provisions must be amended to provide that "Debtors shall: (a)
24 **upon consent with the Consultation Parties**, determine whether a Bidder is a Qualified Bidder.
25 There must be consent from the Consultation Parties with regard to any rules imposed regarding
26 the bidding process, who can bid, and who will be selected as the best and highest bidder. After
27 all, the bidding process is for the benefit of BMO and unsecured creditors. Thus, the Bidding
28 Procedures must be revised to require the consent of BMO and the Committee for all decisions

that are material and potentially outcome determinative for the Bidding Process. This is particularly true where, in addition to the compressed time for marketing and bids, there are grave concerns in this case that the Debtors' assets have not been properly marketed or that interested parties, even if aware of the sale, simply have had insufficient time to review the data pertaining to the Debtors. After all, it is certainly well known that parties were not able to access the Debtors' data room until starting November 16, 2013 (which was a Saturday); so effectively November 18, 2013, and then withheld access to the data room until the Debtors provided them with a Non Disclosure Agreement ("NDA"), which the interested party still has to review and execute, all of which create further time delays.

Additionally, as set forth in the notice regarding the Bidding Process at page 5, the Debtors should not have the right "to adopt such other rules for the Bidding Procedures (including rules that may depart from those set forth herein), that, in Debtors' reasonable discretion, will better promote the goals of the Bidding Procedures." The Debtors should not be allowed to depart from the Bidding Procedures unless the Debtors receive the express consent to depart from the rules from BMO and the Committee. Otherwise, the Debtors have too much discretion over the bidding process and who may be allowed to bid.

12.    In the Motion, Exhibit B (the Bid Requirements) at page 5, the provision regarding a "Written submission of APA and Commitment To Close" must be amended. The provision currently provides that each Bid must include "(ii) a blackline reflecting the Qualified Bidder's proposed changes to the Stalking Horse Agreement." However, such offer need not include this blackline if the Bid is not for the Debtors' equity.

With regard to the Identification of Assets in the Bid Requirements, the paragraph should also include whether the Bid will include the Excluded Real Property.

13.    In the Motion, Exhibit B (the Bid Requirements) at page 6, the provision regarding the Minimum Initial Overbid provides that:

> Each Bid for substantially all of the Debtors' Assets must offer to the Debtors aggregate consideration of at least the sum of $100,000 plus the Bid Protections more than the "Purchase Price" offered by the aggregate bid from the Stalking Horse Bidder as defined in the Stalking Horse Agreement, including cash,

satisfaction or waiver of claims under the senior secured credit facility of the Secured Lender and Assumed Liabilities (the "Minimum Initial Overbid")[.]"

The Debtors must provide the actual amount in dollars that will be required for the Minimum Initial Overbid, which amount shall be reviewed by the Consultation Parties and agreed upon by the Consultation Parties, so that potential bidders can properly attempt to satisfy the Minimum Initial Overbid requirement by all applicable deadlines so its opportunity is not lost.

14.  In the Motion, at Exhibit B (Terms of Break-Up Fee and Expense Reimbursement) at page 10, this provision must be revised to provide that the Break-Up Fee and Expense Reimbursement will not be paid pursuant to the terms of the Stalking Horse Agreement but solely pursuant to this court's Bidding Protections Order, as the Stalking Horse Agreement was not presented to the Court in connection with the motion requesting the Break-Up Fee and Expense Reimbursement.

15.  In the Motion, at Exhibit B (Closing the Auction) at pages 9-10, provides that "Debtors, in consultation with the Consultation Parties, shall (i) immediately review the final Overbid of each Qualified Bidder on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the proposed sale, and (ii) identify the highest, best, and/or otherwise financially superior offer for the Assets. . . ." The Consultation Parties, BMO and the Committee, must agree to who has the highest, best and/or otherwise financially superior offer for the Assets.  As previously stated, for all material determinations that affect the sale, BMO and the Committee must consent to such determination.  After all, the bidding process is for the benefit of BMO and the Committee.

16.  In the Motion, at Exhibit B (Return of Good Faith Deposit) at page 11, the Bid Procedures require that back-up bids stay in place until closing and that deposits be held from all other Qualified Bidders.  The Committee is informed that potential bidders find this provision objectionable and that such back-up bids only stay in place until there is an order on the sale that becomes final.  Significant funds may be tied up for no benefit and potential bidders needlessly will be required to commit to a sale for which they will likely not be the buyer, and thus potential

bidders may be reluctant to bid for these reasons. Bidding requirements should not be imposed that could potentially chill the interest of any potential bidders and thus the Committee requests that back-up bids only stay in place until the sale order becomes final.

17. With regard to the Notices proposed to be sent, the Debtors must update the notices: a) to delete the reference to Greenberg Traurig, a firm that no longer represents the Debtors, and b) include the relevant information for the Committee.

## CONCLUSION

Based upon the foregoing, the Committee requests that the Motion For Entry Of An Order Pursuant To Sections 105(a), 363, 365, 503 And 507 Of The Bankruptcy Code And Rules 2002, 6004, 6006, 9007, 9008 And 9014 Of The Federal Rules Of Bankruptcy Procedure Approving And Authorizing (A) Bidding Procedures In Connection With The Sale Of Substantially All Of The Operating Assets Of Debtors; (B) Form And Manner Of Notice The Sale Hearing; And (C) Related Relief and the Bid Procedures be modified as set forth herein.

Moreover, the Committee requests that the deadlines contained in the Bid Procedures be continued to allow for adequate notice and time for interested parties to be noticed of the sale of the Debtors' assets and allow such parties time to receive a Non Disclosure Agreement from the Debtors (which has proven to take time) and was only permitted on and after November 16, 2013 (but essentially November 18, 2013 (a Monday)) and allow parties time to review information pertaining to the Debtors' assets and its finances to make an informed and appropriate bid based upon the true value of the Debtors' assets. Further, at a minimum, the dates for submitting bids and having the auction must be continued to allow for the maximum amount of time possible for this process.

Dated this 21st day of November, 2013.

/s/ Jeanette E. McPherson
Jeanette E. McPherson, Esq.
Schwartzer & McPherson Law Firm
2850 S. Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Attorneys for the Official Committee
of Unsecured Creditors

P:\Western Funding - PNC\Motion for Bidding Procedures\objection_to_motion_for_bid_proceduresv2 (2).doc