1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Telephone: (702) 382-1170
Fascimile: (702) 382-1169

Attorneys for Debtors

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>WESTERN FUNDING INCORPORATED,<br><br>Debtor. | Case No.: BK-S-13-17588-LED<br>Chapter 11<br>(Jointly Administered) |
| In re:<br><br>WESTERN FUNDING INC. OF NEVADA,<br><br>Debtor. | Case No.: BK-S-13-17586-LED<br>Chapter 11 |
| In re:<br><br>GLOBAL TRACK GPS, LLC,<br><br>Debtor. | Case No.: BK-S-13-17589-LED<br>Chapter 11 |

**JOINT DISCLOSURE STATEMENT TO ACCOMPANY**
**DEBTORS' JOINT PLAN OF REORGANIZATION**

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

## TABLE OF CONTENTS

**EXHIBITS TO DISCLOSURE STATEMENT** ...................................................**6**

**DISCLAIMER**............................................................................................**7**

**ARTICLE I  INTRODUCTION**...............................................................**10**
Section 1.01   Overview of Chapter 11 ...................................................... 10
Section 1.02   The Debtors' Plan of Reorganization ................................ 11
Section 1.03   The Disclosure Statement ................................................... 12
Section 1.04   Sources of Information ....................................................... 13
Section 1.05   Rules of Interpretation ....................................................... 13
Section 1.06   Solicitation Package............................................................ 14
Section 1.07   Voting Procedures, Ballots and Voting Deadlines ............ 14
Section 1.08   The Confirmation Hearing and Objection Deadline........... 15
Section 1.09   Voting Tabulation ............................................................... 16
Section 1.10   Agreements Upon Furnishing Ballots................................ 16
Section 1.11   Recommendation of the Debtors to Approve Plan ............ 17

**ARTICLE II  HISTORICAL BACKGROUND AND PRE-PEITION BUSINESS
OPERATIONS** .......................................................................................**17**
Section 2.01   Overview of the Debtors' Business ..................................... 17
Section 2.02   Debtors' Corporate Structure ............................................ 18
Section 2.03   Debtors' Existing Capital Structure ................................... 19
Section 2.04   Events Leading to Chapter 11 ........................................... 21
Section 2.05   The Civil Investigative Demands from the CFPB .............. 22
Section 2.06   Reorganization Strategy..................................................... 22

**ARTICLE III  ASSETS AND LIABILITIES OF THE DEBTORS** .....................**23**
Section 3.01   The Debtors' Scheduled Assets .......................................... 23
Section 3.02   The Debtors' Assets After Closing ..................................... 24
Section 3.03   Liabilities Scheduled by the Debtors .................................. 24
Section 3.04   Preferences, Fraudulent Transfers and Other Avoidance Actions....................... 24

**ARTICLE IV  THE BANKRUPTCY CASES** .............................................**25**
Section 4.01   Commencement of These Bankruptcy Cases ...................... 25
Section 4.02   Initial Emergency Motions ................................................. 26
Section 4.03   Cash Collateral Motion and Stipulation............................. 26
Section 4.04   Retention of Professionals.................................................. 29
Section 4.05   The Harbor B Parties Motion to Dismiss WFI's Bankruptcy Case ..................... 29
Section 4.06   Debtors' Post-Petition Operations and the Status of its Loan Portfolio .............. 30
Section 4.07   Expense Reimbursement and Break-UP Fee to the Stalking Horse Bidder ........ 31
Section 4.08   Bid Procedures Motion ...................................................... 31
Section 4.09   Las Vegas Property Bid Procedures Motion........................ 32
Section 4.10   Administrative Expense Claim Estimate ............................. 33
Section 4.11   Preference Analysis and Other Potential Avoidance Actions ............................. 33
Section 4.12   Exclusivity ......................................................................... 34

**ARTICLE V  SUMMARY OF THE DEBTORS' PLAN OF REORGANIZATION**............**34**
Section 5.01  General Structure of the Plan ................................................ 34
Section 5.02  Classification of Claims and Interests ................................... 35
Section 5.03  Summary of Proposed Distributions Under the Plan............... 36

**ARTICLE VI  INFORMATION REGARDING THE STALKING HORSE**.....................**38**
Section 6.01  The Stalking Horse SPA ...................................................... 38

**ARTICLE VII  PLAN EXECUTION AND IMPLEMENTATION** ......................**44**
Section 7.01  Sale of the Acquired Property............................................ 44
Section 7.02  Sale of the Ineligible Accounts ......................................... 44
Section 7.03  Means for Implementation ................................................ 45

**ARTICLE VIII  LIQUIDATING TRUST AND LIQUIDATING TRUSTEE**.....................**49**
Section 8.01  Creation of the Liquidating Trust ...................................... 49
Section 8.02  Funding of *Res* of Trust ................................................... 49
Section 8.03  The Liquidating Trustee..................................................... 50
Section 8.04  Retention of Professionals ................................................ 50
Section 8.05  Compensation of the Liquidating Trustee ......................... 51
Section 8.06  Liquidating Trust Expenses ............................................. 51
Section 8.07  Reserves Administered by the Liquidating Trust ............... 51
Section 8.08  Liability; Indemnification ................................................ 51
Section 8.09  Termination of the Liquidation Trust ................................ 51
Section 8.10  Liquidating Trustee Authority .......................................... 51

**ARTICLE IX  PROVISIONS GOVERNING DISTRIBUTIONS GENERALLY** ...............**52**
Section 9.01  Timing of Delivery of Distributions .................................. 52
Section 9.02  Method of Cash Distributions ........................................... 52
Section 9.03  Failure to Negotiate Checks ............................................. 52
Section 9.04  Fractional Dollars ............................................................ 53
Section 9.05  Compliance with Tax Requirements.................................. 53
Section 9.06  *De Minimus* Distributions ................................................. 53
Section 9.07  Setoffs ........................................................................... 53
Section 9.08  Distribution Record Date .................................................. 54

**ARTICLE X  EXECUTORY CONTRACTS, UNEXPIRED LEASES, AND OTHER AGREEMENTS** .........................................................................**54**
Section 10.01  Assumption/Rejection...................................................... 54
Section 10.02  Cure Amounts ............................................................... 54
Section 10.03  Assumed Executory Contracts and Unexpired Leases ....... 54
Section 10.04  Insurance Policies .......................................................... 55
Section 10.05  Pass-through.................................................................. 55
Section 10.06  Claims Based on Rejection of Executory Contracts and Unexpired Leases ........ 55
Section 10.07  Reservation of Rights....................................................... 55
Section 10.08  Nonoccurrence of Effective Date...................................... 56

**ARTICLE XI  PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS** ................................................................**56**

**LARSON & ZIRZOW, LLC**
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Section 11.01  Expunging of Certain Claims................................................................56
Section 11.02  Objections to Claims...........................................................................56
Section 11.03  Estimation of Claims...........................................................................57
Section 11.04  No Distributions Pending Allowance ....................................................57
Section 11.05  Distributions After Allowance ..............................................................57
Section 11.06  Reduction of Claims ............................................................................57

**ARTICLE XII  CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ..........................................................................58**
Section 12.01  Conditions Precedent to Confirmation .................................................58
Section 12.02  Occurrence of the Effective Date..........................................................58
Section 12.03  Substantial Consummation...................................................................59
Section 12.04  Waiver of Conditions...........................................................................59
Section 12.05  Revocation, Withdrawal, or Non-Consummation ...................................59

**ARTICLE XIII  AMENDMENTS AND MODIFICATIONS ......................................60**

**ARTICLE XIV  RETENTION OF JURISDICTION .................................................60**

**ARTICLE XV  EFFECT OF THE PLAN ON CLAIMS AND INTERESTS ...............62**
Section 15.01  Compromises and Settlements .............................................................62
Section 15.02  Satisfaction of Claims .........................................................................62
Section 15.03  Discharge of Liabilities .......................................................................63
Section 15.04  Release of Stalking Horse ...................................................................63
Section 15.05  Exculpation ........................................................................................64
Section 15.06  Permanent Injunction ..........................................................................64
Section 15.07  Setoffs ...............................................................................................65
Section 15.08  Recoupment .......................................................................................65
Section 15.09  Release of Liens ..................................................................................65
Section 15.10  Good Faith .........................................................................................66
Section 15.11  Rights of Defendants and Avoidance Actions ........................................66

**ARTICLE XVI  MISCELLANEOUS PROVISIONS ................................................66**
Section 16.01  Bar Dates for Certain Claims ...............................................................66
Section 16.02  Payment of Statutory Fees ..................................................................67
Section 16.03  Severability of Plan Provisions.............................................................67
Section 16.04  Successors and Assigns ......................................................................67
Section 16.05  Binding Effect.....................................................................................68
Section 16.06  Term of Injunctions or Stay .................................................................68
Section 16.07  Dissolution of Committee ....................................................................68
Section 16.08  No Admissions ...................................................................................68
Section 16.09  Default Under Plan ..............................................................................68
Section 16.10  Governing Law ...................................................................................69
Section 16.11  Entire Agreement ................................................................................69
Section 16.12  Plan Documents ..................................................................................69

**ARTICLE XVII  CERTAIN RISK FACTORS AFFECTING CERTAIN OF THE
DEBTORS ..............................................................................................................69**

4

Section 17.01  General Risks ................................................................................................ 69
Section 17.02  Certain Bankruptcy Law Considerations ..................................................... 70
Section 17.03  Risks Related to Volatility in the Prices of the Property ............................ 70
Section 17.04  Risks Related to the Sale of the Debtors' Assets ........................................ 70

**ARTICLE XVIII  FINANCIAL INFORMATION AND FEASABILITY ............................ 70**
Section 18.01  Financial Information ................................................................................... 70
Section 18.02  Feasibility of the Plan ................................................................................. 71

**ARTICLE XIX  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...................................................................................................................................... 71**
Section 19.01  General ......................................................................................................... 71
Section 19.02  Consequences to the Debtors ...................................................................... 72
Section 19.03  Federal Income Tax Consequences to Holders of Senior Secured Claims ........... 75
Section 19.04  Federal Income Tax Consequences to Holders of General Unsecured Claims .... 76
Section 19.05  Federal Income Tax Consequences of the Liquidating Trust ...................... 77
Section 19.06  Information Reporting and Backup Withholding ......................................... 78
Section 19.07  Importance of Obtaining Professional Tax Assistance ............................... 78

**ARTICLE XX  SECURITIES LAW MATTERS ................................................................ 79**
Section 20.01  Issuance and Delivery of Securities ........................................................... 79
Section 20.02  Subsequent Transfers Under Federal Securities Laws ............................... 80

**ARTICLE XXI  BEST INTEREST OF CREDITORS TEST ............................................. 80**
Section 21.01  Best Interests of Creditors Test .................................................................. 80
Section 21.02  Liquidation Analysis ................................................................................... 82

**ARTICLE XXII  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...................................................................................................................... 82**
Section 22.01  Alternative Plan(s) ....................................................................................... 83
Section 22.02  Liquidation Under Chapter 7 ...................................................................... 83

**ARTICLE XXIII  VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS ................................................................................................................ 84**
Section 23.01  Ballots and Voting Deadline ....................................................................... 84
Section 23.02  Holders of Claims Entitled to Vote ............................................................ 85
Section 23.03  Classes Impaired Under the Plan ................................................................ 85
Section 23.04  Information on Voting and Ballots .............................................................. 85
Section 23.05  The Confirmation Hearing ........................................................................... 87
Section 23.06  Statutory Requirements for Confirmation of the Plan ................................ 88
Section 23.07  Acceptance by Impaired Class .................................................................... 89
Section 23.08  Confirmation Without Acceptance of All Impaired Classes ....................... 89
Section 23.09  Identity of Persons to Contact for More Information .................................. 90

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LARSON & ZIRZOW, LLC**
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

### EXHIBITS TO DISCLOSURE STATEMENT

Exhibit A………………………………………………………..Joint Plan of Reorganization

Exhibit B…………………………………………………………Disclosure Statement Order

Exhibit C……………………………………………………………….Stalking Horse SPA

Exhibit D…………………………………………………………………..Liquidation Analysis

**LARSON & ZIRZOW, LLC**
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **DISCLAIMER**

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE JOINT PLAN OF REORGANIZATION (THE "PLAN"), A COPY OF WHICH IS ATTACHED AS **EXHIBIT A**, PROPOSED BY WESTERN FUNDING INCORPORATED, A CALIFORNIA CORPORATION ("WFI"), WESTERN FUNDING INC. OF NEVADA, A NEVADA CORPORATION ("WFIN"), AND GLOBAL TRACK GPS, LLC, A DELAWARE LIMITED LIABILITY COMPANY ("GLOBAL TRACK" AND, TOGETHER WITH WFI AND WFIN, THE "DEBTORS") IN THESE BANKRUPTCY CASES.  THIS DISCLOSURE STATEMENT ALSO CONTAINS SUMMARIES OF CERTAIN OTHER DOCUMENTS RELATING TO THE CONSUMMATION OF THE PLAN OR THE TREATMENT OF CLAIMS AND INTERESTS AND CERTAIN FINANCIAL INFORMATION RELATING THERETO.

THIS DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IS SET FORTH IN FULL HEREIN.  THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF.  HOLDERS OF CLAIMS AND INTERESTS MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING RISK FACTORS CITED HEREIN AND THE PLAN ATTACHED HERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS AND INTERESTS TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON OR FOR ANY OTHER PURPOSE. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND PLAN.  MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE SUMMARY OF THE PLAN AND OTHER DOCUMENTS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE ACTUAL DOCUMENTS THEMSELVES AND THE EXHIBITS THERETO.

THE DEBTORS BELIEVE THAT THE INFORMATION HEREIN IS ACCURATE,

BUT ARE UNABLE TO WARRANT THAT IT IS NOT WITHOUT ANY INACCURACY OR OMISSION. THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OR THE DEBTORS OR THE VALUE OF THEIR PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY OTHER INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED OR REVIEWED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT"), OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDERANY STATE SECURITIES LAW ("BLUE SKY LAW"). THIS DISCLOSURE STATEMENT AND THE PLAN HAVE NOT BEEN APPROVED OR DISPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN OR THEREIN. NEITHER THE OFFER NOR THE SALE OF ANY SECURITIES PURSUANT TO THE PLAN HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR ANY SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. ANY SUCH OFFER OR SALE IS BEING MADE IN RELIANCE ON THE EXEMPTIONS FROM REGISTRATION THEREUNDER SPECIFIED IN BANKRUPTCY CODE § 1145, OR OTHER APPLCIABLE LAW REQUIRING REGISTRATION BEFORE THE OFFERING, ISSUANCE, DISTRIBUTION OR SALE OF SECURITIES; PROVIDED THAT IF THE ISSUANCE OF THE SECURITIES DOES NOT QUALITY FOR AN EXEMPTION UNDER BANKRUPTCY CODE § 1145, THE SECURITIES SHALL BE ISSUED IN A MANNER, WHICH QUALIFIES FOR ANY OTHER AVAILABLE EXEMPTION FROM REGISTRATION WHETHER AS A PRIVATE PLACEMENT UNDER RULE 5 OF THE SECURITIES ACT, SECTION 4(2) OF THE SECURITIES ACT, OR OTHER APPLICABLE LAW.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR OTHER DOCUMENTS OR FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN, OR SUCH OTHER DOCUMENTS, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

EACH HOLDER OF AN IMPAIRED CLAIM THAT IS ALLOWED TO VOTE SHOULD REVIEW THE ENTIRE PLAN BEFORE CASTING A BALLOT. NO PARTY IS AUTHORIZED BY THE BANKRUPTCY COURT TO PROVIDE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

8

INFORMATION REGARDING THE DEBTORS AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS AND WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER THE DATE HEREOF.  SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING AMONG OTHERS, THOSE DESCRIBED HEREIN. CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD-LOOKING STATEMENTS. CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE.  THE FINANCIAL PROJECTIONS AND DESCRIBED IN THIS DISCLOSURE STATEMENT, HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT.  THE FINANCIAL PROJECTIONS, WHILE PRESENTED BY NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.   THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS.

INFORMATION INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT SPEAKS AS OF THE DATE OF SUCH INFORMATION OR THE DATE OF THE REPORT OR DOCUMENT IN WHICH SUCH INFORMATION IS CONTAINED OR AS OF A PRIOR DATE AS MAY BE SPECIFIED IN SUCH REPORT OR DOCUMENT. ANY STATEMENT CONTAINED IN A DOCUMENT INCORPORATED BY REFERENCE HEREIN SHALL BE DEEMED TO BE MODIFIED OR SUSPENDED FOR ALL PURPOSES TO THE EXTENT THAT A STATEMENT CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY OTHER SUBSEQUENTLY FILED DOCUMENT, WHICH IS ALSO INCORPORATED OR DEEMED TO BE INCORPORATED BY REFERENCE, MODIFIES OR SUPERSEDES SUCH STATEMENT.  ANY STATEMENT SO MODIFIED OR SUPERSEDED SHALL NOT BE DEEMED, EXCEPT AS SO MODIFIED OR SUPERSEDED, TO CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

**ARTICLE I**
**INTRODUCTION**

**Section 1.01    Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  The commencement of a chapter 11 case creates an "estate" comprised of all the legal and equitable interests of a debtor.  Unless the bankruptcy court orders otherwise, a chapter 11 debtor may continue to operate its business and control the assets of its estate as a "debtor in possession."

The filing of a chapter 11 case also triggers the application of Bankruptcy Code § 362, which provides for an automatic stay of all attempts to collect upon claims against a debtor that arose before a bankruptcy filing.  Generally speaking, the automatic stay prohibits interference with a debtor's property or business.

Formulation and confirmation of a plan of reorganization is the principal purpose of chapter 11 case.  Unless a trustee is appointed, only the debtor may file a plan of reorganization during the first 120 days of the chapter 11 case.  A creditor or party in interest may file a plan only after that 120-day exclusive period has expired or has terminated pursuant to a court order.  If a debtor files its plan within the 120 day period, it has an additional 60 days to solicit acceptances of its plan.  The bankruptcy court can reduce or enlarge the solicitation and the exclusive periods for cause shown.

A plan of reorganization sets forth the means for satisfying all claims against, and interests in, a debtor. Although usually referred to as a plan of reorganization, a plan may provide for the liquidation of assets.  Generally, a claim against a debtor arises from a normal debtor/creditor transaction, such as a promissory note or a trade credit relationship, but may also arise from other contractual agreements or from alleged torts.  An interest in a debtor is held by a party that owns the debtor, such as a shareholder.

Subject to certain limited exceptions, the bankruptcy court order confirming a plan of reorganization discharges a debtor from any debt that arose before the date of confirmation of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

Before soliciting acceptances of a plan of reorganization, Bankruptcy Code § 1125 requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical investor to make an informed judgment regarding acceptance of the plan of reorganization.  This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125.

The Bankruptcy Code provides that creditors and shareholders are to be grouped into "classes" under a plan and that they are to vote to accept or reject a plan by class.  As a general matter, creditors with similar legal rights are placed together in the same class and equity holders with similar legal rights are placed together in the same class.  For example, creditors entitled to

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

similar priority under the Bankruptcy Code should commonly be grouped together.

The Bankruptcy Code does not require that each claimant or equity holder vote in favor of a plan in order for the court to confirm the plan. Rather, the plan must be accepted by each class of claimants and shareholders (subject to an exception discussed below). A class of claimants accepts the plan if, of the claimants in the class who actually vote on the plan, such claimants holding at least two-thirds in dollar amount and more than one-half in number of allowed claims vote to accept the plan. For example, if a hypothetical class has ten creditors that vote and the total dollar amount of those ten creditors' claim is $1,000,000, then for such class to have accepted the plan, six or more of those creditors must have voted to accept the plan (a simple majority) and the claims of the creditors voting to accept the plan must total at least $666,667 (a two-thirds majority).

The Bankruptcy Court may confirm a plan even though fewer than all classes of claims and equity interests vote to accept such plan. In such instance, the plan must be accepted by at least one "impaired" class of claims, without including any acceptance of the plan by an "insider." Bankruptcy Code § 1124 defines "impairment" and generally provides that a claim as to which legal, equitable or contractual rights are altered under a plan is deemed to be "impaired."

If all impaired classes of claims under the plan do not vote to accept the plan and at least one impaired class of claims votes to accept the plan, a debtor is entitled to request that the court confirm the plan pursuant to the "cramdown" provisions of Bankruptcy Code § 1129(b). These "cramdown" provisions permit the plan to be confirmed over the dissenting votes of classes of claims or equity interests if the Bankruptcy Court determines that the plan does not discriminate unfairly and is fair and equitable with respect to each impaired, dissenting class of claims or equity interests.

Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan must provide that holders of administrative and priority claims (other than tax claims) be paid in full in cash on the effective date of the plan, and that holders of priority tax claims receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the petition date, of a value, as of the effective date of the plan, equal to the allowed amount of such claim (Bankruptcy Code § 1129(a)(9)).

Independent of the acceptance of the plan as described above, to confirm a plan the bankruptcy court must determine that the requirements of Bankruptcy Code § 1129(a) have been satisfied.

## Section 1.02   The Debtors' Plan of Reorganization

The Debtors believe that the Plan satisfies the confirmation requirements of the Bankruptcy Code. Confirmation of the Plan makes the Plan binding upon the Debtors, the Reorganized Debtors, all holders of Claims and Interests, and other parties-in-interest, irrespective of whether they have Filed Proofs of Claim or Interests and/or they have voted to accept or reject the Plan.

11

**Section 1.03   The Disclosure Statement**

The Debtors are furnishing this Disclosure Statement ("Disclosure Statement")[1] to the holders of Claims against and Interests in the Debtors pursuant to Section 1125 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in connection with the solicitation of ballots for the acceptance of the *Joint Plan of Reorganization* (the "Plan") dated November 26, 2013, a copy of which is attached as **Exhibit A**.  The Plan was formulated after extensive negotiations with the Pre-Petition Agent and the Stalking Horse.  This Disclosure Statement describes the Debtors' business operations, certain aspects of the Plan, including but not limited to, the treatment of holders of Claims and Interests, the proposed transaction relating to the Debtors to be effected pursuant to the Plan, significant events that the Debtors believe will occur in these Bankruptcy Cases, and related matters.

The purpose of this Disclosure Statement is to provide "adequate information" to Persons who hold Claims to enable them to make an informed decision before exercising their right to vote to accept or reject the Plan.  By order of the Bankruptcy Court entered on November 26, 2013 (the "Disclosure Statement Order"), this Disclosure Statement was approved and held to contain adequate information.  A true and correct copy of the Disclosure Statement Order is attached as **Exhibit B.**

This Disclosure Statement sets forth certain detailed information regarding the Debtors' history and significant events expected to occur during the Bankruptcy Cases.  This Disclosure Statement also describes the Plan, effects of Confirmation of the Plan, and the manner in which Distributions will be made under the Plan.  Additionally, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims must follow for their votes to be counted.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PLAN PROVISIONS, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS ATTACHED THERETO AND DEFINITIONS THEREIN).  A COPY OF THE PLAN IS ATTACHED AS **EXHIBIT A**.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES-IN-INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

---

[1] Except as otherwise indicated, capitalized terms used in this Disclosure Statement and not defined herein shall have their respective meanings set forth in the Plan or, if not defined in the Plan, as defined in the Bankruptcy Code.

**LARSON & ZIRZOW, LLC**
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE BY HOLDERS OF CLAIMS AND INTERESTS IN EVALUATING THE PLAN AND BY HOLDERS OF CLAIMS IN VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON THE PLAN. THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES AND THERE CAN BE NO ASSURANCE THAT THE PLAN WILL BE EFFECTUATED.

**Section 1.04    Sources of Information**

Unless otherwise stated herein, the statements contained in this Disclosure Statement are made as of the date hereof, and the information contained in this Disclosure Statement is as of the date hereof and neither the delivery of this Disclosure Statement nor the distribution of any securities pursuant to the Plan will, under any circumstance, create any implication that the information contained herein is correct at any time subsequent to the date hereof, or such other date as described herein. Any estimates of Claims or Interests set forth in this Disclosure Statement may vary from the amounts of Claims or Interests determined by the Debtors or ultimately Allowed by the Bankruptcy Court, and an estimate shall not be construed as an admission of the amount of such Claim.

Information incorporated by reference into this Disclosure Statement speaks as of the date of such information or the date of the report or document in which such information is contained or as of a prior date as may be specified in such report or document. Any statement contained in a document incorporated by reference herein shall be deemed to be modified or superseded for all purposes to the extent that a statement contained in this Disclosure Statement or in any other subsequently Filed document which is also incorporated or deemed to be incorporated by reference, modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Disclosure Statement.

No statements concerning the Debtors, the value of the Debtors' property, or the value of any benefit offered to the holder of a Claim or Interest in connection with the Plan should be relied on other than as set forth in this Disclosure Statement. In arriving at a decision, parties should not rely on any representation or inducement made to secure their acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be immediately reported to counsel for the Debtors, Larson & Zirzow, LLC, Attention: Matthew C. Zirzow, Esq., 810 S. Casino Center Blvd., Suite 101, Las Vegas, Nevada 89101, Telephone: (702) 382-1170, E-mail: mzirzow@lzlawnv.com.

**Section 1.05    Rules of Interpretation**

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract,

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to a person or entity as a holder of a Claim or Interest includes that person or entity's successors and assigns; (5) unless otherwise specified, all references in the Disclosure Statement to Articles are references to Articles of the Disclosure Statement; (6) unless otherwise specified, all references in the Disclosure Statement to exhibits are references to exhibits to the Disclosure Statement; (7) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (9) unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in Bankruptcy Code § 102 shall apply; (10) any term used in capitalized form in the Disclosure Statement that is not otherwise defined in the Disclosure Statement, Plan, or exhibits to the Disclosure Statement Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) all references to docket numbers of documents Filed in the Bankruptcy Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (13) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (14) unless otherwise specified, all references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## Section 1.06    Solicitation Package

Accompanying this Disclosure Statement for the purpose of soliciting votes on the Plan are copies of (i) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider the confirmation of the Plan (the "Confirmation Hearing") and related matters, and the time for filing objections to the confirmation of the Plan, and (ii) a Ballot or Ballots (and return envelope(s)) that you must use in voting to accept or to reject the Plan, or a notice of non-voting status, as applicable.  If you did not receive a Ballot and believe that you should have, please contact the Balloting Agent (as defined below) at the address or telephone number set forth in the next subsection.

## Section 1.07    Voting Procedures, Ballots, And Voting Deadline

After carefully reviewing the Plan and this Disclosure Statement, and the exhibits thereto, and the detailed instructions accompanying your Ballot, holders of Claims in Classes A2, A4, A5, B2, B4, C2 and C4 should indicate their acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot.  Holders should complete and sign their Ballot and return it in the envelope provided so that it is ***received*** by the Voting Deadline (as defined below).

14

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

If you have any questions about the procedure for voting your Claim or with respect to the packet of materials that you have received, please contact Larson & Zirzow, LLC (the "Balloting Agent") (i) telephonically; (ii) in writing by (a) hand delivery, (b) overnight mail, (c) first class mail, or (d) facsimile; or (iii) via e-mail, using the information below:

Larson & Zirzow, LLC
Attn: Matthew C. Zirzow, Esq
810 S. Casino Center Blvd., Suite 101
Las Vegas, Nevada 89101
Telephone: (702) 382-1170
Facsimile: (702) 382-1169
E-mail: mzirzow@lzlawnv.com

**THE BALLOTING AGENT MUST _RECEIVE_ ORIGINAL BALLOTS ON OR BEFORE DECEMBER 16, 2013 AT 5:00 P.M. (PST) (THE "VOTING DEADLINE") AT THE APPLICABLE ADDRESS ABOVE. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT OR DETERMINED OTHERWISE BY THE DEBTORS, BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE ACCEPTED OR USED IN CONNECTION WITH THE DEBTORS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.**

The Debtors reserve the right to amend the Plan. Amendments to the Plan that do not materially and adversely affect the treatment of Claims or Interests may be approved by the Bankruptcy Court at the Confirmation Hearing without the necessity of re-soliciting votes. In the event re-solicitation is required, the Debtors will furnish new solicitation packets that will include new ballots to be used to vote to accept or reject the Plan, as amended.

**Section 1.08   The Confirmation Hearing And Objection Deadline**

**The Bankruptcy Court has scheduled DECEMBER 20, 2013, at 9:30 a.m. (PST) as the date and time for the hearing on confirmation of the Plan and to consider any objections to the Plan. The confirmation hearing will be held at the United States Bankruptcy Court, Foley Federal Building, 300 Las Vegas Blvd., South, Las Vegas, Nevada 89101, Third Floor, Courtroom III, before the Honorable Laurel E. Davis. THE DEBTORS WILL REQUEST CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING.**

**THE BANKRUPTCY COURT HAS FURTHER FIXED DECEMBER 17, 2013 AT 5:00 P.M. AS THE DEADLINE (THE "OBJECTION DEADLINE") FOR FILING OBJECTIONS TO CONFIRMATION OF THE PLAN WITH THE BANKRUPTCY COURT.**

ANY OBJECTION TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND (A) MUST STATE THE NAME AND ADDRESS OF THE OBJECTING PARTY AND THE AMOUNT OF ITS CLAIM OR THE NATURE OF ITS INTEREST AND (B) MUST STATE WITH PARTICULARITY THE NATURE OF ITS OBJECTION. ANY

CONFIRMATION OBJECTION NOT TIMELY FILED AND SERVED AS SET FORTH HEREIN SHALL BE DEEMED WAIVED AND SHALL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**Section 1.09    Voting Tabulation**

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Holders who are entitled to vote and actually vote will be counted.  The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan and such abstentions will not be counted.

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion, may request that the Balloting Agent attempt to contact such voters to cure any such defects in the Ballots.

Except as provided below, unless the applicable Ballot is timely submitted to the Balloting Agent before the Voting Deadline, together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid and decline to count such vote or to utilize it in connection with seeking Confirmation of the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to Bankruptcy Code § 1126(e), that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, unless otherwise determined by the Debtors, must submit proper evidence satisfactory to the Debtors of authority to so act.

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate on the Voting Deadline.  Except to the extent permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).  IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE BALLOTING AGENT.

**Section 1.10    Agreements Upon Furnishing Ballots**

The delivery of an accepting Ballot to the Balloting Agent by a Holder pursuant to the procedures set forth above approved by the Bankruptcy Court, will constitute the agreement of such Holder to accept (i) all of the terms of, and conditions to, the solicitation and voting procedures; and (ii) the terms of the Plan; *provided, however*, all parties-in-interest retain their right to object to Confirmation of the Plan pursuant to Bankruptcy Code § 1128.

**Section 1.11    Recommendation of the Debtors to Approve Plan**

The Debtors approved the solicitation of acceptances of the Plan and all of the

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

16

Transactions contemplated thereunder.  In light of the benefits to be attained by the Holders of Claims pursuant to consummation of the Transactions contemplated under the Plan, the Debtors recommend that such Holders of Claims vote to accept the Plan.  The Debtors have reached this decision after considering the alternatives to the Plan that are available to the Debtors and the possible effect on the Debtors' business operations.  These alternatives include liquidation under chapter 7 of the Bankruptcy Code or reorganization under chapter 11 of the Bankruptcy Code with an alternative plan of reorganization.  The Debtors determined, after consulting with their financial and legal advisors and the Senior Secured Lender and/or such other procedures that the Transactions contemplated in the Plan would likely result in a distribution of greater value to creditors and shareholders than would a liquidation under chapter 7.

THE DEBTORS AND THE SENIOR SECURED LENDER SUPPORT THE PLAN AND RECOMMEND ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO TIMELY SUBMIT BALLOTS TO ACCEPT THE PLAN.

## ARTICLE II
## HISTORICAL BACKGROUND AND PRE-PETITION BUSINESS OPERATIONS

**Section 2.01   Overview of the Debtors' Business**

WFI is a specialized consumer finance company providing automobile financing to borrowers with limited access to traditional credit.  WFI acquires and services installment loan contracts originated by its national, network of over 3,000 approved automobile dealers.  Currently, WFI operates a series of branch offices across the United States, which allows it to work with local dealers in each regional area.

WFI does not lend directly to auto consumers but rather elects to participate with dealerships to make financing available to sub-prime customers of such dealers.  WFI purchases either individual or bulk loan contracts by advancing a portion of the loan amount (between 60% and 80% depending on dealer preferences, the amount finances, the terms of contracts, and status of the vehicles) to the dealer and placing the remaining 20% to 40% of the total principal in a reserve specific to that dealer.  WFI then calculates a "reserve index" by dividing the dealer reserve by the outstanding principal balance.  This reserve index is for the dealer's entire portfolio at WFI and not specific to any one loan.  As borrowers pay interest and principal on their auto loans, which are serviced by WFI, the reserve index increases.  When the reserve index reaches a certain percentage (typically 10% in excess of the reserve index at the time of purchase), the dealer receives a payment from WFI for this excess reserve.  WFI's unique "partnership" approach to dealer relations cultivates an energetic, committed, and incentivized participating dealer base, and made WFI a leader with buy-here-pay-here dealers nationwide.

WFI's loan programs for used vehicles are geared towards the sub-prime borrower unable to access traditional lending credit because of the age of the vehicle being financed or the customer's employment and credit history.  Customers will typically make down payments, in the form of cash or trade-in, typically from 5% to 20% of the purchase price.  The balance of the purchase price plus taxes, title fees and, if applicable, extended service contracts and insurance, is financed.  WFI's loan receivables carry an average contract annual percentage rate (APR) of 23%.  WFI purchases contracts from dealers at discounts ranging from 10% to 50%, depending on the risk profile of the borrower and the age/value of the automobile, however, the advance never exceeds 115% of wholesale book value and is limited to 100% of that value.

WFI utilizes a multi-faceted approach to loan servicing by combining branch staff collectors and home office collection staff. Each staff member possesses a minimum of two years' experience in sub-prime auto loan collection at the time of hire. The branch staff is responsible for the collection work to 60 days delinquent; accounts more than 60 days past due are serviced by staff at the home office in Las Vegas. All accounts in repossession are the responsibility of a special collection team also located in Las Vegas.

WFI's corporate headquarters and principal place of business are 3915 E. Patrick Lane, Las Vegas, Nevada. WFI has branch managers at each of its branch locations, and also has credit verifiers, purchasers in charge of processing contract packages for purchase and balancing daily customer payment receipts, and various collections staff.

Since 2010, WFI invested in upgrading technology, including the use of global positioning system starter interruption devices on vehicles to further secure its collateral. These systems enable WFI to track the location of its collateral and, when necessary in cases of severe delinquency, deactivate the ignition system, thus reducing repossession costs and incentivizing borrowers to make timely payments. The foregoing global position system collateral recovery technology is owned by WFI's affiliate, GPS.

WFIN was incorporated on January 3, 1995. WFIN is a wholly-owned subsidiary of WFI, but has no operations or employees.

## Section 2.02   Debtors' Corporate Structure

WFI is a California corporation incorporated on January 16, 1962. WFI is a wholly-owned subsidiary of Harbor Structured Finance, LLC, a Delaware limited liability company, f/k/a Harbor Truck Structured Finance One ("Harbor"). There is a significant dispute regarding who the members of WFI's board of directors are, which dispute is discussed in greater detail in Section 4.05.

Frederick Cooper ("Mr. Cooper") is the Chief Executive Officer of WFI, and the President of WFIN, and a manager and a member of GPS. From 1992 to 2004, Mr. Cooper was the President, Chief Executive Officer and director of SeaWest Financial Corporation, based in Los Angeles, California, which he founded and grew to $250,000,000 in receivables, 230 employees, and an approved dealer network in excess of 1,000 dealers in 48 states.

Katherine H. Cooper ("Mrs. Cooper" and together with Mr. Cooper, the "Coopers"), is Mr. Cooper's wife and is WFI's President, Chief Operating Officer, Secretary, and Treasurer. Mrs. Cooper is also the Secretary and Treasurer of WFIN. Mrs. Cooper has over twelve years of experience in overseeing and managing vital company operations within the financial services industry, including the evaluation and acquisition of indirect sub-prime auto finance portfolios and the management of related functions. Prior to her tenure with WFI, Mrs. Cooper held similar responsibilities with various other financial companies.

Ed Bentzen is WFI's Chief Financial Officer. Mr. Bentzen has been with WFI for more than three (3) years, and has more than eleven (11) years' experience in accounting and finance. Mr. Bentzen also previously served as the Assistant Vice President of Finance at WFI, as well as Controller at WFI.

18

Harbor is managed by a Board of Managers presently comprised of the Coopers, Mark Finston, and James B. Hadden, Esq. Mr. Finston has been a managing partner of Rock Consulting, LLC since 2010, wherein he provides financial consulting services. Prior to that, Mr. Finston was the Chief Financial Officer, President, and a Board Member of Hudson Keyse, LLC, a defaulted debt buyer, which filed for Chapter 7 bankruptcy in September 2010. Mr. Hadden is an attorney with the law firm of Porter Wright in Columbus, Ohio wherein he practices primarily in government and regulatory affairs, and lobbying. Mssrs. Finston and Hadden are the representatives appointed to the Harbor Board by the Class B Members (as hereinafter defined) of Harbor (the "Class B Managers").

Collectively, the Coopers own 55% of the membership interests in Harbor as Class A members. Philipp D. Nick ("Mr. Nick"), Ellen H. Hardymon, the Suzanne H. Nick Irrevocable Family Trust One, the Suzanne H. Nick Irrevocable Family Trust Two, the Thomas F. Havens Irrevocable Family Trust One; the Thomas F. Havens Irrevocable Family Trust Two (collectively with Mr. Nick, the "Class B Members" and together with the Class B Managers, the "B Parties"), together either directly or indirectly own or control 45% of the membership interests in Harbor as Class B Members.

GPS was organized on June 1, 2011. Mr. Cooper is the sole manager of GPS and the Coopers are its sole members. The Coopers executed a Contribution Agreement relating to the transfer of their interest in GPS to Harbor and/or WFI, however, Harbor's Board never finally affirmed the Contribution Agreement, and thus neither Harbor nor WFI technically owns or controls GPS or its assets.

WFIN was incorporated on January 3, 1995. The Coopers are WFIN's sole directors, Mr. Cooper is its President, and Mrs. Cooper is its Secretary and Treasurer.

**Section 2.03    Debtors' Existing Capital Structure**

(a)    The Senior Secured Lender.

On March 14, 2012, WFI, as borrower, and BMO Harris, as administrative agent for various lenders (the "Pre-Petition Agent" or "Senior Secured Lenders"), entered into a Credit Agreement (the "Credit Agreement") for a total commitment of up to $40,000,000 (the "Senior Secured Obligation"). Harbor, WFIN, and GPS all guaranteed the Senior Secured Obligation. The Senior Secured Obligation was evidenced by a Revolving Note, and secured and perfected in substantially all of Debtors' personal property including, without limitation, all accounts, chattel paper, instruments, documents, general intangibles, deposit accounts, investment property, goods (including all equipment, fixtures and inventory), and all proceeds and products of the foregoing, whether now existing or thereafter arising or acquired (collectively, the "Senior Secured Collateral").

On April 23, 2013, the Senior Secured Lenders delivered to Debtors a written notice of defaults and a reservation of rights under the Credit Agreement, which asserted that as of February 28, 2013, Debtors were not in compliance with respect to the Adjusted Tangible Net Worth covenant, the Interest Coverage Ratio covenant, and the Minimum Loss Reserves covenants as set forth in Sections 8.25(a), (c) and (d) of the Credit Agreement resulting in separate Events of Default under Section 9.1(b) of the Credit Agreement.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Thereafter, beginning in May 2013, the parties to the Credit Agreement entered into a series of forbearance agreements. After four additional forbearance agreements through August 2013, the Pre-Petition Agent refused to provide any further forbearances. On August 13, 2013, the Pre-Petition Agent sent Debtors a Notice of Acceleration and Demand for Payment, which indicated that any remaining standstills and forbearances had expired and declaring the principal and all accrued interest of the Senior Secured Obligation was accelerated and immediately due and payable.

On August 20, 2013, the Pre-Petition Agent filed an action in Nevada state court, thereby asserting claims for declaratory relief for the appointment of a receiver, breach of the Credit Agreement, and breach of the covenant of good faith and fair dealing. On August 21, 2013, the Pre-Petition Agent filed a petition seeking the appointment of a receiver, and on September 4, 2013, the Nevada state court entered an order appointing a receiver over Debtors' business. Within a matter of hours after the appointment of a receiver, Debtors Filed their Bankruptcy Cases in order to avoid imminent loss of its portfolio and control of its business, and also to preserve value for the benefit of creditors.

As of the Petition Date, the principal balance owing to the Senior Secured Lenders was not less than $30,870,301.70, plus interest, attorney's fees, forbearance fees, costs and expenses as recoverable pursuant to the terms of the Senior Lien Documents.

(b)    The Subordinated Debt Holders.

As part of the original purchase of WFI in 2010, various original founders of WFI took back certain notes as part of the purchase price, and were owed, in the aggregate as of the Petition Date, $6,706,000 in principal amount of subordinated debentures of WFI (the "Subordinated Debt Holders"). Approximately $4,000,000 of this debt is owed to Cope Family Ventures, LP, a Nevada limited partnership, over which Donnella M. Cope serves as manager, and $1,950,000 of this debt is owed to Timothy J. Salas and Adrianna Merrell, in their capacity as trustees of various trusts. The remaining Subordinated Debt is held by approximately eleven (11) other holders in various sums ranging from $12,000 to $250,000. The Subordinated Debt Holders are general unsecured creditors of WFI.

(c)    The Real Property.

The Collateral of the Pre-Petition Agent does not include various real property of Debtors, including specifically three (3) parcels of real property located in Las Vegas, Nevada; San Jose, California; and Houston, Texas respectively (collectively, the "Real Property") with an estimated fair market value in the aggregate of just over $2,000,000.00. WFI's property in Las Vegas is located at 3915 East Patrick Lane, Las Vegas, Nevada 89120, and is presently being used by WFI as its corporate headquarters. Debtors recently obtained an appraisal stating that the fair market value of the Las Vegas Property is $1.675 million. WFI's property in San Jose is located at 2202 Stevens Creek Boulevard, San Jose, California 95127, but is not used or occupied; rather, the property has a building with significant fire damage that will need to be razed for any future development. Debtors have an appraisal for the San Jose property valuing it at approximately $500,000. WFI's property in Houston is located at 9905 Gulf Freeway, Houston, Texas 77034, and includes a small retail center that is no longer used by the company for operations, and which is instead leased out to a third-party tenant. Debtors estimate that its Houston property is worth less than $250,000.

At or around the loan transaction with the Pre-Petition Agent in 2012, the Class B Members of Harbor required the Class A Members (the Coopers) to agree to a First Amendment to the Amended and Restated Operating Agreement of Harbor, which, among other matters, provided for the payment to the Class B Members of a preferred return. In March 2012, representatives from the Class B Members recorded deeds of trust in favor of the Class B Members of Harbor to secure the foregoing preferred return. On August 16, 2013, counsel for the B Members of Harbor sent a letter to WFI giving notice of an alleged default under B Members' Deeds of Trust and further purporting to accelerate all of WFI's obligations thereunder to make them immediately due and payable. The B Members have asserted that they are owed in excess of $3 million and are secured in WFI's Real Property. Debtors assert that the deeds of trust held by the Class B Members may be avoidable transfers, or subject to recharacterization, subordination or other challenge, however, such allegations are disputed by the Class B Members, and remain untested and unproven to date. Debtors and/or the Committee anticipates commencing such litigation prior to the Confirmation Hearing.

**Section 2.04   Events Leading to Chapter 11**

In addition to the default and acceleration of the Senior Secured Obligation, an additional factor contributing to the deterioration of WFI and its business has been infighting among various parties involved in either the direct or indirect management of the company. Specifically, from and after the closing of the Harbor transaction in October 2010, the Coopers and their management team assumed control of the day-to-day operations of WFI. Since the closing, the management team sought to make significant improvements to WFI's operations in order to establish a platform to facilitate organic growth and expansion through acquisition, enhance long-term profitability of the business, and significantly improve the credit quality of loan assets. Specifically, management has migrated the entire loan portfolio to the Megasys$^{TM}$ software system, sold its commercial truck loan portfolio, overhauled the entire collection process, expanded the bulk purchasing program, developed new products, rationalized WFI's branch office network, increased the use of outside dealer marketing representatives, revamped the repossession and recovery process, and reestablished robust credit underwriting standards.

Within months after the close of the Harbor transaction in October 2010, significant management disputes between the Class A Members of Harbor and the Class B Members, and the relationship among these parties became more adversarial. In October 2012, Class B Members filed an action in the Court of Common Pleas, Franklin County, Ohio, Civil Division, as Case No. 12 CV 012749 against the Coopers and Harbor, which made various allegations of mismanagement and financial impropriety. In December 2012 the Coopers filed an action in the Eighth Judicial District Court, Clark County, Nevada as Case No. A-12-673394 against the Class B Members, which was later removed to the United States District Court for the District of Nevada in January 2013 as Case No. 2:13-cv-00036-JCM-GWF, and which asserted various claims  against one or all of the Class B Members for conversion, breach of fiduciary duties, intentional interference with contractual relations, intentional interference with prospective economic advantage, civil conspiracy, fraudulent inducement, defamation, defamation per se, business disparagement, abuse of process, declaratory relief, and injunctive relief. The foregoing actions remain pending, some of the claims may be derivative claims that are property of the Debtors' bankruptcy estates, and all of the allegations remain unproven and subject to significant dispute.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

21

**Section 2.05    The Civil Investigative Demands from the CFPB**

The Consumer Financial Protection Bureau ("CFPB") is an independent federal agency that holds primary responsibility for regulating consumer protection with regard to financial products and services in the United States. The CFPB was created in 2011 after its conception was included as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

WFI has received two Civil Investigative Demands (the "CIDs" or a "CID") from the CFPB. The stated purpose of both CIDs was "to determine whether auto-finance companies, their agents, or other unknown persons have engaged or are engaging in unlawful acts or practices in connection with the advertising, marketing, origination, sale, or servicing of, or the collection of debts associated with, auto-finance loans in violation of sections 1031 and 1036 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §§ 5531, 5536; the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.*; the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.*; or any other Federal consumer financial law."

The first CID was dated August 19, 2013, and contained five requests for documents, such as organizational charts, training manuals, and consumer complaints. It also contained three interrogatories, which asked for the creation dates of the documents, the dates the documents were in use, and the number of employees performing certain functions. The CID also requested a one-day investigational hearing about various company operations.

The second CID was dated September 11, 2013, and contained six requests for documents, such as account records, financial statements, bankruptcy petitions, and contracts with dealers and consumers. It also sought responses to two interrogatories regarding customer accounts and creditors of the company.

The CFPB's investigational hearing was held in Las Vegas, Nevada, on October 25, 2013. The company has responded to all requests for documents and interrogatories, as modified by agreement with the CFPB. The CFPB has not advised the company of any findings or proposed actions in connection with this matter.

**Section 2.06    Reorganization Strategy**

To facilitate its goal of maximizing the value of its assets, the Debtors and the Senior Secured Lender has been discussing restructuring alternatives for the Debtors' business. The Debtors (with the consent of the Pre-Petition Agent) entered into that certain Stock Purchase Agreement (the "Stalking Horse SPA")[2] with Carfinco WFI, Inc., a Delaware corporation (the "Stalking Horse") dated November 15, 2013, in which WFI and GPS agreed to sell and the Stalking Horse agreed to purchase and acquire all of the newly-issued and outstanding capital stock of WFI and GPS for a purchase price equal to seventy percent (70%) of the net finance receivables, subject to adjustment as provided in the Stalking Horse SPA, plus Cure Costs up to an aggregate threshold as set forth in the Stalking Horse SPA, and in accordance with the Bid Procedures Order, and the Sale Order and/or Confirmation Order. The Stalking Horse is a subsidiary of Carfinco Financial Group, a Canadian public company based in Edmonton,

---

[2] The Stalking Horse SPA contemplates the sale of the New Interests to the Stalking Horse subject to higher and better offers pursuant to the Bid Procedures Order and the Sale Order and/or the Confirmation Order.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

Alberta, Canada.

Debtors also intend to seek the sale of the Real Property on a timely basis, and are entering into a proposed real property purchase agreement, subject to overbids, with the Stalking Horse, which proposed to purchase the Las Vegas Property for $500,000.00, subject to various adjustments, and in accordance with the Las Vegas Property Purchase Agreement and the Las Vegas Property Bid Procedures Order.  Debtors or the Liquidating Trustee, as the case may be, will also seek to sell Debtors' other Real Property on a timely basis as well.

## ARTICLE III
## ASSETS AND LIABILITIES OF THE DEBTORS

### Section 3.01   The Debtors' Scheduled Assets

The Debtors' assets as of the Petition Date are described in the Bankruptcy Schedules and SOFAs Filed with the Bankruptcy Court on October 2, 2013, as amended on November 7 and 11, 2013, and any amendments thereafter (collectively, the "Bankruptcy Schedules"), and reference should be made thereto for information concerning such assets.  Copies of the Bankruptcy Schedules and any amendments thereto Filed in this Case may be viewed online at any time through the Bankruptcy Court's PACER System at www.nvb.uscourts.gov.

As of the Petition Date, WFI's principal assets included approximately $44.8 million in gross finance receivables, $1.5 million in land and building assets, $400,000 in real property, and $750,000 million in furniture, fixtures and equipment.  Within about two weeks after the Petition Date, WFI's gross portfolio balance had dropped to approximately $43.9 million, less approximately $2.3 million in deferred interest, thus leaving approximately $41.6 million in calculated gross value.  As of that same time period, however, the total credit balance owing to its senior secured lender was the sum of approximately $30.9 million.  Additionally, as of the Petition Date, Debtors had approximately $2.3 million in cash on hand.

GPS's principal asset is certain intellectual property rights for its global position system collateral recovery technology.  Specifically, this technology involves the use of global positioning system starter interruption devices on vehicles to further secure collateral.  These systems enable WFI to track the location of its collateral and, when necessary in cases of severe delinquency, deactivate the ignition system, thus reducing repossession costs and incentivizing borrowers to make timely payments.  The foregoing technology and thus the value of GPS is unknown, however, the technology has never found a substantial successful market outside of the use among WFI's dealers, and thus Debtors believe it has very limited value.

The foregoing having been stated, as a matter of disclosure, on November 30, 2011, FMV Valuation and Financial Advisory Services issued a Valuation Presentation, which provided, among other matters, that as of September 30, 2011, and using a mean of several valuation methodologies (a market approach of the Guideline Public Companies Method, and an income approach of the Discounted Cash Flow Method), that the value of Global Track is $4.33 million.  Debtors do not believe this valuation accurately reflects the present fair market value of Global Track and that it is substantially less.

The Bankruptcy Schedules Filed by the Debtors in their respective Cases included intercompany receivables between and amongst the Debtors.  The Plan provides that all such

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

inter-Debtor receivables will be cancelled on the Effective Date.

**Section 3.02    The Debtors' Assets After Closing**

After the Closing with the Purchaser, the Debtors' assets will consist of (a) the PSA Sale Proceeds; (b) assets excluded from the sale by the Purchaser under the terms of the Purchase and Sale Agreement and the Liquidating Trust, including without the limitation, Liquidating Trust Avoidance Actions and the Real Property (unless the Vegas Real Property is sold as discussed hereinafter); and (c) the stock in WFIN.

**Section 3.03    Liabilities Scheduled by the Debtors**

The Debtors' liabilities as of the Petition Date are set forth in the Bankruptcy Schedules, and reference should be made thereto for information concerning such liabilities as of the Petition Date.  Copies of the Bankruptcy Schedules and any amendments thereto Filed in these Bankruptcy Cases may be viewed online at any time through the Bankruptcy Court's PACER System at www.nvb.uscourts.gov.

As of the Petition Date, WFI's primary liabilities include the principal balance of $30.9 million, plus interest, attorney's fees, forbearance fees, costs and expenses, owing to its Senior Secured Creditor, various disputed sums of approximately $3 million allegedly owing to the Class B Members of Harbor, which are asserted to be secured in Debtors' Real Property, approximately $6.7 million owing to subordinated unsecured debt holders, and amounts owing to dealers under dealer agreements of another estimated $4 to $6 million (subject to setoff), and certain other general unsecured trade claims of less than $500,000.  Debtors believe they do not have any remaining unpaid Priority Tax Claims, Priority Non-Tax Claims or Miscellaneous Secured Claims.

The Bankruptcy Schedules Filed by the Debtors in their respective Bankruptcy Cases included intercompany payables between and amongst the Debtors.  The Plan provides that all such inter-Debtor payables will be cancelled on the Effective Date.

**Section 3.04    Preferences, Fraudulent Transfers and Other Avoidance Actions**

Under Bankruptcy Code § 547, a debtor's bankruptcy estate may recover certain preferential transfers of property, including cash, made insolvent during the 90 days immediately before the filing of its bankruptcy petition with respect to pre-exiting debts, to the extent the transferee receive more than it would have in respect of the preexisting debt had the debtor been liquidated under chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for one (1) year preference period.

Certain defenses can be made to preference recoveries.  Transfers made in the ordinary course of the debtor's and transferee's business according the ordinary business terms in respect of debts less than 90 days before the filing of a bankruptcy case are not recoverable.  Additionally, if the transferees extended credit subsequent to the transfer (and before the commencement of the bankruptcy case), such extension of credit may constitute a defense to recovery, to the extent of any new value, against an otherwise recoverable transfer of property.  If a transfer is recovered by the estate, the transferee has an unsecured claim against the debtor to the extent of the recovery.

24

Under Bankruptcy Code § 547 and various state laws, a debtor may recover certain pre-petition transfers of property including the grant of a security interest in property, made while insolvent to the extent that the debtor receives less than fair value for such property. Additionally, avoidance actions exists under sections 544, 545, 549 and 553(b) of the Bankruptcy Code that allow a debtor to avoid and/or recover certain property.

The Bankruptcy Code preserves the Debtors' rights to prosecute claims and causes of action that exist outside of bankruptcy, and also empowers the Debtors to prosecute certain claims that are established by the Bankruptcy Code, including claims to avoid and recover preferential transfers, and fraudulent conveyances.

Under the Plan, all of the Debtors' rights in respect of all Liquidating Trust Avoidance Actions are preserved and are transferred to the Liquidating Trustee. As such, the Liquidating Trustee, as a representative of the Estates, will have the authority to investigate, prosecute, collect, and/or settle the Liquidating Trust Avoidance Actions in accordance with Bankruptcy Code § 1123(b)(3). To date, the Debtors have not fully investigated any potential Liquidating Trust Avoidance Actions.

**IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OR AGAINST THE PLAN, HOLDERS OF CLAIMS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTORS WITHIN NINETY (90) DAYS BEFORE THE PETITION DATE) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES ALL CAUSES OF ACTION, AND THAT THE PLAN AUTHORIZES THE LIQUIDATING TRUSTEE TO PROSECUTE SUCH CLAIMS.**

### ARTICLE IV
### THE BANKRUPTCY CASES

**Section 4.01    Commencement of These Bankruptcy Cases**

On September 4, 2013 (the "Petition Date"), Debtors Filed voluntary petitions in the United States Bankruptcy Court for the District of Nevada, Las Vegas Division (the "Bankruptcy Court"), thereby commencing their Bankruptcy Cases. The authority of WFI to file for its Bankruptcy Case has been disputed by certain parties, which dispute is explained in greater detail in Section 4.05.

By order of the Bankruptcy Court, the Bankruptcy Cases are being jointly administered for procedural purposes only. The Office of the United States Trustee (the "U.S. Trustee") has not appointed a trustee or an examiner, however, it has appointed an Official Committee of Unsecured Creditors (the "Committee") who has retained counsel. The Committee's members are exclusively Subordinated Debt Holders.

After the Petition Date, the Debtors were authorized to operate and manage their business and properties in the normal course as debtors-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108. The Debtors generally have been paying post-petition operating expenses as they become due, excepting and excluding therefrom payments to WFI's dealers as and for their dealer reserve payments to the extent such financed receivables were acquired from the dealer prior to the Petition Date.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

25

## Section 4.02    Initial Emergency Motions

Shortly after the Petition Date, the Debtors Filed numerous initial emergency motions to streamline the transition to operating under Chapter 11, to stabilize operations, and to preserve their relationships with vendors, customers and utility providers.  These motions requested, among other things, authority to:

• administer the Bankruptcy Cases jointly for administrative purposes;

• establish notice procedures for informing the Debtors' Creditors and Interest Holders of the events and filing in the Cases;

• maintain the Debtors' pre-petition bank accounts and cash management system;

• use cash collateral during the pendency of the Bankruptcy Cases;

• pay pre-petition wages and salaries to employees and contractors;

• provide adequate assurance to the Debtors' utility providers to maintain uninterrupted service;

## Section 4.03    Cash Collateral Motion and Stipulation

(a)    The Cash Collateral Motion and Interim Use on a Nonconsensual Basis

On September 15, 2013, Debtors Filed an *Emergency Motion for Entry of an Interim Order (I) Preliminarily Determining Extent of Cash Collateral and Authorizing Interim Use of Cash Collateral, and (II) Scheduling a Final Hearing to Determine Extent of Cash Collateral and Authorizing Use of Cash Collateral* (the "Cash Collateral Motion").  The Cash Collateral Motion sought entry of an interim order preliminarily determining the extent of cash collateral and authorizing the interim use thereof by Debtors to pay necessary and appropriate costs to operate Debtors' business in the ordinary course pending a final hearing and consistent with a budget.

The Cash Collateral Motion argued that as of the filing of that motion, WFI's gross portfolio balance was approximately $43.9 million, less approximately $2.3 million in deferred interest, thus leaving approximately $41.6 million in calculated gross value.  Further, as of the filing of that motion, Debtors argued that the total credit balance owing to the Senior Secured Lenders was only the sum of approximately $30.9 million, thus leaving the Senior Secured Lenders oversecured in approximate amount of $10.7 million, and without even accounting for the approximate $2.3 million in cash Debtors had then, and also excluding the approximately $2 million in Real Property in which the Pre-Petition Agent is not secured.  As such, Debtors' Cash Collateral Motion argued that assuming the Pre-Petition Agent was secured and properly perfected in all cash presently held by Debtors and the portfolio, the Senior Secured Lenders' coverage ratio was approximately 1.41 ($41.6 million divided by ($30.9 million less $1.3 million)), thus leaving the Senior Secured Lenders' interest adequately protected.

On September 17, 2013, the Pre-Petition Agent opposed Debtors' Cash Collateral Motion and argued that Debtors' analysis regarding the amount of adequate protection was faulty

26

because it ignored the costs of collection and historical recovery rates given the subprime nature of the loans, and that Debtors' portfolio was actually worth far less than as stated, and indeed approximately $30,000,000, thereby leaving the bank with little to no equity cushion. Further, the Pre-Petition Agent argued that its position would deteriorate during the term of the proposed cash collateral budget.

On September 23, 2013, the Court entered an *Order Granting Emergency Motion for Entry of an Interim Order (I) Preliminarily Determining Extent of Cash Collateral and Authorizing Interim Use of Cash Collateral, and (II) Scheduling a Final Hearing to Determine Extent of Cash Collateral and Authorizing Use of Cash Collateral* (the "Interim Order"). The Interim Order granted Debtors' Cash Collateral Motion on a preliminary and interim basis, and thus authorized Debtors' limited use of cash collateral, but only Operating Cash Disbursements per the proposed Cash Collateral Budget (the "Budget"), and did not allow any Bankruptcy Cash Disbursements or Purchase of New Accounts. As and for adequate protection, the Interim Order provided the Pre-Petition Agent with the following: (a) Debtors were to make monthly interest payments to the Pre-Petition Agent as set forth in the Budget; (b) Debtors were to provide the Pre-Petition Agent with weekly reports showing operations, use of cash, and any variances to the Budget; and (c) the Pre-Petition Agent was granted a post-petition replacement lien in and to all of Debtors' Post-Petition Receipts generated by the Senior Secured Collateral to the extent of any diminution in the value of its interest.

    (b)    The Cash Collateral Stipulation

After further substantial negotiations, Debtors and the Pre-Petition Agent were able to come to an agreement on the terms and conditions of a consensual use of cash collateral for the Bankruptcy Cases, and on October 16, 2013, Filed a motion to approve a *Stipulation Authorizing Debtors to Use Cash Collateral, Granting Adequate Protection and Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 361, 362 and 363* (the "Cash Collateral Stipulation").

Pursuant to the Cash Collateral Stipulation, Debtors made various admissions, including but not limited to the following: (a) as of the Petition Date, the Debtors were indebted and liable to the Senior Secured Lenders, without claim, defense, counterclaim, recoupment or offset of any kind, in the aggregate principal amount of no less than $30,870,301.70, exclusive of interest, and all costs, fees, expenses and charges; (b) the Senior Secured Obligations were legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms, and no portion of the Senior Secured Obligation is subject to avoidance, recharacterization, setoff, recoupment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors did not have, and thereby forever waived, released and affirmatively agreed not to allege or otherwise pursue, any defenses, affirmative defenses, counterclaims, claims, causes of action, recoupments, setoffs or other rights that it has or may have arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise against the Pre-Petition Agent or any of its affiliates. Notwithstanding the foregoing, within forty five (45) days after entry of the final order approving the Cash Collateral Stipulation, and other party in interest was able to challenge the foregoing.

The Cash Collateral Stipulation provided that Debtors were authorized on a limited basis to use the Senior Secured Collateral, including the Cash Collateral, but only in strict accordance with the terms and conditions provided in the Cash Collateral Stipulation and Budget and only

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

until the occurrence of a Termination Event (as hereinafter defined). Debtors were also permitted to use Cash Collateral to buy a limited amount of new finance receivables, but prohibited from using any Cash Collateral to pay or fund dealer reserves, or to pay any amounts owed to or by WFI, Global Track, or Harbor.

Debtors also acknowledged in the Cash Collateral Stipulation that their use of Cash Collateral or the imposition of the automatic stay may result in the diminution in value of the Senior Secured Lenders' Collateral and the Senior Secured Lenders' interests therein, and, as a result, it was entitled to adequate protection. As adequate protection, the Pre-Petition Agent was granted a superpriority post-petition administrative claim against the Debtors' estates, as well as certain adequate protection liens consisting of first priority replacement security interest in and a lien on the estates' property, excluding the real property. Debtors also committed to paying to the Pre-Petition Agent non-refundable cash adequate protection payments in the amount of $1,000,000 each on a monthly basis, periodic interest payments on the outstanding balance due under the Senior Loan Documents, and paying the Pre-Petition Agent's reimbursable expenses upon presentation of an invoice.

Debtors also made various other commitments to the Pre-Petition Agent under the Cash Collateral Stipulation, including but not limited to the following: (1) providing the Pre-Petition Agent with any written financial information or periodic reporting that the Pre-Petition Agent should reasonably request; (2) Debtors will continue to retain High Ridge Partners as their financial advisors; (3) Debtors will retain and engage Hilco Receivables, LLC as the backup servicer. The Pre-Petition Agent also consented to the establishment of a Carveout of up to $1,000,000 for the payment of estate professionals, including Committee counsel.

Finally, the Cash Collateral Stipulation also provided for the occurrence various events of termination (the "Termination Events"), including but not limited to the following: (1) failure of the Debtors to deliver to the Pre-Petition Agent by no later than October 25, 2013, a letter of intent, in a form and substance acceptable to the Pre-Petition Agent, from a non-insider to provide sufficient financing to fund a confirmable reorganization involving a transaction to pay the Senior Secured Lenders in full; (2) failure of the Debtors to timely comply with at least one of the following: (i) file a Plan in these Cases on or before October 25, 2013 or (ii) file a motion seeking approval from the Bankruptcy Court to establish bidding procedures for and to sell substantially all of the Collateral with the consent of the Pre-Petition Agent pursuant to section 363 of the Bankruptcy Code (a "363 Sale") on or before November 11, 2013, in either case acceptable in form and substance to the Pre-Petition Agent, or that otherwise fails to provide the Pre-Petition Agent with its full credit bid rights pursuant to section 363(k) of the Bankruptcy Code; (3) failure of Debtors to obtain the entry by the Bankruptcy Court of an order, acceptable in form and substance to the Pre-Petition Agent approving a disclosure statement or approving bidding procedures for the 363 Sale that preserve Pre-Petition Agent's rights to credit bid without limitation, on or before November 25, 2013; (4) failure of the Debtors to obtain the entry by the Bankruptcy Court of an order on or before December 23, 2013, acceptable in form and substance to the Pre-Petition Agent either confirming a Plan or approving a 363 Sale; (5) failure of the Debtors to effect the confirmed Plan or to close the 363 Sale on or before January 4, 2014.

On October 24, 2013, the Bankruptcy Court entered an order approving the Cash Collateral Stipulation on a final basis.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

(c)    The Amendment to the Cash Collateral Stipulation

On November 1, 2013, Debtors and the Pre-Petition Agent Filed a *First Stipulated Amendment* (the "Cash Collateral Amendment") to the Cash Collateral Stipulation, which provides, among other matters, the following:  (1) after entry of the Cash Collateral Amendment, Debtors would pay the Pre-Petition Agent an additional adequate protection payment of $500,000; (2) after approval of a transaction or sale for substantially all of Debtors' business, Debtors would immediately transfer all cash collateral then held or controlled by Debtors; and (3) Debtors would continue and finalize their efforts to return all pre-petition retainers, and imposed other limitations with respect to the retainer being held by Debtors' general reorganization counsel.  At a hearing on November 25, 2013, the Bankruptcy Court orally approved the Cash Collateral Amendment, and a written order thereon should be entered shortly.

**Section 4.04    Retention of Professionals**

The Bankruptcy Court has entered orders approving the Debtors' applications to employ and retain (i) Larson & Zirzow, LLC as their general bankruptcy and restructuring counsel, (ii) FTI Consulting as their interim financial advisors, (iii) High Ridge Partners as their replacement financial advisors, (iv) Hilco Receivables, LLC as their backup servicer, and (v) Lewis Roca Rothgerber, LLP as their special counsel for corporate and transactional matters.  The Debtors may also seek to retain other professionals, including but not limited to Hudson Cook, LLP, as special counsel for consumer financial and related regulatory matters, Timothy R. Morse & Associates as real estate appraiser, a real estate broker and listing agent, and such other professionals as may be necessary.  The Bankruptcy Court has also entered an order granting an application by the Committee to employ and retain Schwartzer McPherson Law Firm as their legal counsel.

**Section 4.05    The Harbor B Parties' Motion to Dismiss WFI's Chapter 11 Case**

On September 16, 2013, the Class B Members Filed a motion (the "Dismissal Motion") seeking to dismiss WFI's bankruptcy filing as being filed without valid corporate authorization.  The Class B Managers later joined in the Dismissal Motion.  The Debtors opposed the Dismissal Motion, and the Committee orally joined in Debtors' opposition.  After extensive briefing of the issues, the Bankruptcy Court held an evidentiary hearing on the Dismissal Motion on November 1 and 4, 2013, wherein the Court heard and considered the testimony of various witnesses and considered various documents admitted into evidence by the parties.  On November 13, 2013, the Bankruptcy Court heard closing arguments on the Dismissal Motion, and at a further hearing on November 15, 2013, the Bankruptcy Court orally denied the Dismissal Motion.

In denying the Dismissal Motion, the Bankruptcy Court found and determined that the B Parties' lacked standing to challenge WFI's bankruptcy filing as unauthorized.  Specifically, the Bankruptcy Court found that the B Parties were not shareholders of WFI, and that only Harbor, as the sole shareholder of WFI, had standing to raise the issue of an alleged lack of corporate authorization for WFI's bankruptcy filing.  With respect to Harbor's Class B Members, the Bankruptcy Court held that they lacked standing to challenge WFI's bankruptcy filing as unauthorized because Harbor's governing documents provided that its business and affairs were to be managed exclusively by Harbor's Board of Managers, not the members.  Similarly, with respect to Harbor's Class B Managers, the Bankruptcy Court held that they lacked standing to challenge WFI's bankruptcy filing as unauthorized because Harbor's governing documents

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

provided that Harbor's Board of Managers could only act pursuant to a majority vote of that Board, and the Class B Managers, standing alone, did not constitute that required majority. The Bankruptcy Court also prospectively denied any request by the B Parties for a stay pending appeal from its decision denying the Dismissal Motion.

On November 25, 2013, the Bankruptcy Court entered a written order denying the B Parties' Dismissal Motion and denying a stay pending appeal from its decision (the "Order Denying Dismissal"). The B Parties have indicated that they may appeal the Order Denying Dismissal. The B Parties also maintain that notwithstanding the entry of the Order Denying Dismissal, there is still an issue regarding, among possibly other matters, the proper corporate authorization to proceed with matters in the WFI Bankruptcy Case, which issue they believe is preserved and may be presented later in the proceedings, including but not necessarily limited to at the Confirmation Hearing.

**Section 4.06    Debtors' Post-Petition Operations and the Status of its Loan Portfolio**

For the period October 14, 2013 through November 17, 2013 (the "Period"), being the first five (5) weeks of the Cash Collateral Budget, that Debtors' total cash receipts were $239,829 or 7.5% greater than the Budget for $3.44M in total cash receipts for the Period. The total cash receipts for the Period were compiled of: (i) gross customer and dealer payments and repossession sales (normal course cash receipts) of $125,700 or 3.9% greater than Budget, and (ii) other cash receipts of $114,130, which were not budgeted, comprised of professional retainer returns, sale of bankruptcy accounts and a small insurance refund. Debtors' total operating cash disbursements were $255,068 or 29.5% favorable to the Budget for total operating cash disbursements of $610,423. However, it should be noted that Debtors have accrued and incurred approximately $60,000 in accounts payable that were forecasted but not paid in the Period as well as received an estimate for director and officer insurance of approximately $47,000 that was also forecasted during the Period but has not been disbursed. The adjusted total operating cash disbursements would demonstrate approximately $148,000 or 17.1% favorability to the Budget. Therefore, Debtors' positive net cash flow (total cash receipts minus total operating disbursements) illustrates a positive $2.83M for the Period. The adjusted (for the accounts payable and insurance not disbursed but forecasted in the Period) net cash flow would be $2.73M for the Period. Additionally, it should be noted that Debtors generated an ending book cash balance of $3.94M at November 17, 2013, which illustrates a positive variance to the Budget of $964,602 or 32.5%. However, the positive variance in the ending book cash balance is somewhat offset by a negative $518,164 variance in the actual gross portfolio balance to the Budget balance at November 17, 2013 for a balance of $38.55M. In summary, Debtors' financial performance comparative to the Budget was favorable for the Period.

Since the Petition Date, WFI's loan portfolio has shrunk and will continue to shrink because the level of new purchases as permitted under the Cash Collateral Stipulation is not sufficient to replace the runoff from the portfolio. The foregoing continuing reduction in the size of the portfolio also results in a decline in the income generated by the portfolio as well. Additionally, the reduced level of new paper purchases permitted under the Cash Collateral Stipulation, which are not at the same level WFI was permitted to purchase pre-petition or sufficient to replace the runoff in the portfolio, combined with the restriction on payments to dealers for receivables WFI purchased pre-petition, results in strain with WFI's dealers.

**Section 4.07    Expense Reimbursement and Break-Up Fee to the Stalking Horse Bidder**

On November 1, 2013, Debtors filed a *Notice of Execution of Letter of Intent*, thereby giving notice of their execution of a letter of intent (the "Letter of Intent") for a definitive transaction with the Stalking Horse.  The Letter of Intent included a rider signed separately by the Pre-Petition Agent providing that, except as qualified therein, the Pre-Petition Agent:  (a) approves and supports the Debtors' execution of the Letter of Intent and the transactions contemplated therein, including, without limitation, the plan of reorganization as contemplated, and (ii) agrees not to object to the Debtors' motion to approve an expense reimbursement and break-up fee to the Stalking Horse so long as it is consistent with the terms set forth in the Letter of Intent; *provided*, *however*, that in the event the Amendment to the Cash Collateral Stipulation is not filed or approved by the Bankruptcy Court, among other conditions, then the support of the Pre-Petition Agent of the foregoing and of the transactions in the Letter of Intent may be revoked by the bank in its sole discretion, with the Pre-Petition Agent expressly reserving all rights upon said revocation.

On November 13, 2013, the Bankruptcy Court entered an order approving a break-up fee (the "Break-Up Fee") equal to $365,000.00 to the Stalking Horse Bidder, and an expense reimbursement (the "Expense Reimbursement") for the Stalking Horse Bidder's documented reasonable out-of-pocket costs and expense of up to $450,000.00, or in the event of a credit bid by the Pre-Petition Agent, up to $350,000.00.  The Break-Up Fee and Expense Reimbursement are entitled to superpriority administrative claim treatment, senior to all superpriority claims; *provided*, *however*, that such Break-Up Fee and Expense Reimbursement shall be payable only in the event that (i) Carfinco is not in material default of the Definitive Agreement, (ii) the Companies consummate an Alternative Transaction, and (iii) the Pre-Petition Obligations and Adequate Protection Claims of the Pre-Petition Agent (as such terms are defined in the Cash Collateral Stipulation) are paid in full in cash, and shall be payable from the proceeds of the sale to such other bidder.

**Section 4.08    Bid Procedures Motion**

On November 26, 2013, the Bankruptcy Court entered an *Order Granting Motion to (A) Approve the Stock Purchase Agreement and Authorize the Debtors to Enter Into the Stock Purchase Agreement and Comply with Their Obligations Thereunder; (B) Approve the Procedures for the Solicitation of Higher or Better Offers; (C) Approve the Form and Manner of Notice; (D) Approve Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (E) Grant Related Relief* (the "Bid Procedures Motion"), which approved a process under which the Debtors will seek competing bids for the sale of the New Interests or the Debtors' Assets.  Specifically, the Bid procedures provide the following:

• Notice of Auction and Sale Hearing (the "Sale Notice") will be (i) served on certain parties within one (1) business day after entry of the Bid Procedures Order.

• Subject to certain requirements in the Bid Procedures, the Debtors will afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence.

• To be deemed a Qualifying Bid, a bid must, among other requirements specified in the Bid procedures, (i) be received no later than the Bid Deadline; (ii) state such Qualified Bidder offers to purchase the Acquired Property on terms and conditions substantially as set

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

forth in the Purchase and Sale Agreement; (iii) includes a duly authorized and executed Purchase and Sale Agreement along with a copy of such agreement marked to show the specific changes to the Stalking Horse SPA that the Potential Bidder requires (which marked copy may be an electronic comparison of the written acquisition agreement submitted and the Stalking Horse SPA (a "Marked Agreement")); and (vi) provide written evidence that the Qualified Bidder is financially capable of consummating the contemplated transaction.

• All Qualifying Bids must also provide the Good Faith Deposit, which shall be returned to each Qualifying Bidder not deemed to be the Purchaser.

• In the event the Debtors timely receive one or more Qualifying Bids other than the Stalking Horse's Qualified Bid, the Debtors shall conduct an Auction.

• The Qualifying Bidder submitting the highest and best bid at the Auction will be deemed the Purchaser, and will complete and execute all documents evidencing and containing the terms and conditions upon which the winning bid was made.

To facilitate this process, the Debtors negotiated and signed the Stalking Horse SPA, which provides that the Stalking Horse will pay an amount equal to seventy percent (70%) of the net financed receivables, after excluding certain accounts, in Cash for the New Interests, subject to adjustments detailed in the Stalking Horse SPA.

The Bid Procedures Order provides that the Auction is currently set to commence on **December 18, 2013 at 9:00 a.m. (PST)**. The Auction will take place at the law offices of Lewis Roca Rothgerber, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada 89169.

## Section 4.09   Las Vegas Property Bid Procedure Motion

On or about November 26, 2013, Debtors filed their *Motion to (A) Approve the Stock Purchase Agreement and Authorize the Debtors to Enter Into the Real Property Purchase Agreement and Comply with Their Obligations Thereunder; (B) Approve the Procedures for the Solicitation of Higher or Better Offers; (C) Approve the Form and Manner of Notice; (D) Approve Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (E) Grant Related Relief* (the "Las Vegas Property Bid Procedures Motion"), which seeks Bankruptcy Court approval of a process under which the Debtors will seek competing bids for the sale of the Las Vegas Property. Specifically, the Las Vegas Property Bid Procedures Motion contemplates similar procedures to those previously referenced with respect to the Bid Procedures Motion for the sale of the New Interests or the Debtors' Assets.

To facilitate this process, the Debtors will negotiate and sign the Las Vegas Property Purchase Agreement with the Stalking Horse, which provides that the Stalking Horse will pay $500,000 in Cash for the Las Vegas Property, subject to adjustments detailed in the Las Vegas Property Purchase Agreement and conditioned, among other things, on the closing of the transactions contemplated in the Stalking Horse SPA.

The Las Vegas Property Bid Procedures Motion contemplates that the Auction is currently set to commence on **December 18, 2013 at 9:00 a.m. (PST)** or such later time after the conclusion of the Auction for the Acquired Property. The Auction will take place at the law offices of Lewis Roca Rothgerber, 3993 Howard Hughes Parkway, Suite 600, Las Vegas,

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Nevada 89169.  As of the circulation of this Disclosure Statement, the Las Vegas Property Bid Procedures have not been approved by the Court.

### Section 4.10    Administrative Expense Claim Estimate

As of the Petition Date, the Debtors estimate that on the Effective Date, the total amount of Allowed Administrative Claims will be $1,150,000.00.  The Debtors further estimate that approximately $1,000,000.00 of the total amount of Allowed Administrative Claims will consist of Professional Fees, some of which have already been paid pursuant to an interim compensation procedures order entered by the Bankruptcy Court, and the remaining $150,000.00 will constitute principally Cure Costs for assumed and assigned executory contracts and unexpired leases, as well as potentially some other minor unpaid ordinary course administrative payables related to Debtors' business.

### Section 4.11   Preference Analysis and Other Potential Avoidance Actions

The Bankruptcy Code preserves the Debtors' rights to prosecute claims and causes of action that exist outside of bankruptcy, and also empowers the Debtors to prosecute certain claims that are established by the Bankruptcy Code, including but not limited to claims to avoid and recover preferential transfers and fraudulent conveyances.  Under the Plan, all of the Debtors' rights in respect of all Liquidating Trust Avoidance Actions are preserved and are transferred to the Liquidating Trustee.  As such, the Liquidating Trustee, as a representative of the Estates, will have the authority to investigate, prosecute, collect, and/or settle the Liquidating Trust Avoidance Actions in accordance with Bankruptcy Code § 1123(b)(3).  Although Debtors have disclosed in their Filed Statements of Financial Affairs (the "SoFA") any and all transfers to insiders within a year prior to the Petition Date, the estates have not undertaken any substantial analysis with respect to the value of any potential recovery on any Liquidation Trust Avoidance Actions.

As a matter of disclosure, Debtors advise that they made the following dividend payments to the B Members of Harbor within two years of the Petition Date:  (a) on March 15, 2012 in the amount of $330,920.22, and (b) on September 15, 2012 in the amount of $112,500.

Second, Debtors' SoFA also reflects that within a year prior to the Petition Date it made charitable contributions in the total amount of $92,028, including $75,000 to the Kentucky Horse Foundation in Lexington, Kentucky.

Third, Debtors' SoFA reflects various transfers to alleged insiders within one year of the Petition Date for various reasons, including bonuses, car allowances, payroll, legal indemnification, wires sent on or behalf of the company and reimbursed, personal use of a credit card for the company, and other matters.  The total sums transferred by WFI to various insiders within a year of the Petition Date include the following:  (a) David Cooper for $118,490.10; (b) Frederick and Katherine Cooper for $1,432,016.82; (c) Frederick Cooper for $415,056.90; (d) Global Track for $216,154.69; (e) James B. Hadden for $30,500; (f) Jay Barrett for $60,000; (g) Katherine Cooper for $363,067.88; (h) Mark Finston for $20,000; and (i) Taryn Cooper for $313,563.33.

As previously noted, Debtors have not undertaken any analysis as to the avoidability or potential avoidability of any of the foregoing transfers, as well as any defenses thereto.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OR AGAINST THE PLAN, HOLDERS OF CLAIMS AND INTERESTS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTORS WITHIN NINETY (90) DAYS BEFORE THE PETITION DATE) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES CAUSES OF ACTION, AND THAT THE PLAN AUTHORIZES THE LIQUIDATING TRUSTEE TO PROSECUTE ACTIONS INCLUDING LIQUIDATING TRUST AVOIDANCE ACTIONS.

**Section 4.12   Exclusivity**

The Debtors have the exclusive right to file a plan of reorganization in the Bankruptcy Cases until January 2, 2014, and the exclusive right to solicit acceptances until March 3, 2014. Although a possibility always exists that Confirmation of the Plan will not occur, at this time, the Debtors do not contemplate the need to extend these dates.

**ARTICLE V**
**SUMMARY OF THE DEBTORS' PLAN OF REORGANIZATION**

**Section 5.01   General Structure of the Plan**

The primary purpose of the Plan is to facilitate the restructuring of the Debtors pursuant to the Purchase and Sale Agreement. The Debtors have determined in the exercise of their business judgment that the effectuation of the Purchase and Sale Agreement is the best course of action given the Debtors' financial constraints. A reorganization strategy other than a sale is not possible given the position taken by various creditors of the Debtors, the lack of availability in the credit markets, and the Debtors' inability to sustain operations given their current cash balances. The Plan is structured to enable the Debtors to facilitate a flexible Transaction that is expressly subject to a process to solicit higher or better offers for the Debtors' Assets and New Interests. Additionally, the Plan contemplates the creation of a Liquidating Trust to liquidate certain Liquidating Trust Assets and distribute any remaining funds in accordance with the Plan. Under the Plan, Claims against the Debtors' Estates and Interests in the Debtors are classified, treated, entitled to vote as follows:

**Section 5.02   Classification of Claims and Interests**

All Claims and Interests, except for Administrative Claims and Priority Tax Claims, are placed in the Classes as set forth below. In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims of the kinds specified in Bankruptcy Code §§ 507(a)(1) and 507(a)(8) have not been classified.

The categories of Claims and Interests set forth in the Plan classify Claims and Interests for all purposes, including for purposes of voting, confirmation, and distribution pursuant to the Plan and Bankruptcy Code §§ 1122 and 1123(a)(1). A Claim or Interest shall be deemed classified in a particular Class only to the extent that it qualifies within the description of such Class, and shall be deemed classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. Notwithstanding anything to the contrary in the Plan, a Claim or Interest shall be deemed classified in a Class only to the extent that such Claim or Interest has not been paid, released, or otherwise settled

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

before the Effective Date.

In no event shall the Reorganized Debtors or the Stalking Horse be liable for the payment of any Claims or Interests pursuant to this Plan and the Bankruptcy Code.

Under the Plan, Claims and Interests are classified as follows:

| Class | Type of Allowed Claim or Interest | Treatment | Impairment | Entitled to Vote |
|---|---|---|---|---|
| -- | Administrative Claims | Paid in full in Cash on the Effective Date | Unclassified | No, not entitled to vote |
| -- | Priority Tax Claims | Paid in full in Cash on the Effective Date | Unclassified | No, not entitled to vote |
| A1, B1 and C1 | Priority Non-Tax Claims | Paid in full in Cash on the Effective Date | Unimpaired | No, deemed to accept this Plan |
| A2, B2 and C2 | Senior Secured Claims | See Section 4.02 of Plan | Impaired | Yes, entitled to vote |
| A3, B3 and C3 | Miscellaneous Secured Claims | Paid in full in Cash on the Effective Date | Unimpaired | No, deemed to accept this Plan |
| A4 | B Member Secured Claims | See Section 4.04 of Plan | Impaired | Yes, entitled to vote |
| A5, B4 and C4 | General Unsecured Claims | See Section 4.05 of Plan | Impaired | Yes, entitled to vote |
| A6, B5 and C5 | Intercompany Claims | Canceled | Impaired | No, deemed to reject this Plan |
| A7, B6 and C6 | Interests | Canceled | Impaired | No, deemed to reject this Plan |

**Section 5.03    Summary of Proposed Distributions Under the Plan**

(a)    <u>Administrative and Priority Tax Claims</u>

Certain Claims, including Administrative Expense Claims and Priority Tax Claims, are not classified under the Plan and are not entitled to vote on the Plan and are, therefore, treated as follows:

Each Holder of an Allowed Administrative Claim shall, in full satisfaction, release, settlement, and discharge of such Allowed Administrative Claim: (a) to the extent such claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date; (b) to the extent such claim is not due and owing on the Effective Date, be paid in full, in Cash, (i) in accordance with the terms of any agreement among the Liquidating Trustee, the Pre-Petition Agent and such Holder, or (ii) when such claim becomes due and payable under applicable non-bankruptcy law, or (iii) in the ordinary course of business; or (c) receive such other treatment as to which such Holder may agree with the Liquidating Trustee and the Pre-Petition Agent.  Cash payments of Allowed Administrative Claims shall be paid from the Claims Reserve, or if the Claims Reserve is insufficient to pay all Allowed Administrative Claims, any shortfall shall be paid from the Liquidating Trust.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Each Holder of an Allowed Priority Tax Claim shall, in full satisfaction, release, and discharge thereof, receive (i) such treatment as to which such Holder may agree with the Liquidating Trustee, and the Pre-Petition Agent or (ii) at the sole option of the Liquidating Trustee, (a) payment in full, in Cash, of such Allowed Priority Tax Claim on the Effective Date; or (b) treatment in accordance with Bankruptcy Code §§ 1129(a)(9)(C) or 1129(a)(9)(D), as the case may be, with the Liquidating Trustee's selection of (a) or (b) being subject to the prior written approval of Pre-Petition Agent.  Cash payments of Allowed Priority Tax Claims shall be paid from the Claims Reserve, or if the Claims Reserve is insufficient to pay all Allowed Priority Tax Claims, any shortfall shall be paid from the Liquidating Trust.

(b)    Priority Non-Tax Claims

Except to the extent that a Holder of an Allowed Priority Non-Tax Claim has agreed in writing with the Debtors (or the Liquidating Trustee) and the Pre-Petition Agent to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in this Cass shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Liquidating Trustee, (i) Cash equal to the amount of such Allowed Claims in accordance with Bankruptcy Code § 1129(a)(9), on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date such Claim becomes an Allowed Claim (or as soon as reasonably practicable thereafter); or (ii) such other treatment agreed to by the Debtors, Liquidating Trustee, and the Pre-Petition Agent required to render such Allowed Claims Unimpaired pursuant to Bankruptcy Code § 1124.  Cash payments of Allowed Claims in this Class shall be paid from the Claims Reserve, or if the Claims Reserve is insufficient to pay all Allowed Priority Non-Tax Claims, any shortfall shall be paid from the Liquidating Trust.

(c)    Senior Secured Claims

In partial and/or full satisfaction of the Allowed Senior Secured Claims, the Pre-Petition Agent shall receive:

(i)    on the Effective Date and as part of the Closing, from the Purchaser, all of the PSA Sale Proceeds;

(ii)    on the Effective Date, from the Debtors, contemporaneously with the payment from the Purchaser in clause (i) above, all Available Cash, if any (but only to the extent such Available Cash does not include the proceeds of any Liquidating Trust Avoidance Actions, Excluded Real Properties or Retained Claims); and

(iii)    as soon as reasonably practicable after the Effective Date, the Net Proceeds of the sale, collection or other monetization of all or each a portion of the Other Assets.

The Pre-Petition Agent shall disburse the funds received pursuant to this Section 4.02 in accordance with the Senior Credit Agreement.

In the event sufficient PSA Sale Proceeds exist to pay the Allowed Claim of the Senior Secured Lenders in full, the Senior Secured Lenders shall be entitled to amend their claim as necessary to allow recovery of all other amounts to which the Senior Secured Lenders would be

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

entitled under the Senior Lien Documents and applicable law, including without limitation section 506(b) of the Bankruptcy Code, which might not otherwise be set forth in their Allowed Claim, such as interest and legal fees. In the event that the Allowed Senior Secured Claim Distribution Amounts are greater than the Allowed Senior Secured Claims and the Senior Secured Claims are paid in full, then the Liquidating Trust shall distribute the excess amount in accordance with the order of priority provided in the Liquidating Trust Agreement.

To the extent that the amounts received by the Pre-Petition Agent as provided herein are less than the amount of the Allowed Senior Secured Claims, the shortfall shall be a "Senior Secured Deficiency Claim" and shall be treated as an Allowed General Unsecured Claim in Classes A5, B4, and C4 against the Debtors.

(d)    Miscellaneous Secured Claims

On or as soon as reasonably practicable after the latest to occur of (i) payment in full of the Allowed Senior Secured Claims in full in Cash, (ii) the Effective Date, or (iii) the date on which each such Miscellaneous Secured Claim becomes an Allowed Claim, each Holder of such an Allowed Claim, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Miscellaneous Secured Claim, at the election of the Liquidating Trustee (with the prior written consent of Pre-Petition Agent), (a) such treatment in accordance with Bankruptcy Code § 1124 as may be determined by the Bankruptcy Court; (b) payment in full, in Cash, of such Allowed Class A3, B3, and C3 Claim; (c) satisfaction of any such Allowed Class A3, B3, and C3 Claim by delivering the Collateral securing any such Claims (if such Collateral is an Other Asset and not previously sold or otherwise transferred other than to the Liquidating Trust) and paying any interest fees, costs and/or expense required to be paid under Bankruptcy Code § 506(b); or (d) providing such Holder with such treatment in accordance with Bankruptcy Code § 1129(b) as may be determined by the Bankruptcy Court. Following (and only following) payment of the Allowed Senior Secured Claims in full in cash, cash payments of Allowed Claims in Classes A3, B3, and C3 shall be paid from the Claims Reserve, or if the Claims Reserve is insufficient to pay all Allowed Miscellaneous Secured Claims, any shortage shall be paid from the Liquidating Trust.

(e)    B Member Secured Claims

On or as soon as reasonably practicable after the latest to occur of (i) the Effective Date or (ii) the date on which each such B Member Secured Claim becomes an Allowed Claim, each Holder of such an Allowed Claim, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Class A4 Claim, at the election of the Liquidating Trustee (with the prior written consent of Pre-Petition Agent), (a) such treatment in accordance with Bankruptcy Code § 1124 as may be determined by the Bankruptcy Court; (b) payment in full, in Cash, of such Allowed Class A4 Claim; (c) satisfaction of any such Allowed Class A4 Claim by delivering the Collateral securing any such Claims (if such Collateral is an Other Asset and not previously sold or otherwise transferred other than to the Liquidating Trust) and paying any interest fees, costs and/or expense required to be paid under Bankruptcy Code § 506(b); or (d) providing such Holder with such treatment in accordance with Bankruptcy Code § 1129(b) as may be determined by the Bankruptcy Court. Following (and only following) payment of the Allowed Senior Secured Claims in full in cash, cash payments of Allowed Claims in Class A4 shall be paid from the Claims Reserve, or if the

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Claims Reserve is insufficient to pay all Allowed Miscellaneous Secured Claims, any shortage shall be paid from the Liquidating Trust.

(f)    General Unsecured Claims

Each Holder of an Allowed General Unsecured Claim shall receive from the Liquidating Trust on or as soon as reasonably practicable after the Effective Date, their Pro Rata share of the sum of the aggregate proceeds of any Liquidating Trust Avoidance Actions, and the proceeds of any sales of Excluded Real Properties, less any amounts required to satisfy the Allowed Plan Carve Out Claims as provided in this Plan.

(g)    Intercompany Claims and Interests

On the Effective Date, all of the Intercompany Claims and Interests as of the Effective Date shall be eliminated, extinguished, cancelled, and discharged.  Pursuant to Bankruptcy Code § 1129(b)(2)(C), Holders of Intercompany Claims and Interests shall not be entitled to, nor shall they receive, any distribution or retain any property or interest in property on account of such Intercompany Claims or Interests.

**ARTICLE VI**
**INFORMATION REGARDING THE STALKING HORSE**

**Section 6.01   The Stalking Horse SPA**

Set forth below is a summary of the material terms of the Stalking Horse SPA.  The description of the Stalking Horse SPA herein is intended as a summary and is qualified in its entirety by reference to the Stalking Horse SPA, a copy of which is attached hereto as **Exhibit C** and incorporated by reference herein.

| Purchase Price | The Purchase Price for the New Shares shall be an amount equal to (i) 70% of the Net Finance Receivables as of the date immediately prior to the Closing Date plus (ii) the aggregate amount of pre-petition or post-petition costs and expenses that are due and payable as of the Closing and that are required under the Confirmation Order to be paid as Cure Costs pursuant to Bankruptcy Code § 365 to cure any and all monetary defaults as of the Closing under any and all Assumed Contracts up to a maximum of $200,000; provided that the Purchase Price shall be reduced by the aggregate amount of Cure Costs up to and including $100,000. |
|---|---|
| Closing | The Closing of the purchase and sale of the New WFI Shares and New Global Track Shares shall take place on the date that is two Business Days following the satisfaction or waiver by the requisite Parties of various enumerated conditions, including that all right, title and interest of each Debtor in, to or under all of the Debtor Assets (excluding certain enumerate assets) shall vest in the Reorganized Debtors, free and clear of all Claims and Liens other than Permitted Post-Closing Liens; and each Reorganized Debtor, Buyer and its Subsidiaries and their respective Representatives shall be fully released and discharged with respect to any and all Claims and Liens relating to or arising under any such Debtor Assets, other than |

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

**LARSON & ZIRZOW, LLC**
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

| | |
|---|---|
| | Permitted Post-Closing Liens. |
| Good Faith Deposit | No later than one (1) Business Day after the provision of the Disclosure Schedules, Buyer shall deposit with Escrow Agent in cash $2,400,000.00, which Deposit shall be held and released by the Escrow Agent in accordance with the provisions of the Escrow Agreement, among other matters. |
| Representations and Warranties of Seller | Each of WFI and Global Track, jointly and severally, represents and warrants to Buyer, as of the date thereof and as of the Closing Date, that: (1) it has the requisite corporate existence, power and authorization to enter into and consummate the Transactions contemplated, subject to approval of the Bankruptcy Court; (2) the execution, delivery and performance of the Transactions contemplated will not require any governmental authorization other than as specified; (3) subject to various items, the entry into the transactions will not contravene or otherwise cause any conflict with any Organizational Document, orders of the Bankruptcy Court, Contracts or Permits affecting or relating to Debtors, among other matters; (4) matters concerning Debtors' capitalization, subsidiaries, financial statements, undisclosed liabilities, contracts, litigation, compliance with other laws, real property, financing programs, insurance coverage, licenses and permits, employees, employee benefit matters, environmental matters, taxes, intellectual property, books and records, contracts involving Harbor, finders' fees, disclosures and schedules. |
| Representations and Warranties of Buyers | Buyer represents and warrants to Debtors, as of the date hereof and as of the Closing Date, that: (1) it has the requisite corporate existence, power and authorization to enter into and consummate the Transactions contemplated; (2) the execution, delivery and performance of the Transactions contemplated will not require any governmental authorization other than as specified; (3) subject to various items, the entry into the transactions will not contravene or otherwise cause any conflict with any Organizational Document, orders of the Bankruptcy Court, Contracts or Permits affecting or relating to Debtors, among other matters; (4) matters concerning Buyer's litigation and whether any matters are pending or threatened that may affect its ability to close and consummate the transactions; matters concerning Buyer's financing, including that if Buyer entered into the Exit Financing Facility it will have sufficient cash or credit to perform all of its obligations; and that there are no finders' fees, or related items owing other than with respect to William Blair, and for which Debtors shall not be responsible. |
| Covenants of Debtors | From the date of the agreement through the closing, various covenants regarding the conduct of the business, additional financial information, assumption and rejection of various executory contracts and unexpired leases, access to information, updating of the Schedules attached to the agreement, delivery of a statement regarding the Net Finance Receivables being purchased immediately prior to the Closing, and the use of |

| | commercially reasonable efforts and other further assurances. |
|---|---|
| Conditions to Obligations of Buyers and Debtors to Closing | The obligations of each Party to consummate the Closing are subject to the satisfaction (or waiver by each Party) of numerous conditions at or prior to the Closing, including but not limited to the following: (a) consummation of the Transactions shall not have been restrained, enjoined or otherwise prohibited or made illegal by any Applicable Law; (b) all of the conditions to the effectiveness of the Plan shall have been satisfied such that the Plan shall have become effective or shall become effective simultaneously with the Closing; (c) no Proceeding instituted by any Governmental Authority shall be pending and no Order of any Governmental Authority, which seeks to or does, as applicable, restrain, enjoin or otherwise prohibit the consummation of the Plan or the Transactions or which would cause the Transactions to be rescinded following the Closing. |
| Conditions to Obligations of Debtors to Close | The obligation of each Debtor to consummate the Closing is subject to the satisfaction (or waiver by such Debtor) of the following further conditions, among other matters: (i) Buyer shall have performed in all material respects all of its covenants and other obligations under the agreement required to be performed by it on or prior to Closing and (ii) the representations and warranties of Buyer set forth in this Agreement or any other Transaction Document shall be true and correct in all material respects. |

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

| Conditions to Obligation of Buyer to Close | The obligation of Buyer to consummate the Closing is subject to the satisfaction (or waiver by Buyer) of numerous further conditions, including but not limited to: (a) (i) each Debtor shall have performed in all material respects all of its covenants and other obligations under the Agreement and each of the other Transaction Agreements required to be performed by it on or prior to Closing and (ii) the representations and warranties of each Debtor or any other Transaction Document shall be true and correct in all material respects; (b) the Bid Procedures Order, the Expense Reimbursement Order, the Disclosure Statement Order and the Confirmation Order shall have been entered by the Bankruptcy Court, each such order shall be in form and substance acceptable to Buyer and each such order shall be a Final Order and in full force and effect; (c) certain enumerated Licensing Approvals shall have been received; (d) all actions by or in respect of or filings with any Governmental Authority required to permit the consummation of the Transactions shall have been taken, made or obtained; (e) the Liquidating Trustee shall have executed and delivered the Liquidating Trust Agreement, and the Liquidating Trust Agreement shall be in full force and effect; (f) the aggregate amount of Cure Costs shall not exceed $200,000; (g) WFI shall have purchased new Retail Contracts in an amount not less than the permitted amount set forth in, and consistent with, the Budget, from the date of interim Bankruptcy Court approval of the Budget through Closing; (h) as of the Closing, all Assumed Contracts shall have been assumed by the Debtors, and all other Contracts of the Debtors shall have been rejected by the Debtors or assigned to the Liquidating Trust; (i) Reorganized Debtors shall have, pursuant to the Plan, entered into an exit financing facility with a lender designated by Buyer (which facility shall have been sourced and negotiated by Buyer) on terms and conditions satisfactory to Buyer for a principal amount equal to at least the Purchase Price; (j) all Debtor Assets (other than the Excluded Assets and the Trust Assets) shall be free and clear of any Liens and Claims (other than Permitted Post-Closing Liens), including the termination of any and all security interests granted against any such assets and (ii) Buyer shall have received evidence thereof in form and substance satisfactory to it; (k) Buyer shall have conducted such due diligence on the Debtors and the WFI Subsidiary (including in respect of their respective assets and Liabilities) within the scope set forth in Schedule A of their letter of intent, as it shall deem appropriate and Buyer shall be satisfied with the results of such diligence in its sole discretion; and (l) the Las Vegas Property Auction shall have occurred promptly after any auction relating to an Alternative Transaction or that includes a sale of the Retail Contracts, and at least five days prior to the Confirmation Hearing. |
|---|---|

| Termination | The Agreement may be terminated at any time prior to the Closing for the following, among other reasons: (a) by mutual written agreement of WFI, Global Track and Buyer; (b) by any of WFI, Global Track or Buyer if the Closing and the effective date of the Plan shall not have occurred by January 4, 2014 (subject to extension to January 8, 2014 upon agreement of certain enumerated matters between Buyer and the Senior Secured Lender); and (c) by any of WFI, Global Track or Buyer if there shall be any Applicable Law that makes consummation of the Transactions illegal or otherwise prohibited or if consummation of the Transactions would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction. |
| --- | --- |
| | The Agreement may be terminated by Buyer, among other reasons, if:  (a) the Expense Reimbursement Order, in form and substance reasonably acceptable to Buyer, shall not have been entered on or before November 13, 2013; (b) the Bid Procedures Order, in form and substance reasonably acceptable to Buyer, shall not have been entered on or before November 27, 2013; (c) the Disclosure Statement shall not have been approved by the Bankruptcy Court on or before November 27, 2013; (d) the Debtors shall not have filed a motion to determine Cure Costs for Assumed Contracts on or before November 27, 2013; (e) the Confirmation Order shall not have been approved by the Bankruptcy Court on or before December 23, 2013; (f) the Bankruptcy Court shall have approved any Alternative Transaction, or either WFI or Global Track have entered into any definitive agreement with respect to any Alternative Transaction which agreement has been approved by the Bankruptcy Court; (g) WFI or Global Track shall have breached any of its respective representations and warranties, or shall have failed to perform or comply with any of its respective covenants and agreements, contained in this Agreement or any Transaction Document, such that the relevant condition shall not be satisfied, (subject to certain enumerated cure rights of the Debtors); (h) if the Debtors shall not have filed the motion seeking Bankruptcy Court approval of the Las Vegas Property Bid Procedures Order on or before November 20, 2013. |
| | The Agreement may be terminated by WFI or Global Track if:  (a) the Bankruptcy Court shall have approved any Alternative Transaction, or WFI or Global Track shall have entered into any definitive agreement with respect to any Alternative Transaction which agreement has been approved by the Bankruptcy Court; (b) Buyer shall have breached any of their respective representations or warranties or failed to perform or comply with any of their respective covenants or agreements contained in the Agreement such that the relevant condition shall not be satisfied; (c) any condition shall have become incapable of being satisfied by the Outside Date; or (d) Buyer shall not have deposited the Deposit with the Escrow Agent within two (2) Business Day after the date the Disclosure schedules are finalized. |

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Capitalized terms used but not defined in this Section 6.01 and defined in the Stalking Horse SPA have the meaning given them in the Stalking Horse SPA.

Importantly, the Purchase Price is proposed as a percentage of the net finance receivables in WFI's loan portfolio because, as previously noted, the amount of financed receivables in the portfolio has been on a continuing decline over the last few months--both before the Petition Date and during the pendency of the Bankruptcy Cases themselves--because new accounts are not permitted to be purchased at the same rate as old accounts are running off from the portfolio, whether through being satisfied or otherwise ineligible.  Moreover, given that the Stalking Horse has to make an offer to purchase the portfolio several months or more in advance of the purchase being approved by the Bankruptcy Court and closing, it is impossible to know exactly how much in net financed receivables will remain as of the anticipated closing in early January 2014, and thus an exact final number is not known.

Debtors project that after the first week of January 2014, which is the projected closing, the following approximate borrowing based on its existing loan with the Senior Secured Lender:

| | |
|---|---|
| Beginning Line of Credit Balance | $27.8 million |
| Payment per Cash Collateral Stipulation | $1.0 million |
| Ending Line of Credit | $26.8 million |
| Cumulative Cash Balance | $1.8 million |
| Line of Credit Less Cash Balance | $25 million |
| | |
| Gross Finance Receivables Ending Balance | $36.1 million |
| Total Ineligibles[3] | $7.3 million |
| Eligible Finance Receivables | $28.7 million |
| Advance Rate (subject to modifier) | 78.30% |
| Net Eligible Receivables | $22.5 million |
| Principal Portfolio Balance (Gross Receivables – Unearned Finance Charges) | $34.5 million |

The existing line balance to the Senior Secured Lender hereinabove is exclusive of various fees, costs and expenses that may be owing under the Senior Lien Documents and also prior to factoring in the effects of the anticipated $500,000 immediate paydown pursuant to the Cash Collateral Amendment, and the application of proceeds on the sale of the Ineligible Accounts as previously discussed.

The Stalking Horse SPA, however, only contemplates a purchase of the performing accounts in WFI's portfolio, not the Ineligible Accounts, and specifically, a Purchase Price equal to 70% of the net financed receivables (as defined therein).  As such, taking the roughly $34.5 million principal portfolio balance results in an approximate Purchase Price under the Stalking Horse SPA of $24.15 million.  For the avoidance of doubt, the foregoing is a projected estimate only, and is subject to change based on the actual status of the portfolio.

---

[3] Includes $1.6 million in projected unearned interest finance charges, a loan level discount of a projected $.1 million, dealer reserves of roughly $4 million, and an approximate $1.6 million in other ineligible accounts.

Finally, it is noteworthy that the Stalking Horse SPA also contemplates the assumption of a substantial number of executory contracts between WFI and the individual dealers in its dealer network throughout the United States. Although a buyer may decide to elect not to assume the same number or indeed any such dealer agreements, a buyer's decision not to assume dealer agreements in a similar fashion will likely leave the Estates with no choice but to reject such agreements, thus potentially resulting in millions of dollars in additional general unsecured claims for rejection damages against the Estates related to unpaid dealer reserves, and thus significantly diluting any net recovery that may otherwise be available for existing unsecured creditors. For example, as of the projected closing of the Stalking Horse SPA, Debtors project that they will owe roughly $4 million in dealer reserves. Although such claims are subject to the terms and conditions of the various dealer agreements, including any right of setoff and other contractual remedies the Debtors may have against the dealers arising therefrom, there is a significant possibility of substantial additional general unsecured claims arising if the dealer agreements are not assumed by a proposed purchaser.

**ARTICLE VII**
**PLAN EXECUTION AND IMPLEMENTATION**

**Section 7.01    Sale of the Acquired Property**

The Plan contemplates the sale of the Acquired Property to a third party. The Acquired Property generally includes, but is not limited to, the stock of WFI, and thus also its main, performing loan portfolio. To effect this, the Debtors Filed the Bid Procedures and Sale Motion which seeks, *inter alia*, to approve the Stalking Horse SPA and to establish the Auction. On November 26, 2013, the Bankruptcy Court entered the Bid Procedures Order, which established December 16, 2013 at 5:00 p.m. (PST) as the deadline for Potential Bidders to submit bids for the Acquired Property, and established December 18, 2013 at 9:00 a.m. (PST) as the date for the Auction. In connection with the Auction, the Debtors have identified the Stalking Horse as a potential purchaser for the New Interests. If no timely Qualifying Bid (as defined in the Bid Procedures) (other than the Stalking Horse bid) is received by the Bid Deadline (as defined in the Bid Procedures), the Debtors shall not hold an Auction and instead shall request at the Sale Hearing that the Bankruptcy Court approve the Stalking Horse SPA as the Purchase and Sale Agreement and declare the Stalking Horse to be the Successful Bidder/Bid. If additional Qualified Bidders are identified, at the conclusion of the Auction, the Debtors, with the consent of the Pre-Petition Agent, will seek Bankruptcy Court approval to sell the Acquired Property pursuant to the Purchase and Sale Agreement to the Successful Bidder, Free and Clear. The Sale Order and/or the Confirmation Order shall contain specific authority for the Debtors to comply with the Purchase and Sale Agreement as set forth above.

**Section 7.02    Sale of the Ineligible Accounts**

The non-performing accounts in Debtors' portfolio include various accounts that are ineligible and thus excluded from the borrowing base calculation under its existing credit facility, and also which are thus excluded from and not sold pursuant to the Stalking Horse SPA. These accounts generally include the following: (a) finance receivables charged-off the balance sheet as uncollectible; (b) finance receivables where the obligor has filed for bankruptcy; and (c) finance receivables over 90 days past due (collectively, the "Ineligible Accounts"). Specifically, the chargeoff accounts have a balance of approximately $14.2 million presently,

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

and Debtors believe they can obtain 3-5% net recovery for such accounts if sold to an appropriate buyer, and thus approximately $400,000 to $700,000 for those accounts. The bankruptcy accounts have a balance of $110,000 presently, and Debtors believe they can obtain 30-45% net recovery on those accounts, and thus approximately $33,000 to $49,500 for those accounts. Finally, the delinquent receivables have a balance of $1.2 million, and Debtors believe they can obtain 30-35% net recovery on those accounts, and thus approximately $400,000.

Debtors have solicited offers from various parties for the sale of the Ineligible Accounts. Given the significant differences and likely recoveries on the Ineligible Accounts as compared with the generally performing accounts that are part of the Acquired Property, there are different types of buyers for the sale of each type of account, and indeed, different buyers among the various types of Ineligible Accounts as well. Given the existing Stalking Horse SPA, to the extent a buyer would want to make an offer for the Acquired Property and one or more of the Ineligible Accounts, such buyer would need to allocate its bid in order to allow for a true comparison of its purchase price as compared with any other offers for the accounts, whether under the Stalking Horse SPA or offers for the Ineligible Accounts. Moreover, the sale of the Ineligible Accounts will be conducted at a different time and apart from the Auction of the Acquired Property under the Stalking Horse SPA, and the proposed sale of the Las Vegas Property.

Debtors intend to file a series of motions in early December 2013 requesting court approval to sell the Ineligible Accounts, subject to overbid, with such sales being separate and apart from the sale of its main, performing portfolio proposed to be sold pursuant to the Purchase and Sale Agreement. Given that the Ineligible Accounts can change in value significantly and in a short time, and given further that offers from prospective buyers often must be accepted quickly, otherwise the underlying economics of the offer may change, Debtors intend on seeking such approvals quickly, and subject to the consent of the Senior Secured Lender and in consultation with the Committee.

**Section 7.03    Means for Implementation**

(a)    <u>Application of PSA Sale Proceeds and Available Cash</u>

(i)    *Claims Reserve Funding*. Contemporaneously with the Closing, the Effective Date and the delivery of the PSA Sale Proceeds to the Pre-Petition Agent described below in an amount sufficient to pay the Allowed Senior Secured Claims in full in Cash, the Debtors will transfer from their Available Cash an amount sufficient to fund the Claims Reserve for the benefit of the Holders of Allowed Plan Carve Out Claims (and, to the extent of any surplus from such Claims Reserve after the payment of such Allowed Claims, for the benefit of the Holders of Senior Secured Claims) to the Liquidating Trust.

(ii)    *Liquidating Trust Funding*. If there is additional Available Cash after the Claims Reserve has been funded and the Allowed Senior Secured Claims have been paid in full in cash, then the Debtors will transfer any remaining Available Cash to the Liquidating Trust to be distributed per the order of priority in the Liquidating Trust Agreement.

(iii)    *Payment of Allowed Senior Secured Claim*. Contemporaneously with and

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

as part of the Closing and the Effective Date, the Purchaser shall transfer to the Pre-Petition Agent all of the PSA Sale Proceeds (including the release of any deposit paid pursuant to the Purchase and Sale Agreement or Bid Procedures) and any subsequent adjustments or payments received from the Purchaser pursuant to the Purchase and Sale Agreement or the Sale Order.  In the event that the Allowed Senior Secured Claims are paid in full, excess amounts of the PSA Sale Proceeds shall be transferred to the Liquidation Trust to be distributed per the order of priority in the Liquidating Trust Agreement.

(b)     Other Assets. Any Other Assets and except as otherwise provided in the Purchase and Sale Agreement or in any purchase and sale agreement for the Excluded Real Properties, shall be transferred to the Liquidating Trust for the benefit of the Allowed Senior Secured Claims.  Except as otherwise provided in the Purchase and Sale Agreement, any assets received by the Liquidating Trust after the Effective Date of the Plan (other than the proceeds of the Liquidating Trust Avoidance Actions and Excluded Real Properties) shall also be Other Assets and transferred to the Liquidating Trust for the benefit of the Allowed Senior Secured Claims.

(c)     Avoidance Actions. All Liquidating Trust Avoidance Actions are transferred to the Liquidating Trust to be distributed per the order of priority in the Liquidating Trust Agreement.

(d)     Deemed Consolidation of Debtors for Plan Purposes Only. Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan solely for the limited purposes of distribution under the Plan.

(e)     Creation of Liquidating Trust. As set forth in Article VII of the Plan, a Liquidating Trust will be created with certain Liquidating Trust Assets and for the distribution and delivery of said assets in accordance with the terms of the Plan.

(f)     Governance Documents. On the Effective Date, the Governance Documents of Debtors shall be amended and restated in substantially the form set forth in the Plan Supplement.

(g)     Directors and Officers. On the Effective Date, (a) the positions of the current directors, or in the case of a governing body created by a partnership agreement, limited liability company agreement or similar agreement, the members of such governing body (such persons and the corporate directors collectively, the "Governors") of each Debtor shall be eliminated, and each Governor shall be terminated (without the necessity of further action); (b) to the fullest extent permitted by applicable law, the rights, powers, and duties of the Governors of each Debtor (that is not a Debtor whose Interests have been sold to the Purchaser pursuant to the Sale Order and/or the Confirmation Order) that has a Governor shall vest in the Liquidating Trustee and the Liquidating Trustee or its designee shall be the presiding officer and the sole Governor of each such Reorganized Debtor; and (c) to the fullest extent permitted by applicable law, the Governors of each Debtor whose Interests have been sold to the Purchaser pursuant to the Sale Order and/or the Confirmation Order shall be selected by the Purchaser.  The Liquidating Trustee shall make all determinations with respect to employment of any other directors, officers, managers and employees of each such Debtor described in clause (b) on and after the Effective Date.

(h)     Cancellation of Existing Secured Claims. Except as otherwise provided herein

46

and in accordance with the Purchase and Sale Agreement, upon the Effective Date, any Lien encumbering the Acquired Property shall be deemed released and the Holder of such Allowed Secured Claim shall deliver to the applicable Debtor (or Reorganized Debtor) any Collateral or other property of any Debtor (or Reorganized Debtor) held by such Holder, and any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Allowed Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*.

(i)    Vesting of the Vested Assets. Except as otherwise set forth in the Plan, the Sale Orders, and/or the Confirmation Order, on the Effective Date, (a) the Vested Assets shall vest in the applicable Reorganized Debtors Free and Clear; and (b) the assumed contracts shall be assumed by the applicable Debtors as provided in Article X of the Plan and vest in the applicable Reorganized Debtor(s).  Except as otherwise set forth in the Plan or the Purchase and Sale Agreement from and after the Effective Date, the Reorganized Debtors shall perform and pay when due liabilities under, or related to the ownership or operation of, the Vested Assets and the Liquidating Trust shall not be responsible for any such liabilities.  The Reorganized Debtors may operate free of any restrictions of the Bankruptcy Code.

(j)    Cancellation of Interests. On the Effective Date, all Interests in the Debtors (including those Interests held in Treasury by any of the Debtors) shall be terminated and extinguished and the certificates that previously evidenced ownership of those interests shall be deemed canceled (all without further action by any person or the Bankruptcy Court) and shall be null and void and such certificates shall evidence no rights or interests in any of the Debtors.

(k)    Issuance of New Interests/New WFIN Stock. On the Effective Date, after the Interests are cancelled, Reorganized Global Track shall issue the New Global Track Stock to Purchaser and Reorganized WFI shall issue the New WFI Stock to the Purchaser in accordance with the Purchase and Sale Agreement, and in each case such shares shall be Free and Clear. The New WFI Stock shall constitute one hundred percent of the authorized and issued equity interest in the Reorganized WFI.  The New Global Track Shares shall constitute one hundred percent of the limited liability company interests in Reorganized Global Track.  On the Effective Date there shall not be issued, reserved for issuance or outstanding any (i) shares of capital stock or other voting or other securities of, or ownership interests in, any Reorganized Debtor, other than the New Interests issued to Purchaser at the Closing, (ii) securities of any Reorganized Debtor convertible into or exchangeable for shares of capital stock or other voting or other securities of, or ownership interests in, any Reorganized Debtor, (iii) warrants, calls, options or other rights to acquire from any Reorganized Debtor, or other obligation of any Reorganized Debtor to issue, any capital stock, voting or other securities or ownership interests, or securities convertible into or exchangeable for capital stock or voting or other securities of, or ownership interests in, any Reorganized Debtor or (iv) restricted shares, stock appreciation rights, performance units, contingent value rights, "phantom" stock or similar securities or rights that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any capital stock of or voting or other securities of, or ownership interests in, any Reorganized Debtor.

On the Effective Date, after the Interests are cancelled, Dissolved WFIN shall issues new shares in Dissolved WFIN  pursuant to section 1145 of the Bankruptcy Code to the Liquidating Trust and such shares shall be Free and Clear provided that the termination of Interests in

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Dissolved WFIN; the issuance of the shares are each intended to qualify as a "reorganization" under Section 368(a)(1)(E) of the Internal Revenue Code; *provided*, *further*, that the termination of Interests are each intended to qualify as a "contribution" under Section 721 of the Internal Revenue Code.

(l)    Exemption from Registration. The New Interests and New WFIN Stock shall be exempt from registration under any federal (including the Securities Act), state or local law, rule or regulation pursuant to Bankruptcy Code § 1145 or other applicable law requiring registration before the offering, issuance, distribution or sale of securities; provided that if the issuance of the New Interests or New WFIN Stock, as applicable, does not qualify for an exemption under Bankruptcy Code § 1145, the New Interests and New WFIN Stock, as applicable, shall be issued in a manner, which qualifies for any other available exemption from registration, whether as a private placement under Rule 506 of the Securities Act, Section 4(2) of the Securities Act, and/or the safe harbor provisions promulgated thereunder.  In connection with the confirmation of the Plan, the Debtors intend to seek an order from the Bankruptcy Court to the effect that the issuance of the New Interests and New WFIN Stock is exempt from registration under the Securities Act and any applicable laws.

(m)    Authorization for Transactions. On the Effective Date or as soon as reasonably practicable thereafter, the Debtors, and the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan or the Transactions.

(n)    Preservation of Rights of Action; Settlement. Except to the extent such rights, Claims, Causes of Action, defenses, and counterclaims are otherwise disposed of in the Plan, the Purchase and Sale Agreement, the Las Vegas Property Purchase Agreement, or are expressly and specifically released in connection with the Plan, the Las Vegas Property Sale Order, the Sale Order and/or Confirmation Order, or in any settlement agreement approved during the Bankruptcy Cases, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code § 1123(b): (1) any and all rights, Claims, Causes of Action (including Liquidating Trust Avoidance Actions, but excluding Retained Claims), defenses, and counterclaims of or accruing to the Debtors or their Estates shall be transferred to the Liquidating Trust, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, Claims, Causes of Action, defenses and counterclaims have been Scheduled, listed or referred to in the Plan, the Bankruptcy Schedules, or any other document Filed with the Bankruptcy Court; and (2) the Liquidating Trust does not waive, relinquish, or abandon (nor shall it be estopped or otherwise precluded from asserting) any right, Claim, Cause of Action, defense, or counterclaim that constitutes property of the Estates or alter the Liquidating Trust's right to commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, or counterclaims that a Debtor has, or may have, as of the Effective Date.  The Liquidating Trust may, subject to the Plan and the Liquidating Trust Agreement, commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, and counterclaims in its sole discretion, in accordance with what is in the best interests, and for the benefit, of the beneficiaries of the various assets in the Liquidating Trust.

(o)    Treatment of Executory Contracts and Unexpired Leases. Pursuant to the Purchase and Sale Agreement and as contemplated by the Bid Procedures and Sale Motion, the

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

48

Debtors will provide notice to certain counterparties to executory contracts and unexpired leases advising them that their respective executory contracts and unexpired leases may be assumed and, if applicable, assigned. In accordance with the Bid Procedures, as part of the Plan Supplement, the Debtors will File a list of the Desired 365 Contracts along with the proposed Cure Costs. Any party taking exception to the proposed Cure Costs shall, in accordance with the Bid Procedures Order, File a detailed statement setting forth its reason and the Bankruptcy Court shall determine the proper amount of the Cure Costs at the Combined Hearing. The fixing of the Cure Costs shall constitute the Debtors' right to assign the Desired 365 Contract lease to the Purchaser under Bankruptcy Code §§ 365(c) and (f).

(p)    Retention of Jurisdiction. Under the Plan, notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date of the Plan, the Bankruptcy Court shall retain jurisdiction, to the fullest extent legally permitted, over the Bankruptcy Case, all proceedings arising under, arising in or related to the Bankruptcy Case, the Confirmation Order, the Plan and administration of the Liquidating Trust. Some specific types of disputes and proceedings that the Bankruptcy Court shall retain jurisdiction over are identified in Article XIV of this Disclosure Statement.

(q)    Liquidating Trustee Closing of the Bankruptcy Cases. When (a) the Bankruptcy Court has adjudicated all applications by professionals for final allowances of compensation for services and reimbursement of expenses and the issuance of a Final Order for each application and the payment of all amounts payable thereunder; (b) all Disputed Claims filed against a Debtor have become Allowed Claims or have been Disallowed by Final Order or otherwise pursuant to this Plan, and all appropriate Plan Distributions have been made pursuant to the Plan, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close such Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE VIII
## LIQUIDATING TRUST AND LIQUIDATING TRUSTEE

### Section 8.01    Creation of the Liquidating Trust

The Liquidating Trust, duly organized under the laws of Nevada, is created for the purpose of liquidating the Liquidating Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d) and shall be governed by the Liquidating Trust Agreement. The Liquidating Trust Agreement shall conform to the terms of the Plan, and to the extent that the Liquidating Trust Agreement is inconsistent with the Plan, the terms of the Plan shall govern. The Liquidating Trustee will file all federal income tax returns for the Liquidating Trust as a grantor trust pursuant to Section 671 of the Internal Revenue Code of 1986 and the Treasury Regulations promulgated thereunder.

### Section 8.02    Funding of *Res* of Trust

On the Effective Date, all of the Liquidating Trust Assets shall be transferred and assigned to the Liquidating Trust, and the Liquidating Trust shall be in possession of, and have title to, all the Liquidating Trust Assets. The conveyances of all Liquidating Trust Assets shall be accomplished pursuant to the Plan, the Sale Orders, and/or the Confirmation Order. The Debtors shall convey, transfer, assign and deliver the Liquidating Trust Assets Free and Clear, except that the Liens of the Senior Secured Lender shall attach to the Liquidating Trust Assets

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

other than the Liquidating Trust Avoidance Actions and the Excluded Real Properties. For all federal income tax purposes, all Persons (including, without limitation, the Debtors, the Liquidating Trustee, and the beneficiaries of the Liquidating Trust) will treat the transfer and assignment of the Liquidating Trust Assets to the Liquidating Trust for the benefit of the beneficiaries of the Liquidating Trust as (a) a transfer of the Liquidating Trust Assets directly to the beneficiaries of the Liquidating Trust followed by (b) the transfer by the beneficiaries of the Liquidating Trust to the Liquidating Trust of the Liquidating Trust Assets. The Liquidating Trust will be treated as a grantor trust for federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The beneficiaries of the Liquidating Trust will be treated as the grantors and owners of their Pro Rata portion of the Liquidating Trust Assets for federal income tax purposes.

### Section 8.03    The Liquidating Trustee

The Liquidating Trustee shall be appointed by mutual consent of the Debtors, the Committee and Pre- Petition Agent. The Liquidating Trustee shall retain and have all the rights, powers and duties necessary to carry out his or her responsibilities under the Plan and the Liquidating Trust Agreement, and as otherwise provided in the Sale Orders and/or the Confirmation Order. However, the Liquidating Trustee shall not be obligated to review, investigate, evaluate, analyze, or object to Fee Applications or Professional Fee Claims relating to services rendered and expenses incurred before the Effective Date. The Plan Supplement shall designate the Person who will initially serve as the Liquidating Trustee.

### Section 8.04    Retention of Professionals

The Liquidating Trustee shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Liquidating Trustee, are necessary to assist the Liquidating Trustee in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Liquidating Trust upon the monthly submission of statements to the Liquidating Trustee. The payment of the reasonable fees and expenses of the Liquidating Trustee's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court except as otherwise provided in the Plan. Professionals of, among others, the Debtors and the Committee, shall be eligible for retention by the Liquidating Trustee on a special counsel basis, and former employees of the Debtors shall be eligible for retention by the Liquidating Trust and Liquidating Trustee.

The reasonable fees and expenses incurred in connection with services performed by the Liquidating Trust relating to the administration and/or liquidation of General Unsecured Claims and/or Liquidating Trust Avoidance Actions shall be paid by the Liquidating Trust solely from amounts otherwise distributable to Holders of Allowed General Unsecured Claims. Before each payment of the Liquidating Trustee's fees, fees and expenses of the Liquidating Trustee's retained professionals and other costs, expenses and liabilities of the Liquidating Trust, the Liquidating Trustee shall provide written notice thereof to the Pre-Petition Agent in such detail and with such support as the Pre-Petition Agent may reasonably request. If the Pre-Petition Agent do not object to the payment of such amounts within five (5) Business Days after receipt of such notice, the Liquidating Trustee may make such payments. If any Pre- Petition Agents objects and the objecting Pre-Petition Agent(s) and the Liquidating Trustee cannot agree on the

appropriate amount of such payment, then the Liquidating Trustee may not make such payment unless he or she obtains an order from the Bankruptcy Court approving such payment.

**Section 8.05    Compensation of the Liquidating Trustee**

The Liquidating Trustee's compensation, on a post-Effective Date basis, shall be disclosed in the Plan Supplement. The payment of the fees of the Liquidating Trustee and any professionals retained by the Liquidating Trustee shall be made by the Liquidating Trust in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

**Section 8.06    Liquidating Trust Expenses**

All costs, expenses and obligations incurred by the Liquidating Trustee in administering this Plan and the Liquidating Trust, or in any manner connected, incidental or related thereto shall come from amounts distributable to the appropriate beneficiaries for whose benefit such expenses or obligations were incurred. For example, reasonable costs incurred in resolving Liquidating Trust Avoidance Actions and General Unsecured Claims shall be paid first from amounts otherwise distributable to Holders of Allowed General Unsecured Claims, and expenses incurred in monetizing Other Assets shall be paid first from funds otherwise distributable to the Senior Secured Lender.

**Section 8.07    Reserves Administered by the Liquidating Trust**

On the Effective Date, the Liquidating Trustee shall establish the Claims Reserve, and such other accounts as may be or become necessary.

**Section 8.08    Liability; Indemnification**

The Liquidating Trustee shall not be liable for any act or omission taken or omitted to be taken in his or her capacity as the Liquidating Trustee, other than acts or omissions resulting from such Person's willful misconduct, gross negligence or fraud.

**Section 8.09    Termination of the Liquidating Trust**

The duties, responsibilities and powers of the Liquidating Trustee shall terminate after all Liquidating Trust Assets have been fully resolved, abandoned or liquidated and the Liquidating Trust Assets have been distributed in accordance with the Plan and the Liquidating Trust Agreement. Except in certain circumstances, the Liquidating Trust shall terminate no later than three (3) years after the Effective Date.

**Section 8.10    Liquidating Trustee Authority**

(a)    <u>Compromise of Claims</u>. The Liquidating Trust shall have full authority to compromise Claims or settle interests without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, the Confirmation Order, and the Liquidating Trust Agreement. As to any Claims that may arise or exist after the Effective Date relating to or arising out of the Purchase and Sale Agreement, the Liquidating Trustee shall not compromise or resolve any such Claims without the express written consent of the Pre-Petition Agent.

51

(b)    <u>Payment of Professional Fees</u>. The Liquidating Trust may, without application to or approval by the Bankruptcy Court, pay fees that it incurs after the Effective Date for professional fees and expenses.  Before settling or compromising any Plan Carve Out Claims or interests related thereto, the Liquidating Trustee shall provide written notice to the Pre-Petition Agent of the terms and conditions of the proposed settlement or compromise.

(c)    <u>Compliance with Tax Requirements/Allocations</u>. In connection with the Plan, to the extent applicable, the Liquidating Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.

(d)    <u>Request for Expedited Tax Review</u>. The Liquidating Trustee shall have the right to request an expedited determination under Bankruptcy Code § 505(b) with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

(e)    <u>Access and Preservation of Records</u>. The Liquidating Trustee shall be granted reasonable access during normal business hours with prior notice to, among other things the offices, books, and records relating to the Debtors or any of their businesses or operations that are in possession of the Purchaser and the Purchaser shall preserve records all to the extent and on the terms of the Stalking Horse SPA.

## ARTICLE IX
## PROVISIONS GOVERNING DISTRIBUTIONS GENERALLY

**Section 9.01    Timing and Delivery of Distributions**

The Liquidating Trust Agreement shall govern distributions from the Liquidating Trust and shall include the terms of the other sections of Article IX of the Plan and other relevant provisions of the Plan.

**Section 9.02    Method of Cash Distributions**

Any Cash payment to be made pursuant to the Plan may be made by Cash, draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law at the option of and in the sole discretion of the Liquidating Trustee, except for Cash payments made to the Pre-Petition Agent, which shall be made by wire transfer or such other method as shall be specified by such Persons.

**Section 9.03    Failure to Negotiate Checks**

Checks issued in respect of distributions under the Plan shall be null and void if not negotiated within sixty (60) days after the date of issuance.  The Liquidating Trustee shall hold any amounts returned in respect of such non-negotiated checks.  The Holder of an Allowed Claim with respect to which such check originally was issued shall make requests for reissuance for any such check directly to the Liquidating Trustee.  All amounts represented by any voided check will be held until the later of one (1) year after (x) the Effective Date or (y) the date that a particular Claim is Allowed by Final Order, and all requests for reissuance by the Holder of the Allowed Claim in respect of a voided check are required to be made before such date.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Thereafter, all such amounts shall be deemed to be Unclaimed Property, and all Claims in respect of void checks and the underlying distributions shall be forever barred, estopped and enjoined from assertion in any manner against the Liquidating Trustee.

**Section 9.04    Fractional Dollars**

Notwithstanding any other provision of the Plan, Cash distributions of fractions of dollars will not be made; rather, whenever any payment of a fraction of a dollar would be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as Unclaimed Property pursuant to Section 9.03 of the Plan.

**Section 9.05    Compliance with Tax Requirements**

In connection with each distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the Liquidating Trustee shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution or effect any such withholding and deposit all moneys so withheld as required by law.  With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law has not been received by the Liquidating Trustee within thirty (30) days from the date of such request (the "Initial Request"), the Liquidating Trustee may, at his/her option, withhold the amount required to such Person and decline to make such distribution until the information is received.  Failure of any Person to provide the information requested within six months of the Initial Request shall result in the forfeit of the affected distribution and the treatment of said distribution as Unclaimed Property.

**Section 9.06    *De Minimis* Distributions**

No Cash payment of less than twenty-five ($25.00) dollars shall be made to the Holder of any Claim on account of its Allowed Claim.

**Section 9.07    Setoffs**

Except for any Claim that is Allowed in an amount set forth in the Plan (including the Allowed Senior Secured Claim), the Debtors or the Liquidating Trustee may, but shall not be required to, set off against any Claims and the payments or distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities and claims of every type and nature whatsoever that the Estate or a Debtor may have against the Holder of any Claim, but neither the failure to do so nor the Allowance of any such Claims, whether pursuant to the Plan or otherwise, shall constitute a waiver or release by any Debtor of any such claims the Debtor may have against such Holder of any Claim, and all such claims shall be reserved for and retained by the Liquidating Trustee.

**Section 9.08    Distribution Record Date**

As of the close of business on the fifth (5th) Business Day following the Effective Date (the "Distribution Record Date"), all transfer ledgers, transfer books, registers and any other

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

records maintained by the designated transfer agents with respect to ownership of any Claims will be closed and, for purposes of the Plan, there shall be no further changes in the record holders of such Claims. The Liquidating Trustee shall have no obligation to recognize the transfer of any Claims occurring after the Distribution Record Date, and will be entitled for all purposes to recognize and deal only with the Holder of any Claim as of the close of business on the Distribution Record Date, as reflected on such ledgers, books, registers or records.

## ARTICLE X
## EXECUTORY CONTRACTS, UNEXPIRED LEASES, AND OTHER AGREEMENTS

### Section 10.01 Assumption/Rejection

On the Effective Date, and to the extent permitted by applicable law, all of the Debtors' executory contracts and unexpired leases will be rejected unless such executory contract or unexpired lease: (a) is a Desired 365 Contract and being assumed pursuant to the Plan; (b) is the subject of a motion to assume Filed on or before the Confirmation Date; or (c) has been previously rejected or assumed.

### Section 10.02 Cure Amounts

The Bid Procedures and Sale Motion contemplates that Desired 365 Contracts will be assumed by the Debtors and/or assigned to the Purchaser pursuant to the Sale Order and/or the Confirmation Order. In accordance with the Bid Procedures, as part of the Plan Supplement, the Debtors will file a list of the Desired 365 Contracts along with the proposed Cure Costs. Any party taking exception to the proposed Cure Costs shall, in accordance with the Bid Procedures Order, File a detailed statement setting forth its reason and the Bankruptcy Court shall determine the proper amount of the Cure Costs at the Combined Hearing. The fixing of the Cure Costs shall constitute the Debtors' right to assign the Desired 365 Contract lease to the Purchaser under Bankruptcy Code §§ 365(c) and (f).

### Section 10.03 Assumed Executory Contracts and Unexpired Leases

Each Desired 365 Contract will include (a) all amendments, modifications, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease; and (b) with respect to any executory contract or unexpired lease that relates to the use, ability to acquire, or occupancy of real property, all executory contracts or unexpired leases and other rights appurtenant to the property, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, and any other equity interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements have been rejected pursuant to an order of the Bankruptcy Court or are the subject of a motion to reject Filed on or before the Confirmation Date.

Amendments, modifications, supplements, and restatements to executory contracts and unexpired leases that have been executed by the Debtors during their Bankruptcy Cases shall not be deemed to alter the pre-petition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

### Section 10.04 Insurance Policies

All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Hearing shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Reorganized Debtors if scheduled as a Desired 365 Contact to be assume or otherwise by the Liquidating Trust.

### Section 10.05 Pass-through

Except as otherwise provided in the Plan, any rights or arrangements necessary or useful to the administration of the Liquidating Trust but not otherwise addressed as a Claim or Interest, and other executory contracts not assumable under Bankruptcy Code § 365(c), shall, in the absence of any other treatment under the Plan, the Purchase and Sale Agreement, the Sale Order and/or the Confirmation Order, be passed through the Bankruptcy Cases for the benefit of the Liquidating Trust and the counterparty unaltered and unaffected by the Bankruptcy Cases.

### Section 10.06 Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' executory contracts and unexpired leases pursuant to the Plan or otherwise must be Filed no later than thirty (30) days after the later of the Effective Date or the date a Final Order is entered granting the rejection. Any Proofs of Claim arising from the rejection of the Debtors' executory contracts or unexpired leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Debtor or the Liquidating Trust without the need for any objection by any Person or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Bankruptcy Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' executory contracts and unexpired leases shall be classified as General Unsecured Claims for the particular Debtor in question and shall be treated in accordance with the particular provisions of the Plan for such Debtor; *provided, however*, if the Holder of an Allowed Claim for rejection damages has an unavoidable security interest in any Collateral to secure obligations under such rejected executory contract or unexpired lease, the Allowed Claim for rejection damages shall be treated as an Other Secured Claim to the extent of the value of such Holder's interest in the Collateral, with the deficiency, if any, treated as a General Unsecured Claim.

### Section 10.07 Reservation of Rights

Nothing contained in the Plan or this Disclosure Statement shall constitute an admission by the Debtors that any such Desired 365 Contract is in fact an executory contract or unexpired lease or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, the Liquidating Trustee, or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter and to provide appropriate treatment of such contract or lease.

**Section 10.08 Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request by the Debtors to extend the deadline for assuming or rejecting unexpired leases pursuant to Bankruptcy Code § 365(d)(4).

**ARTICLE XI**
**PROCEDURES FOR RESOLVING DISPUTED,**
**CONTINGENT, AND UNLIQUIDATED CLAIMS**

**Section 11.01 Expunging of Certain Claims**

All Claims marked or otherwise Scheduled as contingent, unliquidated or disputed on the Bankruptcy Schedules and for which no Proof of Claim has been timely filed, shall be deemed Disallowed Claims and such Claims shall be expunged as of the Effective Date without the necessity of filing a claim objection and without further notice to, or action, order or approval of the Bankruptcy Court.

**Section 11.02 Objections to Claims**

(a)    <u>Authority</u>. The Debtors, the Reorganized Debtors, or the Liquidating Trustee (as applicable) and the Pre-Petition Agent shall have the exclusive authority to File objections to the Plan Carve Out Claims, and to withdraw any objections to such Claims that they File. The Debtors or the Liquidating Trustee (as applicable) shall have the exclusive authority to settle, compromise, or litigate to judgment any objections to Disputed Plan Carve Out Claims, (i) if they have the prior written consent of Pre-Petition Agent, (ii) if they have given detailed written notice of the proposed settlement, compromise or litigation to the Pre-Petition Agent and the Pre-Petition Agent has not objected thereto within five (5) Business Days after receipt of such notice, or (iii) upon the order of the Bankruptcy Court after the Pre-Petition Agent has had notice and an opportunity to object. The Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment any objections to other Claims. Except as set forth above, from and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Except as set forth above, the Liquidating Trustee also shall have the right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

(b)    <u>Objection Deadline</u>. As soon as practicable, but no later than the Claims Objection Deadline, the Liquidating Trustee or the Pre-Petition Agent may File objections with the Bankruptcy Court and serve such objections on the Creditors holding the Claims to which such objections are made. Nothing contained herein, however, shall limit the right of the Liquidating Trustee or the Pre-Petition Agent to object to Claims, if any, Filed or amended after the Claims Objection Deadline. The Claims Objection Deadline may be extended by the Bankruptcy Court upon motion by the applicable Debtor, Reorganized Debtor or the Liquidating Trustee, as the case may be, or Pre-Petition Agent.

**Section 11.03 Estimation of Claims**

The Liquidating Trustee may (after the Pre-Petition Agent's prior written consent in the

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

case of Disputed Plan Carve Out Claims) at any time request that the Bankruptcy Court estimate any such Disputed Claim pursuant to Bankruptcy Code § 502(c), regardless of whether the Liquidating Trustee or any Debtor, Reorganized Debtor or the Pre-Petition Agent has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection.  In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the maximum limitation on such Claim, as determined by the Bankruptcy Court and the Liquidating Trustee (and the Pre-Petition Agent in the case of the Disputed Plan Carve Out Claims) may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.  Disputed Plan Carve Out Claims may be estimated and thereafter resolved by any permitted mechanism (i) if it has the Pre-Petition Agent's prior written consent, (ii) if the Pre-Petition Agent has received a detailed written notice of the proposed estimation and resolution and the Pre-Petition Agent has not objected thereto within five (5) Business Days after receipt of such notice, or (iii) upon the order of the Bankruptcy Court after the Pre-Petition Agent has had notice and an opportunity to object.  Other Claims may be estimated and thereafter resolved as the Liquidating Trustee may deem appropriate.

## Section 11.04 No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

## Section 11.05 Distributions After Allowance

The Liquidating Trustee shall make payments and distributions from the appropriate account (whether the Claims Reserve in the case of Allowed Plan Carve Out Claims, or in the case of all other Allowed Claims, from such other funds to each Holder of a Disputed Claim that has become an Allowed Claim in accordance with the provisions of the Plan governing the class of Claims to which such Holder belongs.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing all or part of any Disputed Claim becomes a Final Order, the Liquidating Trustee shall distribute to the Holder of such Claim the distribution (if any) that would have been made to such Holder on the Distribution Date had such Allowed Claim been allowed on the Distribution Date.  After a Disputed Claim is Allowed or otherwise resolved, the excess Cash or other property that was reserved on account of such Disputed Claim, if any, shall become a Liquidating Trust Asset for the benefit of other Allowed Claims of the Class or Classes for which the distribution reserve was created.

## Section 11.06 Reduction of Claims

Notwithstanding the contents of the Bankruptcy Schedules or the Bankruptcy SOFAs, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors before the Effective Date, including pursuant to orders of the Bankruptcy Court.  To the extent such payments are not reflected in the Bankruptcy Schedules or the Bankruptcy SOFAs, such Bankruptcy Schedules and Bankruptcy SOFAs will

be deemed amended and reduced to reflect that such payments were made. Nothing in the Plan shall preclude the Liquidating Trustee from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court before the Effective Date.

## ARTICLE XII
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

### Section 12.01 Conditions Precedent to Confirmation

The following are conditions precedent to the occurrence of Confirmation, each of which must be satisfied or waived in accordance with Section 12.04 below:

(a)     The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Debtors, approving the adequacy of this Disclosure Statement, and such Order shall have become a Final Order.

(b)     The Confirmation Order approving and confirming the Plan, as such Plan may have been modified, amended or supplemented, shall (i) be in form and substance reasonably acceptable to the Debtors, the Pre-Petition Agent and the Purchaser; and (ii) include a finding of fact that the Debtors, the Purchaser, the Stalking Horse, the Reorganized Debtors, and their respective present and former members, officers, directors, managers, employees, advisors, attorneys and agents (but excluding the Excluded Persons), acted in good faith within the meaning of and with respect to all of the actions described in Bankruptcy Code § 1125(e) and are therefore not liable for the violation of any applicable law, rule, or regulation governing such actions.

(c)     If the Purchaser purchases the Acquired Property and/or the Las Vegas Property pursuant to the Sale Orders, the Bankruptcy Court shall have entered the Sale Orders, as applicbale, in form and substance reasonably acceptable to the Debtors, the Pre-Petition Agent, and the Purchaser.

### Section 12.02 Occurrence of the Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Section 12.04 below:

(a)     The Confirmation Order shall have been entered in form and substance reasonably acceptable to the Debtors, Pre-Petition Agent, and the Purchaser, and such Order shall have become a Final Order and must, among other things, provide that: (i) the Debtors and the Liquidation Trustee are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan; and (ii) the provisions of the Confirmation Order are non-severable and mutually dependent.

(b)     If the Purchaser purchases the Acquired Property pursuant to the Sale Order and/or the Las Vegas Property pursuant to the Las Vegas Property Sale Order, the Sale Order and the Las Vegas Property Sale Order, as applicable, shall have been entered in form and substance reasonably acceptable to the Debtors, the Pre-Petition Agent, and the Purchaser and

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

such order(s) shall have become a Final Order(s).

(c)    The Purchaser shall have provided written evidence satisfactory to the Debtors and the Pre-Petition Agent that simultaneous with the occurrence of the Effective Date, the Purchaser is prepared to close the Transactions.

(d)    The Closing shall have occurred pursuant to the Purchase and Sale Agreement and, with respect to the Las Vegas Property, the Las Vegas Property Purchase Agreement.

(e)    The Liquidating Trust Agreement shall have been fully executed in form and substance reasonably acceptable to the Debtors, and the Pre-Petition Agent.

(f)    All authorizations, consents, and regulatory approvals required, if any, in connection with the Effective Date shall have been obtained.

(g)    There shall not be in effect any (i) order entered by any court of any competent jurisdiction; (ii) any order, opinion, ruling or other decision entered by any administrative or governmental entity or (iii) applicable law staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the Transactions contemplated by the Plan.

**Section 12.03 Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under Bankruptcy Code §§ 1101 and 1127(b).

**Section 12.04 Waiver of Conditions**

Each of the conditions set forth in Section 12.01 or Section 12.02 hereof may be waived in whole or in part by the Debtors with the prior written consent of the Pre-Petition Agent (and the Purchaser, if applicable), which consent shall not be unreasonably withheld.  The failure to satisfy or waive any condition to Confirmation or the Effective Date may be asserted by the Debtors, the Purchaser, or the Pre-Petition Agent regardless of the circumstances giving rise to the failure of such condition to be satisfied.

**Section 12.05 Revocation, Withdrawal, or Non-Consummation**

The Debtors reserve the right to revoke or withdraw the Plan at any time before the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation of the Plan does not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing, allowance or limiting to an amount certain of any Claim or Interests or Class of Claims or Interests), unless otherwise agreed to by the Debtors and any counterparty to such settlement or compromise, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; (iii) nothing contained in the Plan, and no acts taken in preparation for Consummation of the Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (b) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (c) constitute an admission of any sort by the Debtors or

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

any other Person; and (iv) the rights and remedies of the Stalking Horse pursuant to the Expense Reimbursement Order shall survive and remain in full force and effect.

## ARTICLE XIII
## AMENDMENTS AND MODIFICATIONS

The Debtors may alter, amend, or modify the Plan, the Plan Supplement, or any Exhibits thereto under Bankruptcy Code § 1127(a) at any time before the Confirmation Date; *provided, however*, that where the Plan requires a document to be acceptable to, consented to, agreed to or otherwise satisfactory to Pre-Petition Agent or the Purchaser, the Debtors may not modify such document without the written consent of Pre-Petition Agent or the Purchaser, as applicable. Further, if any amendment, modification or supplement to the Plan (including the Plan Supplement or a modification described in this Article XIII of the Plan) or any Exhibit hereto or thereto is made without the prior written consent of the Senior Secured Lender, then notwithstanding any other agreement to the contrary, the Senior Secured Lender shall have no obligation to support, or take any actions in support of, the Plan.  After the Confirmation Date and before "substantial consummation" of the Plan, as defined in Bankruptcy Code § 1101(2), the Debtors may, under Bankruptcy Code § 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, this Disclosure Statement, the Sale Orders, the Bid Procedures Order, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not (i) materially adversely affect the treatment of Holders of Claims or Interests under the Plan or (ii) modify any provision of the Purchase and Sale Agreement or any of the Purchaser's rights thereunder; *provided, however*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

## ARTICLE XIV
## RETENTION OF JURISDICTION

Under Bankruptcy Code §§ 105(a) and 1142, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Bankruptcy Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A. Allow, disallow, determine, liquidate, classify, estimate or establish the priority or Secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the Secured or unsecured status, priority, amount or allowance of Claims or Interests;

B. Hear and determine all applications for compensation and reimbursement of expenses of Professionals under Bankruptcy Code §§ 327, 328, 330, 331, 503(b), 1103 or 1129(a)(4); *provided, however*, that from and after the Effective Date, the payment of fees and expenses of professionals retained by the Debtors shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court except as otherwise set forth in the Plan;

C. Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which one or more of the Debtors are parties or with respect to which one or more of the Debtors may be liable, including, if necessary, the nature or

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

amount of any required cure or the liquidating of any claims arising therefrom;

D.    Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Bankruptcy Cases;

E.    Enter and enforce such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, this Disclosure Statement, the Sale Orders, or the Confirmation Order;

F.    Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

G.    Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

H.    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with implementation, Consummation, or enforcement of the Plan, the Sale Orders, and/or the Confirmation Order;

I.    Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

J.    Hear and determine any matters arising in connection with or relating to the Plan, this Disclosure Statement, the Sale Orders, and/or the Confirmation Order, the Purchase and Sale Agreement, the Las Vegas Property Purchase Agreement, the Liquidating Trust Agreement or any other contract, instrument, release, or other agreement or document created in connection with the Plan, this Disclosure Statement, the Sale Orders, and/or the Confirmation Order;

K.    Hear and determine any disputes regarding the interpretation or implementation of the Purchase and Sale Agreement;

L.    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Bankruptcy Cases or pursuant to the Plan;

M.    Recover all assets of the Debtors and property of the Estates, wherever located;

N.    Hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code §§ 346, 505, and 1146;

O.    Hear and determine all disputes involving the existence, nature, or scope of Debtors' discharge or any releases granted in the Plan;

P.    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Q.     Enter an order or final decree concluding or closing the Bankruptcy Cases; and

R.     Enforce all orders previously entered by the Bankruptcy Court.

## ARTICLE XV
## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

### Section 15.01 Compromises and Settlements

Except for those Liquidating Trust Avoidance Actions and Causes of Action transferred to the Liquidating Trust, pursuant to Bankruptcy Code § 363 and Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising before the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

### Section 15.02 Satisfaction of Claims

The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever against the Debtors or any of their Estates, assets, properties, or interests in property; *provided*, *however*, that all Liens and Allowed Claims of the Pre-Petition Agent and the Senior Secured Lenders shall survive and remain attached to all of their Collateral (or the proceeds thereof) not sold to Purchaser pursuant to the Purchase and Sale Agreement (including any assets comprising their Collateral, or the proceeds thereof, that are transferred to the Liquidating Trust) until the Allowed Senior Secured Claims are paid in full in cash.  Except as otherwise provided herein (including in the immediately preceding sentence), on the Effective Date, all Claims against and Interests in the Debtors shall be satisfied, discharged, and released in full.  None of the Debtors, the Reorganized Debtors or the Reorganized Debtors' Affiliates, shall be responsible for any pre- Effective Date obligations of the Debtors or the Reorganized Debtors, except those expressly assumed by the Debtors or the Reorganized Debtors, as applicable.  Except as otherwise provided herein, all Persons and Entities shall be precluded and forever barred from asserting against the Debtors, the Reorganized Debtors, and the Affiliates of the Reorganized Debtors, their respective successors or assigns, or their Estates, assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence before the Effective Date, whether or not the facts of or legal bases therefore were known or existed before the Effective Date.

### Section 15.03 Discharge of Liabilities

Pursuant to Bankruptcy Code § 1141(d), and except as otherwise specifically provided in

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

the Plan, the Sale Orders, and/or the Confirmation Order, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(i), in each case whether or not:  (a) a Proof of Claim or Interest based upon such debt, right, Claim, or Interest is Filed or deemed Filed pursuant to Bankruptcy Code § 501; (b) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to Bankruptcy Code § 502; or (c) the Holder of such a Claim or Interest has accepted the Plan. Subject to the terms of the Plan, the Sale Orders, and/or the Confirmation Order, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Bankruptcy Cases shall be deemed satisfied on the Effective Date.  Subject to the terms of the Plan, the Sale Orders, and/or the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.   Subject to the terms of the Plan, the Sale Orders, and/or the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, their Estates, the Reorganized Debtors and all successors thereto.  As provided in Bankruptcy Code § 524, subject to the terms of the Plan, the Sale Order, the Las Vegas Property Sale Order, and/or the Confirmation Order such discharge shall void any judgment against the Debtors, their Estates, the Reorganized Debtors or any successors thereto at any time obtained to the extent it relates to a Claim or Interest discharged, and operates as an injunction against the prosecution of any action against the Reorganized Debtors or their respective property and assets to the extent it relates to a discharged Claim or Interest.  Notwithstanding any of the foregoing to the contrary, all Liens and Allowed Claims of the Pre-Petition Agent and the Senior Secured Lenders shall survive and remain attached to all of their Collateral (or the proceeds thereof) not sold to the Purchaser pursuant to the Purchase and Sale Agreement (including any assets comprising their Collateral, or the proceeds thereof, that are transferred to the Liquidating Trust), and shall not be deemed discharged, satisfied or released, until the Allowed Senior Secured Claims are paid in full in cash.

**Section 15.04  Release of Stalking Horse**

On or after the Effective Date, the Debtors, on behalf of themselves and their respective Affiliates (including the Liquidating Trust) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released (i) the Stalking Horse, (ii) the Stalking Horse's Affiliates, current directors, managers, officers, employees, attorneys, and other representatives, in their capacities as such; and (iii) legal and financial advisors of the Stalking Horse, from any and all Claims, interests, obligations, rights, suits, damages, losses, costs and expenses, actions, Causes of Action, remedies, and liabilities of any kind or character

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, suspected or unsuspected, matured or unmatured, fixed or contingent, in law, equity, or otherwise, that the Debtors' and their Affiliates (including the Liquidating Trust) or any Entity claiming by or through the Debtors or their subsidiaries and affiliates ever had, now has or hereafter can, shall or may have, or otherwise be legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, through the Closing, save and except for Actions and/or continuing obligations under, in connection with or relating to the Expense Reimbursement Order, the Purchase and Sale Agreement, the Las Vegas Property Purchase Agreement (if applicable), the Las Vegas Property Sale Order (if applicable), the Sale Order, and/or the Confirmation Order.

## Section 15.05 Exculpation

The Exculpated Parties shall not be liable for any cause of action arising in connection with or out of the administration of the Bankruptcy Cases, the planning of the Bankruptcy Cases, the formulation, negotiation or implementation of the Plan, the good faith solicitation of acceptances of the Plan in accordance with Bankruptcy Code § 1125(e), pursuit of Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the Acquired Property to be sold pursuant to the Purchase and Sale Agreement, or the Excluded Assets to be sold pursuant to other sale agreement, or to be distributed under the Plan, except for gross negligence or willful misconduct as determined by a Final Order of the Bankruptcy Court. All Holders of Claims and Interests are enjoined from asserting or prosecuting any Claim or cause of action against any protected Person as to which such Exculpated Party has been exculpated from liability pursuant to the preceding sentence.

## Section 15.06 Permanent Injunction

Except as otherwise expressly provided in the Plan, the Purchase and Sale Agreement the Confirmation Order, all Persons and Governmental Units (each as defined in the Bankruptcy Code) who have held, hold or may hold Claims against, or Interests in, the Debtors are permanently enjoined, on and after the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means of judgment, award, decree or order against any Exculpated Party on account of any such Claim or Interest; (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Exculpated Parties or against the property or interests in property of any such Exculpated Parties on account of any such Claim or Interest; and (d) asserting any right of setoff, recoupment or subrogation of any kind against any obligation due from any of the Exculpated Parties or against the property or interests in property of any of the Exculpated Parties on account of any such Claim or Interest. The foregoing injunction will extend to successors of any the Exculpated Parties and their respective property and interests in the property.

Notwithstanding anything to the contrary contained herein, the injunctions set forth in this shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Reorganized Debtors, the Stalking Horse, the Liquidating Trust, or the Purchaser to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by the

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Reorganized Debtors, the Stalking Horse, the Liquidating Trust or the Purchaser pursuant to the Plan or the Purchase and Sale Agreement and related orders.

## Section 15.07 Setoffs

Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including Bankruptcy Code § 553), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, each Debtor or each Reorganized Debtor may setoff against any Allowed Claim or Interest (other than the Allowed Senior Secured Claim) and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before such distribution is made), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or before the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such Claims, rights, and Causes of Action that such Debtor may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or cause of action of the Debtors or Reorganized Debtors, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Bankruptcy Code § 553 or otherwise.

## Section 15.08 Recoupment

Except as provided in the Plan, any Holder of a Claim or Interest shall not be entitled to recoup any Claim or Interest against any Claim, right, or cause of action of the Debtors or Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

## Section 15.09 Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full in cash of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Debtor and its successors and assigns.

## Section 15.10 Good Faith

As of the Confirmation Date, the Debtors shall be deemed to have solicited acceptance or rejections of the Plan in good faith and in compliance with the applicable provisions of the

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Bankruptcy Code.

**Section 15.11 Rights of Defendants and Avoidance Actions**

All rights, if any, of a defendant to assert a Claim arising from relief granted in an Avoidance Action, together with the Liquidating Trustee's right to oppose such Claim are fully preserved. Any such Claim that is Allowed shall be entitled to treatment and distribution under the Plan as a General Unsecured Claim.

**ARTICLE XVI**
**MISCELLANEOUS PROVISIONS**

**Section 16.01 Bar Dates for Certain Claims**

(a)     Administrative Claims; Substantial Contribution Claims. The Confirmation Order will establish a Bar Date for Filing of all Administrative Claims, including substantial contribution claims (but not including Professional Fee Claims, claims for the expenses of the members of the Committee and Administrative Claims in section (b) or (c) below), which date will be thirty (30) days after the Confirmation Date (the "Administrative Claims Bar Date"). Holders of asserted Administrative Claims, other than Professional Fee Claims, claims for U.S. Trustee fees under 28 U.S.C. § 1930, administrative tax claims and administrative ordinary case liabilities described in section (b) below, must submit proofs of Administrative Claim on or before such Administrative Claims Bar Date or forever be barred from doing so. A notice prepared by the Debtors will set forth such date and constitute notice of this Administrative Claims Bar Date. The Liquidating Trustee and the Pre-Petition Agent shall have thirty days (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and object to such Administrative Claims before a hearing for determination of allowance of such Administrative Claims.

(b)     Administrative Ordinary Course Liabilities. Holders of Administrative Claims that are based on liabilities incurred and paid by any Debtor in the ordinary course of the applicable Debtor's business (other than Claims of governmental units for taxes and for interest and/or penalties related to such taxes) on and after the Petition Date shall not be required to File any request for payment of such Administrative Claims. For the avoidance of doubt, Holders of Administrative Claims pursuant to Bankruptcy Code § 503(b)(9) shall be required to File a proof of Administrative Claim on or before the Administrative Claims Bar Date.

(c)     Administrative Tax Claims. All requests for payment of Administrative Claims by a governmental unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date, and for which no bar date has otherwise been previously established, must be Filed and served on the Reorganized Debtors, the Pre-Petition Agent, and any other party specifically requesting a copy in writing on or before the later of (a) thirty (30) days following the Confirmation Date; and (b) one hundred and twenty (120) days following the Filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any Holder of any such Claim that is required to File a request for payment of such taxes and does not File and properly serve such a claim by the applicable Bar Date shall be forever barred from asserting any such claim against the Debtors, the Reorganized Debtors, the Liquidating Trust or their property, regardless of whether any such

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Claim is deemed to arise on or before the Effective Date. Any interested party desiring to object to an Administrative Claim for taxes must File and serve its objection on counsel to the Debtors, the Reorganized Debtors, the Liquidating Trustee, and the relevant taxing authority no later than ninety (90) days after the taxing authority Files and serves its application.

(d)    Professional Fee Claims. All final requests for compensation or reimbursement of professional fees pursuant to Bankruptcy Code §§ 327, 328, 330, 331, 363, 503(b) or 1103 for services rendered to or on behalf of the applicable Debtors or the Committee (if one has been appointed) before the Confirmation Date (other than substantial contribution claims under Bankruptcy Code § 503(b)(4)) must be Filed and served on the Debtors, the Liquidating Trustee, the Pre-Petition Agent, and their respective counsel no later than thirty days (30) after the Confirmation Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be Filed and served on the Debtors, the Liquidating Trustee, the Pre-Petition Agent, and their counsel and the requesting Professional or other entity no later than thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

**Section 16.02 Payment of Statutory Fees**

On or before the Effective Date, the Debtors shall have paid in full, in Cash (including by check or wire transfer), in U.S. dollars, all fees payable pursuant to section 1930 of title 28 of the United States Code, in the amount determined by the Bankruptcy Court at the Confirmation Hearing.

**Section 16.03 Severability of Plan Provisions**

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**Section 16.04 Successors and Assigns**

The rights, benefits and obligations of any Person named or referred to in the Plan, including any Holder of a Claim, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

**Section 16.05 Binding Effect**

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims against and Interests in the Debtors, their respective successors and

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

assigns, including, but not limited to, the Debtors, and all other parties-in-interest in these Bankruptcy Cases.

**Section 16.06 Term of Injunctions or Stay**

Unless otherwise provided in the Plan, the Sale Orders and/or Confirmation Order, all injunctions or stays provided for in the Bankruptcy Cases under Bankruptcy Code §§ 105 or 362 or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan, the Sale Orders, and/or Confirmation Order shall remain in full force and effect in accordance with their terms.

**Section 16.07 Dissolution of Committee**

On the Effective Date, the Committee shall dissolve and the members of the Committee shall be released and discharged from all authority, duties, responsibilities and obligations related to and arising from and in connection with the Bankruptcy Cases.

**Section 16.08 No Admissions**

Notwithstanding anything herein to the contrary, nothing in the Plan shall be deemed as an admission by the Debtors with respect to any matter set forth herein, including liability on any Claim.

**Section 16.09 Default Under Plan**

(a)  Plan Default Notice. Except or otherwise provided for in the Plan, after the Effective Date, in the event of an alleged default by the Liquidating Trustee under the Plan, any party alleging such default shall provide written notice of default (the "Plan Default Notice") to the Liquidating Trustee at the address set forth in the Notice of Effective Date filed pursuant to Section 16.11 of the Plan with a copy thereof to the Debtors' counsel and the Pre-Petition Agent's counsel at the addresses set forth in the Plan and shall contemporaneously file such Plan default notice with the Bankruptcy Court and serve it on the Committee.  The Liquidating Trustee shall have thirty (30) days from the receipt of a Plan Default Notice to cure any actual default that may have occurred.

(b)  Cure. The Liquidating Trustee and any other party-in-interest shall have the right to dispute an alleged default that has occurred and to notify the party alleging such default that the Liquidating Trustee (or such other party-in-interest) contends no default has occurred, with such notice to be sent within the thirty-day period following receipt of a Plan Default Notice. In such event, the Bankruptcy Court shall retain jurisdiction over the dispute relating to the alleged default and the remedy with respect to any remedy therefore.

(c)  Failure to Cure. In the event the Liquidating Trustee (or any other party-in-interest) fails to either dispute the alleged default or timely cure such default, the party alleging such default shall be entitled to assert its rights under applicable law.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

68

**Section 16.10 Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Nevada, without giving effect to the principles of conflicts of law thereof, shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control) as well as corporate governance matters with respect to the Debtors; *provided, however*, that corporate governance matters relating to the Debtors or Reorganized Debtors, as applicable, not organized under Nevada law shall be governed by the laws of the state of organization of such Debtor.

**Section 16.11 Entire Agreement**

This Plan and the Plan Documents set forth the entire agreement and understanding among the parties-in-interests relating to the subject matter hereof and supersede all prior discussions and documents.

**Section 16.12 Plan Documents**

The Plan Documents are incorporated herein and are a part of this Plan as set forth in full Herein.

**ARTICLE XVII**
**CERTAIN RISK FACTORS AFFECTING CERTAIN OF THE DEBTORS**

BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF IMPAIRED CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**Section 17.01 General Risks**

The bankruptcy proceeding could possibly adversely affect (i) the Debtors' relationships with their key vendors; (ii) the Debtors' relationships with their customers; (iii) the Debtors' relationships with their employees; and (iv) the legal rights and obligations of the Debtors under agreements that may be in default as a result of the Cases.

The extent to which the Chapter 11 Case has and will continue to disrupt the Debtors' businesses will likely be directly related to the length of time it takes to complete the proceeding. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, they may be forced to operate in chapter 11 for an extended period while they try to develop a different reorganization plan that can be confirmed. That would increase both the probability and the magnitude of the adverse effects described in this Disclosure Statement.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

**Section 17.02 Certain Bankruptcy Law Considerations**

Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, the Debtors give no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, the Debtors give no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, the Debtors give no assurance as to such timing. In the event the conditions precedent to Confirmation of the Plan have not been satisfied or waived (to the extent possible) by the Debtors or applicable party (as provided in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no Distributions under the Plan will be made, and the Debtors and all Holders of Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though such Confirmation Date had never occurred.

**Section 17.03 Risks Related to Volatility in the Prices of the Property**

In the absence of the sales contemplated under the Plan, the Debtors' revenue, profitability, cash flow, and the carrying value of contracts are substantially dependent on prevailing interest rates. Historically, the markets for interest rates have been volatile and those markets are likely to continue to be volatile in the future. Predicting future interest rate movements with certainty is impossible. Interest rates are subject to wide fluctuation in response to relatively minor changes in the supply of and demand for contracts, market uncertainty, and a variety of additional factors beyond the Debtors' control. These factors include the level of consumer product demand, overall economic conditions, weather conditions, domestic and foreign governmental relations, governmental regulations, taxes, price and availability of vehicles, level and price of gasoline.

**Section 17.04 Risks Related to the Sale of the Debtors' Assets**

The Bankruptcy Court has not yet approved a sale of the New Interests and/or the Debtors' Assets. Further, the Purchase and Sale Agreement is subject to certain conditions precedent, which must be satisfied before the Transaction is consummated. There is no guarantee that these conditions precedent will be satisfied or that the Bankruptcy Court will approve a sale of the New Interests and/or the Debtors' Assets. If the sale of the New Interests and/or the Debtors' Assets is not consummated, the feasibility of the Plan may be adversely affected.

**ARTICLE XVIII**
**FINANCIAL INFORMATION AND FEASIBILITY**

**Section 18.01 Financial Information**

The Projections set forth in **<u>Exhibit E</u>** and the above summary reflect the Debtors' reasonable judgments as to the cash flow of the Reorganized Debtors; however, there can be no assurance that any of the various assumptions on which they are based will prove to be accurate, that any of the forecasted expenses will not exceed assumptions or that the projected results will be realized any time in the future or at all. Actual results will be impacted by a number of factors, including, without limitation, general economic and business conditions, successful

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

implementation of business plans, third-party contractual relationships, sufficient working capital and sources of funding, as well as other conditions which affect the capital markets and the automobile loan industry, all of which can be materially adverse to the Reorganized Debtors.

**Section 18.02 Feasibility of the Plan**

In connection with Confirmation of the Plan, Bankruptcy Code § 1129(d)(ii) requires the Bankruptcy Court to find that Confirmation of the Plan is not likely to be followed by the liquidation of, or the need for further reorganization of, the Reorganized Debtors. This requirement is the so-called "feasibility" test. After Consummation of the Plan, the Reorganized Debtors will have a new lender facility and no other debt other than trade debt reincurred in the ordinary course of business.

**ARTICLE XIX**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**Section 19.01 General**

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims or Interests. This summary is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to any particular Holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

The discussion is based upon the Internal Revenue Code, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS") as in effect on the date hereof. Legislative, judicial or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or new interpretations may have retroactive effect and could significantly affect the federal income tax consequences of the Plan.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to (i) special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Internal Revenue Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities and holders of Claims or Interests who are themselves in bankruptcy) or (ii) Holders not entitled to vote on the Plan, including Holders whose Claims or Interests are entitled to reinstatement or payment in full in cash under the Plan or Holders whose Claims or Interests are to be extinguished without any Distribution.

This discussion assumes that Holders of Claims or Interests hold only Claims or Interests

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

in a single Class. Holders of multiple Classes of Claims or Interests should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS OR INTERESTS ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS OR INTERESTS UNDER THE INTERNAL REVENUE CODE, (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN TO WHICH THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE ANCILLARY, AND (3) HOLDERS OF CLAIMS OR INTERESTS SHOULD SEEK ADVICE BASED UPON THEIR PARTICULAR CIRCUMSTANCES FROM THEIR OWN TAX ADVISOR.

**Section 19.02 Consequences to the Debtors**

WFI has NOL carryforward for federal income tax purposes of approximately $1.6 million as reported in its TY 2012 federal tax return, and net unrealized built in losses of an estimate net $4 million. As discussed below, the amount of the NOL carryforwards, and possibly certain other tax attributes, may be significantly reduced upon implementation of the Plan. In addition, the Purchaser's subsequent utilization of any net built-in losses with respect to their assets and NOLs remaining, and possibly certain other tax attributes, may be restricted as a result of and upon the implementation of the Plan. These positive tax attributes are not separately saleable assets for the benefit of creditors, but are aspects, if preserved by way of a properly structured transaction, that could cause a purchaser to factor in such favorable aspects, into its purchase price.

(a)    Cancellation of Indebtedness Income. Under the Internal Revenue Code, a taxpayer generally must recognize income from the cancellation of debt ("COD Income") to the extent that its indebtedness is discharged during the taxable year. COD Income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property (including stock) transferred by the debtor in satisfaction of such discharged indebtedness. COD Income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

Section 108(a)(1)(A) of the Internal Revenue Code provides an exception to this rule, however, where a taxpayer is in bankruptcy and where the discharge is granted, or is effected, pursuant to a plan approved by the bankruptcy court. In that case, instead of recognizing

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

income, the taxpayer is required, under Section 108(b) of the Internal Revenue Code, to reduce certain of its tax attributes by the amount of COD Income. The attributes of the taxpayer are to be reduced in the following order: NOLs, general business and minimum tax credit carryforwards, capital loss carryforwards, and the basis of the taxpayer's assets (collectively, the "Tax Attributes"). Section 108(b)(5) of the Internal Revenue Code permits a taxpayer to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other Tax Attributes in the order stated above. In addition to the foregoing, Section 108(e)(2) of the Internal Revenue Code provides a further exception to the realization of COD Income upon the discharge of debt to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for federal income tax purposes.

The Debtors expect to realize a significant amount of COD Income as a result of the Plan. The ultimate amount of COD income realized by the Debtors is uncertain. Regardless of the amount of the Debtors' COD Income, the Debtors will not be required to include COD Income in gross income because the indebtedness will be discharged while the Debtors are under the jurisdiction of a court in a Title 11 case. Accordingly, the Debtors expect that there will be no United States federal income taxes payable by the Debtors in respect of the COD Income. However, certain Tax Attributes of the Debtors will be reduced or eliminated. The Debtors do not currently anticipate that they will make the election under Section 108(b)(5) of the Internal Revenue Code to apply any required attribute reduction first to the basis of the Debtors' depreciable property. The Debtors will avoid recognition of COD Income and reduction of Tax Attributes pursuant to Section 108(e)(2) of the Internal Revenue Code only to the extent that the discharge is of amounts that the Debtors would have been entitled to deduct if the Debtors had paid such amounts.

(b)    Net Operating Losses And Other Attributes. The Debtors currently have NOLs that will carry forward to the extent that they are not offset by income and/or gain and are not reduced by the attribute reduction rules of Section 108(b) of the Internal Revenue Code discussed above.

(c)    Annual Section 382 Limitation on Use of NOLs. With respect to any NOLs remaining after confirmation of the Plan and any required attribute reduction, Section 382 of the Internal Revenue Code contains certain rules limiting the amount of NOLs a corporate taxpayer can utilize in the years following an "ownership change" (the "Annual Section 382 Limitation"). An "ownership change" generally is defined as a more than 50 percentage point change in ownership of the stock of a "loss corporation" (a corporation with NOLs or net unrealized built-in losses) that takes place during a testing period (generally three years) ending on the date on which such change in ownership is tested. The Debtors will undergo an ownership change on the Effective Date.

(1)    *General Annual Section 382 Limitation.* As a general rule, a loss corporation's Annual Section 382 Limitation equals the product of the value of the stock of the corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate," a rate published monthly by the Treasury Department (for example, 3.55% for ownership changes that occur during February, 2012). Any unused portion of the Annual Section 382 Limitation generally is available for use in subsequent years. If a loss corporation does not continue its historic business or use a significant portion of its assets in a new business for two years after the

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

ownership change, the corporation's Annual Section 382 Limitation is zero. The Annual Section 382 Limitation is increased if the loss corporation has net unrealized built-in gains, *i.e.*, gains economically accrued but unrecognized at the time of the ownership change, in excess of a threshold amount. A loss corporation can use NOLs in excess of its Annual Section 382 Limitation to the extent that it realizes those net unrealized built-in gains for federal income tax purposes in the five years following the ownership change. A correlative rule applies to a corporation that has net unrealized built in losses, *i.e.*, losses economically accrued but unrecognized as of the date of the ownership change in excess of a threshold amount. Such a corporation's ability to deduct its built-in losses (in addition to its NOLs) following an ownership change is limited. Although the Debtors will expect to have a net unrealized built-in loss as of the Effective Date, this is uncertain at this time.

(2)    *Special Bankruptcy Exceptions*. Section 382(1)(5) of the Internal Revenue Code provides an exception to the application of the Annual Section 382 Limitation when a corporation is under the jurisdiction of a court in a Title 11 case (the "382(1)(5) Exception"). The 382(1)(5) Exception provides that where an ownership change occurs pursuant to a bankruptcy reorganization or similar proceeding, the Annual Section 382 Limitation will not apply if the pre-change shareholders and/or "qualified creditors" (as defined by applicable Treasury Regulations) own at least 50 percent of the stock of the reorganized corporation immediately after the ownership change. However, under the Plan, the Debtors do not expect to qualify for the 382(l)(5) Exception because not of the pre-change shareholders and/or "qualified creditors" will own any of the New Interests of the Reorganized Debtors.

(d)    Exchange of Liquidating Trust Assets. The Debtors will transfer the Liquidating Trust Assets to the Liquidating Trust and will transfer the interests in the Liquidating Trust to certain Holders of Allowed Claims. For federal income tax purposes, these transfers will be treated as a taxable disposition by the Debtors of the Liquidating Trust Assets to such Holders of Allowed Claims in satisfaction of a Pro Rata portion of their Claims. The Debtors will recognize gain or loss measured by the difference between the fair market value of the Liquidating Trust Assets and their basis in the Liquidating Trust Assets. The character of any gain or loss as capital or ordinary, and in the case of capital gain or loss, as short term or long term, will depend upon the nature of the Liquidating Trust Assets and the Debtors' holding period for the Liquidating Trust Assets.

(e)    Accrued Interest. To the extent that the consideration issued to Holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the Debtors should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtors have not already deducted such amount. The Debtors should not have COD Income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to Section 108(e)(2) of the Internal Revenue Code, as discussed above.

(f)    Federal Alternative Minimum Tax. In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

74

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation might otherwise be able to offset all of its taxable income for regular federal income tax purposes by available NOL carryforwards, a corporation is generally entitled to offset no more than 90% of its AMTI with NOL carryforwards (as recomputed for AMT purposes).  Accordingly, usage of the Debtors' NOLs by the Reorganized Debtors or Purchaser may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

In addition, if a corporation (or a consolidated group) undergoes an ownership change and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets may be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.  Accordingly, if the Debtors are in a net unrealized built-in loss position on the Effective Date, for AMT purposes the tax benefits attributable to basis in assets may be reduced.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

**Section 19.03 Federal Income Tax Consequences to Holders of Senior Secured Claims**

(a)     Receipt of Cash and Liquidating Trust Interests. Pursuant to the Plan, each Holder of a Senior Secured Claim will receive Cash and Liquidating Trust interests in exchange for its Claim.  For federal income tax purposes, a Holder of a Senior Secured Claim should be treated as exchanging a Pro Rata portion of its Claim for Cash, and the transfers of the Liquidating Trust interests will be treated as the transfer by the Debtors of a Pro Rata portion of the Liquidating Trust Assets to a Holder of a Senior Secured Claim in satisfaction of a portion of its Claim, followed by the transfer by such Holders of a Pro Rata portion of the Liquidating Trust Assets to the Liquidating Trust.  A Holder of a Senior Secured Claim will recognize gain or loss measured by the difference between (i) the amount of Cash and the fair market value of its Pro Rata share of the Liquidating Trust Assets it is treated as receiving (net of any liabilities it is treated as assuming), and (ii) its basis in the Claims exchanged therefor (other than any claims for accrued interest as discussed below). The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the tax status of the Holder of the Claim; (ii) whether the Claim is a capital asset in the hands of the Holder; (iii) whether the Claim has been held by the Holder for more than one year; (iv) the extent to which the Holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (v) the extent to which the Holder acquired the Claim at a market discount.  The rules governing the character, timing, and amount of bad debt deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a deduction is claimed and are subject to the exchange provisions of Section 1271 of the Internal Revenue Code.  Holders of Senior Lien Notes, therefore, should consult their tax advisors with respect to their ability to take such a deduction.

(b)     Accrued Interest. Consideration received by a Holder of a Senior Secured Claim that is attributable to accrued but unpaid interest will be treated as ordinary income, regardless of whether the Holder's existing Claims are capital assets in its hands.

The manner in which consideration is to be allocated between accrued and unpaid

interest and principal of the Claims of the Senior Secured Lender for federal income tax purposes is unclear under present law. Although there can be no assurance with respect to this issue, the consideration paid pursuant to the Plan with respect to the Senior Secured Claims shall be allocated, pursuant to the Plan, first to the principal amount of the Senior Secured Claims as determined for federal income tax purposes and then to accrued and unpaid interest, if any, with respect to the Senior Secured Claims. Accordingly, in cases where a Holder of a Senior Secured Claim receives distributions under the Plan having a value less than the principal amount of the Senior Secured Claim, the Debtors allocate the full amount of consideration transferred to such Holder to the principal amount of such claim and do not treat any amount of the consideration to be received by such Holder as attributable to accrued and unpaid interest. Holders should be aware, however, that the IRS may take a different position with respect to the proper allocation.

**Section 19.04 Federal Income Tax Consequences to Holders of General Unsecured Claims**

    (a)    <u>Receipt of Liquidating Trust Interests by Holders of General Unsecured Claims</u>. The Debtors will transfer the Liquidating Trust Assets to the Liquidating Trust and will transfer Liquidating Trust interests to the Holders of General Unsecured Claims. For federal income tax purposes, these transfers will be treated as the transfer by the Debtors of a Pro Rata portion of the Liquidating Trust Assets to the Holders of General Unsecured Claims in satisfaction of their Claims, followed by the transfer by such Holders of a Pro Rata portion of the Liquidating Trust Assets to the Liquidating Trust. A Holder of a General Unsecured Claim will recognize gain or loss measured by the difference between (i) the fair market value of its Pro Rata share of the Liquidating Trust Assets it is treated as receiving (net of any liabilities it is treated as assuming), and (ii) its basis in the Claims exchanged therefor (other than any claims for accrued interest as discussed below). The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the tax status of the Holder of the Claim; (ii) whether the Claim is a capital asset in the hands of the Holder; (iii) whether the Claim has been held by the Holder for more than one year; (iv) the extent to which the Holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (v) the extent to which the Holder acquired the Claim at a market discount. The rules governing the character, timing, and amount of bad debt deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a deduction is claimed and are subject to the exchange provisions of Section 1271 of the Internal Revenue Code. Holders of General Unsecured Claims, therefore, should consult their tax advisors with respect to their ability to take such a deduction.

    The deemed contribution by the Holders of General Unsecured Claims of the Liquidating Trusts Assets to the Liquidating Trust should not be a taxable transaction.

    (b)    <u>Accrued Interest.</u> Consideration received by a Holder of a General Unsecured Claim that is attributable to accrued but unpaid interest will be treated as ordinary income, regardless of whether the Holder's existing Claims are capital assets in its hands.

    The manner in which consideration is to be allocated between accrued and unpaid interest and principal of the Claims of the Holders of General Unsecured Claims for federal income tax purposes is unclear under present law. Although there can be no assurance with respect to this issue, the consideration paid pursuant to the Plan with respect to the General Unsecured Claims shall be allocated, pursuant to the Plan, first to the principal amount of the

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

General Unsecured Claims as determined for federal income tax purposes and then to accrued and unpaid interest, if any, with respect to the General Unsecured Claims. Accordingly, in cases where a Holder of a General Unsecured Claim receives distributions under the Plan having a value less than the principal amount of the General Unsecured Claim, the Debtors allocate the full amount of consideration transferred to such Holder to the principal amount of such claim and do not treat any amount of the consideration to be received by such Holder as attributable to accrued and unpaid interest. Holders should be aware, however, that the IRS may take a different position with respect to the proper allocation.

**Section 19.05 Federal Income Tax Consequences of the Liquidating Trust**

(a)     Classification of the Liquidating Trust. The Liquidating Trust will be organized for the primary purpose of liquidating the Liquidating Trust Assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Thus, the Liquidating Trust is intended to be classified for federal income tax purposes as a "Liquidating Trust" within the meaning of Treasury Regulation Section 301.7701-4(d). Under the Plan, all parties are required to treat the Liquidating Trust as a "Liquidating Trust," subject to definitive guidance to the contrary from the IRS. In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to Sections 671 *et seq.* of the Internal Revenue Code, owned by the Persons who transfer assets to it.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to challenge successfully the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Holders of General Unsecured Claims could vary from those discussed herein (including the potential for an entity-level tax).

(b)     Allocation of Liquidating Trust Taxable Income and Loss And Disposition of Trust Assets. Each Holder of a Liquidating Trust interest must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the Liquidating Trust. None of the Debtors' NOLs (if any) will be available to reduce any income or gain of the Liquidating Trust. Moreover, upon the sale or other disposition of any Liquidating Trust Asset, each Holder of a Liquidating Trust interest must report on its federal income tax return its share of any gain or loss measured by the difference between (i) its Pro Rata share of the amount of cash and/or the fair market value of any property received by the Liquidating Trust in exchange for the Liquidating Trust Asset so sold or otherwise disposed of and (ii) such Holder's adjusted tax basis in its share of such Liquidating Trust Asset. The character of any such gain or loss to any such Holder will be determined as if such Holder itself had directly sold or otherwise disposed of the Liquidating Trust Asset. The character of items of income, gain, loss, deduction and credit to any Holder of a Liquidating Trust interest, and the ability of such Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of such Holder.

As a grantor trust, each Holder of a Liquidating Trust interest has an obligation to report its share of the Liquidating Trust's tax items (including gain on the sale or other disposition of a Liquidating Trust Asset) that is not dependent on the distribution of any Cash or other

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

77

Liquidating Trust Assets by the Liquidating Trust. Accordingly, a Holder of a Liquidating Trust interest may incur a tax liability as a result of owning a share of the Liquidating Trust Assets, regardless of whether the Liquidating Trust distributes Cash or other Liquidating Trust Assets to the Holders. Although the Liquidating Trust Agreement provides that the Liquidating Trust generally make at least semi-annual distributions of Cash, due to the Liquidating Trust's requirement to satisfy certain liabilities, and due to possible differences in the timing of income on, and the receipt of Cash from, the Liquidating Trust Assets, a Holder of a Liquidating Trust interest may, in certain years, report and pay tax on a greater amount of income than the amount of Cash received from the Liquidating Trust by such Holder in such year.

**Section 19.06 Information Reporting and Backup Withholding**

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the Debtors or the Liquidating Trust to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) under certain circumstances. Backup withholding is not an additional tax. Rather, amounts withheld under the backup withholding rules may be credited against a Holder's federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS (generally a U.S. federal income tax return). The Debtors and the Liquidating Trust intend to comply with all applicable reporting withholding requirements of the Internal Revenue Code.

Holders of Allowed Claims should consult their own tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

The Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders of Allowed Claims should consult their own tax advisors regarding these Treasury Regulations and whether the exchanges contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holders' tax returns.

**Section 19.07 Importance of Obtaining Professional Tax Assistance**

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AS MANDATED BY SECTION 1125 OF THE BANKRUPTCY CODE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

# ARTICLE XX
# SECURITIES LAW MATTERS

## Section 20.01 Issuance and Delivery of Securities

The Debtors intend to issue New Interests to the Purchaser as part of the Transaction. Pursuant to Section 2.02(c) of the Stalking Horse SPA. At the Closing, Reorganized WFI and Global Track will issue the New Interests and deliver to the Purchaser certificates representing the New Interests. Such certificates will bear the following restrictive legend: "These securities have not been registered under the Securities Act of 1933, as amended, or any state securities law. These securities may not be sold, offered for sale, pledged or hypothecated in the absence of a registration statement in effect with respect to the securities under the Securities Act and any such state securities laws or the issuer has received documentation reasonably satisfactory to it that such transaction does not require registration under such Act and state securities laws."

Bankruptcy Code § 1145(a)(1) exempts the offer or sale of securities under a chapter 11 plan of reorganization from registration under the Securities Act and under state securities laws if three (3) principal requirements are satisfied:

(a)    the securities are offered or sold under a plan of reorganization and must be securities of the debtors, of an affiliate participating in a joint plan with the debtors or of a successor to the debtors under the plan;

(b)    the recipients of the securities must hold a claim against, an interest in, or a claim for an administrative expense against the debtors or such affiliate; and

(c)    the securities are offered or sold entirely in exchange for the recipient's claim against or interest in the debtors, or principally in such exchange and partly for cash or property.

The New Interests shall be exempt from registration under any federal (including the Securities Act), state or local law, rule or regulation pursuant to Bankruptcy Code § 1145 or other applicable law requiring registration prior to the offering, issuance, distribution or sale of securities; provided that if the issuance of the New Interests does not qualify for an exemption under Bankruptcy Code § 1145, the New Interests shall be issued in a manner, which qualifies for any other available exemption from registration, whether as a private placement under Rule 506 of the Securities Act, Section 4(2) of the Securities Act, and/or the safe harbor provisions promulgated thereunder with respect to transactions with accredited investors or qualified institutional buyers and not involving a public offering.

In connection with the confirmation of the Plan, the Debtors intend to seek an order from the Bankruptcy Court to the effect that the issuance of the New Interests is exempt from registration under the Securities Act and state laws. No registration rights will be provided with respect to holders of New Interests.

## Section 20.02 Subsequent Transfers Under Federal Securities Laws

In general, all resales and subsequent transactions involving the New Interests will be exempt from registration under the Securities Act under section 4(1) of the Securities Act, unless the holder is deemed to be an "underwriter" with respect to such securities, an "affiliate" of the

issuer of such securities or a "dealer." Bankruptcy Code § 1145(b)(1) defines four types of "underwriters":

(a)    persons who purchase a claim against, an interest in, or a claim for administrative expense against the debtors with a view to distributing any security received or to be received in exchange for such a claim or interest ("accumulators");

(b)    persons who offer to sell securities offered or sold under a plan for the holders of such securities ("distributors");

(c)    persons who offer to buy securities offered or sold under a plan from the holders of the securities, if the offer to buy is (1) with a view to distributing such securities and (2) made under an agreement in connection with the plan or with the offer and sale of securities under the plan; and

(d)    a person who is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer. Under section 2(12) of the Securities Act, a "dealer" is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.

The determination of whether a particular Person would be deemed to be an "underwriter" or an "affiliate" with respect to any security to be issued under the Plan, or would be deemed a "dealer," would depend on various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be an "underwriter" or an "affiliate" with respect to any security to be issued under the Plan or would be a "dealer."

ANY PERSON INTENDING TO RELY ON THIS EXEMPTION IS URGED TO CONSULT HIS OR HER OWN COUNSEL AS TO THEIR APPLICABILITY TO HIS OR HER CIRCUMSTANCES.

## ARTICLE XXI

## BEST INTEREST OF CREDITORS TEST

### Section 21.01 Best Interest of Creditors Test

The Bankruptcy Code requires that the Bankruptcy Court find that the Plan is in the best interest of all holders of Claims and Interests that are Impaired by the Plan and that have not accepted the Plan as a requirement to confirm the Plan. The "best interests" test, as set forth in Bankruptcy Code § 1129(a)(11), requires the Bankruptcy Court to find either that all members of an Impaired Class of Claims or Interests have accepted the Plan or that the Plan will provide a member who has not accepted the Plan with a recovery of property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each Impaired Class of Claims and Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the disposition of the Debtors' property if liquidated in chapter 7 cases under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' property by a chapter 7 trustee.

The amount of liquidation value available to Holders of unsecured Claims against the Debtors would be reduced by, first, the Claims of secured creditors (to the extent of the value of their collateral), and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of the chapter 7 cases. Costs of a chapter 7 liquidation of the debtors would include the compensation of a chapter 7 trustee and his or her counsel and other professionals, asset disposition expenses, and litigation costs. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay unsecured Claims or to make any distribution in respect of Interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured Claims.

In chapter 7 liquidation, no junior class of Claims or Interests may be paid unless all classes of Claims or Interests senior to such junior class are paid in full. Bankruptcy Code § 510(a) provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination is enforceable under applicable non-bankruptcy law. Therefore, no class of Claims or Interests that is contractually subordinated to another class would receive any payment on account of its Claims or Interests, unless and until such senior classes were paid in full.

In a chapter 7 liquidation, unsecured creditors and equity holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for:

- Secured creditors (to the extent of the value of their collateral);

- Administrative and other priority creditors;

- Unsecured creditors;

- Debt expressly subordinated by its terms or by order of the Bankruptcy Court; and

- Equity holders.

Once the Bankruptcy Court ascertains the recoveries in liquidation of the Debtors' secured and priority creditors, it would then determine the probable distribution to unsecured creditors from the remaining available proceeds of the liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the

Bankruptcy Court.

As shown in the Liquidation Analysis attached as **Exhibit D**, the Debtors believe that each member of each Class of Impaired Claims and Interests will receive at least as much, if not more, under the Plan as it would receive if the Debtors were liquidated. Accordingly, the Plan satisfies the best interest of creditors test.

**Section 21.02 Liquidation Analysis**

The Debtors believe that the value of any distributions in a chapter 7 case would be less than the value of distributions under the Plan. The Debtors' belief is based primarily on:

- consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Impaired Claims and Interests, including:

  ° increased costs and expenses of a liquidation under chapter 7 arising from fees payable to one or more chapter 7 trustees and professional advisors to such trustee(s), who may not be familiar with the Debtors' industry and business operations;

  ° erosion in value of assets in a chapter 7 case in the context of the rapid liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail;

  ° significant adverse effects on the Debtors' businesses as a result of the likely departure of key employees;

  ° substantial increases in Claims, as well as substantially increased estimated contingent Claims, lease and contract rejection Claims;

  ° substantial delay in distributions, if any, to the holders of Claims and Interests that would likely ensue in a chapter 7 liquidation; and

- the Liquidation Analysis prepared by the Debtors.

**ARTICLE XXII**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The Debtors believe that the Plan affords Holders of Claims and Interests the potential for the greatest realization on the Debtors' property and, therefore, is in the best interests of such Holders. If, however, enough acceptances received from the Impaired Classes sufficient for the Debtors to confirm the Plan are not received, or the Plan is not subsequently confirmed and consummated, the theoretical alternatives include: (a) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code; and (b) formulation of an alternative plan of reorganization.

**Section 22.01 Alternative Plan(s)**

If enough acceptances to confirm the Plan are not received or if the Plan is not confirmed,

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a reorganization plan have expired, any other party-in-interest) could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of assets.

A likely scenario would involve the Debtors' turning over all assets to the Pre-Petition Secured Lenders and immediately ceasing operations. The Debtors believe that the Plan, as described herein, enables Holders of Claims and Interests to realize the highest and best value under the circumstances. The Debtors believe that this scenario or any other alternative form of chapter 11 plan is a much less attractive alternative to creditors than the Plan because of the far greater returns and certainty provided by the Plan. Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs.

**Section 22.02 Liquidation Under Chapter 7**

If no plan can be confirmed, the Debtors' Bankruptcy Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed (or elected) to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests is set forth below. The Debtors believe that a chapter 7 liquidation would result in smaller distributions to creditors than those provided for in the Plan because of: (a) the likelihood that the property of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time; (b) additional administrative expenses involved in the appointment of a trustee; and (c) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

Specifically, the Debtors' costs of a chapter 7 liquidation would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that the trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Bankruptcy Cases. The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Bankruptcy Cases, including any unpaid expenses incurred by the Debtors and the Committee during the Bankruptcy Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Allowed General Unsecured Claims.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared with the value of the property offered to such Classes of Claims and Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to the Holders of Claims and Interests in the Bankruptcy Cases, including (i) the increased costs and expenses of a chapter 7 liquidation arising from fees payable to a chapter 7 trustee in bankruptcy and professional advisors to the trustee; (ii) the likely erosion in value of assets in a chapter 7 case in the context of an expeditious liquidation

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

and the "forced sale" atmosphere that would prevail under a chapter 7 liquidation; and (iii) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in the Bankruptcy Cases, the Debtors have determined that Confirmation of the Plan will provide each Holder of an Allowed Claim or Interest with a recovery that is not less than such Holder would receive pursuant to a chapter 7 liquidation.

The Debtors' Liquidation Analysis provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a chapter 7 trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates. The Liquidation Analysis was prepared by the Debtors.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation. The chapter 7 liquidation period is assumed to be a period of 6 months, allowing for, among other things, the (i) discontinuation of the Debtors' operations; (ii) sale of property; and (iii) collection of receivables.

### ARTICLE XXIII
### VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS

**Section 23.01 Ballots and Voting Deadline**

A Ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement, and has been mailed to holders of Claims and Interests entitled to vote. After carefully reviewing this Disclosure Statement and all exhibits, including the Plan, each holder of a Claim entitled to vote should indicate its vote on the enclosed Ballot. All holders of Claims or Interests entitled to vote must (i) carefully review the Ballot and instructions thereon, (ii) execute the Ballot, and (iii) return it to the address indicated on the Ballot by the Voting Deadline (defined below) for the Ballot to be considered.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be ***received*** by the Balloting Agent **no later than December 17, 2013 at 5:00 p.m. (PST)** (the "Voting Deadline") at the following address:

Larson & Zirzow, LLC
Attn: Matthew C. Zirzow, Esq.
810 S. Casino Center Blvd., Suite 101
Las Vegas, Nevada 89101
Facsimile: (702) 382-1169
E-mail: mzirzow@lzlawnv.com

ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.

**Section 23.02 Holders of Claims Entitled to Vote**

Except as otherwise provided in the Plan, any holder of a Claim against the Debtors whose claim is impaired under the Plan is entitled to vote, if either (i) the Debtors have scheduled the holder's Claim at a specific amount other than $0.00 (and such Claim is not scheduled as "disputed," "contingent," or "unliquidated") or (ii) the holder of such Claim has filed a Proof of Claim on or before the deadline set by the Bankruptcy Court for such filings in a liquidated amount. Any holder of a Claim as to which an objection has been filed (and such objection is still pending as of the time of confirmation of the Plan) is <u>not</u> entitled to vote, unless the Bankruptcy Court (on motion by a party whose Claim is subject to an objection) temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Such motion must be heard and determined by the Bankruptcy Court before the first date set by the Bankruptcy Court for the Confirmation Hearing of the Plan. In addition, the vote of a holder of a Claim may be disregarded if the Bankruptcy Court determines that the holder's acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

**Section 23.03 Classes Impaired Under the Plan**

Priority Non-Tax Claims (Classes A1, B1, C1) and Miscellaneous Secured Claims (Classes A4, B4, C4) are not impaired under the Plan. Pursuant to Bankruptcy Code § 1126(f), holders of Priority Non-Tax Claims and Miscellaneous Secured Claims are conclusively presumed to have accepted the Plan, and therefore are not entitled to vote to accept or reject the Plan.

The Senior Secured Claims (Classes A2, B2, C2), B Class Secured Claims (Class A3), and General Unsecured Claims (Classes A5, B5, C5), are impaired under the Plan and are entitled to vote to accept or reject the Plan.

Holders of Intercompany Claims (Classes A6, B6, C6) and Interests (Classes A8, B8, C8) are impaired under the Plan, but will not receive or retain any property under the Plan. As such, holders of Intercompany Claims and Interest are conclusively deemed to reject the Plan, and therefore, are not entitled to vote to accept or reject the Plan.

**Section 23.04 Information on Voting and Ballots**

(a)      <u>Transmission of Ballots to Creditors.</u> Ballots are being forwarded to all holders of Claims entitled to vote. Those holders of Claims whose Claims are unimpaired under the Plan are conclusively presumed to have accepted the Plan under Bankruptcy Code § 1126(f), and therefore need not vote with regard to the Plan.

(b)      <u>Ballot Tabulation Procedures.</u> For purposes of voting on the Plan, the amount and classification of a Claim and the procedures that will be used to tabulate acceptances and rejections of the Plan shall be exclusively as follows:

(i)      If no Proof of Claim has been timely filed, the voted amount of a Claim shall be equal to the amount listed for the particular Claim in the Schedules, as and if amended, to the extent such Claim is not listed as "contingent," "unliquidated," or "disputed," and the Claim shall be placed in the appropriate Class, based on the Debtor's

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

records, and consistent with the Schedules of Assets and Liabilities and the Claims registry of the Clerk of the Bankruptcy Court (the "Clerk");

(ii)    If a Proof of Claim has been timely filed, and has not been objected to before the expiration of the Voting Deadline, the voted amount of that Claim shall be as specified in the Proof of Claim filed with the Clerk;

(iii)    Subject to subparagraph (d) below, a Claim that is the subject of an objection filed before the Voting Deadline shall be disallowed for voting purposes;

(iv)    If a Claim has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, the voted amount and classification shall be that set by the Bankruptcy Court;

(v)    If a holder of a Claim or its authorized representative did not use the Ballot form provided by the Debtors, or the Official Ballot Form authorized under the Federal Rules of Bankruptcy Procedure, such vote will not be counted;

(vi)    If the Ballot is not received by the Balloting Agent on or before the Voting Deadline at the place fixed by the Bankruptcy Court, the Ballot will not be counted;

(vii)    If the Ballot is not signed by the holder of a Claim or its authorized representative the Ballot will not be counted;

(viii)    If the individual or institution casting the Ballot (whether directly or as a representative) was not the holder of a Claim on the Voting Record Date (as that term is defined below), the Ballot will not be counted;

(ix)    If the holder of a Claim or its authorized representative did not check one of the boxes indicating acceptance or rejection of the Plan, or checked both such boxes, the Ballot will not be counted;

(x)    Whenever a holder of a Claim submits more than one Ballot voting the same Claim(s) before the applicable deadline for submission of Ballots, except as otherwise directed by the Bankruptcy Court after notice and a hearing, the last such Ballot shall be deemed to reflect the voter's intent and shall supersede any prior Ballots.

(c)    Execution of Ballots by Representatives. If a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, such persons must indicate their capacity when signing and, at the Debtors' request, must submit proper evidence satisfactory to the Debtors of their authority to so act.

(d)    Waivers of Defects and Other Irregularities Regarding Ballots. Unless otherwise directed by the Bankruptcy Court, all questions concerning the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will initially be determined by the Debtors, subject to review by the Bankruptcy Court, whose determination will be final and binding.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

(e)    Withdrawal of Ballots and Revocation. Any holder of a Claim in an impaired Class who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to counsel for the Debtors at any time before the Voting Deadline.

To be valid, a notice of withdrawal must:  (i) contain the description of the Claims to which it relates and the aggregate principal amount, represented by such Claims; (ii) be signed by the holder of the Claim or Interest in the same manners as the Ballot; and (iii) be received by counsel for the Debtors in a timely manner at the addresses set forth herein.  The Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballot that is not received in a timely will not be effective to withdraw a previously furnished Ballot.

Any holder of a Claim who has previously submitted a properly completed Ballot before the Voting Deadline may revoke such Ballot and change its vote by submitting to the Balloting Agent before the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

**Section 23.05 The Confirmation Hearing**

Bankruptcy Code § 1128(a) requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing.  Bankruptcy Code § 1128(b) provides that any party-in-interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for **December 20, 2013, at 9:30 a.m. (PST)**, before the Honorable Laurel E. Davis, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Nevada, at the Foley Federal Building, 3rd Floor, Courtroom III, 300 Las Vegas Blvd. South, Las Vegas, Nevada 89101.

Objections to Confirmation of the Plan must be filed and served on the Debtors and the other parties set forth in this Disclosure Statement Order, and certain other parties, by no later than **December 17, 2013 at 5:00 p.m. (PST)**, in accordance with this Disclosure Statement Order.   THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THIS DISCLOSURE STATEMENT ORDER.

The notice of the Confirmation Hearing will contain, among other things, the deadline to object to Confirmation of the Plan, the Voting Deadline, and the date and time of the Confirmation Hearing.

**Section 23.06 Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Bankruptcy Code § 1129 have been satisfied.  The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Bankruptcy Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- The Debtors, as Plan proponent, have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an Affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy.

- The Debtors, as Plan proponent, have disclosed the identity of any insider (as defined in Bankruptcy Code section 101) that will be employed or retained by Reorganized Debtors, and the nature of any compensation for such insider.

- The Plan does not propose any rate change that is subject to approval by a governmental regulatory commission.

- Either each Holder of an Impaired Claim or Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to Bankruptcy Code § 1129(b).

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, Priority Tax Claims and, Priority Non-Tax will be paid in full, in Cash, on the Effective Date, or as soon thereafter as practicable.

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

United States Trustee, will be paid as of the Effective Date.

• The Debtors have no retirement benefit obligations except for 401(k) plans, and such plans will be rolled over.

The Debtors believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of chapter 11; and (c) the Plan has been proposed in good faith.

**Section 23.07 Acceptance by Impaired Class**

The Bankruptcy Code requires, as a condition to Confirmation, that, except as described in the following section, each Class of Claims or Interests that is Impaired under the Plan accept the Plan. A class that is not impaired under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is impaired unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of that claim or interest; or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest after the occurrence of a default--(1) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in Bankruptcy Code § 365(b)(2) of this title or of a kind that Bankruptcy Code § 365(b)(2) expressly does not require to be cured; (2) reinstates the maturity of such claim or interest; (3) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (4) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Bankruptcy Code § 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (5) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

**Section 23.08 Confirmation Without Acceptance of All Impaired Classes**

Bankruptcy Code § 1129(b) allows a bankruptcy court to confirm a plan, even if an impaired classes entitled to vote on the plan has not accepted it, provided that the plan has been accepted by at least one impaired Class. Holders of Interests in Classes A8, B8, and C8 are deemed to reject the Plan and, therefore, the Debtors intend to confirm the plan pursuant to Bankruptcy Code § 1129(b). Bankruptcy Code § 1129(b) states that, notwithstanding an impaired class's failure to accept a plan of reorganization, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Exhibit or Schedule, including to amend or modify it to satisfy Bankruptcy Code § 1129(b), if necessary.

**Section 23.09 Identity of Persons to Contact for More Information**

Any interested party desiring further information about the Plan should contact the Balloting Agent at the phone number and/or address listed in Section 1.07 of this Disclosure Statement.

*[Rest of page intentionally left blank]*

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

### ARTICLE XXIV
### CONCLUSION AND RECOMMENDATION

The Debtors believe that the Plan is in the best interests of all Holders of Claims and Interests, and urge those Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be ***received*** by the Balloting Agent no later than **December 17, 2013 at 5:00 p.m. (PST)**. If the Plan is not confirmed, or if Holders in those Classes do not vote to accept the Plan, the Holders in those Classes may not receive a distribution.

Dated: November 26, 2013.                   WESTERN FUNDING INCORPORATED,
                                            a California corporation,


By: _____
Frederick Cooper, Chief Executive Officer


Dated: November 26, 2013.                   WESTERN FUNDING INC. OF NEVADA,
                                            a Nevada corporation,


By _____
Frederick Cooper, President


Dated: November 26, 2013.                   GLOBAL TRACK GPS, LLC,
                                            a Delaware limited liability company,


By: _____
Frederick Cooper, Manager


Prepared and Submitted:

LARSON & ZIRZOW, LLC

By:  /s/ Matthew C. Zirzow
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101

Attorneys for Debtors

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169