1  LARSON & ZIRZOW, LLC
2  ZACHARIAH LARSON, ESQ.
   Nevada Bar No. 7787
3  E-mail: zlarson@lzlawnv.com
   MATTHEW C. ZIRZOW, ESQ.
4  Nevada Bar No. 7222
   E-mail: mzirzow@lzlawnv.com
5  810 S. Casino Center Blvd. #101
   Las Vegas, Nevada 89101
6  Telephone: (702) 382-1170
   Fascimile: (702) 382-1169
7

8  Attorneys for Debtors

9

10              **UNITED STATES BANKRUPTCY COURT**
                    **DISTRICT OF NEVADA**
11

12 | In re:                          | Case No.: BK-S-13-17588-LED |
   |                                 | Chapter 11                  |
13 | WESTERN FUNDING INCORPORATED,   | (Jointly Administered)      |
14 |            Debtor.              |                             |

15 | In re:                          | Case No.: BK-S-13-17586-LED |
   |                                 | Chapter 11                  |
16 | WESTERN FUNDING INC. OF NEVADA, |                             |
17 |            Debtor.              |                             |
18

19 | In re:                          | Case No.: BK-S-13-17589-LED |
   |                                 | Chapter 11                  |
20 | GLOBAL TRACK GPS, LLC,          |                             |
21 |            Debtor.              | Date:  January 21, 2014     |
   |                                 | Time:  10:30 a.m.           |
22

23         **OPPOSITION TO THE MOTION OF THE UNITED STATES TRUSTEE TO**
           **APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)(1)**
24

25

26

27

28

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

1

# TABLE OF CONTENTS

I.  JURISDICTION ..................................................................................1

II.  SUMMARY OF ARGUMENT ........................................................2

III.  STATEMENT OF FACTS ................................................................4

    A.  Relevant Pre-Petition Events ....................................................4

    B.  The Cash Collateral Motion and Stipulation...........................5

    C.  Debtors' Disclosure Statement and Previous Plan ...................6

    D.  Debtors' Filing of Its Plan Supplement and Reactions Thereto ....................8

    E.  The Auction and the Successful Bidder ...................................12

    F.  Debtors' Sale Reply and Accompanying Declarations ............14

    G.  The UST's Motion to Appoint a Chapter 11 Trustee ..............16

    H.  The Sale Hearing and the Sale Order ......................................18

    I.  Debtors' Proposed Liquidating Plan .......................................20

    J.  Other Filings Related to the UST's Motion Filed to Date ......20

IV.  LEGAL ARGUMENT ......................................................................21

    A.  Due Process and Fundamental Fairness in the Briefing ..........21

    B.  Standard of Decision ................................................................22

    C.  The Applicable Burden of Proof ..............................................25

    D.  Debtors' Management Never Had Any Future Employment with Carfinco .......29

    E.  Inclusion or Impairment of Avoidance Actions as Part of a Sale Transaction ....30

    F.  The Exculpation Provisions in Debtors' Previous Plan ...........32

    G.  Alleged Acrimony Between Debtors' Management and Creditors ..................34

V.  CONCLUSION ................................................................................39

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

# **TABLE OF AUTHORITIES**

**Cases**

Adams v. Marwil (In re Bayou Grp., LLC), 564 F.3d 541 (2d Cir. 2009)............................25

In re Altman, 230 B.R. 6 (Bankr. D. Conn. 1999)..................................................25

In re Bellevue Place Assocs., 171 B.R. 615 (Bankr. N.D. Ill. 1994) ..............................37

In re Briarwood Capital, LLC, Nos. 10–02677–PB11, 2010 WL 2884949
        (Bankr. S.D. Cal. July 19, 2010) ........................................................26

In re Cajun Electric Power Coop., Inc., 74 F.3d 599 (5th Cir. 1996)...........................35

In re Colo.-Ute Elec. Assoc., Inc., 120 B.R. 164 (Bankr. D. Colo. 1990).......................36

Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261 (1990).......................................29

Fukutomi v. United States Trustee (In re Bibo), 76 F.3d 256 (9th Cir. 1996) ..................24

Grogan v. Garner, 498 U.S. 279 (1991) ...................................................25, 27

In re Keeley & Grabanski Land P'ship, 455 B.R. 153 (B.A.P. 8th Cir. 2011) ...................25

In re LHC, LLC, 497 B.R. 281 (Bankr. N.D. Ill. 2013) ......................................26, 37

Lujan v. Nat'l Wildlife Fed., 497 U.S. 871 (1990)............................................22

In re Marvel Entm't Grp., Inc., 140 F.3d 463 (3d Cir. 1998) .............................26, 35-37

Meritage Homes of Nevada, Inc. v. JPMorgan Chase Bank, N.A. (In re South
        Edge, LLC), 478 B.R. 403 (D. Nev. 2012) ............................................33, 34

Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.),
        385 F.3d 313 (3d Cir. 2004) ...........................................................25, 37

Owens v. Miller (In re Miller), 276 F.3d 424 (8th Cir. 2002).................................27

Peruta v. County of San Diego, 678 F. Supp. 2d 1046 (S.D. Cal. 2010)........................22

In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000).......................................33

Sogeti USA LLC v. Scariano, 606 F. Supp. 2d 1080 (D. Ariz. 2009)..........................22

In re Sundale, Ltd., 400 B.R. 890 (Bankr. S.D. Fla. 2009)................................26, 37

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

In re The 1031 Tax Group, LLC, 374 B.R. 78 (Bankr. S.D.N.Y. 2007)..............................25

Tradex v. Morse, 339 B.R. 823 (D. Mass 2006)....................................................................25

United States ex rel. Giles v. Sardie, 191 F. Supp. 2d 1117 (C.D. Cal. 2000)...................22

United States Tr. v. Pettibone Corp., 251 B.R. 335 (N.D. Ill. 2000)..................................26

In re Veblen W. Dairy LLP, 434 B.R. 550 (Bankr. D.S.D. 2010)........................................25

In re WCI Cable, Inc., 282 B.R. 457 (Bankr. D. Or. 2002)..................................................33

## Statutes

11 U.S.C. § 1104(a)(1)................................................................................................passim

11 U.S.C. § 1104(a)(2)..............................................................................2, 17, 21 and 23

11 U.S.C. § 1104(e)................................................................................................................24

11 U.S.C. § 1107(a)..................................................................................................................1

11 U.S.C. § 1108......................................................................................................................1

11 U.S.C. § 1121....................................................................................................................20

28 U.S.C. § 157........................................................................................................................2

28 U.S.C. § 1334......................................................................................................................2

## Other Authorities

Clifford J. White III & Walter W. Theus, Jr., Chapter 11 Trustees and Examiners
    After BAPCPA, 80 Am. Bankr. L.J. 289 (2006) ................................25, 27 and 28

7 Collier on Bankruptcy ¶ 1104.02 (16th ed. 2013) ....................................23, 24, and 27

Delaware Bankruptcy Court Approves Contested Real Mex Section 363 Sale to
    Second Lien Noteholders Notwithstanding Administrative Insolvency,
    available at www.olshanlaw.com/media/alert/25_Client_Alert_1202.pdf
    (last visited January 5, 2014) ...............................................................................31

Grede Foundries – Preference Claims, 503(b)(9) Claims Opposition Precede 363 Sale,
    available at http://www.burbageweddell.com/2009/11/17/preference-claims-
    503b9-363-sale/ (last visited January 5, 2013) ...................................................31

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

iv

Jonathan M. Landers, The Changing Face of Chapter 11 for Large Operating Businesses, Pratt's Journal of Bankruptcy Law (February/March 2012) ................................31

Kelly Frazier, A Comparison Shopping Guide for 363 Sales (Am. Bankr. Inst. 2009)..............31

5 Norton Bankr. L. & Prac. 3d § 99:1.............................................................................28

Samir D. Parikh, The Improper Application of the Clear and Convincing Standard of Proof:  Are Bankruptcy Courts Distorting Accepted Risk Allocation Schemes?, 78 U. Cinn. L. Rev. 271 (Fall 2009).......................................................27, 28

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Western Funding Incorporated ("WFI"), Western Funding Inc. of Nevada, and Global Track GPS, LLC (collectively, the "Debtors"), debtors and debtors in possession, hereby submit their opposition (the "Opposition") to the motion (the "Motion") [ECF No. 575] filed by the Office of the United States Trustee (the "UST") seeking to appoint a Chapter 11 trustee in these bankruptcy cases.

This Opposition is supported by the following declarations previously filed in these cases: (a) *Omnibus Declaration of Frederick A. Cooper in Support of Debtors' Initial Emergency Motions and Related Relief* (the "Omnibus Declaration") [ECF No. 53]; (b) *Declaration of Frederick A. Cooper in Support of Motion for Order Approving Stipulation Authorizing Debtors' to Use Cash Collateral, Granting Adequate Protection and Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362 and 363* (the "Cooper Cash Collateral Declaration") [ECF No. 205]; (c) *Declaration of Frederick A. Cooper in Support of Debtors' Omnibus Opposition to Motion to Dismiss Chapter 11 Case and Joinder Therein* (the (the "Cooper Dismissal Declaration") [ECF No. 224]; (d) *Declaration of Frederick A. Cooper in Support of Debtors' Motion Pursuant to Sections 105(a), 363 and 504(b) of the Bankruptcy Code and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure for an Order Approving Break-Up Fee and Expense Reimbursement Payments to Plan Sponsor* (the "Cooper Breakup Fee Declaration") [ECF No. 276]; (e) *Declaration of Michael A. Tucker in Support of Reply in Support of Motion to Sell Substantially All of the Operating Assets of the Debtors* (the "Tucker Sale Declaration") [ECF No. 570]; (f) *Declaration of Frederick A. Cooper in Support of Reply to Oppositions to Sale of Substantially All of the Operating Assets of the Debtors* (the "Cooper Sale Declaration") [ECF No. 571].

## I. JURISDICTION

1.      On September 4, 2013 (the "Petition Date"), Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing their bankruptcy cases (the "Chapter 11 Cases"). Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases are being

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

1

1   jointly administered and an Official Committee of Unsecured Creditors (the "<u>Committee</u>) has

2   been appointed and retained counsel.

3   2.      The Court has subject matter jurisdiction to consider and determine this matter

4   pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §

5   157(b).  Pursuant to LR 9014.2, Debtors consent to the entry of final orders and judgments by the

6   bankruptcy judge with respect to the Motion.

7   **II.  SUMMARY OF ARGUMENT**

8   3.      The UST seeks the appointment of a Chapter 11 Trustee "for cause" pursuant to

9   section 1104(a)(1) of the Bankruptcy Code.  The UST's Motion argues that two separate grounds

10  provide "cause" for the appointment of a chapter 11 trustee:  (1) alleged "self-dealing by

11  management" and references four specific instances of such alleged self-dealing, and (2)

12  "acrimony between a debtor's management and creditors."  Motion, ¶¶ 27 and 28.  The UST's

13  Motion is not premised on any argument based upon the "interests of creditors . . . and other

14  interests of the estate" pursuant to section 1104(a)(2) of the Bankruptcy Code.  As explained

15  herein, the UST's Motion must be denied for numerous reasons.

16  4.      First, Debtors' existing management never had, obtained or was promised any

17  position or employment with Carfinco Financial Group, or any affiliate thereof ("<u>Carfinco</u>") by

18  virtue of Carfinco being designated as the stalking horse bidder in these Chapter 11 Cases, and

19  thus there was never any position to disclose or to influence the process as the UST claims.  In

20  fact, the UST's entire argument is premised on a misunderstanding of the Plan Supplement (as

21  hereinafter defined), which listed only the possibility, and out of an abundance of caution, that

22  Debtors' existing management may possibly serve in an officer role in the reorganized entity if

23  Carfinco were the successful bidder.  The evidence is unrefuted, however, that at no time was

24  any specific employment or officer arrangement ever made, much less any specific terms

25  discussed, offered, agreed to, or accepted, whether formally, informally, in writing or oral.  In

26  short, the UST's arguments regarding management's alleged self-dealing or breach of fiduciary

27  duty based upon some future role with Carfinco are all based on a faulty premise that is

28  unsupported by any evidence, and which has been refuted by several declarations and witnesses.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

2

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

5.     Second, the UST's argument that Debtors' management "shielded themselves from avoidance actions under the plan they proposed," and thus were involved in self-dealing or conflicts of interest is also incorrect because the purchase terms and thus the Previous Plan (as hereinafter defined) filed to consummate that proposed purchase were ultimately dictated by Carfinco as the stalking horse bidder.  Moreover, it is a common and well-recognized practice that a buyer of an operating business in bankruptcy may seek to purchase or resolve various avoidance actions to protect its purchased assets and to allow it to operate the business going forward and unimpeded by avoidance actions against existing vendors and other parties that could be critical to its successful operation and to the maintenance of goodwill.  In addition, based upon the specific facts and circumstances of these particular cases, given the significant pre-petition management disputes that devolved into substantial litigation, and lead to the chapter 11 filings, it should not at all be surprising, if not expected, that a potential buyer like Carfinco may be interested in trying to "buy some peace" and require as part of its purchase that certain estate-owned litigations to be included and resolved as part of its offer.  As such, the foregoing also does not establish the requisite cause for the appointment of a chapter 11 trustee.

6.     Third, to the extent the UST questions the exculpation and related provisions in Debtors' Previous Plan (as hereinafter defined), such provisions are proper and have been upheld in appropriate circumstances.  As such, Debtors' use of an appropriately tailored exculpation provision in its plan also fails to establish the requisite cause for the appointment of a chapter 11 trustee.

7.     Finally, the UST states that "acrimony between a debtor's management and creditors is grounds for the appointment of a Chapter 11 trustee," but fails to provide any discussion as to why that argument applies in these Chapter 11 Cases in particular.  As such, Debtors are at a loss to address this argument in light of the lack of any explanation provided.  In addition, shortly after the sale of a significant portion of its assets, and given that much of the remaining asset sales should be concluded in the next month or less (other than perhaps certain of the realty), Debtors have taken the responsible step of seeking to conclude its Chapter 11 Cases by filing a simple and unobjectionable liquidating plan seeking to preserve all remaining assets

3

and litigation claims and place them into a liquidating trust to be administered by a neutral liquidating trustee for the benefit of unsecured creditors. Although there have certainly been significant disputes in these Chapter 11 Cases—including most notably the B Parties' motion to dismiss the cases for an alleged lack of corporate authorization and also the filings immediately prior to Debtors' main portfolio auction, which ended up being a resounding success—the previous disputes in these cases do not extend beyond the normal and healthy conflicts present in many large chapter 11 proceedings. In sum, there is no acrimony rising to the level of interfering with a successful reorganization; rather, Debtors are expeditiously proceeding towards a rapid, yet economical conclusion to these cases by filing a liquidating plan, which can be confirmed and effective in less than two months. As such, any prior or perceived acrimony does not exist and/or does not rise to the level of mandating the extraordinary remedy of displacing existing management with a chapter 11 trustee, especially given the very limited remainder of work left to do to bring the main Chapter 11 Cases to a meaningful conclusion.

### III. STATEMENT OF FACTS

**A.    <u>Relevant Pre-Petition Events</u>**

8.    An overview of Debtors' business, corporate and management structure, WFI's sale to Harbor Structured Finance, LLC ("<u>Harbor</u>") in 2010, the subordinated debt holders who took back paper as part of the purchase price from the foregoing sale—and who now comprise the entirety of the Committee's members, the substantial disagreements and litigation that erupted among the parties involved in Harbor, and Debtors' loan and default with its senior secured lender, BMO Harris Bank N.A. ("<u>BMO</u>"), are all set forth in the Omnibus Declaration, which background facts are incorporated herein by reference as though fully set forth herein.

9.    Commencing in or about May 2013, Debtors considered competing restructuring, investment, and/or acquisition proposals from certain of their parent company's equity owners, various third parties, and Carfinco. Carfinco is a leading company in the automotive finance sector, whose core business is indirect originations and servicing of auto loans. Carfinco is a public company headquartered in Edmonton, Alberta, Canada.

10.    Carfinco was first approached to consider a possible transaction involving WFI on

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

or about November 2012. In June, July and August of 2013, Carfinco submitted various letters of intent for a share purchase or an asset purchase and negotiated extensively with Debtors and BMO. BMO did not approve of Debtors entering into any transactions contemplated by those letters of intent pre-petition of various reasons.

**B.    The Cash Collateral Motion and Stipulation**

11.    At the outset of these Chapter 11 Cases, Debtors sought and obtained interim authority to use cash collateral pursuant to a budget on a nonconsensual basis over BMO's significant objection. [ECF Nos. 46 and 97]. After further substantial negotiations stretching over more than a week, after the production of voluminous documentary discovery and with potentially further significant and expensive discovery imminent, Debtors and BMO were eventually able to come to an agreement on the terms and conditions of a consensual use of cash collateral for the Chapter 11 Cases. The parties were only able to come to an agreement after the exchange of multiple drafts of a proposed stipulation and budget, which also had substantial input from the Committee.

12.    As noted in the Cooper Cash Collateral Declaration, Debtors' negotiations with BMO regarding the proposed budget and cash collateral stipulation were at arms' length and in good faith, and the documents were the product of substantial and lengthy discussions. Although the deadlines in this stipulation were unquestionably tight, Debtors sought approval of it so as to provide them with a degree of certainty in knowing how much time it would have to effectuate a transaction in these Chapter 11 Cases, and avoid unnecessary and expensive valuation litigation with BMO, which would also allow Debtors to better devote their time toward finding a transaction to maximize the value of the estates' assets.

13.    Debtors and BMO entered into a *Stipulation Authorizing Debtors to Use Cash Collateral, Granting Adequate Protection and Granting Relief from the Automatic Stay Pursuant to Sections 361, 362 and 363 of the Bankruptcy Code* [ECF No. 204-1] (the "Cash Collateral Stipulation"). On October 24, 2013, the Court approved the Cash Collateral Stipulation on a final basis [ECF No. 237].

14.    Subject to a five (5) day cure, the Cash Collateral Stipulation provided for the

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

following "milestones," the failure of which are termination events: (a) failure to file a Plan on or before October 25, 2013, or file a motion seeking Court approval to establish bidding procedures for and to sell substantially all of the collateral pursuant to section 363 of the Bankruptcy Code with the consent of BMO and with a full preservation of its credit bid rights on or before November 11, 2013; (b) failure to obtain entry of an order, in an acceptable form to BMO, approving a disclosure statement or approving bidding procedures for a sale pursuant section 363 of the Bankruptcy Code by November 23, 2013; (c) failure to obtain entry of an order, in an acceptable form to BMO, either confirming a plan or approving a sale pursuant to section 363 of the Bankruptcy Code on or before December 23, 2013; and (d) failure of Debtors to effect a confirmed plan or to close a sale pursuant to section 363 of the Bankruptcy Code on or before January 4, 2014.  (Cash Collateral Stipulation at §§ 12(g)-(j)).  At no time did the Committee ever raise any objection to the foregoing milestones; rather, its only objection in this context was to the salaries paid to Debtors' management as part of the budget, which the parties ultimately resolved consensually by having Debtors' senior management agree to a pay cut during the term of the Cash Collateral Stipulation.

## C.    Debtors' Disclosure Statement and Previous Plan

15.    After lengthy negotiations, Debtors selected the latest proposal by Carfinco as being in the best interests of their creditors and other constituencies.  Under the proposal, Carfinco was to acquire all of the new equity ownership interests of the reorganized Debtors, free and clear of all liens, claims and encumbrances in accordance with a confirmed plan of reorganization and an accompanying stock purchase agreement.  Carfinco insisted on a share purchase styled transaction through a chapter 11 plan of reorganization, instead of a "straight" 363 asset sale, apparently because such a structure may preserve certain positive tax attributes, and because it had the potential, in certain jurisdictions, to ease the transfer of various required state licenses.

16.    On November 1, 2013, Debtors filed a fully executed copy of their Letter of Intent with Carfinco as stalking horse bidder [ECF No. 265].

17.    On November 26, 2013, the Court entered an *Order: (i) Approving Adequacy of*

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

*Disclosures in Debtors' Proposed Disclosure Statement to Accompany Debtors' Joint Plan of Reorganization, et al.* (the "Disclosure Statement Order") [ECF No. 383], which approved Debtors' solicitation of votes and setting a confirmation hearing on Debtors' proposed *Joint Plan of Reorganization* (the "Previous Plan") [ECF No. 384] for December 20, 2013.[1]

18.    On November 27, 2013, the Court entered an *Order Approving and Authorizing (A) Bidding Procedures in Connection with the Purchase of the Operating Assets of the Debtors, (B) Form and Manner of Notice of the Sale Hearing, and (C) Related Relief* (the "Bid Procedures Order") [ECF No. 390], which set a bid deadline for the sale of Debtors' principal assets for December 16, 2013, a deadline for any objections to the proposed sale of December 17, 2013, an Auction for December 18, 2013, and a Sale Hearing for December 20, 2013.

19.    On December 3, 2013, Debtors filed their *Notice of Bid Deadline, Auction and Sale Approval Hearing in Connection with the Sale of the Debtors Assets Free and Clear of Liens, Claims, and Encumbrances* [ECF No. 403].

20.    On December 9, 2013, the Committee served various written discovery on Debtors and at the same time filed a *Motion for Approval of Procedures To Set Expedited Discovery Schedule, And Motion in Limine* (the "Committee Discovery Motion") [ECF No. 440], which sought extensive discovery from Debtors in contemplation of plan confirmation.    The Committee's discovery sought documents and interrogatory responses on various matters, including but not limited to:    (a) determining whether Debtors' existing management had any employment or role with Carfinco, (b) all backup documentation regarding all transfers made within the applicable chapter 5 statutory lookback periods to Debtors' management, and (c) all communications between or among Carfinco and Debtors.

21.    Debtors timely responded to the Committee's substantial confirmation discovery, including but not limited to providing backup for all transfers listed on WFI's *Statement of Financial Affairs* (the "SoFA").    In this regard, although the UST's Motion vaguely asserts that

---

[1] A copy of the transcript of the hearing on November 25, 2013 regarding approval of the proposed Disclosure Statement is attached hereto as Exhibit "1."

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

"over $2.2 million was paid to Frederick and Katherine Cooper during the one year look back period," Motion, ¶ 5, such a statement ignores that nearly all of these payments were either for salary and other benefits paid pursuant to longstanding employment agreements that had been in place since 2010, or to reimburse them for WFI's use of their personal credit cards, which they permitted WFI and its employees to use in the ordinary course of business because WFI was unable to obtain its own business credit cards. In addition, Debtors provided extensive backup documentation for the foregoing expenses and none of these reimbursements has ever been challenged in spite of the foregoing disclosures.

22.    As part of its discovery responses Debtors also provided the following verified interrogatory response to the Committee's requests for information concerning any actual or potential employment of the Coopers by Carfinco:

> In the summer of 2013, the Coopers had a brief discussion with Carfinco regarding potential post-sale employment at reduced compensation levels. No terms of employment were provided and, upon advice of counsel, no further discussions were undertaken until on or about November 20, 2013, when the Coopers have a meeting with a principal of Carfinco. During the November 20, 2013 discussion, Carfinco indicated that there may be potential employment for the Coopers once Carfinco completed its purchase of the company, but at compensation levels substantially less than per their existing employment agreements with Debtors. In response, the Coopers noted that they were unsure whether they wanted to continue to work at the business after Carfinco closed on its proposed purchase. To date, no employment terms have been proposed or provided by Carfinco and no further discussions regarding the Coopers' employment have occurred. On December 12, 2013, Carfinco indicated its intent to reject all employment contracts if it is the successful bidder at the Sale Hearing. Upon information and belief, with respect to all other employees, it is Debtors' understanding that Carfinco intends to make offers of employment to substantially all of Debtors' existing non-management level employees on similar terms as they were employed pre-petition.

Response to Interrogatory No. 20.

**D.    Debtors' Filing of Its Plan Supplement and Reactions Thereto**

23.    On December 14, 2013, Debtors filed their *Plan Supplement for Joint Plan of*

*Reorganization* (the "Plan Supplement") [ECF No. 510], which was required pursuant to and contemplated by Section 1.06 of the Plan.[2]  Section 1.06 of the Previous Plan has always been included as part of every version of Debtors' Previous Plan, including the original version filed on November 15, 2013 and the amended version filed on November 25, 2013. See ECF No. 322, Ex. 1; see also ECF No. 373, Ex. 2 (redline of Previous Plan showing no changes to Section 1.06 between original version of Previous Plan filed on November 15, 2013 and the amended version filed the day before the Disclosure Statement).  In other words, all parties were put on notice for a month prior to Debtors' filing of its Plan Supplement that such a filing was forthcoming, as well as the timing of the filing and its contents.  Section 1.06 of the Previous Plan has always provided that the Plan Supplement would be filed by the Plan Supplement Filing Date, that the documents would need to be approved as part of the Confirmation Order, and that Debtors explicitly reserved the right to modify or make additions or subtractions to the Plan Supplement before the Confirmation Date.  The Plan Supplement Filing Date was defined in Section 1.02(106) of the Plan as five (5) days before the Voting Deadline, which date itself was also made expressly subject to modification.  As such, given the short deadlines in the Chapter 11 Cases as necessitated by the Cash Collateral Stipulation, the Plan Supplement Filing Date has always been, and necessarily was shortly before the confirmation hearing, after solicitation on the Previous Plan had commenced, and shortly prior to the Voting Deadline.  Additionally, Section 7.04(f) of the Disclosure Statement and Section 6.10 of the Plan both clearly indicated that the Reorganized WFI's governance documents would be provided as part of the Plan Supplement. Significantly, no party ever objected to any of the foregoing as part of their filed objections to approval of the Disclosure Statement.  See ECF Nos. 356, 359-361 and 371.  As such, it is disingenuous for any party to complain about the timing and process set forth for the Plan Supplement when they were fully advised since mid-November that it would happen, when it

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

---

[2] As Debtors' counsel has sought to do throughout the Chapter 11 Cases, drafts of the revised governing documents for reorganized WFI, which Carfinco had prepared--and without any input from Debtor--for inclusion in the Plan Supplement, were actually shared with the Committee the day prior to their being filed with the Court.  Moreover, Debtors' counsel specifically discussed them with Committee counsel several days prior to their being filed to make sure they would not be misinterpreted or misconstrued as to what they actually meant.

would be filed and what it would contain.

24.    The Plan Supplement provided numerous documents including the proposed corporate and organizational documents for the Reorganized Debtors, a copy of the applicable financing commitment that Carfinco had obtained for its new credit facility, and a copy of the proposed form of liquidating trust agreement for the Previous Plan.  At no point prior to the filing of the Plan Supplement did any party inquire from Debtors regarding the source of Carfinco's financing for the proposed stalking horse transaction.  Additionally, Debtors' counsel stated numerous times on the record in open court and well in advance of the Sale Hearing that BMO was an existing lender to Carfinco (among various others), and thus that lender-borrower relationship was fully disclosed.  As such, it is disingenuous for any party to claim to be surprised by the disclosure in the Plan Supplement that one of Carfinco's existing lenders would serve as the lender for a new or expanded facility to allow it to acquire Debtors' assets as well.

25.    On December 16, 2013, and ostensibly in "reaction" to the Plan Supplement, the Committee filed what it called a *Motion To Extend Bidding Deadlines or in the Alternative, Allow the Committee to Have Consent Rights in Connection With Bidding Process* (the "Motion to Extend") [ECF No. 513 and 523], to which the B Parties filed a joinder [ECF No. 525].  The Committee's Motion to Enforce alleged that the Plan Supplement's listing of Debtors' existing management as having some potential officer role was a "newly disclosed relationship," and in spite of being apprised directly to the contrary by Debtors' counsel several days prior to that filing.  Based on this mistaken premise, the Committee further argued in its Motion to Extend that "[t]he newly disclosed relationship between the Coopers and the Debtors [sic], coupled with the facts and actions by the Debtors in this case, demonstrate that the Debtors have been conducting themselves in a manner that is solely intended to benefit insiders and in breach of their fiduciary duties and obligations to unsecured creditors and in violation of applicable law . . ."  Id. at p. 1.  As a result of the foregoing, and various other unsupported allegations, the Committee asserted that Debtors had breached their fiduciary duties, that Carfinco may have aided and abetted such breaches of fiduciary duties, that Debtors' actions were a breach of good faith and unfair, and that other potential claims such as civil conspiracy, tortious interference,

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

unjust enrichment and damages may be available.

26.     On December 17, 2013, both BMO [ECF No. 531] and Carfinco [ECF No. 534] filed their respective oppositions to the Committee's Motion to Extend, and Carfinco also filed a declaration of its principal in support thereof [ECF No. 535].  In BMO's opposition to the Committee's Motion to Extend, BMO argued that the deadlines in the Chapter 11 Cases were negotiated between the parties, with the input of the Committee, and were approved by the Court. BMO also argued that its collateral was an asset that was declining in value over time, that it allowed the use of its collateral to allow Debtors a chance to reorganize or orderly liquidate, and that this use does not come without risk to BMO, and thus it was for that reason that it required the deadlines.  Further, BMO explained that extending the deadlines will terminate BMO's consent to Debtors' use of cash collateral, will be a termination event under the Cash Collateral Stipulation, and will, in all likelihood, wreak havoc in the Chapter 11 Cases. Additionally, BMO argued that extending the deadlines was not necessary in any event because Debtors' assets were marketed extensively prepetition, and the bid process has garnered an overbid, and that the scheduled auction would be an active auction that will maximize the value of the assets.

27.     BMO also argued that despite the Committee's insinuations to the contrary, there is nothing untoward or inappropriate about BMO, through the origination side of the bank, agreeing to provide financing for Carfinco's stalking horse bid, while the workout side of the bank participates in the bankruptcy process as senior secured lender.  In this regard, BMO made it clear to all parties in interest that it intended to maximize the value of its collateral and that it will not allow its collateral to be sold at a price that undervalues such collateral.  Indeed, BMO had transmitted to Debtors and the Committee its Notice of Intent to Credit Bid, by which BMO placed both parties on notice that BMO intended to credit bid at the auction should the bids not reach an amount that BMO deems to be reflective of the value of its collateral.  Further, BMO argued that it allowed its cash collateral to fund the sale efforts through Debtors' retention of an investment banker/financial advisor, FTI Consulting, as well as funding the Committee and its financial advisor, Amherst Partners, all in an attempt to maximize value for the estates.  As a result, BMO argued that the Committee's concerns were misplaced and do not provide cause to

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

1    either extend the deadlines applicable in this case.

2    28.    Carfinco's opposition to the Committee's Motion to Extend argued that the

3    deadlines in Carfinco's Letter of Intent with Debtors were driven by and a direct result from the

4    milestones required in the Cash Collateral Stipulation as approved by the Bankruptcy Court,

5    which stipulation Carfinco took no part it whatsoever.  Carfinco also argued that given that it was

6    not offering to purchase the loan portfolio merely to wind it down as a liquidation, but rather was

7    seeking to purchase a going concern, it is only logical that it not want claims against its potential

8    new employees and its vendors to continue post-acquisition.  Carfinco further argued that there is

9    nothing unusual from the perspective of a purchase of a debtor to start fresh without litigation

10   ensnarling its reorganized entity.  Nevertheless, Carfinco stated that it was no longer requiring

11   clause (iii) of the Retained Claims as defined in the Plan--the claims against employees, officers

12   and directors of the Company, but was still requiring the retention of claims against

13   counterparties to assumed contracts because such retentions are customary in transactions.

14   29.    At a limited hearing on December 17, 2013, the Court held that the Committee's

15   Motion to Extend was premature, as such arguments could be made in conjunction with the

16   Confirmation Hearing and/or Sale Hearing to be held later that week, and that at that juncture—

17   being the day before the scheduled Auction, the Court would not interrupt Debtors' sale process

18   that was well underway at that point.

19   30.    Also on December 17, the Committee filed its opposition to Debtors' Sale

20   Motion, in which the B Parties filed a *Joinder* (collectively, the "Sale Objections") [ECF Nos.

21   549 and 552], which repeated many of the same allegations made in their Motion to Extend.

22   31.    On December 18, 2013, the Committee filed an objection to the confirmation of

23   Debtors' proposed Plan, in which the B Parties filed a *Joinder* (collectively, the "Confirmation

24   Objections") [ECF Nos. 553 and 554], which repeated many of the same allegations made in the

25   Motion to Extend and the Sale Objections.

26   **E.    The Auction and the Successful Bidder**

27   32.    As of the Bid Deadline on December 16, 2013, Debtors had received Carfinco's

28   bid as the stalking horse bidder, a notice of intent to credit bid from BMO, and a qualifying

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

overbid from Westlake Services, LLC dba Westlake Financial ("Westlake"). In light of the receipt of minimum overbid from Westlake by the Bid Deadline, on December 16, 2013, Debtors filed with the Court that evening a *Notice of Auction* [ECF No. 530] indicating that the Auction would be proceeding as scheduled given that there were multiple Qualified Bidders.

33. On December 18, 2013, the Auction proceeded as scheduled and the result was astounding. A copy of the transcript from the Auction is attached hereto as Exhibit "2." As previously noted, and to avoid any confusion, the foregoing modifications with respect to the Retained Claims were put on the record at the Auction.

34. At the Auction, from the projected initial Purchase Price offered by Carfinco as the stalking horse bidder of $22,893,318, there were thirty four (34) overbids resulting in an increase in the projected Purchase Price to $26,193,318 (plus recovery of the $365,000 break-up fee and up to $450,000 expense reimbursement) for a net gain of an estimated $3,300,000 (and a total estimated final bid of $27,008,318). The Successful Bid of Westlake results in an offer of 80.090% of Debtors' projected net finance receivables as of January 5, 2014, which was up from the 70% offer made as part of the initial stalking horse bid.

35. On the afternoon of December 18, 2013, Debtors filed their *Notice of Auction Results* [ECF No. 562] setting forth Westlake's Successful Bid, thereby giving notice of its intent to proceed with approval of Westlake's Successful Bid at the Sale Hearing. As a result thereof, Debtors withdrew their Previous Plan without prejudice and proceeded only with approval of the proposed sale to Westlake pursuant to section 363 of the Bankruptcy Code.

36. The result at the Auction was so exceptional that the Sale Oppositions and the Motion to Extend were all withdrawn or mooted. On December 19, 2013, the Court approved a stipulation between the Committee and Debtors to withdraw the Confirmation Discovery Motion [ECF Nos. 563 and 566], and the Committee and the B Parties agreed to withdraw their Sale Objections and the Motion to Extend, provided that the Sale Order reflected that the Retained Claims were not being sold, and any alleged causes of action against management, if any, were preserved for the benefit of the estates.

37. That the Auction was vigorous and resulted in a substantial increase in the net

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

value to the estates speaks volumes of the propriety of the process.  The Auction was hotly bid up by two competing bidders and without requiring any intervention by BMO as credit bidder. Indeed, when comparing the asserted claim of BMO as against all of Debtors' cash on hand, the anticipated sale proceeds from the sale to Westlake, and the anticipated sale proceeds of the Excluded Retail Contracts, Debtors believe it will result in a positive recovery for general unsecured creditors, and without even including any potential recovery on any sales of Debtors' real properties, which are encumbered by certain deeds of trust recorded in favor of the B Parties, but which are also the subject of substantial dispute and forthcoming litigation.

**F.**    **Debtors' Sale Reply and Accompanying Declarations**

38.    On December 19, 2013 at approximately 2:00 p.m., Debtors filed their *Omnibus Reply to Oppositions to Sale of Substantially All of the Operating Assets of the Debtors* (the "Sale Reply") [ECF No. 567], which addressed the various arguments made by the Committee and the B Parties in their Sale Objections and related filings.  The Sale Reply was also supported by the Tucker Sale Declaration and the Cooper Sale Declaration.

39.    The Tucker Sale Declaration described FTI's efforts to engage bidders and have a meaningful marketing and sale process under the timing circumstances imposed by the Cash Collateral Stipulation.  In addition, the Tucker Declaration testified as follows:

> a.    At no point was I ever involved in or party to any discussions between Debtors' existing management and Westlake regarding any potential offer of employment or continuing role for Debtors' existing management in Westlake or any affiliated entity that may purchase Debtors' assets.  I am unaware of any separate agreements or arrangements between anyone involved in Debtors' management and anyone involved with Westlake.
>
> b.    Based upon my knowledge and experience, I believe that Debtors' assets were adequately marketed given the specific facts and circumstances of this case, as well as the stringent deadlines imposed by the Cash Collateral Stipulation and related deadlines and terms in the Carfinco LOI.

Id. at ¶¶ 25 and 26.

40.    The Cooper Sale Declaration testified to various significant points, including the following:

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

a.      The negotiations with Debtors, BMO, the Committee and Carfinco leading up to the execution of the Stalking Horse Agreement, as well as the proposed Agreement with Westlake, involved extensive arms-length bargaining among the parties who participated, each represented by competent legal counsel.  Carfinco and/or Westlake representatives were responsible for proposing and/or negotiating the terms on behalf of their respective clients.  Those bidders efforts to acquire the assets have been made in good faith.

b.      I am not aware of any fraud, collusion or bad faith in or relating to the negotiations leading up to the execution of Stalking Horse Agreement with Carfinco or the Agreement with Westlake, the Auction, the request to consummate the sale transaction or in any other matter involving the sale transaction.

c.      I am not aware of any agreement by Carfinco or Westlake, the Committee or the Debtors, or any other party, pursuant to which any party has agreed to provide or receive consideration or compensation that has not been disclosed to the Bankruptcy Court in connection with approval of the Stalking Horse Agreement with Carfinco or the Agreement with Westlake, or that would be inconsistent with a good faith finding by the Bankruptcy Court.

d.      Neither Carfinco nor Westlake have made any offers of employment or compensation to the Debtors' current or former officers or board members as a condition to closing the sale transaction; rather, I am advised that both parties, at best, contemplated the possibility of such matters, but have opted to leave such matters until after the closing of a transaction.

e.      With respect to Carfinco, in the summer of 2013, my wife and I had a brief discussion with Carfinco regarding potential post-sale employment at reduced compensation levels.  No specific terms of employment were provided and, upon advice of counsel, no further discussions were undertaken until on or about November 20, 2013, when we had a meeting with a principal of Carfinco.  During the November 20, 2013 discussion, Carfinco indicated that there may be potential employment for my wife and I once Carfinco completed its purchase of the company, but at compensation levels substantially less than per their existing employment agreements with Debtors.  In response, I noted that we were unsure whether we wanted to continue to work at the business after Carfinco closed on its proposed purchase.  To date, no employment terms were ever proposed or provided by Carfinco and no further discussions regarding our employment have occurred.  On December 12, 2013, Carfinco indicated its intent to reject all employment contracts if it is the successful bidder.  Upon information and belief, with respect to all other employees, it is Debtors' understanding that Carfinco intended to make offers of employment to substantially all of Debtors' existing non-management level employees on similar terms as they were employed pre-petition.

f.      With respect to Westlake, in early December 2013, my wife and I personally met with the owner of Westlake who asked us generally whether we would be willing to relocate to the Los Angeles area should Westlake be the Successful Bidder.  I responded that we may consider it, however, it would be difficult to move away from our

15

daughter who also lives in Las Vegas. No specific terms were never and have never been discussed, agreements or promises made in any fashion with respect to my wife and I, or any family member, for any employment with Westlake.

g.    At all times Debtors acted in good faith and using their best efforts to effectively and efficiently market their assets for sale and to achieve the highest and price for the assets under the trying circumstances of these bankruptcy cases. In this regard, I believe Debtors canvassed the market of likely potential bidders, and attempted to focus its efforts on what it believed in the exercise of its business judgment were the most likely potential bidders for those assets. Based upon my extensive experience in the automobile loan industry, and in a proper exercise of my business judgment, I believe the price obtained for the assets sold to Westlake fairly compensates the bankruptcy estates under the specific circumstances of these cases and believe it is appropriate for the court to authorize and approve the proposed sale transaction to Westlake.

Id. at ¶¶ 3-9.

41.    Indeed, if anything, Debtors' management was exceptionally cautious in its communications with Carfinco regarding the possibility of their potential future employment because they required that their personal counsel to be physical present and listen to the November 2013 telephone call wherein Carfinco briefly discussed such a possibility, and without providing any real specifics or terms. Debtors' management took the significant step of including their personal counsel in this telephone call as a protective measure, because they took their fiduciary duties to the estates very seriously, and because they wanted to ensure that they were fully complying with such duties. Additionally, given the litigious nature of certain constituencies in the Chapter 11 Cases, Debtors' management wanted to make sure that such a conversation was witnessed and thus could not be misconstrued later. Moreover, in any event, and as previously noted, this discussion was preliminary, contained no specifics, and occurred long after Debtors had entered into the Carfinco Letter of Intent. As such, there is no conceivable way, given when it occurred, that this discussion could have had any real influence on the process, as Carfinco had previously already been designated the stalking horse bidder. Moreover, it was far from certain whether Debtors' management would even accept such a position from Carfinco should it prove to be the winning bidder in any event as no specific terms were ever discussed, implied, or inferred.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

**G.    The UST's Motion to Appoint a Chapter 11 Trustee**

42.    On December 19, 2013 at 8:48 p.m., which was the evening before the Sale Hearing, and after Debtors had already indicated that Westlake, as an asset buyer, was the winning bidder, not Carfinco, and thus that Debtors were withdrawing their Previous Plan, the UST filed its Motion.  The UST's Motion argues that there are two principal grounds constituting "cause" for the appointment of a trustee:  (1) alleged "self-dealing by management," and (2) "acrimony between a debtor's management and creditors."  Motion, ¶¶ 27 and 28.  The UST's Motion is premised solely on the "cause" standard pursuant to section 1104(a)(1) of the Bankruptcy Code, and not on the "interests" standard pursuant to section 1104(a)(2) of the Bankruptcy Code.

43.    With respect to the alleged "self-dealing by management," the UST's Motion identifies the following four (4) grounds of alleges cause to appoint a chapter 11 trustee:  (a) "Debtors' officers obtained officer positions through the stalking horse in the reorganized debtor;" (b) "Debtors' officers failed to disclose their relationships with the stalking horse until after submission of a plan, approval of a disclosure statement, and the start of solicitation;" (c) "by becoming officers through the stalking horse in the reorganized debtors, Debtors' officers shielded themselves from avoidance actions under the plan they proposed;" (d) "by becoming officers through the stalking horse in the reorganized debtors, Debtors' officers obtained exculpation under the plan they proposed."

44.    With respect to the alleged "acrimony between a debtor's management and creditors," the UST's Motion fails to explain specifically what acrimony exists, how it has affected the case, or really any other explanation or evidence in that regard.  As such, it is very difficult for Debtors' to respond to such an unexplained, conclusory allegation, and it is unfair for Debtors to have to guess in this Opposition, or allow the UST to actual explain this allegation with any degree of specificity only in the reply.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

**H.    The Sale Hearing and the Sale Order**

45.    At the Sale Hearing,[3] and even though the UST had only filed its Motion late on the evening prior, the Court inquired of Debtors' counsel if he had had the opportunity to review the UST's Motion and discuss the matter with the UST.  Debtors' counsel advised the Court that given the timing of the UST's filing late in the evening immediately prior to the Sale Hearing, he had only had a chance to skim the Motion, and had only sent a preliminary e-mail to the UST with various observations, but had not yet discussed the matter with him.  Debtors' counsel also explained that Debtors were extremely troubled that the UST had not even bothered to call Debtors' counsel to discuss such allegations before filing the Motion with the Court.  Second, the allegations themselves were clearly dispelled in Debtors' Sale Reply and accompanying declarations, which were filed approximately four (4) hours <u>before</u> the UST had filed its Motion. Third, the Committee and the B Parties had withdrawn their oppositions to the Sale Motion, provided that any claims they may have against Debtors, BMO and Carfinco, if any, were preserved.  As such, it is unclear why the UST still proceeded with its Motion.

46.    Because of the timing of the Auction shortly before the Sale Hearing, as well as the substantial revisions, coordination and transition issues involved, as well as the intervening holidays, the finalization of the Sale Order took several weeks.  On January 6, 2014, the Court entered the *Order (A) Authorizing the Sale of Substantially All of the Debtors' Operating Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, et al.* (the "<u>Sale Order</u>") [ECF No. 603].  The Sale Order approved the sale to Westlake, found that the sale was a proper exercise of Debtors' business judgment, and that the sale was in the best interests of the estate and done in good faith.  <u>See</u> Sale Order, ¶¶ Y-BB, DD, 1, and 32.  Notwithstanding the foregoing significant findings and conclusions in support of the Sale Order, at the insistence of the Committee and the B Parties, the Sale Order provided the following "reservation" of alleged claims:

---

[3] A copy of the transcript of the Sale Hearing on December 20, 2013 is attached hereto as <u>Exhibit "3."</u>

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

At the hearing, the Committee, the B Members, Hadden and Finston noted their withdrawal of their respective objections due to the Purchaser being Westlake and the amount of the Purchaser's bid and the bid's fairness in relation to the value of the assets being purchased; however, at the hearing the Committee, the B Members, Hadden and Finston noted that by withdrawing their objections, none of them was waiving the claims any of them has raised against the Debtors, the insiders of the Debtors, BMO Harris Bank, N.A. and Carfinco Financial Group and that all such claims are being preserved; *provided, however*, that such claims and the prosecution of such claims in no way shall or are intended to modify, amend, restrict or otherwise affect this Order, the findings contained herein or the terms herein, which shall otherwise remain in full force and effect. For the avoidance of doubt, nothing herein is intended or should be construed as in any way suggesting or providing for the validity or propriety of any claims asserted or preserved herein, and such claims are disputed.

See *id.* at p. 2 n.2. Notwithstanding the foregoing provision, in light of the Court's approval of the sale and the findings of fact and conclusions of law in support of the Sale Order—including those specific findings referenced above, the Committee and the B Parties could really never have any legitimate claims as against Debtors' management, BMO and/or Carfinco from the sale.

47.     On January 6, 2013, Westlake funded and closed on its purchase of substantially all of Debtors' operating assets, thereby leaving the three excluded real properties and various groups of excluded retail contracts to be sold. Debtors' existing officers, Frederick and Katherine Cooper, have no role or employment with Westlake. As of the immediate takeover by Westlake, it chose to retain approximately 80-90% of Debtors' existing employees, at least for now, including Debtors' Chief Financial Officer, Corporate Controller and Chief Technology Officer.

I.     **Debtors' Proposed Liquidating Plan**

48.     On January 2, 2014, and as represented to the Court at the Sale Hearing in response to the Court's question regarding whether Debtors had an "exit strategy" for the Chapter 11 Cases if the Court were to approve the sale to Westlake, Debtors filed their proposed *Joint Plan of Liquidation* (the "Liquidating Plan") [ECF No. 602]. Prior to the hearing on the UST's Motion, Debtors will have also filed their proposed disclosure statement to accompany their Liquidating Plan, and seek to have such matters approved as expeditiously and as economically

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

as possible.

49.      Debtors' Liquidating Plan provides for a simple, straightforward resolution of these Chapter 11 Cases by installing a neutral plan administrator to handle any remaining administrative issues with respect to the estates post-confirmation, and by preserving and pouring all remaining assets and litigation claims into a liquidating trust to be administered by a liquidating trustee for the benefit of unsecured creditors. Debtors believe that the foregoing is the most efficient, economical and responsible way to wind down the remaining affairs of the Chapter 11 Cases in a responsible fashion and consistent with their fiduciary duties.

50.      Debtors filed their Liquidating Plan within the exclusive period pursuant to section 1121(b) of the Bankruptcy Code, and thus Debtors' exclusive period to obtain acceptance of its proposed Liquidating Plan extends through early March 2014 pursuant to section 1121(c)(3) of the Bankruptcy Code.

**J.       Other Filings Related to the UST's Motion Filed to Date**

51.      On January 7, 2014, which was the day originally due for objections to the Motion,[4] Carfinco filed a *Limited Opposition* [ECF No. 610] to the UST's Motion, as well as a *Declaration of Troy Graf* [ECF No. 611] in support thereof. Among other matters, Carfinco argued that the UST's Motion is not supported by any evidence, the Motion was filed after the UST received notice of the results of the Auction and after Debtors gave notice of their withdrawal of their Previous Plan, that the Motion is moot in light of the sale closing and Debtors' filing of the Liquidating Plan, and the factual allegations of any relationship or employment between Debtors' management and Carfinco have already clearly been refuted.

52.      Also on January 7, 2014, the B Parties filed their *Joinder* [ECF No. 614] to the UST's Motion. The B Parties' Joinder joined in the UST's arguments as raised in the Motion, but also purported to incorporate all prior arguments made in twelve (12) previous filings with the Court, all or nearly all of which are not referenced in and do not form the specific grounds for

---

[4] Debtors and the UST stipulated and the Court approved a one day extension of time for Debtors to file this Opposition. See ECF Nos. 606 and 608.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

cause articulated in the UST's Motion.  As such, it is unclear if the B Parties are attempting by way of this "joinder" to expand the scope of the arguments made and evidence (or lack thereof) presented in the UST's Motion.

53.    As of the filing of this Opposition, the Committee has not filed any pleading or paper with respect to the UST's Motion.

## IV.  LEGAL ARGUMENT

### A.    Due Process and Fundamental Fairness in the Briefing

54.    The UST's Motion argues that two separate grounds provide "cause" for the appointment of a chapter 11 trustee pursuant to section 1104(a)(1) of the Bankruptcy Code:  (1) alleged "self-dealing by management" and references four specific instances of such alleged self-dealing, and (2) "acrimony between a debtor's management and creditors," but fails to explain or provide any specifics regarding this latter allegation.  The UST's Motion is premised solely on the "cause" standard pursuant to section 1104(a)(1) of the Bankruptcy Code, and not on section 1104(a)(2) of the Bankruptcy Code.  As such, any arguments regarding the alleged interest of creditors or the estate pursuant to section 1104(a)(2) of the Bankruptcy Code should not be entertained as they have not been alleged or briefed, and thus are not properly before the Court.

55.    The UST does not submit any declarations, affidavits or evidence in support of its Motion; rather, the Motion's only evidence is a request for judicial notice of certain previous filings in the Chapter 11 Cases, including principally WFI's SoFA, the various filed versions of Debtors' Previous Plan and Disclosure Statement, and the Plan Supplement.  The UST did not present any other or further evidence other than its simple request for judicial notice of the foregoing filings.  As such, Debtors are filing this Opposition premised on the arguments made and evidence—really the requests for judicial notice--presented with the Motion.  Given the history of these cases, however, there has been an unfortunate pattern of parties filing new and significant allegations in reply or so-called "joinder" filings (or even raising them for the first time at a hearing) that were not made or referenced in the original motion or supported by admissible evidence, thus preventing Debtors a proper and fair opportunity to adequately respond. The UST's Motion was set for hearing in the ordinary course and on normal notice, and

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

thus any party wanting to raise additional arguments or evidence outside of the UST's Motion had every opportunity to seek leave to do so (or file their own separate motion) prior to the opposition deadline.

56.     It is improper for a party, on the day <u>oppositions</u> to the Motion are due, to submit a "joinder" to a Motion—like the B Parties have done--purporting to include by reference additional arguments or evidence that are outside what is referenced in the Motion, as such a "joinder" filing does not allow Debtors sufficient time to respond to such arguments. Likewise, to the extent any other party—like the B Parties with their Joinder--apparently seeks to add additional arguments or evidence to the UST's Motion in the form of a "joinder" or "reply" to this Opposition, such a filing is inappropriate and should not be permitted. It is simply unfair and violates fundamental due process for parties to ambush Debtors either on the day oppositions are due, or thereafter, with filings raising or "incorporating by reference" arguments not part of the UST's Motion. Rather, the hearing should be limited to only the arguments raised and evidence presented in the UST's Motion (and the rebuttal arguments in reply), and the Court should not permit parties by way of a "joinder" or "reply" to raise new arguments or introduce new evidence thus turning what was once a targeted motion and proceeding into a "free-for-all." If other parties believe they have different or additional arguments or evidence in support of the appointment of a chapter 11 trustee, then they either should have filed such matters far enough in advance of the opposition deadline to allow Debtors a meaningful opportunity to respond, or should be required to file their own motions separately for hearing in the ordinary course. Allowing otherwise results in "pleading by ambush," which should never be tolerated, let alone with respect to the instant Motion given the seriousness of the allegations made and the relief sought. <u>See</u>, <u>e.g.</u>, <u>United States ex rel. Giles v. Sardie</u>, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.") (citing <u>Lujan v. Nat'l Wildlife Fed.</u>, 497 U.S. 871, 894-95 (1990)); <u>see also</u> <u>Peruta v. County of San Diego</u>, 678 F. Supp. 2d 1046, 1051 n.4 (S.D. Cal. 2010) (refusing to consider new arguments raised in a reply to an opposition to a motion to dismiss) (citing <u>Sogeti USA LLC v. Scariano</u>, 606 F. Supp. 2d 1080, 1086 (D.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Ariz. 2009) (same)).

**B.**   **Standard of Decision**

57.   Section 1104(a)(1) of the Bankruptcy Code governs the appointment of a trustee for "cause," and provides as follows:

> (a)   At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
>
>   (1)   for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; . . .

11 U.S.C. § 1104(a)(1).   As previously noted, the UST's Motion is not premised on section 1104(a)(2) of the Bankruptcy Code.

58.   As explained by Colliers:

> Normally in chapter 11 cases, the debtor remains in possession of its assets and continues to operate its business as it restructures or sells and attempts to formulate a reorganization plan.  The concept of the debtor remaining in possession recognizes that debtor's managers are most familiar with the business and normally will be able to provide the most capable and efficient management during the chapter 11 process.  In addition, continuation of the debtor's management encourages managers to be willing to commence a chapter 11 case at an appropriate time, without undue fear that they will be ousted upon commencement of the case.  Moreover, the debtor in possession concept, coupled with the debtor's exclusive period for proposing a reorganization plan, enables the debtor to protect its interests and, to some extent, those of its owners and managers, during the reorganization process.

7 Collier on Bankruptcy ¶ 1104.02[1] (16th ed. 2013).

59.   There is a strong presumption that the debtor is entitled to remain in possession in a chapter 11 case, and thus the appointment of a trustee is an "extraordinary remedy."  Id. and ¶ 1104.02[3][a][i].  The question of whether a trustee should be appointed in a chapter 11 case

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

23

must be considered on a case-by-case basis.  See id. at ¶ 1104.02[3][a].  According to the

applicable legislative history, "in most cases, the debtor will have entered bankruptcy as a result

of honest business reverses, and appointment of a trustee, with the attendant disruption of

business management, would not benefit, and indeed would might harm, creditors."  Id. at ¶

1104.02[3][b] and n.9 (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 232-33 (1977)).  "A

trustee unfamiliar with the business and its creditors will usually suffer delay and expense

learning facts and circumstances that the trustee needs to know in order to facilitate the debtor's

reorganization."  Id. and n.10 (collecting cases)

60.     Although section 1104(a) of the Bankruptcy Code provides that the court "shall"

order the appointment of a trustee upon a finding of "cause," as explained by Colliers:

> [T]he court retains considerable discretion to determine when
> evidence of fraud, dishonesty, incompetence, mismanagement or
> other factors are sufficiently serious to constitute 'cause' requiring
> the appointment of a trustee . . .  Exercising this discretion, some
> courts have held that even after a court finds evidence of
> management's misbehavior, the court may determine that there is
> insufficient cause to warrant the appointment of a trustee.

Id. at ¶ 1104.02[3][b][iii] and n.4 (citing cases).

61.     "Cause" for the appointment of a chapter 11 trustee based on "[f]raud, dishonesty

and incompetence require fact-sensitive determinations concerning types of behavior that would

suggest a need to oust the current management of the debtor."  Id. at ¶ 1104.02[3][c].  For

example, in one case the court ordered the appointment of a trustee after discovering that the

principal of the debtor in possession was looting the estate through a kickback scheme in

connection with a company that was hired to provide management services to the debtor.  See

Fukutomi v. United States Trustee (In re Bibo), 76 F.3d 256 (9th Cir. 1996).

62.     Debtors appreciate that the UST may have believed that it was duty-bound by

section 1104(e) of the Bankruptcy Code, as enacted by BAPCPA, to file the instant Motion

because that statute requires the trustee to act "if there are reasonable grounds to suspect that

current members of the governing body of the debtor . . . participated in actual fraud, dishonesty

of criminal conduct in the management of the debtor . . ."  11 U.S.C. § 1104(e) (emphasis

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

24

added).  In other words, even if the UST believed that the appointment of a chapter 11 trustee was not actually warranted, the UST could at least perceive that "reasonable grounds to suspect" something may exist—especially given the many hysterical, careless and unfounded allegations made in various filings made immediately prior to the Auction.  In fact, that is arguably a very minimal threshold that could potentially even be triggered by mere allegations of some impropriety (even if unproven or unsupported by admissible evidence).  Moreover, section 1104(e) may also strip the UST of at least some discretion in deciding whether to actually bring the motion, and instead may arguably mandate the filing.  See, e.g., In re The 1031 Tax Group, LLC, 374 B.R. 78, 87 n.8 (Bankr. S.D.N.Y. 2007).

**C.    The Applicable Burden of Proof**

63.    As the movant, the UST has the burden of proof to establish "cause" for the appointment of a trustee.  The UST asserts that it need only establish cause by the general civil "preponderance of the evidence" standard, and cites to the following in support of this proposition:  two out-of-circuit district court cases, a law review article written by the Director of the Executive Office for United States Trustees seven (7) years ago, and a Supreme Court case determining the appropriate standard of proof in the nondischargeability context pursuant to section 523(a) of the Bankruptcy Code, which the UST argues by analogy should also apply in this context.  See Motion, ¶ 23 (citing Tradex v. Morse, 339 B.R. 823, 830-32 (D. Mass 2006); In re Altman, 230 B.R. 6, 16-17 (Bankr. D. Conn. 1999), vacated in part on other grounds, 254 B.R. 509 (D. Conn. 2000); Grogan v. Garner, 498 U.S. 279, 286 (1991); Clifford J. White III & Walter W. Theus, Jr., Chapter 11 Trustees and Examiners After BAPCPA, 80 Am. Bankr. L.J. 289, 315-316 (2006) [hereinafter the "White Article"].[5]

64.    The vast majority of courts, however, including the only circuit courts of appeal to address the appropriate burden of proof in this context, hold that the party seeking the

---

[5] In fairness to the UST, and although not cited by him, there are several more recent out-of-circuit courts that have also applied the lower "preponderance of the evidence" standard to motions to appoint a trustee.  See, e.g., Keeley & Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Land P'ship), 455 B.R. 153, 162-163 (B.A.P. 8th Cir. 2011); In re Veblen W. Dairy LLP, 434 B.R. 550, 555-56 (Bankr. D.S.D. 2010).  That having been said, as hereinafter explained, the foregoing is and remains a minority position.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

appointment of a chapter 11 trustee must establish cause by "clear and convincing evidence." See Adams v. Marwil (In re Bayou Grp., LLC), 564 F.3d 541, 546-47 (2d Cir. 2009) ("The standard for § 1104 appointment is very high.  The U.S. Trustee has the burden of showing by 'clear and convincing evidence' that the appointment of a trustee is warranted.") (internal citations and quotation marks omitted); Official Comm. of Asbestos Claimants v. G-I. Holdings, Inc. (In re G-I Holdings, Inc.), 385 F.3d 313 (3d Cir. 2004); In re Marvel Entm't Grp., Inc., 140 F.3d 463, 471 (3d Cir. 1998) ("The party moving for appointment of a trustee, in this case the Lenders, must provide the need for a trustee under either subsection by clear and convincing evidence. . . .  It is settled that appointment of a trustee should be the exception, rather than the rule.").

65.    Other recent lower court decisions outside of the Second and Third Circuits also adhere to the majority view that a movant seeking the appointment of a chapter 11 trustee must establish cause by "clear and convincing evidence" and not by a mere "preponderance of the evidence."  See In re LHC, LLC, 497 B.R. 281, 291 (Bankr. N.D. Ill. 2013) (citing to a long line of Illinois bankruptcy court decisions applying the "clear and convincing" standard to trustee motions, acknowledging and citing to the "minority of courts from other jurisdictions [that] apply the preponderance of the evidence standard," but ultimately concluding that the "clear and convincing" standard is "more consistent with the presumptions that a debtor should generally be permitted to remain in control and possession of its business and that the appoint of a Chapter 11 trustee is an extraordinary remedy"); In re Sundale, Ltd., 400 B.R. 890, 899-900 and n.8 (Bankr. S.D. Fla. 2009) (acknowledging the split of authority, but also that "the vast majority of courts, including the only circuit court to address this issue, has held that the standard of proof to appoint a trustee is clear and convincing evidence," and holding that "[b]ecause the appointment of a trustee is such an extraordinary remedy, the moving party must show cause for appointment of a trustee exists by clear and convincing evidence"); In re Briarwood Capital, LLC, Nos. 10–02677–PB11, 2010 WL 2884949, at *2-3 (Bankr. S.D. Cal. July 19, 2010) (citing the Third Circuit's Marvel decision with approval, acknowledging the general presumption that a debtor-in-possession should be able to remain in possession, and ultimately reasoning that movants must

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

1    rebut that presumption by clear and convincing evidence).

2         66.    Although this Court is not bound by the decisions of another circuit, a sister

3    circuit's reasoned decision deserves great weight. See United States Tr. v. Pettibone Corp., 251

4    B.R. 335, 341 (N.D. Ill. 2000) ("While this court is not bound by th[e] precedent [of another

5    circuit], this court should follow a holding from another circuit court of appeals unless it is

6    convinced that court's decision is erroneous."); Owens v. Miller (In re Miller), 276 F.3d 424, 429

7    (8th Cir. 2002) ("a sister circuit's reasoned decision deserves great weight and precedential

8    value").

9         67.    That the majority view is the "clear and convincing" standard of proof for trustee

10   motions is also well established by several of the leading treatises on bankruptcy law and one

11   recent article focusing on the issue. See 7 Collier on Bankruptcy ¶ 1104.02[4][b] (16th ed. 2013)

12   ("Although the Code contains no particular standard of proof, courts are split on whether the

13   moving party must establish the grounds for the appointment of a trustee by a preponderance of

14   the evidence or by clear and convincing evidence, though the majority view seems to be the

15   latter."); 5 Norton Bankr. L. & Prac. 3d § 99:1 and n.6 ("Indeed, the presumption against

16   appointment is so strong that courts generally impose a clear and convincing standard of proof . .

17   .") (listing cases); Samir D. Parikh, The Improper Application of the Clear and Convincing

18   Standard of Proof:  Are Bankruptcy Courts Distorting Accepted Risk Allocation Schemes?, 78

19   U. Cinn. L. Rev. 271, 314 (Fall 2009) [hereinafter, the "Parikh Article"] ("[T]he vast majority of

20   courts apply the clear and convincing standard of proof to motions seeking the appointment of a

21   trustee under Section 1104.") (emphasis added).

22        68.    The U.S. Supreme Court decision cited by the UST, Grogan v. Garner, 498 U.S.

23   279 (1991), had nothing to do with the standard of proof for the appointment of a Chapter 11

24   trustee under section 1104(a)(1) of the Bankruptcy Code; rather, it involved the appropriate

25   burden of proof for determining an exception to discharge pursuant to section 523 of the

26   Bankruptcy Code, and held that the proper burden in that context was a preponderance of the

27   evidence.  The minority view expressed in the UST's cases argues that the Supreme Court's

28   Grogan decision must be applied, by analogy, to the burden of proof for the appointment of a

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

chapter 11 trustee as well.  Since the <u>Grogan</u> decision was entered in 1991, however, the vast majority of lower courts and circuit courts have not applied that decision in the trustee appointment context as the UST argues.

69.    Finally, the academic commentary on the topic is varied.  The UST's Motion cites to the White Article published in 2006, which article was written by the Director of the Executive Office for United States Trustees.  The White Article is critical of the longstanding majority view of courts applying the "clear and convincing" burden of proof, <u>see</u> <u>id.</u> at 312-320, and argues that the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("<u>BAPCPA</u>"), including specifically the enactment of section 1104(e) of the Bankruptcy Code and the imposition on  the UST therein, "calls for a reexamination of the case law that established this heightened level of proof."  <u>Id.</u> at 316.  As previously cited, however, in the more than seven (7) years since the publication of the White Article, the great majority of more recent court decisions continue to apply the "clear and convincing" standard of proof to trustee motions as the better, more well-reasoned view.

70.    Additionally, other more recent academic analysis has disagreed with application of the "preponderance of the evidence" burden of proof.  For example, in the Parikh Article, in reconciling the competing views, and after acknowledging some of the problems with the view of the "vast majority" of courts requiring the "clear and convincing" evidence standard, the Parikh Article ultimately concludes as follows:

> The statute's and legislative history's silence as to the appropriate standard of proof could indicate that the legislature chose to defer to the courts' discretion in crafting the particulars of the analysis under section 1104(a); this deference could be seen as extending to the applicable standard of proof.  The vast majority of courts appear to take this view and have decided, without explanation, to apply the clear and convincing standard of proof.  The foundation of this decision is not flawless, but can be reconciled with Supreme Court precedent.  Indeed, the interests at stake are varied and certainly more substantial than a mere loss of money.  The consequences of a decisional error by the factfinder are greater than a mere misallocation of money.  Further, Congress sought to protect the interests of the debtor and its employees and creditors by moving away from the rigidity of Chapter X, and decreasing the

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

likelihood that a trustee would be appointed.  Though this appears to benefit the debtor's management, the legislature and the courts have established that replacement of debtor's management is often anathema to a successful reorganization.   The courts have acknowledged this and adopted a presumption against appointment of a trustee.   In light of this presumption--as explained in the legislative history to Section 1104--as well as the balance of the interests at stake, <u>parties seeking the appointment of a trustee under Section 1104 should be required to make the necessary showing with clear and convincing evidence.</u>

<u>Id.</u> at 316-317 (emphasis added).  In light of the foregoing, the more widely accepted and better reasoned view is that a movant must establish cause for the appointment of a chapter 11 trustee by "clear and convincing evidence."

71.    For the UST's evidence to be "clear and convincing," it must produce "in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." <u>Cruzan v. Dir., Mo. Dep't of Health</u>, 497 U.S. 261, 285 n.11 (1990) (citation, internal brackets, and quotation marks omitted).  As hereinafter set forth, the UST has failed to carry its substantial burden of burden of proof in this regard.  In fact, even if the Court were to agree with the minority view that cause for the appointment of a chapter 11 trustee need only be established by the lower "preponderance of the evidence" standard, the UST has also failed to carry that lower burden as well.

**D.    <u>Debtors' Management Never Had Any Future Employment with Carfinco</u>**

72.    As has now been supported by declarations of Debtors' management, Debtors' investment banker, and Carfinco's principal, as well as statements on the record in open court by Debtors' counsel and Debtors' management's personal counsel, there simply never was any employment or any definitive offer of employment, but rather at best a very preliminary, general, vague entreaty without any specific terms, much less any actual agreement or arrangement that was ever accepted.  Further, at the Sale Hearing, Debtors' management and various counsel were proffered as witnesses and made fully available for any party to cross-examine, however, no party—whether the UST, the Committee and/or the B Parties—sought any such examination.

73.    As previously explained, all that the Plan Supplement did was to advise parties of the possibility of some potential officer role by Debtors' existing management, nothing more, and indeed such a retained role may actually have been needed for other mechanical purposes such as easing of licensing transfers were Carfinco to have been the buyer.  In light of the foregoing, there was no specific agreement for Debtors to disclose pursuant to LR 6004(b)(6)(B) in conjunction with the Bid Procedures Motion, and thus Debtors' disclosure were and at all times proper.

74.    In light of the unrefuted evidence directly to the contrary to that assumed incorrectly by the UST based on the Plan Supplement, and given that all of the UST's self-dealing and breach of fiduciary duty allegations are rooted in that faulty assumption, the Court can and should summarily deny the appointment of a chapter 11 trustee for cause on that basis. Notwithstanding such a glaring hole, Debtors will still address the secondary allegations in the UST's Motion, which allegations the UST claims were the result of Debtors' management's alleged new employment by Carfinco.

**E.    Inclusion or Impairment of Avoidance Actions as Part of a Sale Transaction.**

75.    The UST's Motion apparently advocates a *per se* rule that anytime potential avoidance actions—including those against management—are included in a bankruptcy sale, then a debtors' management has definitively engaged in a breach of fiduciary duty.  Such proposition must be rejected out of hand.  Although Debtors acknowledge that avoidance actions may generally be preserved for the benefit of unsecured creditors, this need not always be the case.  In fact, it is a well-recognized strategy that a purchaser of a debtor's operating business may seek to purchase and/or impair avoidance actions for its benefit, and likely to the detriment of unsecured creditors.  See Kelly K. Frazier, A Comparison Shopping Guide for 363 Sales, at pp. 239-243 (Am. Bankr. Inst. 2009) (describing the practice and strategy at length, and noting that releases, waivers, and transfers of such actions have been approved in multiple jurisdictions, including but not limited to Nevada, and providing numerous examples thereof)[6]; Jonathan M.

---

[6] For ease of reference, a copy of the applicable portion of this reference is attached hereto as Exhibit "4."

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Landers, <u>The Changing Face of Chapter 11 for Large Operating Businesses</u>, Pratt's Journal of Bankruptcy Law (February/March 2012) (describing how 363 sales often limit avoidance actions and that "[t]he most important limiting factor has been the 'deals' made as part of the sale. Generally, contracts of favored vendors and contract creditors will have been assumed, thereby eliminating the possibility of preference actions by many of the largest recipients. Other favored parties may have been given releases as part of the sale process, or avoidance claims against them might have been 'sold' to the purchaser.").[7]

76.     The possibility that avoidance actions may, in an appropriate case, get compromised, sold or impaired as part of a sale transaction is so well known that many jurisdictions' local rules, including Nevada, specifically require disclosure of such provisions in sale motions. <u>See</u> Local Rule 6004(b)(6)(K) ("The sale motion must highlight any provision pursuant to which the debtor seeks to sell or otherwise limit any rights to pursue avoidance claims under Chapter 5 of Title 11 of the United States Code."); <u>see</u> <u>also</u> Del. Bankr. L.R. 6004-1(b)(iv)(C) and (K) (requiring highlighting provisions in sale motions concerning releases and sales or other limits on avoidance actions).

77.     A buyer cannot be faulted for seeking to obtain the best possible deal it can in a bankruptcy sale, and even if that offer may involve some compromises of avoidance actions to the detriment of unsecured creditors. It is a buyer's prerogative and a buyer owes no fiduciary duties to the estate or creditors, but rather only to its own shareholders to negotiate the best possible deal for itself. In this regard, a buyer may seek to compromise estate avoidance actions for its own benefit and to ensure that the business it is purchasing can "hit the ground running" and unimpeded by critical vendors or employees being subjected to chapter 5 actions, especially when such parties may be necessary to the future operations of the business and maintenance of

---

[7] <u>See also</u> <u>Delaware Bankruptcy Court Approves Contested Real Mex Section 363 Sale to Second Lien Noteholders Notwithstanding Administrative Insolvency</u>, available at www.olshanlaw.com/media/alert/25_Client_Alert_1202.pdf (last visited January 5, 2014) ("Purchasers seek to have avoidance actions assigned to them in order to prevent others from suing their new vendors."); <u>Grede Foundries – Preference Claims, 503(b)(9) Claims Opposition Precede 363 Sale</u>, available at http://www.burbageweddell.com/2009/11/17/preference-claims-503b9-363-sale/ (last visited January 5, 2013)) ("Finally, it is not unusual in 363 sales for the purchaser to insist on acquiring the avoidance actions (which include preference claims) in order to preserve the good will of the supply base.").

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

goodwill.  In the same vein, if a buyer makes demands on a debtor's management that such potential avoidance actions or litigation claims be included as part of its proposed bid, and a debtor's management complies, that management cannot not be faulted for adhering to the buyer's demands if it is a proper exercise of their business judgment.

78.    Second, given the actual history of Debtors, including the significant management disputes between the B Parties and Debtors' existing management, which resulted in substantial pre-petition litigation that served to interfere with Debtors' business, and which ultimately led, in part, to Debtors' need to file the Chapter 11 Cases, it is perfectly understandable why a potential buyer like Carfinco would consider including such claims as part of its proposed purchase.  It should not at all be surprising that a company or platform buyer like Carfinco would include such claims in its offer as a way to try and "buy some peace" and not have such parties distracted by litigation.

79.    In any event, the issue of the Retained Claims was ultimately rendered a non-issue.  Westlake never included such claims in its bid, and prior to the Auction, and in light of the substantial resistance encountered, Carfinco withdrew its request to purchase such claims as against management and only wanted to purchase Retained Claims to the extent they related to contracts and leases that were proposed to be assumed.  In this vein, the adversarial process in this bankruptcy case worked:   positions were taken, some of them encountered resistance, that resistance caused some of the positions to change in order to allow the proposed sale to proceed, and ultimately the sale was allowed to proceed on modified and more favorable terms, which achieved an outcome that was far better than expected and which resulted in BMO being paid in full with interest.  Although parties have attempted to advance conspiracy theories that Debtors were attempting to "deliver" the company to Carfinco because of some perceived promise of potential future employment that never actually existed, the actual sale process and exposure to the market allowed for a proper vetting of the stalking horse bid, and the ultimate result was that a third party buyer—not the stalking horse—was the successful bidder.

F.    **The Exculpation Provisions in Debtors' Previous Plan**

80.    The UST also argues that "Debtors' efforts in prosecuting an unconfirmable plan

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

32

1  involving self-dealing and breaches of fiduciary duty have delayed the administration of these

2  cases and increased the administrative expenses that may be asserted against the estates."

3  Motion, p. 2. The UST's assertions regarding why Debtors' Previous Plan was uncomfirmable

4  apparently are focused on the exculpation, release and permanent injunction provisions in the

5  Previous Plan.

6      81.    Such provisions were recently addressed by the U.S. District Court for the District

7  of Nevada in Meritage Homes of Nevada, Inc. and Meritage Homes Corp. v. JPMorgan Chase

8  Bank, N.A. (In re South Edge, LLC), 478 B.R. 403 (D. Nev. 2012). In Meritage, the District

9  Court noted that although some circuits allow a bankruptcy plan to include a nonconsensual

10  release of one nondebtor's claims against another nondebtor under certain circumstances, that the

11  U.S. Court of Appeals for the Ninth Circuit has prohibited such releases as a matter of law,

12  concluding that bankruptcy courts lack the power under the Bankruptcy Code to discharge the

13  liabilities of third parties who are not seeking bankruptcy protection. Id. at 414 (collecting

14  cases). As articulated by the District Court, "[t]he question thus becomes whether the

15  exculpation clause . . . improperly releases third parties liability or whether it merely sets the

16  standard of care in this bankruptcy proceeding which would preempt the assertion of any state

17  law claims which seek to impose a different standard of care." Id. at 415.

18      82.    In conformity with these principles, the Meritage Court noted that some courts

19  have found exculpation provisions confirmable because they "do [ ] not affect the liability of

20  these parties, but rather states the standard of liability under the Code, and thus do[ ] not come

21  within the meaning of § 524(e)." Id. (quoting In re PWS Holding Corp., 228 F.3d 224, 245 (3d

22  Cir. 2000), and citing In re WCI Cable, Inc., 282 B.R. 457, 476–77 (Bankr. D. Or. 2002)). In

23  other words, as explained by the Meritage Court, "the exculpation clauses do not affect a change

24  in third party liability to nondebtors" because a state law claims are preempted, and thus there is

25  no liability to release. See id. In light of the above authorities, the Court held that the

26  exculpation provision at issue, when properly interpreted, is within the bankruptcy court's power

27  because the bankruptcy court has exclusive jurisdiction over the parties and their conduct in the

28  bankruptcy proceedings and because it sets a standard of care to be applied in the bankruptcy

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

proceeding, which is a matter which lies within the bankruptcy court's exclusive jurisdiction and reiterates federal preemption principles. See id. at 415-416.

83.    Consequently, the District Court in Meritage held that the plan exculpation provision at issue did not improperly release third party nondebtors from liability arising out of the plan proponents' activities in relation to the bankruptcy proceeding because, to the extent any particular state law claim is preempted, no such state law claim exists. See id. at 416.  As such, the District Court thus held that the exculpation clause at issue did not violate the Ninth Circuit's prohibition on nonconsensual third party releases through plan confirmation. See id.

84.    Similarly, with respect to the post-confirmation injunction in the plan at issue in Meritage, the District Court held that the provision was not a de facto discharge provision in violation of section 1141(d)(3) of the Bankruptcy Code, but rather merely to effectuate the plan and ensure that the claims, if and when fixed, would be treated in accordance with the plan. See id. at 416-418.

85.    As applied in the case at hand, the provisions at issue in Debtors' Previous Plan were appropriate and reasonable under Meritage and the specific circumstances of these cases. The provisions the UST apparently attacks in Debtors' Previous Plan were either warranted by existing law or by a nonfrivolous argument for the extension, modification or reversal of existing law or the establishment of new law, and were not being presented for any improper purpose.  As such, the UST's arguments that Debtors' Previous Plan was uncomfirmable are without merit, and thus also cannot constitute a breach of fiduciary duty.  Finally, such arguments ignore the practical reality that Debtors' perceived the Previous Plan and stalking horse bid from Carfinco as the only reasonable, likely and definitive proposal available when faced with an impending Termination Event under the Cash Collateral Stipulation, which termination, if allowed to proceed, would have led to a significant loss to unsecured creditors in these cases.

**G.    Alleged Acrimony Between Debtors' Management and Creditors**

86.    Finally, as a second theory of asserted "cause" for the appointment of a trustee, the UST asserts that alleged "acrimony between a debtor's management and creditors is grounds for the appointment of a Chapter 11 trustee."  Motion, ¶ 29 (citing In re Marvel Entm't Grp., Inc.,

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

140 F.3d at 473).  The UST does not provide any further explanation or detail in support of this argument, and thus it is very difficult for Debtors to respond.  The following is an analysis of the applicable case law, and Debtors' best response they can give under the circumstances.

87.    In In re Cajun Electric Power Coop., Inc., 74 F.3d 599 (5th Cir. 1996) (adopting on rehearing the opinion of dissent in 69 F.3d at 751), the Fifth Circuit upheld a trustee appointment based on a finding of acrimony.  In that case, the debtor-in-possession's interests conflicted with those of its creditors to such an extent that the court found that "the appointment of a trustee may be the only effective way to pursue reorganization."  Id. at 600.  The debtor-in-possession was a utility cooperative whose board members were faced with a federal agency order lowering its utility rates. The debtor-in-possession's board members, themselves managers or members of the debtor-in-possession's individual member utility companies, were required to decide whether to appeal the agency order, seeking to maintain the high rates charged to the individual member companies and thus to better enable the debtor-in-possession to meet its debt obligations to its creditors in bankruptcy, or to take no action and charge less to their individual companies. 69 F.3d at 747.  The court recognized that the debtor-creditor conflict went "beyond the 'inherent' conflicts under which all healthy cooperatives operate."  74 F.3d at 600 (adopting dissent at 69 F.3d at 751).  The court reasoned that the extent of this conflict alone provided sufficient cause for the appointment of a trustee under section 1104(a)(1) of the Bankruptcy Code.  The Fifth Circuit also rejected the notion that its holding created a *per se* rule requiring the appointment of a chapter 11 trustee; rather, as later explained by the Third Circuit in Marvel, "the teachings of [the Cajun Electric case] are that a district court may find cause to appoint a trustee for 'acrimony' only on a case-by-case basis, when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor, or as it found in that case, when the parties 'begin working at cross-purposes.'"  Marvel, 140 F.3d at 472-473 (quoting Cajun Elec., 74 F.3d at 751) (emphasis added).

88.    In Marvel, two hedge funds run by well-known billionaires—one run by Ron Perelman as creditors and one by Carl Icahn and related entities—were battling incessantly.  The district court found that "the Debtors, as controlled by the Icahn interests, and the Lenders, take

35

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

dramatically different stances on many issues," and cited to (a) the debtor-in-possession's institution of several adversary actions, (b) unconsummated settlements, (c) the UST's opinion "that the parties seem to be unable to reach a consensus," and (d) its observations that "the Debtors and the Lenders have flung accusations at each other, and have failed to demonstrate any ability to resolve matters cooperatively," to conclude that "there is no reasonable likelihood of any cooperation between the parties in the near future."  140 F.3d at 473.  Further, the district court had found that it involved a "large and messy bankruptcy that promises to get worse without a disinterested administrator at the helm."  Id. (citing In re Colo.-Ute Elec. Assoc., Inc., 120 B.R. 164, 176 (Bankr. D. Colo. 1990) (finding cause to appoint trustee under section 1104(a)(1) of the Bankruptcy Code when the court could not "envision a way for the current management and board to resolve the inherent conflict between what is best for Colorado-Ute, its creditors and the co-op members")).

89.    The Third Circuit in Marvel agreed with the Fifth Circuit's refusal in Cajun Electric to "expressly hold that there is no *per se* rule by which mere conflicts or acrimony between debtor and creditor mandate the appointment of a trustee."   Instead, as explained by the Court:

> In this case, rather, we are faced with circumstances in which the Icahn interests, themselves creditors of the Perelman holding companies, are currently in control of the debtor at the same time that the debtor proposes reorganization plans. In this position, although the Icahn interests are technically and officially fiduciaries to all creditors, they would also be placed in an awkward position of evaluating their own indenture and debt claims. Having found that this unhealthy conflict of interest was manifest in the "deep-seeded conflict and animosity" between the Icahn-controlled debtor and the Lenders and in the lack of confidence all creditors had in the Icahn interests' ability to act as fiduciaries, the district court did not depart from the proper exercise of discretion when it determined sufficient cause existed under § 1104(a)(1) to appoint a neutral trustee to facilitate reorganization.
>
> We reject the Icahn interests' argument that unhappy creditors involved in future bankruptcies could remove the debtors-in-possession by their obstinate refusal to cooperate. We are not

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

impressed by this *argumentum ad terrorem*. In the view we take, it is within the district court's sound discretion to make a determination of cause, and this requires fact-finding and application of the facts to relevant precepts. The district court here determined that the Icahn interests were not entirely without blame for the breakdown of reorganization efforts with the Lenders: "[T]here can be no question that the debtor-in-possession has demonstrated difficulty resolving its conflicts with other parties, such as the Lenders." The district court noted that the Icahn-controlled debtor-in-possession instituted litigation against Perelman without seeking the approval of the bankruptcy court; moreover, the debtor-in-possession was represented by counsel who had not previously entered an appearance in the case. In addition, the day after the district court "made clear that it did not want to interfere with the bankruptcy court's ability to resolve the underlying dispute," the Icahn interests sent a letter to the bankruptcy court which "incorrectly stated that while that motion [on jurisdiction] was pending, the bankruptcy court was required to refrain from taking further action." This caused the bankruptcy court to cancel a hearing on the appointment of a trustee.

. . .

The intense and high-stakes bickering between the Icahn interests and the Lenders does not instill confidence that the Icahn interests could fairly negotiate with the creditors to whom they owe these duties, nor that reorganization will occur effectively. See, e.g., In re Bellevue Place Assocs., 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994) (finding no wrongful conduct by debtor-in-possession but an inability to control reorganization, thus an inability to discharge fiduciary duties, necessitating appointment of trustee "to unfreeze" unproductive negotiations).

Id.

90.    Other more recent decisions have refused to appoint a chapter 11 trustee absent "intense and high stakes bickering," and have required that the level of animosity be extreme and not just the normal disagreements that may occur in any complex chapter 11 proceeding. See G-I Holdings, Inc., 385 F.3d at 321 (affirming the bankruptcy court's denial of a motion to appoint a chapter 11 trustee and noting that although "[t]here is unquestionably considerable acrimony between the debtor and the asbestos claimants, . . . some of the most contentious disputes will presumably be addressed in other pending litigation, and it was the Bankruptcy Court's judgment that the debtor in possession would be able to discharge its fiduciary obligations with regard to other matters"); In re LHC, LLC, 497 B.R. at 311 (holding that a lender's asserted lack of trust in

37

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

a debtor and the mere acrimony present in that case were insufficient to warrant the appointment of a trustee because the level of animosity was not to such the extreme level as present in Marvel); In re Sundale, Ltd., 400 B.R. at 902-910 (holding that notwithstanding a "tremendous amount of rancor and acrimony," which "unquestionably contributed to a level of litigation from both sides that has taken up court time and resources," it was ultimately insufficient to establish cause for the appointment of a chapter 11 trustee).

91.    As applied in the case at hand, pending the hearing and approval of Debtors' Liquidating Plan, there are numerous, smaller matters left to be concluded. These first include the sale of several groups of excluded retail contracts, which generally include various types of impaired, lesser or non-performing accounts such as accounts for debtors in bankruptcy, accounts more than 90 days past due, and other chargeoffs accounts both that are within and outside of the applicable statute of limitations for collection. Additionally, there is the matter of potential selling the various pieces of real property that presently remain subject to the B Parties' deeds of trust, and the litigation surrounding those alleged encumbrances. All of the foregoing requires Debtors' management's experience, handling and historical knowledge to allow them to be completed in an orderly and economical fashion.

92.    With the filing of their Liquidating Plan, Debtors have already started down the road toward a prompt, cost-effective resolution—indeed the same resolution that any chapter 11 trustee would eventually take, but likely only after spending significant additional amounts of money. Far from being acrimonious, working at "cross purposes," or involving "intense and high stakes bickering--which may have been existence with respect to the dismissal motion and/or prior to the Auction---Debtors now already have underway a straight forward, unobjectionable and indeed altogether expected exit strategy for these Chapter 11 Cases, which can result in a confirmed plan in a matter of less than two months. Debtors committed to the Court at the Sale Hearing that they would expeditiously pursue such route, and they have done so in a proper exercise of their fiduciary duties. Given the foregoing, this is simply not the kind of deep-seeded, acrimonious case that mandates the extraordinary remedy of displacing existing management with a chapter 11 trustee to close out an exit process that is already well underway.

# V.  CONCLUSION

WHEREFORE, Debtors respectfully request that the Court deny the UST's Motion, and grant Debtors such other and further relief as is just and proper.

DATED:  January 8th, 2014.

LARSON & ZIRZOW, LLC

By:  _____
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101

Attorneys for Debtors

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169