1  Jeanette E. McPherson, NV Bar No. 5423
2  Schwartzer & McPherson Law Firm
   2850 South Jones Boulevard, Suite 1
3  Las Vegas, Nevada 89146-5308
   Telephone: (702) 228-7590
4  Facsimile: (702) 892-0122
   E-Mail: bkfilings@s-mlaw.com
5
6  Attorneys for the Official Committee of Unsecured Creditors

7  ## UNITED STATES BANKRUPTCY COURT

8  ## DISTRICT OF NEVADA

9  | In re: | Case No. BK-S-13-17588-LED |
10 | **WESTERN FUNDING INCORPORATED,** | Chapter 11 (Jointly Administered) |
11 | Debtor. | |
12 | In re: | Case No. BK-S-13-17586-LED |
13 | **WESTERN FUNDING INC. OF NEVADA,** | Chapter 11 |
14 | Debtor. | |
15 | In re: | Case No. BK-S-13-17589-LED |
16 | **GLOBAL TRACK GPS, LLC,** | Chapter 11 |
17 | Debtor. | **MOTION TO APPOINT TRUSTEE UNDER 11 U.S.C. § 1104(a)(2) AND JOINDER IN MOTION OF THE UNITED STATES TRUSTEE TO APPOINT A CHAPTER 11 TRUSTEE, PURSUANT TO 11 U.S.C. § 1104(A)(1)** |

Date: OST PENDING
Time: OST PENDING

22         The Official Committee of Unsecured Creditors in the above-entitled case (the

23  "Committee"), by and through its undersigned counsel, hereby files its Motion To Appoint Trustee

24  Under 11 U.S.C. § 1104(a)(2) And Joinder In Motion Of The United States Trustee To Appoint a

25  Chapter 11 Trustee, Pursuant To 11 U.S.C. § 1104(a)(1) ("Motion"). This Motion is made and

26  based upon 11 U.S.C. § 105, § 1104(a), Fed.R. Bank. P. 9014, the Points And Authorities set forth

27  herein, the pleadings on file of which the Committee respectfully requests that this Court take

28  judicial notice, and any argument entertained at the time of the hearing on this Motion.

*SCHWARTZER & McPHERSON LAW FIRM*
*2850 South Jones Boulevard, Suite 1*
*Las Vegas, Nevada 89146-5308*
*Tel: (702) 228-7590 · Fax: (702) 892-0122*

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## INTRODUCTION

The Committee requests that a Trustee be appointed under both 11 U.S.C. § 1104(a)(1) and (2). Because the United States Trustee's Office has already moved for the appointment of a trustee under § 1104(a)(1), the Committee moves and joins in the United States Trustee's motion to have a trustee appointed based upon the Debtors' conduct in this case as evidenced by the pleadings filed by the Debtors.

The Committee further moves to have a trustee appointed with respect to § 1104(a)(2). As set forth under § 1104(a)(2), the Committee requests that a Trustee be appointed as being in the "interests of creditors." The Committee believes that the interests of creditors would be better served by the appointment of a trustee under § 1104(a)(2) due to creditors' lack of confidence in the Debtors' management arising from past performance, conflicts of interest, and lack of prospects for a confirmable plan of reorganization.

## POINTS AND AUTHORITIES

### Facts

**Petition And Statement Of Financial Affairs**

1.      On September 4, 2013, Western Funding Incorporated ("WFI"), Western Funding Inc. of Nevada ("WFIN"), and Global Track GPS, LLC ("GPS") (WFI, WFIN, and GPS collectively referred to herein as the "Debtors") filed for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date"). The Debtors' cases have been ordered to be jointly administered.

2.      Frederick Cooper is listed on WFI's petition as its President, Chief Executive Officer and Director. [Doc. #1]. Frederick Cooper is also listed on WFIN's petition as its President. [Doc. #1]. Frederick Cooper is also listed on GPS's petition as its President and Manager. [Doc. #1]. Katherine Cooper is the Chief Operating Officer of WFI.

3.      Frederick Cooper's annual compensation is in the amount of $240,000.00. Mr. Cooper agreed to a 20% reduction upon approval of the cash collateral order. Katherine Cooper's annual compensation is in the amount of $220,000.00. Mr. Cooper agreed to a 20% reduction upon approval of the cash collateral order. Taryn Cooper's annual compensation is in the amount of $195,000.00. Taryn Cooper is the daughter of Frederick and Katherine Cooper.

4.      On October 2, 2013, WFI, WFIN, and GPS filed their schedules and statement of financial affairs.  WFI's amended statement of financial affairs, filed on November 20, 2013, indicates that over $2,000,000.00 was paid to Frederick and/or Katherine Cooper during the one year period prior to the Petition Date.  There are no further disclosures of transfers later than the one year period prior to the Petition Date.

5.      The Committee does not know whether these transfers are avoidable as it has not made a full investigation of these transfers.  Although the Committee propounded discovery in contemplation of the hearing on confirmation of the Debtors' plan of reorganization, due to the withdrawal of the plan and the pending motion for the appointment of a trustee, the Committee only conducted a basic review of the discovery produced.

**CARFINCO Letter of Intent And Execution While In Possession of the Westlake Offer**

6.      On November 1, 2013, the Debtors filed a Notice Of Execution Of Letter Of Intent, which provides that a Letter of Intent was executed by Carfinco Financial Group, Inc. with WFI and GPS ("Carfinco LOI") [Doc. #265].

7.      There are several key provisions in the Carfinco LOI, as set forth below, that the Committee has found troubling:

a)      The Debtors agreed to not support any Alternative Transaction or any plan of reorganization or liquidation other than the Plan with Carfinco.  Carfinco LOI at p.4, para. iv(p).

b)      Despite their fiduciary duties, the Debtors failed to provide themselves with any meaningful "fiduciary out" in connection with its agreement to the Carfinco LOI.  The Carfinco LOI provides in pertinent part:

b)      Exclusivity.  Until the earlier of (a) termination of this Proposal Letter or (b) the execution of the Definitive Agreement (the "Exclusivity Period"), neither the Companies nor their members, directly or indirectly, through any officer, director, manager, employee, agent, partner, affiliate or otherwise, will enter into any agreement, agreement in principle or other commitment (whether or not legally binding) relating to any business combination with recapitalization of, or acquisition or purchase of all or a significant portion of the assets of any material equity interest in the business of the Companies (an "Alternative Transaction") . . . . Notwithstanding the foregoing, in the event (x) the Companies receive a written

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    proposal from a third party (other than an affiliate of any of the Companies) in

2    respect of an Alternative Transaction **that was not solicited by the Companies**
     **and did not otherwise result from a breach of the immediately preceding**

3    **sentence,** (y) each of the board of directors (or applicable governing body of WFI
     and the manager of Global Track (each, a "Governing Body") determines in good

4    faith . . . that such proposed Alternative Transaction would, if consummated result
     in a transaction more favorable to the estate of the Companies than the transaction

5    contemplated herein (a "Superior Proposal"), and (z) each Governing Body
     determines in good faith . . . that the failure to approve such Superior Proposal or

6    enter into an agreement in respect of such Superior Proposal is reasonably likely to
     be inconsistent with its fiduciary duties under applicable law, including Bankruptcy

7    Law, then the Companies may enter into negotiations, and agreements, with such
     third party in respect of such Superior Proposal ; provided that (a) the Companies

8    must first give Carfinco written notice of its intention . . . .

9    (Emphasis added).

10       c) <u>Termination</u>.  Unless sooner terminated by the mutual agreement of the parties
         hereto, this Proposal Letter shall terminate on the earliest to occur of: (a)

11       consummation of an Alternative Transaction; (b) the execution of the Definitive
         Agreement; and (c) November 15, 2013. . . [.].

12

13   Thus, these key provisions of the Carfinco LOI demonstrate that the Debtors failed to provide

14   themselves with any meaningful "fiduciary out" with respect to the Carfinco LOI. As set forth in

15   the Carfinco LOI, the Debtors were prohibited from supporting any Alternative Transaction

16   unless, in general, it was not solicited by the Debtors or any of the Debtors' memebers.  By

17   imposing such restrictions, the Debtors placed themselves in a position where they were locked

18   into the Carfinco LOI with no ability to exercise their fiduciary duties.

19       The Debtors have argued that there was a "fiduciary out" as contained in the above-

20   referenced provision regarding "Exclusivity"; however, this provision has no real, meaningful out

21   for the Debtors to exercise their fiduciary obligations to creditors because the Debtors were still

22   prohibited from soliciting parties to purchase the Debtors until after November 15, 2013, which

23   time was critical in a case with extremely abbreviated deadlines.  This prohibition, along with

24   accompanying short deadlines and the intervening Thanksgiving Holiday, served as significant

25   deterrents for parties who may have been interested in purchasing the Debtors' assets but did not

26   believe proper due diligence could possibly be performed before the existing deadlines.  See

27   Declaration Of Terry M. Keating In Support Of Motion To Extend Bidding Deadlines Or In The

28   Alternative, Allow The Committee To Have Consent Rights In Connection With Bidding Process

1  [Doc. #524].   The Debtors lost over a half a month, a significant period of time in this case due to

2  the short time frames, to adequately market their assets for the benefit of creditors and in

3  accordance with their fiduciary duties.

4          8.      In connection with the agreement to the Carfinco LOI, merely a few short days

5  later on November 4, 2013, the Debtors filed Debtors' Motion Pursuant To Sections 105(A), 363

6  And 503(B) Of The Bankruptcy Code And Rules 2002 And 6004 Of The Federal Rules Of

7  Bankruptcy Procedure For An Order Approving Break-Up Fees And Expense Reimbursement

8  Payments To Plan Sponsor, which was set for hearing on November 6, 2013 ("Break Up Fee

9  Motion").   On November 6, 2013, the day of the hearing on the Break Up Fee Motion and also the

10  original FTI employment application, the Debtors produced a letter to the Committee from a party

11  who, unsolicited, had expressed an interest in purchasing the assets of the Debtors ("Alternative

12  Offer").   The Debtors' apparent intended purpose of revealing the Alternative Offer to the

13  Committee was to establish that FTI had been working on selling the Debtors.  **See Exhibit 1**

14  (email from Matt Zirzow to Committee counsel dated November 6, 2013).   However, despite the

15  Debtors' intended submission of the Alternative Offer to the Committee (and BMO the day prior)

16  to demonstrate the value of FTI's services, the Alternative Offer raised the question of why the

17  Debtors had failed to present the Alternative Offer to BMO before BMO had to accept the

18  Carfinco LOI and be locked into the Carfinco terms, particularly since the Carfinco LOI was less

19  lucrative and more costly and complex for the estate (being a stock purchase).   BMO also

20  expressed grave concerns as to why this offer was not presented to it by the Debtors.

21          9.      The Debtors' response to why it had not presented the Westlake offer to BMO has

22  been that the Carfinco offer was more "certain," even though, undisputedly: a)  the Carfinco offer

23  did not comply with the terms of the Cash Collateral Stipulation because it did not provide

24  payment in full to BMO, and b) the Debtors stated, "at present, and in good faith, such proposed

25  Alternative Transaction [the Westlake offer] would, if consummated, result in a transaction more

26  favorable to the Companies' estates than the transactions contemplated in Carfinco's LOI, and the

27  failure to approve the Alternative Transaction is reasonably likely to be inconsistent with its

28  fiduciary duties." See attached **Exhibit 2** (letter from Katherine Cooper to Carfinco dated October

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   25, 2013).   Further, beyond the plain facts, the Debtors' response simply fails to meet the basic

2   "smell test."   That is, why would the Debtors, just by way of common sense and full disclosure

3   and in an effort to obtain more time from BMO for themselves in connection with the Cash

4   Collateral Stipulation, provide the other offer to BMO?

5   **Disclosure Statement, Plan, And Amended Plan**

6          10.     On November 15, 2013, the Debtors filed their Motion For Approval Of

7   Procedures Motion For Order: (I) Approving Adequacy Of Disclosures In Debtors' Proposed Joint

8   Disclosure Statement To Accompany Debtors' Joint Plan Of Reorganization; (II) Setting Deadlines

9   For Balloting And Opposing Confirmation Of Debtors' Joint Plan; (III) Approving Form Of

10  Ballots; (IV) Setting A Record Date For Voting Purposes; And (V) Setting The Confirmation

11  Hearing On The Plan and Joint Disclosure Statement For Joint Plan of Reorganization ("Disclosure

12  Statement") [Doc. #322].

13         11.     The Disclosure Statement was set for hearing on November 25, 2013. The

14  Disclosure Statement provided inadequate information for many reasons, including without

15  limitation, there was no liquidation analysis attached.   In an attempt to cure such significant

16  deficiencies, on the day of the hearing, on November 25, 2013, the Debtors filed a Supplement To

17  Motion For Approval Of Procedures Motion For Order: (I) Approving Adequacy Of Disclosures In

18  Debtors' Proposed Joint Disclosure Statement To Accompany Debtors' Joint Plan Of

19  Reorganization; (II) Setting Deadlines For Balloting And Opposing Confirmation Of Debtors' Joint

20  Plan; (III) Approving Form Of Ballots; (IV) Setting A Record Date For Voting Purposes; And (V)

21  Setting The Confirmation Hearing On The Plan [Doc. #377], which had as attached, a Liquidation

22  Analysis.

23         12.     Thereafter, the Debtors obtained an order approving their Disclosure Statement and

24  filed their Joint Plan Of Reorganization on November 26, 2013 [Doc. #385] (the "Plan").

25         13.     The Disclosure Statement listed some transfers to insiders only within the last year

26  (these are transfers listed in response to the questions required to be answered in connection with

27  the Statement of Financial Affairs and thus do not include transfers that could be avoided within the

28  last 4 years) and provided as follows:

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Debtors' SoFA also reflects that within a year prior to the Petition Date it made charitable contributions in the total amount of $92,028, including $75,000 to the Kentucky Horse Foundation in Lexington, Kentucky. Third, Debtors' SoFA reflects various transfers to alleged insiders within one year of the Petition Date for various reasons, including bonuses, car allowances, payroll, legal indemnification, wires sent on or behalf of the company and reimbursed, personal use of a credit card for the company, and other matters. The total sums transferred by WFI to various insiders within a year of the Petition Date include the following: (a) David Cooper [Frederick Cooper's father] for $118,490.10; (b) Frederick and Katherine Cooper for $1,432,016.82; (c) Frederick Cooper for $415,056.90; (d) Global Track for $216,154.69; (e) James B. Hadden for $30,500; (f) Jay Barrett for $60,000; (g) Katherine Cooper for $363,067.88; (h) Mark Finston for $20,000; and (i) Taryn Cooper for $313,563.33.

Disclosure Statement at p. 33 [Doc. #384]. Thus, merely based upon some of the transfers the Debtors listed, there are potential transfers well in excess of $2,000,000.00. Thus, this amount does not include transfers made later than before the one year prior to the Petition Date which may also be in the millions of dollars.

14.     The Plan (notably, not the version that was noticed with the Disclosure Statement) was revised to propose that the Reorganized Debtor retain "Retained Claims," which are defined as follows:

(124)  Retained Claims means any rights, Causes of Action (including Avoidance Actions) and Claims (including claims under chapter 5 of the Bankruptcy Code) of a Reorganized Debtor (i) relating to, or against a counter party to a Desired 365 Contract that is assumed by a Reorganized Debtor or assumed and assigned to a Purchaser; (ii) relating to all Vested Assets; and (iii) relating to all employees, officers and directors of Reorganized Debtors (unless such Persons are Excluded Persons). For the avoidance of doubt, all Avoidance Actions against any Excluded Persons are Liquidating Trust Avoidance Actions.

Plan, at p. 19 [Doc. #385]. Under the initial plan of reorganization, the claims against insiders would have been available for liquidation for the benefit of unsecured creditors. However, under the Plan, as revised, all claims against the insiders, namely the Coopers were going to be retained, except, quite notably, any claims against the B Members. Thus, no claims against the Coopers or similarly situated insiders were going to be transferred to the Liquidating Trust. These assets, the Retained Claims, were not being purchased by Carfinco for an additional amount. That is, the Retained Claims were not part of Carfinco's offer in the Carfinco LOI, see [Doc. #265], and Carfinco did not increase its offer to purchase the assets of the Debtors after it decided it was going to require that it be given the Retained Claims.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

15.     It is undisputed that Carfinco wanted to retain the Retained Claims because it did not want litigation against the insiders who were going to work for Carfinco. That's understandable. However, the problem is that assets cannot be obtained without paying the estate for the value of the asset. Carfinco made no offer to pay the estate for the Retained Claims.

16.     The Plan also contained clauses which effectively discharged the insiders of the Debtors from claims in violation of *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401-02 (9th Cir. 1995), *cert. denied*, 517 U.S. 1243 (1996) and *In re South Edge LLC*, 478 B.R. 403, 414 (D. Nev. 2012).

17.     On December 14, 2013, the Debtors filed a Plan Supplement For Joint Plan Of Reorganization ("Supplement"). See attached **Exhibit 3** for easy reference. The Plan undisputedly provides that a Supplement could be filed; however, alarmingly, the Supplement contained information that had previously been denied. That is, prior to the time of the Supplement, the Debtors denied any employment relationship with Carfinco. See **Exhibit 4** (Transcript of Section 341 Meeting held on November 7, 2013). At the Section 341 Meeting, Committee counsel asked Fred Cooper the following:

> **Ms. McPherson:** Okay. And in connection with the Carfinco offer, are there any agreements, formal or otherwise, to employ any of the debtor's employees?
> **Mr. Cooper:** No.
> **Ms. McPherson:** Has --- has an agreement like that been discussed in the past?
> **Mr. Cooper:** Uh, we had brief discussion, um, with them in I want to say December – no. It wasn't December. Um, when we had the first LOI with Carfinco, uh, we had a discussion in which, uh, it was – prior to bankruptcy—in which the company, uh, traveled to Edmonton. And at the time, they were paying, um, I believe it was 22 to $24 million for the stock value of the company. And we had brief discussion at that time of what a combined entity would look like.

See **Exhibit 4** at p. 15.

18.     Further, despite the contents of the Supplement, the Debtors and Carfinco have argued that there was never any agreement by the Coopers to work for Carfinco as no definitive terms pertaining to compensation had been reached and Carfinco needed the Coopers listed as officers for state licensing purposes. These arguments are disingenuous. The Debtors themselves filed the Supplement which references Exhibit 2 as "Identity of Officers and Directors of Reorganized Debtors." In addition, on Exhibit 2 of the Supplement, Fred Cooper is listed as the President of WFI and GPS and Katherine Cooper is listed as the Chief Operating Officer of WFI and GPS. See attached **Exhibit 3**. If

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Fred and Katherine Cooper were really not going to be the officers of the Reorganized Debtors, as the

2  Debtors have suggested, then the Debtors obviously sent out information to creditors in connection with

3  the Plan that was false and misleading intending that creditors (and licensing authorities) rely on this

4  false information.  The Debtors cannot legitimately argue the facts both ways to serve their own

5  purposes.

6  **The Las Vegas Real Property**

7  　　　　18.　　On December 5, 2013, the Debtors filed their Motion For Entry Of An Order

8  Pursuant To Sections 105(a), 363, 365, 503 And 507 Of The Bankruptcy Code And Rules 2002,

9  6004, 6006, 9007, 9008 And 9014 Of The Federal Rules Of Bankruptcy Procedure Approving And

10  Authorizing (A) Bidding Procedures In Connection With The Sale Of Substantially All  Of The

11  Debtor's Las Vegas Real Property; (B) Form And Manner Of Notice The Sale Hearing; And (C)

12  Related Relief ("Vegas Property Bid Procedures Motion") [Doc. #412].   The Vegas Property Bid

13  Procedures Motion sought approval of the procedures to sell real property located at 3915 E.

14  Patrick Lane, Las Vegas, Nevada 89120 (the "Property").  Notably, the Debtors listed the value for

15  the Property in their schedules as "unknown" instead of even attempting to place some value on

16  this real property to provide information to creditors.  Moreover, the Debtors never listed the value

17  of the Property even despite that fact that the Debtors filed amendments to their schedules well

18  after obtaining the appraisal of the Property in November 2013.

19  　　　　A stalking horse bid amount for the Property provided by Carfinco was $500,000.00, an

20  amount that this Court is aware is substantially less than the appraisal amount, and the Debtors

21  accepted this offer and presented it to the Court.  The Vegas Property Bid Procedures Motion was

22  not approved.

23  **Hearing On Sale And Statements Made**

24  　　　　19.　　At the hearing on approval of the sale of substantially all of the assets, due to the

25  amount of the offer made by Westlake (a third party bidder) and due to the fact that if additional

26  marketing were allowed by the Court to seek additional offers considerable additional expenses

27  would be incurred, the Committee withdrew its objection to the sale of the assets and withdrew its

28  motion to extend the bid procedures deadlines (noting that it was not waiving any of the claims

9

1  that it believes may exist against the Debtors, insiders, Carfinco, and BMO, claims based upon the

2  Debtors own pleadings and documents).  See Debtors' Opposition To The Motion Of The United

3  States Trustee To Appoint A Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)(1) [Doc. # 617,

4  Exhibit 3 at pp. 18-19].

5        20.    At the hearing on the sale, Debtors' counsel stated as follows:

6  I think we have a wildly successful process under the very trying circumstances of
7  this case.  I cannot dispute that we had a very quick process here.  That is the
   unfortunate reality of many bankruptcy cases, and it was the unfortunate reality of
8  this case.
         But notwithstanding all of that, the process still worked. We still had two
9  very interested bidders who bid this asset up far in excess of any expectations that I
   or my financial advisor or investment banker had.  It is a success.
10        It's hard to argue with that success in light of the results of this case and the
   meaningful distribution perhaps up to a third to unsecured creditors of the actual
11  allowed claims. That's nothing to sneeze at.  That's pretty substantial.

12

13  See Doc. # 617, Exhibit 3 at p. 10.  However, despite these statements, after the actual closing of

14  the sale to Westlake, the Committee has learned that due to various accounting reconciliations or

15  irregularities which are believed are still being identified by Debtors, there may be little to no

16  excess funds from the sale of the assets to Westlake for the estate and available for unsecured

17  creditors.

18  **Debtors' Amended Plan**

19        21.    The Debtors amended their plan of reorganization on January 2, 2014 [Doc.

20  #602]("Amended Plan").  The Amended Plan is a liquidating plan, and thus there will be no

21  reorganization of the Debtors.  Under the Amended Plan, the Debtors propose that a Plan Administrator

22  and Liquidating Trustee both be appointed.  The Amended Plan is currently not acceptable to the

23  Committee due to the additional layer of expense of both a Plan Administrator and Liquidating Trustee.

24  As a result, the Committee anticipates that the Amended Plan is not likely confirmable since the

25  necessary votes on the Amended Plan will likely not be obtained.

26  **Summary of Debtors' Conduct As Demonstrated By Pleadings Not In Interests Of Creditors**

27        22.    A non-exhaustive summary of the facts in this case, as demonstrated by the Debtors'

28  own pleadings of which the Committee respectfully requests that this Court take judicial notice,

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    demonstrates that the Debtors have not acted and cannot act in the interest of creditors. To summarize:

2          a)     Within one year prior to the Petition Date, the insiders of the Debtors received in excess

3    of $2,000,000.00 in transfers. This is established by the Debtors' own petition and schedules. These

4    transfers only reach back one year prior to the Petition Date, and therefore, there are likely additional

5    transfers within the time prior to the one year period which would also be avoidable under 11 U.S.C. §

6    544 and 548. While the Committee acknowledges that it has not determined whether such transfers are

7    avoidable, the Committee does not believe that the Debtors can legitimately review these transfers and

8    claims to determine whether a complaint should be filed against insiders for the avoidance of transfers;

9          b)     The Debtors entered into a letter of intent with Carfinco, which had no meaningful

10   "fiduciary out" and in addition, while in possession of a more favorable offer from Westlake (who was

11   ultimately the successful bidder and who as a result of its offer being an asset purchase did not require

12   the costly plan of reorganization which the Debtors had already commenced on extremely shortened

13   time) causing undue substantial expense to the estate including, without limitation, a break-up fee and

14   expense reimbursement of $815,000.00. The Carfinco letter of intent was filed with this Court [Doc.

15   #265] and it is undisputed by the Debtors that they had the Westlake offer in their possession and did

16   not present it to BMO prior to BMO's acceptance of the Carfinco LOI and motion for approval of

17   break-up fee and expense reimbursement, **see Exhibit 1**;

18         c)     The Debtors sought to sell the Las Vegas real property with Carfinco serving as its

19   stalking horse for the amount of $500,000, an amount substantially less than the appraised value of this

20   property, demonstrating a lack of reasonable business judgment and undue deference to Carfinco at the

21   expense of the estate. In connection with this motion, the Debtors also sought to keep the appraisal on

22   this property confidential. These facts are established by the Vegas Property Bid Procedures Motion

23   and related pleadings related to sealing the appraisal;

24         d)     The Debtors' Plan proposed to keep all actions against the insiders and not transfer them

25   to the Liquidating Trust without paying the estate for their value, attempting to effectively provide

26   insiders with a release and discharge of claims against them personally. In addition, the insiders were to

27   be released from the claims against them. The Plan is on file and evidence of these actions to not pay

28   the value of these assets and shield insiders is the Plan proposal itself;

1    e)    A Plan Supplement filed by the Debtors and distributed to creditors that provides that

2  Fred and Katherine Cooper were to be officers of the Reorganized Debtors;  However, the Debtor

3  denied that such relationship existed shortly before this time as evidenced by Fred Cooper's testimony

4  at the 341 Meeting held on November 7, 2013, and the Debtors later represented that creditors

5  essentially should not rely on the Supplement sent to them which provides that Fred and Katherine

6  Cooper were to be officers of the Reorganized Debtors because no "firm" agreement had been reached

7  regarding employment;

8    f)    The Debtors originally represented to this Court that a substantial sum of money would

9  come to the estate after the sale of the assets to Westlake.  However, after the closing of the sale, the

10  Committee has learned that there will be essentially little to nothing going to the estate; and

11    g)    The Amended Plan is a liquidating plan that proposes to retain both a Liquidating

12  Trustee and Plan Administrator.  The Committee does not believe both a Liquidating Trustee and Plan

13  Administrator are needed and that such proposal simply creates undue expense for the estate.  In

14  addition, the Committee anticipates that the Debtors may not be able to confirm such plan due to the

15  inability to get the required votes to accept it.

## Memorandum of Law

### A.    BURDEN OF PROOF

18    In the past, there have been several cases which have stated that the burden of a movant

19  seeking the appointment of a trustee is by "clear and convincing evidence." See, e.g., See also *In*

20  *re Sharon Steel Corp.,* 871 F.2d 1217, 1226 (3d Cir. 1989); *In re Marvel Entertainment Group*

21  *Inc.,* 140 F.3d 463, 473 (3d Cir. 1998).  However, since the Supreme Court's decision in *Grogan*

22  *v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), several court's have recognized

23  that the burden of a movant seeking the appointment of a trustee is by the "preponderance of the

24  evidence." See *In re Keeley and Grabanski Land Partnership*, 455 B.R. 153, 162-3 (8th Cir.BAP

25  2011); *In re Veblen West Dairy LLP,* 434 B.R. 550, 555 (Bankr.D.S.D.2010); *Tradex Corp. v.*

26  *Morse,* 339 B.R. 823, 829 (D.Mass.2006) ("[F]actual findings for appointment of a trustee must be

27  made to a preponderance of the evidence by the appointing judge"); *In re Altman,* 230 B.R. 6, 16–

28  17 (Bankr.D.Conn.1999) (holding that, following *Grogan v. Garner,* the appropriate standard of

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

proof for appointment of a Chapter 11 trustee is preponderance of the evidence), *vacated on other grounds,* 254 B.R. 509 (D.Conn.2000); *Contra, In re G-I Holdings, Inc.,* 385 F.3d 313, 317-8 (3rd Cir. 2004) (Alito, J.) ("we see no support for the proposition that the burden of persuasion in a case of this nature is ever reduced from clear and convincing evidence to a preponderance of the evidence").

> As the court in *Veblen West Dairy* said, while a Chapter 11 debtor's desire to remain in possession of the property of the bankruptcy estate and in control of its reorganization is certainly an important interest, that interest cannot reasonably be said to be any more important than a Chapter 7 debtor's interest in receiving a discharge of his debts. We agree: If a preponderance of the evidence standard is a sufficient standard for the denial of discharge based on a debtor's fraud, it should likewise be sufficient for the appointment of a trustee based on allegations of the debtor's fraud or misconduct. Consequently, we conclude that the proper standard for a party seeking the appointment of a Chapter 11 trustee is preponderance of the evidence.

*Keeley and Grabanski Land Partnership,* 455 B.R. at 163.

The Committee asserts that it can meet either standard but is only required to prove that there is "cause" for appointment of a trustee by *a preponderance of the evidence.*

**B.    A TRUSTEE MUST BE APPOINTED UNDER EITHER 11 U.S.C. § 1104(a)(1) OR (2)**

The statutory requirements for appointment of a trustee in Chapter 11 cases are stated in Bankruptcy Code § 1104(a):

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
> (1) **for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either *before or after the commencement of the case,* or similar cause**, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
> (2) **if such appointment is in the interests of creditors**, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. §1104(a) (emphasis added). Thus, Section 1104(a) provides two alternative grounds for the appointment of a trustee - (a)(1) and (a)(2). *In re Lowenschuss*, 171 F.3d 673, 685 (9th Cir. 1999), *certiorari denied*, 528 U.S. 877, 120 S.Ct. 185, 145 L.Ed.2d 156 (1999) ("Either one of

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    these two, independent grounds was sufficient to justify granting Selnick's motion [to appoint a

2    trustee]").

### 1.  The Presumption That Debtors Should Remain In Possession Does Not Apply In This Case Since Substantially All Assets Have Been Sold

The Committee recognizes that there is a presumption, rooted in the debtor-in-possession's familiarity with the business both before and after the filing of bankruptcy, that Chapter 11 debtors should remain debtors in possession. *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3rd Cir. 1998). The presumption to allow a Chapter 11 debtor to remain a debtor in possession is based upon the debtor operating a business enterprise with management. "Nevertheless in the appropriate case, the appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." *In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr.S.D.Ga. 2000).

The presumption is not a factor in this case because substantially all of the assets of the Debtors have been sold to Westlake. The remaining assets to be liquidated include loans that have been referred to as the "ineligibles" (such as loans that include charge offs, borrowers who filed bankruptcy, and where a payment has not been made for over 90 days), real estate, and litigation claims. Ongoing management is not needed to dispose of these assets and in fact, some of these assets already have buyers. Moreover, there is potential litigation, including litigation against current management that the current management, of course, will not pursue against themselves.

In addition, the Debtors have drafted a plan of reorganization. There is no need for the estate to incur the expense of having a new plan of reorganization that is simply a liquidation plan and bear the expense of having two parties, a Plan Administrator and the Liquidating Trustee, handling matters to wind up this case. In addition, while this plan is pending, management will continue to be in place and be required to be paid their high salaries.

Thus, the presumption that debtors in possession should remain in possession is overcome by the circumstances in this case.

### 2.  Section 1104(a)(1)

Under subsection (a)(1), "cause" is not limited to fraud, dishonesty, incompetence

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  or gross mismanagement. *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 472 (3d

2  Cir.1998). The inability to fulfill the fiduciary duties of a debtor in possession is "cause" for

3  appointment of a trustee. *In re SunCruz Casinos, LLC*, 298 B.R. 821, 830 (Bankr.S.D.Fla. 2003).

4  Determinative factors in the appointment of a trustee include:

> 1)  Materiality of the misconduct;
> 2)  Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers;
> 3)  The existence of pre-petition voidable preferences or fraudulent transfers;
> 4)  Unwillingness or inability of management to pursue estate causes of action;
> 5)  Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;
> 6)  Self-dealing by management or waste or squandering of corporate assets.

10  *In re Intercat, Inc.*, 247 B.R. 911, 921 (Bankr.S.D.Ga. 2000); *In re Briarwood Capital, LLC*, 2010

11  WL 2884949 (Bankr.S.D.Cal. 2010)(quoting *Intercat*).

12      The United States Trustee has filed a motion to appoint a chapter 11 Trustee pursuant to 11

13  U.S.C. § 1104(a)(1).  The Committee hereby joins in this motion and adopts the arguments set

14  forth therein.

15      In addition to the arguments set forth herein, the Committee believes a trustee is necessary

16  because it is self-evident that the Debtors will not investigate and potentially sue the Coopers for

17  avoidable transfers and it is equally self-evident that the Debtors will not investigate and sue

18  family members of the Coopers for the return of fraudulently transferred assets. This, in itself, is

19  grounds for appointment of a trustee because of the Debtors' inability to investigate and prosecute

20  claims against insiders.  As stated by Judge Walrath in *In re PRS Insurance Group, Inc.*, 274 B.R.

21  381, 387-8 (Bankr. D.Del. 2001):

> Because of the evidence of significant transfers of assets to Mr. Lucia and his family, we conclude that an independent basis for the appointment of a trustee exists. It is unrealistic to assume that the Debtor, if controlled by Mr. Lucia, will authorize or even cooperate in the investigation and prosecution of such actions.

25  Based upon the foregoing, a chapter 11 trustee should be appointed under 11 U.S.C. § 1104(a)(1).

26      **3.    11 U.S.C. § 1104(a)(2)**

27      A court need not find any of the enumerated wrongs set forth in § 1104(a)(1) to

28  appoint a trustee.  Instead, it is sufficient that the appointment of a trustee be in the "interest of the

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    creditors." *In re Oklahoma Ref. Co.*, 838 F.2d 1133 (10th Cir. 1988).  In connection with

2    considering the interest of creditors under subsection (a)(2) of § 1104, factors courts consider are:

> (1) the trustworthiness of the debtor;
> (2) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation;
> (3) the confidence—or lack thereof—of the business community and of creditors in present management; and
> (4) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.

*In re Sundale, Ltd.*, 400 B.R.890, 901 (Bankr.S.D.Fla. 2009).  *See also In re Ionosphere Clubs, Inc.*, 113 B.R. 164 (Bankr. S.D.N.Y. 1990).

> "Unlike § 1104(a)(1), § 1104(a)(2) does not require a finding of fault; the court may appoint a trustee even if no 'cause' exists." *In re Euro–Am. Lodging Corp.*, 365 B.R. 421, 428 (Bankr.S.D.N.Y.2007). Instead, section 1104(a)(2) reflects the practical reality that a trustee is needed. *Id. See also, In re Sharon Steel Corp.*, 871 F.2d at 1226; *In re V. Savino Oil & Heating Co.*, 99 B.R. at 527 n. 11.

*In re Sundale, Ltd.*, 400 B.R.890, 901 (Bankr.S.D.Fla. 2009). See also, *In re Eurospark Industries, Inc.*, 424 B.R. 621, 627 (Bankr.E.D.N.Y. 2010) ("It is not necessary to find fault on the part of the debtor before appointing a chapter 11 trustee").

> A chapter 11 debtor and its managers owe fiduciary duties to the estate. *Hirsch v. Penn. Textile Corp., Inc. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 612 (Bankr.S.D.N.Y.1998). An independent trustee should be appointed under § 1104(a)(2) when they suffer from material conflicts of interest, and cannot be counted on to conduct independent investigations of questionable transactions in which they were involved.

*In re Ridgemour Meyer Properties, LLC*, 413 B.R. 101, 113 (Bankr.S.D.N.Y. 2008); *In re Taub*, 427 B.R. 208, 227 (Bankr.E.D.N.Y. 2010) (same).

In this case, the Committee believes that it is in the interests of creditors to have a trustee appointed to pursue and dispose of the remaining assets.  The reasons for the Committee's position are as follows:

1)    Within one year prior to the Petition Date, the insiders of the Debtors received in excess of $2,000,000.00 in transfers.  The Committee does not believe that the Debtors can legitimately review records to determine whether a complaint should be filed against insiders for the avoidance of transfers

1  or other litigation claims.

2       2)    The Debtors entered into a letter of intent with Carfinco, which had no meaningful

3  "fiduciary out" and while in possession of a more favorable offer from Westlake causing undue

4  substantial expense to the estate including, without limitation, a break-up fee and expense

5  reimbursement of $815,000.00.

6       3)    The Debtors sought to sell the Las Vegas real property with Carfinco serving as its

7  stalking horse for the amount of $500,000, an amount substantially less than the appraised value of this

8  property, demonstrating a lack of reasonable business judgment.

9       4)    The Debtors' Plan proposed to keep all actions against the insiders and not transfer them

10  to the Liquidating Trust without paying the estate for their value, and attempting to effectively provide

11  insiders with a release and discharge of claims against them personally.  In addition, the insiders were to

12  be released from the claims against them in other provisions of the Plan.

13       5)    A Plan Supplement filed by the Debtors and distributed to creditors provided that Fred

14  and Katherine Cooper were to be officers of the Reorganized Debtors, yet the Debtors have denied that

15  such employment was established and apparently argue that creditors should have not relied on the

16  information the Debtors sent.

17       6)    The Debtors originally represented that a substantial sum of money would come to the

18  estate after the sale of the assets to Westlake.  However, after the closing of the sale, the Committee has

19  learned that there may be little to nothing available for the estate.

20       7)    The Amended Plan is a liquidating plan.  Thus, there is no reorganization in prospect.

21  Further, the Amended Plan proposes to retain both a Liquidating Trustee and Plan Administrator.  The

22  Committee does not believe both a Liquidating Trustee and Plan Administrator are needed and that such

23  proposal simply creates undue expense for the estate.  The Committee does not believe there is a

24  need for the separation of the roles for Plan Administrator and Liquidating Trustee with, among

25  other things, the Plan Administrator being vested with the "sole authority to prosecute causes of

26  action on behalf of and for the benefit of the post-confirmation estates (except for causes of action

27  vested in the Liquidation Trustee) and having the authority to compromise, settle, resolve,

28  discontinue, abandon or dismiss all such actions without approval of the Bankruptcy Court."  In

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  addition, the Committee anticipates that the Debtors may not be able to confirm such plan due to the

2  inability to get the required votes to accept it.

3         Based upon the foregoing, the Committee believes that the interests of creditors would be

4  better served by the appointment of a trustee under § 1104(a)(2) due to creditors' lack of

5  confidence in the Debtors' management arising from past performance, conflicts of interest, and

6  lack of prospects for a confirmable plan of reorganization. Even if the Court has questions about

7  the significance of the issues set forth in this Motion, it is clear that it is in the interests of creditors

8  to have an independent trustee review these claims and investigate these claims.  The Debtors'

9  inherent conflict of interest with regard to these issues leaves little choice.

**CONCLUSION**

11        Based upon the foregoing, the Committee respectfully requests that this Court grant its

12  Motion To Appoint Trustee, and immediately appoint a Chapter 11 Trustee.

13        Dated this 10th day of January, 2014.

Respectfully submitted,

/s/ Jeanette E. McPherson
Jeanette E. McPherson, Esq.
Schwartzer & McPherson Law Firm
2850 S. Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Attorneys for the Official Committee
of Unsecured Creditors

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT "1"

Angela Hosey

**Subject:**          FW: WFTI: WFI ˙        ⌐OI's
**Attachments:**      Western Funding LOI - 10-24-2013.pdf; Western Funding LOI - 10-29-2013 without loan
                      detail.pdf; Western Funding LOI 11-1-2013.pdf;          Due Diligence List
                      11-1-2013.xlsx; Notice of Receipt of LOI 10 25 2013.pdf

**From:** Matt Zirzow [mailto:Matt@lzlawnv.com]
**Sent:** Wednesday, November 06, 2013 8:19 AM
**To:** Jeanette McPherson
**Cc:** Michael.Tucker@fticonsulting.com; Davis, Jerome
**Subject:** WFTI: WFI Westlake LOI's

Jeanette: Please see e-mail below and attached. This is a potential LOI generated by FTI. Although there is a current exclusivity provision with Carfinco, FTI's involvement could potentially add significant value. Michael will be with me this morning at this hearing. Perhaps we could meet and discuss 15 minutes before the hearing?

 **LARSON & ZIRZOW**

Matthew C. Zirzow, Esq.
LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd., Suite 101
Las Vegas, Nevada 89101
(702) 382-1170
Facsimile: (702) 382-1169

**From:** Tucker, Michael [mailto:Michael.Tucker@FTIConsulting.com]
**Sent:** Wednesday, November 06, 2013 12:34 AM
**To:** 'David Audley' (audley@chapman.com) (audley@chapman.com)
**Cc:** Ryan Andersen (randersen@lionelsawyer.com); Rodney Jean (rjean@lionelsawyer.com); Katherine Cooper (KCooper@westernfundinginc.com); Fred Cooper (FCooper@westernfundinginc.com); Matt Zirzow; Greg Garman (ggarman@gordonsilver.com); Ed Bentzen; Davis, Jerome
**Subject:** WFI Westlake LOI's

Attached please find the LOI's from ˙              and the notice to Carfinco of the same. The chronology is as follows:

1) Carfinco LOI is signed 10-22 starting the exclusivity provision in section xi
2)        unsolicited LOI is received 10-24 (        had been contacted prior to 10-22 and was doing diligence prior to WFI signing the Carfinco LOI)
3) WFI sends Carfinco notice of        LOI being a Superior Proposal starting the 2 business day notice provision in the exclusivity section
4)        calls and clarifies its LOI and        provides an updated LOI on 10-29 that corrects the portfolio purchase to be Net Receivables not Gross Receivables as Gross includes unearned interest. The LOI also updates the number of loans to match the tape data provided to it.
5)        calls and adds more clarity to its LOI and provides another updated LOI on 11-1-13. This LOI adds that the offer is a cash offer with no financing contingency, confirms it will buy the loans funded between 10-18 and closing subject to similar loan review (as it has done its diligence on the loan portfolio as of 10-18) and provides a list of confirmatory diligence that it believes would be completed in 2 weeks.

1

Please let us know if you have any questions.

Michael Tucker
FTI Consulting, Inc.
Two North Central Ave.  Suite 1200
Phoenix, AZ  85004
602 744 7144, Direct Dial
602 744 7110, Fax
602 619 7899, Cell
Email: michael.tucker@FTIConsulting.com

Confidentiality Notice:
This email and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and then delete this copy and the reply from your system. Thank you for your cooperation.

2

# EXHIBIT "2"



October 25, 2013 **since 1962**

VIA E-MAIL:
Carfinco Financial Group, Inc.
Attn: Tracy Graf

Tracy:

As your counsel was advised in a telephone conference yesterday, BMO Harris Bank, N.A. ("BMO") has advised that the Letter of Intent (the "LOI") dated October 22, 2013 by Carfinco Financial Group Inc. ("Carfinco") does not conform with the requirements in the existing cash collateral stipulation (the "Cash Collateral Stipulation") with Western Funding Incorporated and Global Track GPS LLC (collectively, the "Companies") because, among possibly other matters, it does not payoff BMO in full, and thus if the Companies were to proceed with Carfinco's LOI in its current form, it would result in a Termination Event pursuant to Section 12(e) of the Cash Collateral Stipulation, among possibly other sections.

Consistent with Section xi (the "Exclusivity Provision") of the LOI, please be advised that the Companies received a written proposal from a third party in respect of an Alternative Transaction (as defined in the LOI), and the Companies have determined that and hereby certify that, at present, and in good faith, such proposed Alternative Transaction would, if consummated, result in a transaction more favorable to the Companies' estates than the transactions contemplated in Carfinco's LOI, and the failure to approve the Alternative Transaction is reasonably likely to be inconsistent with its fiduciary duties. A copy of the letter of intent from                                     regarding the above-referenced Alternative Transaction is enclosed herein.

As a result of the foregoing, this letter is to advise that, subject to the requirements in the Exclusivity Provision, the Companies reserve the right to enter into negotiations and potentially agreements with                in respect of that proposal.

Please contact us should you have any questions or wish to discuss this matter further.


Very truly yours,

*[signature]*


3915 E. Patrick • P.O. Box 94858 • Las Vegas, NV 89193-4858 • (702) 434-1990

# EXHIBIT "3"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Telephone: (702) 382-1170
Facsimile: (702) 382-1169

Attorneys for Debtors

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>WESTERN FUNDING INCORPORATED,<br><br>    Debtor. | Case No.: BK-S-13-17588-LED<br>Chapter 11<br>(Jointly Administered) |
| In re:<br><br>WESTERN FUNDING INC. OF NEVADA,<br><br>    Debtor. | Case No.: BK-S-13-17586-LED<br>Chapter 11 |
| In re:<br><br>GLOBAL TRACK GPS, LLC,<br><br>    Debtor. | Case No.: BK-S-13-17589-LED<br>Chapter 11 |

**PLAN SUPPLEMENT FOR JOINT PLAN OF REORGANIZATION**

Pursuant to Section 1.06 of the *Joint Plan of Reorganization* (the "Plan") [ECF No. 385], Western Funding Incorporated, Western Funding Inc. of Nevada, and Global Track GPS, LLC (collectively, the "Debtors"), debtors and debtors-in-possession, hereby file their *Plan Supplement for Joint Plan of Reorganization* (the "Plan Supplement"). The Plan Supplement includes the following documents, which are attached as exhibits:

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd., Suite 101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

| Exhibit | Description |
|---------|-------------|
| 1 | Reorganized Debtors' Governance Documents |
| 2 | Identity of Officers and Directors of Reorganized Debtors |
| 3 | Carfinco WFI Revolving Credit Facility Summary Terms and Conditions |
| 4 | WFI Liquidating Trust Agreement |
| 5 | Side Letter/Desired 365 Contracts |
| 6 | Building License Agreement |

Dated:  December 14, 2013

LARSON & ZIRZOW, LLC

By: _____

ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101

Attorneys for Debtors

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd., Suite 101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

# EXHIBIT 2

Post-Closing Plan

### Proposed Directors and Officers

| Company | Jurisdiction | Directors | Officers |
|---|---|---|---|
| Western Funding Incorporated | California | Tracy Graf<br>Troy Graf<br>Stephen Dykau | Fred Cooper – President<br><br>Troy Graf – Executive Vice President<br><br>Stephen Dykau – Chief Financial Officer<br><br>Katherine Cooper – Chief Operating Officer |
| Global Track GPS LLC | Delaware | Tracy Graf<br>Troy Graf<br>Stephen Dykau | Fred Cooper – President<br><br>Troy Graf – Executive Vice President<br><br>Stephen Dykau – Chief Financial Officer<br><br>Katherine Cooper – Chief Operating Officer |

# EXHIBIT "4"

Page 1

ORIGINAL

1

2

3

4

5

6

7

8

9

10      TRANSCRIPT OF TAPE-RECORDED

11      HEARING OF THE UNITED STATES BANKRUPTCY COURT

12      DISTRICT OF NEVADA

13      WESTERN FUNDING INCORPORATED, WESTERN FUNDING

14      INC. OF NEVADA & GLOBAL TRACK GPS, LLC

15      NOVEMBER 7, 2013

16

17      CASE NOS. 13-17588, 13-17586 & 13-17589

18

19

20

21

22       Oasis Job Number:   #8604

23

24

24

Page 2

1    MR. MCDONALD:  My name is Edward McDonald. I work

2    for the Department of Justice. I represent the United

3    States Trustee. We're here today for continued 341s in,

4    uh, three, uh, uh, jointly administered cases. The lead

5    case is In Re Western Funding, Incorporated, case number

6    13-17588, uh, before the Honorable Laurel E. Davis, who's

7    a bankruptcy judge in the District of Nevada.

8    It's the time of day set for the 341 -- continued

9    341 meetings of creditors. And it is, uh, about 12:09 in

10   the afternoon Pacific Time on November 7, 2013.

11   The other two cases that are jointly administered

12   with the lead case are In Re Western Funding, Incorporated

13   of Nevada, case number 13-17586, also before Judge Davis;

14   and Global Track GPS, LLC case number 13-17589 also

15   before Judge Davis.

16   Uh, this was continued, uh, for a number of reasons

17   bec- -- because the, uh, uh, debtor had, uh, requested,

18   uh, a -- and I think it -- and extension of time to file

19   the schedules and had filed them in about week before the

20   original 341. So we continued it to get, uh, uh,

21   creditors and parties in interest a chance to look the,

22   uh, schedules over since they were fairly voluminous.

23   In addition, uh, we discussed, uh, um, uh, the --

24   the debtor and debtor's, uh, counsel discussed the need -

25   - their need to, uh, um, add in, uh, a fairly large

Page 3

1    amount of detail to SOFA number 3; and, uh, that they

2    also plan to make, uh, amendments to Schedules F and G of

3    the original schedules. And, uh, that was another reason

4    why we continued it.

5      Uh, and, uh -- and because the revisions to

6    Schedules F and G and SOFA 3 were made within an hour of

7    this, uh, continued meeting, we're going to continue the

8    meeting again to Thursday -- Thursday, November 21, 2013

9    at 12:00 noon.

10     Uh, and again, please restrain me if I try to

11   conclude this meeting, uh, since I just said I was going

12   to continue it. And thank you in advance.

13     Uh, okay. So having said that, uh, um, I have, uh,

14   the debtor's representative here. Please make your

15   appearance here.

16     MR. COOPER:  Uh, Frederick A. Cooper.

17     MR. MCDONALD:  Mr. Cooper, please raise your right

18   hand. Do you swear or affirm to tell the truth, the whole

19   truth, and nothing but the truth during the course of

20   this examination? And do you understand testifying under

21   penalty of perjury?

22     MR. COOPER:  I do.

23     MR. MCDONALD:  Thank you very much, sir. You can put

24   your hand down. I have your counsel here. Please make

25   your appearance, sir.

Page 4

1    MR. ZIRZOW:  Yeah. Matt Zirzow with Larson and

2    Zirzow, proposed counsel to the debtors.

3    MR. MCDONALD:  Thank you very much. We have a number

4    of people on the, uh -- in the room. Uh, we have somebody

5    on the phone. Can you please make your appearance Ms.,

6    uh, Christopher.

7    MS. CHRISTOPHER:  Carmen Christopher on behalf of

8    the Consumer Financial Protection Bureau by phone.

9    MR. MCDONALD:  Okay. And then we have a number of

10    people physically here that represent creditors or

11    parties in interest. If you want to make your

12    appearances, please state so, uh, now or sign the sign in

13    sheet and you'll be part of the record in that way.

14    Anybody want to verbally appear?

15    MR. ANDERSEN:  Yes. Uh, Ryan Anderson, Lionel Sawyer

16    & Collins, uh, appearing on behalf of a secured lender,

17    BMO Harris Bank NA.

18    MR. MCDONALD:  Thank you very much, sir. Anybody

19    else? Okay.

20    Um, all right. So, uh, a lot of this case is moving

21    fairly quickly. Uh, Mr. Zirzow, uh, can you give us a

22    sort of, uh, uh, overview of what's happened since the

23    last time we met?

24    MR. ZIRZOW:  Uh, sure. With respect to the schedules

25    or the case in -- overall? Or both? Or --

Page 5

1    MR. MCDONALD:  Yeah. The case overall. Both.

2    MR. ZIRZOW:  Okay. Um, uh, well, overall, uh, we've

3    had an evidentiary hearing on the B parties, uh, motion

4    to dismiss the bankruptcy case. The evidentiary hearing

5    portion of that was concluded on Monday. Uh, the judge

6    has requested supplemental briefing, which is due

7    tomorrow.

8     And she has scheduled a further hearing next, uh,

9    Wednesday at 10:00 for final closing arguments and she's

10   thereafter indicated that she would most likely be ruling

11   on that motion from the bench either at that hearing or

12   sometime later that day.

13    So, uh, hopefully, um, that will -- that matter will

14   be concluded, uh, satisfactorily, uh, uh, next week and

15   will lift a cloud that's kind of existed over the case.

16    In the meantime, uh, the, uh, debtors have signed a

17   letter of intent with Carfinco Financial Group.

18   MR. MCDONALD:  Mm-hmm.

19   MR. ZIRZOW:  Uh, and filed that last Friday and have

20   filed a motion to approve an expense reimbursement for

21   them as plan sponsor and intend on filing tomorrow a, uh,

22   bid procedures motion and sometime next week, a proposed

23   plan disclosure statement, uh, with a proposed, uh,

24   [inaudible] transaction document.

25   MR. MCDONALD:  Okay.

1    MR. ZIRZOW:  Uh, with a --

2    MR. MCDONALD:  And with regard to the breakup fee,

3    that, uh -- the hearing on that is, uh, at 3:00 p.m.

4    today; right?

5    MR. ZIRZOW:  Correct.

6    MR. MCDONALD:  And -- and a number of parties have

7    objected to that, including the unsecured creditors

8    committee and --

9    MR. ZIRZOW:  And the B parties have -- have I think

10   given their standard -- standing objection that the court

11   doesn't have jurisdiction based upon their motion to

12   dismiss.

13   MR. MCDONALD:  And then, uh, who -- uh, Ogona Adamos

14   [ph] client also joined in that; right?

15   MR. ZIRZOW:  Uh, yeah. When I say B parties, I mean,

16   the B members represented by Chris Hiney [ph] as well as

17   the B managers who Ms. Adamos represents.

18   MR. MCDONALD:  Okay. Um, and, uh, so let's see what

19   else. Uh --

20   MR. ZIRZOW:  Uh, else -- elsewhere in the case, next

21   Tuesday are a significant number of estate retentions.

22   Um, there's also going to be filed, uh, shortly a motion

23   to approve an amended cash collateral arrangement with

24   BMO Harris, our senior secured lender. Uh, and --

25   MR. MCDONALD:  Is that going to fix the, uh,

Page 7

1    scheduling issues? Like -- like --

2    MR. ZIRZOW:   Uh --

3    MR. MCDONALD:   -- uh, the October 25th deadline is

4    going to be pushed out so that you're in compliance with

5    cash collateral?

6    MR. ZIRZOW:   No. No. Not in particular.

7    MR. MCDONALD:   Okay.

8    MR. ZIRZOW:   And, um --

9    MR. MCDONALD:   Well, so what -- what's the -- can

10   you give us an overview on what that's going to --

11   MR. ZIRZOW:   Oh. Well, it's going to involve a, um -

12   - uh, further cleanup of existing matters under the

13   existing cash collateral stipulation. Uh, for example,

14   uh, we have been -- the debtor's operations have been

15   extremely under budget.

16   Uh, and as part of getting BMO's consent to approve

17   what, uh, is alleged to be a non-conforming letter of

18   intent under the terms of the cash collateral

19   stipulation, uh, because it allegedly does not pay BMO

20   out in full. Uh, they would otherwise consent to allow

21   further transaction to proceed, um, uh, in spite of it

22   being non-conforming.

23   So, uh, as -- as part of that, in addition to the

24   effect that we're being under budget, uh, while we

25   continue to use BMO's cash collateral, uh, we've agreed

Page 8

1    to make an additional adequate protection payment.

2      MR. MCDONALD:  Okay. What -- anything else?

3      MR. ZIRZOW:  Um, uh, no. I mean, I also have, uh,

4    various schedule amendments if you really want me to walk

5    through all of them just so everybody knows.

6      MR. MCDONALD:  So you're -- you're going to make

7    additional schedule amendments besides the one that --

8      MR. ZIRZOW:  No.

9      MR. MCDONALD:  -- ones that you guys --

10     MR. ZIRZOW:  No.

11     MR. MCDONALD:  -- just submitted.

12     MR. ZIRZOW:  These are -- I -- I just want -- I made

13   a list of all the changes that have been made and now

14   filed just, uh --

15     MR. MCDONALD:  O- -- okay. So give us a quick

16   overview of that.

17     MR. ZIRZOW:  Sure. Uh, the, uh, sub debt holders

18   have now been marked undisputed. Um, previously they were

19   marked disputed. Um, we've added three additional

20   accounts receivable. We've corrected the amount of, uh,

21   the BMO debt to 30.8 million.

22    Um, we've changed various other items in the SOFA,

23   including listing and providing explanations for the one

24   year insider payments; uh, other amendments, as

25   requested. Uh, that's all with respect to WFI.

1  With respect to WFI-N, uh, we've listed, um -- we've

2  modified certain items in the SOFA and made similar

3  changes with respect to BMO. And then with respect to

4  GPS, we've changed the inventory value. Uh, changed the

5  BMO debt and, uh, added certain, uh -- other adjustments

6  to the SOFA, including principally an insider payment.

7    MR. MCDONALD:  Okay.

8    MR. ZIRZOW:  Uh, an issue that was raised at the

9  last 341 meeting.

10    MR. MCDONALD:  All right. And, uh, with regard to

11  the disclosure statement and plan, so under the original

12  schedule, that was -- that was supposed to be -- there

13  was -- you were supposed to have confirmation by late

14  November; right?

15    MR. ZIRZOW:  No. Uh, we're supposed to have a, uh,

16  disclosure statement. The court has reserved a disclosure

17  statement and plan confirmation hearing dates.

18    MR. MCDONALD:  Uh-huh.

19    MR. ZIRZOW:  Uh, the milestone or the cash

20  collateral stipulation required that they, uh -- or

21  approving a disclosure statement be entered by November

22  23rd or 25th.

23    MR. MCDONALD:  Oh. Okay. So it's the disclosure

24  statement --

25    MR. ZIRZOW:  Yeah.

Page 10

1    MR. MCDONALD:  -- that's, uh, approved.

2    MR. ZIRZOW:  Correct, subject to a five-day cure

3    period. Um, and then the next milestone was, I believe,

4    uh, plan confirmation order entered as of the 23rd of

5    December. So those are the impending milestones on the

6    cash collateral stipulation.

7    MR. MCDONALD:  So -- so you're going to -- you

8    haven't filed the disclosure statement yet.

9    MR. ZIRZOW:  Correct.

10   MR. MCDONALD:  And --

11   MR. ZIRZOW:  We had --

12   MR. MCDONALD:  And --

13   MR. ZIRZOW:  Because I have no short term memory

14   when --

15   MR. MCDONALD:  When did you say you're going --

16   MR. ZIRZOW:  Uh, well, hopefully by early next week.

17   MR. MCDONALD:  Uh, okay. So that would be --

18   Monday's a holiday. So around the 12th. So you're going

19   to ask that it be --

20   MR. ZIRZOW:  Short in time.

21   MR. MCDONALD:  -- short in time and we'll have about

22   two weeks to --

23   MR. ZIRZOW:  Right.

24   MR. MCDONALD:  Okay. All right. Um, and, uh, Mr.

25   Cooper, uh, all this stuff that, uh, Mr. Zirzow has, uh,

Page 11

1    been talking about, does that sound like how you
2    understand the case is progressing generally?
3    MR. COOPER:  I -- I do. Yes.
4    MR. MCDONALD:  Okay. Do you have anything else to
5    add as to what's going on in the case right now?
6    MR. COOPER:  Um, no. I think that, um, it is in the
7    company's best interest and I think it's the bank's
8    desire, um, and, uh, as well as Carfinco, uh, to shorten
9    time as much as we possibly can, uh, as the court would
10   permit.
11    I think that, um, under the, uh, uh, cash collateral
12   stipulation we have with the bank, um, it doesn't give us
13   much room beyond the end of the year to complete the
14   transaction. And so we need to try to, uh, stay in
15   compliance with the cash collateral step.
16    And so we need to, uh, attempt to move things along
17   as, uh, quickly as allowable.
18   MR. MCDONALD:  Okay. Um, and, uh -- all right. So I
19   -- like I said, I'm going to continue this to the 21st.
20   Um, and I guess that'll give us a chance to ask about
21   the, um -- well, let's see. That's a Thursday.
22    It's got -- there's got to be an order approving the
23   disclosure statement by the 23rd. So it's the next, uh --
24   is the 21st going to be past the disclosure statement
25   hearing and probably?

1   MR. ZIRZOW:  Well, uh, it'll be within the cure

2   period, at least under the milestone and cash collateral

3   stipulation.

4   MR. MCDONALD:  Okay. Maybe the 12th. Do you think I

5   should, uh -- well, anyways, does anybody want to ask

6   questions now of the debtor?

7   MS. MCPHERSON:  [Inaudible].

8   MR. MCDONALD:  Okay. Good.

9   MS. MCPHERSON:  Jeanette McPherson [ph], counsel for

10  the official committee of unsecured creditors. Good

11  morning --

12  MR. COOPER:  Good morning.

13  MS. MCPHERSON:  -- Mr. Cooper, um, I wanted to ask

14  you about the Carfinco offer. Um, does the debtor find

15  the Carfinco offer favorable?

16  MR. COOPER:  This is the only, uh, conforming or

17  quasi-conforming, uh, letter of intent that the company

18  was able to, um, uh, get prior to, uh, the expiration

19  date under the cash collateral stipulation, uh, with the

20  bank.

21   In fact, uh, this wasn't signed until the last day

22  of the five-day, uh, uh, grace period, uh, under the cash

23  collateral stipulation.

24  MS. MCPHERSON:  And what is your understanding of

25  the amount that Carfinco will essentially pay to BMO?

Page 13

1    MR. COOPER:  So the amount that they're going to pay

2    is going to be, uh, 70 percent of, uh -- of the, uh, net

3    receivable as defined in their letter of intent, um, at

4    the date of closing.

5    MS. MCPHERSON:  And dollar-wise -- let me -- sorry.

6    Strike that.

7    Percentage wise, how much of BMO's debt will then be

8    paid?

9    MR. COOPER:  Um, it's unclear to us at this time

10   because we do not have all of the -- their expenses and

11   fees. Uh, and I believe that there's another $300,000

12   additional, uh, interest charge. So we don't know

13   specifically what that number is, um, at this point.

14   MS. MCPHERSON:  Do you think the Carfinco offer will

15   pay BMO in full?

16   MR. COOPER:  I don't believe it will if you added,

17   um, all of their fees and expenses.

18   MS. MCPHERSON:  Um, I see the Carfinco offer is an

19   offer to buy the stock of the company; is ---

20   MR. COOPER:  Correct.

21   MS. MCPHERSON:  -- that correct?

22   MR. COOPER:  Yes.

23   MS. MCPHERSON:  Um, do you think an offer to buy the

24   stock of the company would be more -- is more beneficial

25   than selling the assets of the company themselves?

Page 14

1    MR. COOPER:  I do. And the primary reason is by

2    buying the stock of the company, um, there are, uh, tax

3    benefits that would tag along with the stock purchase

4    that have a benefit to the acquiring company.

5    MS. MCPHERSON:  Is there any benefit to the debtor?

6    MR. COOPER:  We believe that ultimately in a, um,

7    structure like this, we will derive the highest price.

8    Um, Carfinco also excluded all of the real property in

9    their offer, um, and so the real property is not part of

10   what they are purchasing.

11   Um, and so essentially they're focused on the

12   financial receivables and the operations of the company,

13   uh, in their bid.

14   MS. MCPHERSON:  Is it correct, though, that

15   Carfinco's offer, um, includes, uh, an offer to purchase

16   the Las Vegas real estate?

17   MR. COOPER:  It does not.

18   MS. MCPHERSON:  It does not.

19   MR. COOPER:  No. That's been separated out in the

20   letter of intent. They want to purchase the Las Vegas

21   property, but I don't believe it's specifically listed in

22   the latest version of the LOI.

23   MR. ZIRZOW:  Well, yeah. To be -- it's listed in the

24   LOI, but as a separate proposed transaction. So --

25   MS. MCPHERSON:  Okay.

Page 15

1    MR. COOPER:  They cut their market value, um, but

2    it's not included in their, uh, bank offer. There's

3    additional consideration that would have to be paid, um,

4    at fair market value if they were to acquire that.

5    MS. MCPHERSON:  Okay. Is the offer to buy the real –

6    – the Las Vegas real property $500,000 or the appraised

7    value, whichever is less?

8    MR. COOPER:  It's my understanding that the offer is

9    that they have to pay the appraised value. It's got to be

10   whatever the appraised value is, it, uh, would be, uh,

11   what they would pay for the Las Vegas, uh, real property.

12   MS. MCPHERSON:  Okay. And in connection with the

13   Carfinco offer, are there any agreements, formal or

14   otherwise, to employ any of the debtor's employees?

15   MR. COOPER:  No.

16   MS. MCPHERSON:  Has -- has an agreement like that

17   been discussed in the past?

18   MR. COOPER:  Uh, we had brief discussion, um, with

19   them in I want to say December -- no. It wasn't December.

20   Um, when we had the first LOI with Carfinco, uh, we had a

21   discussion in which, uh, it was -- prior to bankruptcy --

22   in which the company, uh, traveled to Edmonton.

23   And at the time, they were paying, um, I believe it

24   was 22 to $24 million for the stock value of the company.

25   And we had brief discussions at that time of what a

Page 16

1    combined entity would look like.

2    MS. MCPHERSON:   Okay. When you say a combined entity

3    --

4    MR. COOPER:   We be a -- a wholly owned subsidiary of

5    Carfinco.

6    MS. MCPHERSON:   So in that, uh, kind of

7    relationship, there would -- it would be contemplated

8    that all of the employees would -- or most would stay in

9    place in Las Vegas for the debtor; is that what you're --

10   MR. COOPER:   That was -- that was --

11   MS. MCPHERSON:   -- saying?

12   MR. COOPER:   -- the discussion. And they were also

13   paying $22 million for the equity value, um, I think at

14   the time.

15   Uh, uh, there was, uh, 6.7 million was being, uh,

16   paid to the subdebt holders in that transaction; um, $7

17   million was being paid to the B, uh, shareholders. And I

18   think there was 6-point-something, uh, paid to the A

19   shareholders.

20   MS. MCPHERSON:   Oh. And what happened to that

21   proposed --

22   MR. ZIRZOW:   We're a little far from that now.

23   MR. COOPER:   We are.

24   MR. ZIRZOW:   What happened to that proposal?

25   MS. MCPHERSON:   Yeah.

1    MR. ZIRZOW:  Um, essentially the, uh, litigation,

2    uh, from the class B shareholders caused that transaction

3    not to move forward.

4    MS. MCPHERSON:  Okay. All right. So is there any

5    special relationship between the debtor and Carfinco?

6    When I say special, I'm going to refer to any kind of, uh

7    -- something out of the regular, uh, in the business

8    world. Is -- is there any connection between the debtor

9    and Carfinco?

10    MR. COOPER:  No.

11    MS. MCPHERSON:  Is there any connection between you

12    and your wife or your daughter and Carfinco?

13    MR. COOPER:  No.

14    MS. MCPHERSON:  Are you familiar with a letter of

15    intent from Westlake?

16    MR. COOPER:  I am.

17    MS. MCPHERSON:  Um, what is your understanding of

18    that offer?

19    MR. COOPER:  Unfortunately, the, um, we received,

20    they, uh -- it was unclear. They listed gross receivables

21    and then they applied a multiplier of gross receivables

22    to get to a defined net receivable number. And so the LOI

23    as stated, um, didn't -- wasn't sufficient for us to

24    understand what their intent was.

25    Um, but as the process moves forward, I believe

Page 18

1    we're in an exclusive period until the SPA is signed. It

2    is our intent then to go back to Westlake and to explore,

3    uh, in more detail that letter of intent.

4    MS. MCPHERSON:  At this point in time, do you think

5    the Westlake offer -- letter of intent is superior to the

6    Carfinco letter of intent?

7    MR. COOPER:  I don't think we can really make that

8    determination until we get clarification from Westlake as

9    to their -- their, uh, definitions. They use a gross

10   receivable number as, um -- in their letter of intent.

11   And then they define an 80 percent advance against that

12   as a uh -- 80 percent advance against net receivables.

13   And in that transaction, it's my understanding that

14   they do not contemplate paying out the approximately $5

15   million of dealer reserves, uh, that are also part of the

16   unsecured claim. So we need to get clarification from,

17   uh, Westlake as to all of the terms.

18   MS. MCPHERSON:  And is there any kind of, uh -- I'm

19   going to say again, special relationship between the

20   debtor and or its principles at Westlake?

21   MR. COOPER:  I've known Westlake, uh, Financial

22   probably for, um, at least 15 years. Uh, Jim Vegan [ph],

23   who used to be the president; um, I knew, he's no longer

24   there. Uh, I believe Don Hankey is the owner of the

25   company; I've met him on several occasions. Uh, but as

1    far as special relationship, the answer is no.

2    MS. MCPHERSON:  Are you aware of any other potential

3    parties who may be making an offer to -- by the assets of

4    the debtors or propose a stock purchase?

5    MR. COOPER:  Yes. Before we went into a, um,

6    exclusivity period with, um, um, Carfinco, there were

7    approximately, my understanding, were four parties, um,

8    that had expressed interest; most of which were private

9    equity firms, um, that were interested in, uh, making an

10   offer of either assets or company.

11    And as we told, uh, everyone in the process prior to

12   going silent that, uh, the company will entertain, um,

13   the highest and best offer no matter what form it takes.

14    MS. MCPHERSON:  So as we sit here today, there are

15   potentially five other parties who are interested?

16   Westlake plus the four, um --

17    MR. COOPER:  That's correct.

18    MS. MCPHERSON:  -- private equity --

19    MR. COOPER:  Yes.

20    MS. MCPHERSON:  -- firms? I have nothing else. Thank

21   you.

22    MR. MCDONALD:  Does anybody else want to ask

23   questions of the debtor? Oh. Mr. Cope, come on up

24   and, uh, say your name and ask your questions, sir.

25    MR. COPE:  I'm Dwight Cope. I represent, uh, Cope

Page 20

1   Family Ventures. I think the second largest creditor. I

2   have a few questions about accounting.

3    I noticed that your simple interest contracts have

4   no interest to be earned. When you buy a contract, don't

5   you put a -- on simple interest, don't you have a -- what

6   you expect to earn on it?

7    MR. COOPER:  We do not. GAAP accounting states that

8   on a simple interest contract that it's based on the

9   amount financed. Then there's a secerd [sic] -- separate

10   interest hopper that accumulates that does not increase

11   the outstanding balance, but calculates the daily

12   interest.

13    So we can determine from the last payment to the

14   next payment, uh, how much is interest and how much is

15   principle.

16    MR. COPE:  So you have no idea what your -- your

17   earnings are going to be.

18    MR. COOPER:  Well, we do. But --

19    MR. COPE:  Well, you don't disclose it.

20    MR. COOPER:  We -- we do disclose it according to

21   GAAP. So our financial statements, unlike your system,

22   um, which grossed all the contracts up, is not GAAP. And

23   you also took straight line income, which is not GAAP,

24   which required --

25    MR. COPE:  Mm-hmm.

1    MR. COOPER:  -- a year-end adjustment. We don't have

2    to do that year end adjustment any longer.

3    MR. COPE:  Now it's all done by computer.

4    MR. COOPER:  I'm sorry.

5    MR. COPE:  Now it's all done by computer. Let's see.

6    No -- you seem to buying contracts at a very low rate, 18

7    percent APR on your simple interest.

8    MR. COOPER:  There are some at that rate.

9    MR. COPE:  There's a lot at that rate.

10   MR. COOPER:  The average coupon rate on the, uh,

11   portfolio is at 21.5 percent.

12   MR. COPE:  That's awfully low.

13   MR. COOPER:  Well, our annualized charge-offs are

14   now running --

15   MR. ZIRZOW:  There's no question.

16   MR. COOPER:  Okay.

17   MR. COPE:  The average you say is 21-point what?

18   MR. COOPER:  21.5.

19   MR. MCDONALD:  If you were going to elaborate on

20   your -- on the answer to your question before, I would

21   ask that you do so, Mr. Cooper.

22   MR. ZIRZOW:  There wasn't a question pending. They

23   were -- they were having a commentary about the rates. If

24   there's a question, he can answer the question. But --

25   MR. COPE:  Tell me about -- I saw a column called

Page 22

1    original discount.

2    MR. COOPER:  Okay.

3    MR. COPE:  What is it?

4    MR. COOPER:  That would be the difference between,

5    um, what was paid to the dealer and what would go into

6    the dealer reserve at the, uh, origination, uh, of the

7    contracts. When we set it up in the system, uh, for

8    accounting purposes, we're going to put the amount we

9    advanced, um, the amount of the, uh -- amount financed of

10   the contract.

11   And then depending on what else is there, uh, dealer

12   reserve, uh, would be set up separately, and so we track

13   all those, uh, accounting-wise separately.

14   MR. COPE:  So the really -- uh, original discount is

15   going to -- put into the reserve?

16   MR. COOPER:  Well, it depends on what the -- the

17   category is. And I believe that instead of having a

18   dealer reserve, it just says reserve or discount.

19   And it depends on which hopper it goes into, whether

20   it's accretive into income as a, uh, yield enhancement.

21   But most of that does not, uh, accrete into income. It

22   sits into a, uh -- it's separated into a dealer reserve,

23   uh, account that just --

24   MR. COPE:  Non-payable.

25   MR. COOPER:  -- is static. Well, it's payable, uh,

Page 23

1    under the, uh, governing documents, uh, for dealer

2    reserve payments.

3        MR. COPE:  Okay. I was going -- I guess that's why

4    the original discount and ones I could find were varied

5    from amount to amount. It wasn't a, uh, set figure. It's

6    just --

7        MR. COOPER:  No. It --

8        MR. COPE:  Variations.

9        MR. COOPER:  Yeah. We have different, uh, uh,

10   advance amounts depending on what the underlying risk of

11   each contract is that we purchase. So it usually goes

12   from a 60, 70, or 80 percent advance.

13       MR. COPE:  Okay. I also noticed on your simple

14   legacy bulk purchase accounts that there was somewhat no

15   reserve taken. And advance was entered from 55 to 70

16   percent. Uh, what happened to the difference?

17       MR. COOPER:  I don't understand the question.

18       MR. COPE:  Well, uh, concept, you borrow on the

19   simple legacy bulk group that I was looking at. You were

20   advancing between 55 and 70 percent to the dealer.

21       MR. COOPER:  Well --

22       MR. COPE:  And then there was a no finance charge

23   because you don't show it. And there was no reserve.

24       MR. COOPER:  Well, if I could -- the legacy accounts

25   are the accounts that we acquired, um, when we do the

Page 24

1    transaction in October 15th of 2010. So I can't speak to

2    how, uh, it was done prior to us originating.

3        MR. COPE:  I never did any.

4        MR. COOPER:  Well, they were legacy. So they are

5    prior to us. Um, and in fact, the company did do some,

6    uh, bulk purchases prior, uh --

7        MR. COPE: Yeah. We did a lot of them.

8        MR. COOPER:  Okay.

9        MR. COPE:  And we also set up a reserve for

10   everyone.

11       MR. COOPER:  And I don't know -- I can't answer that

12   because we didn't originate it. So that was a --

13       MR. COPE:  So you're saying that these legacy

14   accounts are accounts that I had purchased when I control

15   of Western Funding?

16       MR. COOPER:  That's correct. All the accounts that

17   are designated as legacy are prior to October 15th of

18   2010.

19       MR. COPE:  Okay. And I know those accounts all had a

20   reserve set up for it. And I don't --

21       MR. COOPER:  It could be that that dealer had a

22   reserve -- had run out of his reserve. So he could be in

23   a deficit position on the reserve. Therefore, there would

24   be no reserve on that account because he -- uh, that

25   dealer, uh, charged off more than, um, the reserve that

1  was established.

2    MR. COPE:  Let's see. Tell me about how you -- you

3  do your spreads now. Uh, so many seems to be -- so many

4  buckets you -- that you have, it's hard to keep track of

5  them from what you've been telling me. I know about the

6  advance. That goes to the dealer; right?

7    Uh, you have this -- a reserve sometimes?

8    MR. COOPER:  All of them are set up with reserves.

9  Yes.

10    MR. COPE:  That goes into a reserve account number?

11    MR. COOPER:  Uh-huh. Yes. For the benefit of the

12  dealer.

13    MR. COPE:  Okay. Then you -- then we had talked

14  about this, uh, original discount. That's another bucket.

15    MR. COOPER:  Yeah. The original discount --

16    MR. COPE:  Wait.

17    MR. COOPER:  If we -- it could be that that's part

18  of, uh, a GAAP program. It could be part of -- an

19  additional yield enhancement that accretes into income.

20  I'd have to look at the specific account, uh, to give

21  you, uh, direct, uh, answer on that.

22    MR. COPE:  Okay. If it's, uh, pre-computed, then you

23  would show a --

24    MR. COOPER:  Gross balance on that account.

25    MR. COPE:  And --

1    MR. COOPER:  So we show principle and interest, uh,

2    as --

3    MR. COPE:  So you show interest.

4    MR. COOPER:  Right. That's what GAAP calls for. If

5    it's a pre-compute, then it's loaded as a, uh, gross

6    contract. If it's simple interest, then it's listed as

7    the, uh, principle balance and the interest is calculated

8    on a daily basis.

9    MR. COPE:  Mm-hmm. Then -- and that is, uh -- okay.

10   That -- okay. That's, uh -- net would be the cash

11   invested.

12   MR. COOPER:  I believe. It -- depending on the

13   terminology. Yes.

14   MR. COPE:  Okay. I'm kind of curious. I, uh -- how

15   do you improve your profit by 5 or 6 percent overnight?

16   MR. COOPER:  I'm sorry.

17   MR. COPE:  You did it about two months ago or three

18   months ago. You improved your profit overnight by 5 or 6

19   percent. How'd you do that?

20   MR. COOPER:  I don't know. You'd have to show me the

21   information.

22   MR. COPE:  I don't have that information. I just

23   heard on the street that overnight, you improved your

24   profit 5 or 6 percent.

25   MR. COOPER:  I don't think that's accurate.

1   MR. COPE:  Hmm. That's interesting. Okay. You did

2   the -- basically the same thing overnight to the dealer

3   reserves also from a -- from a negative figure to a

4   positive figure a couple of months ago.

5   MR. COOPER:  That, once again, I don't -- I have no

6   reference. You'd have to show me the documents that

7   would, uh -- that you're referring to and I can most

8   probably answer the question.

9   MR. COPE:  Okay.

10   MR. COOPER:  The dealer reserve has always been a

11   positive number. There's approximately $5 million, uh, as

12   we've stated in our disclosures of unsecured debt. So in

13   no time has that ever been negative.

14   MR. COPE:  Isn't it a liability?

15   MR. COOPER:  Uh, it's a contra-asset.

16   MR. COPE:  And you change it to an asset.

17   MR. COOPER:  It's a contra-asset.

18   MR. COPE:  Okay. That's basically something new in

19   the terminology of GAAP.

20   MR. COOPER:  No. That's been around for quite a

21   while.

22   MR. COPE:  Okay.

23   MR. COOPER:  Contra-asset, uh, is what it's, uh,

24   listed as. It is a, um -- the function of the dealer

25   reserve is primarily to absorb the losses associated with

Page 28

1    that dealer.

2    MR. COPE:  Mm-hmm.

3    MR. COOPER:  In the cases in which the, uh, losses

4    are less than the established reserve amount, then the,

5    uh, balance is payable to, uh, the dealer.

6    MR. COPE:  Then until it's earned.

7    MR. COOPER:  I'm sorry?

8    MR. COPE:  I said, until it -- until it's earned,

9    the cash.

10    MR. COOPER:  Is that a question?

11    MR. COPE:  No. I just made a comment.

12    MR. MCDONALD:  You got anything else?

13    MR. ANDERSEN:  I have a couple of questions.

14    MR. MCDONALD:  Okay.

15    MR. ANDERSEN:  I want to follow up on Ms.

16    McPherson's questions.

17    MR. COPE:  I'm done. Thank you.

18    MR. MCDONALD:  All right. Thank you, sir.

19    MR. ANDERSEN:  Again, Ryan Anderson on behalf of BMO

20    Harris Bank. Uh, Mr. Cooper, I have just a couple of

21    questions to follow up on --

22    MR. COOPER:  Okay.

23    MR. ANDERSEN:  -- Ms. McPherson's questions. Um, uh,

24    the debtor has a financial advisor; correct?

25    MR. COOPER:  We do.

Page 29

1    MR. ANDERSEN:  And they are, uh -- what's the name

2    of the financial advisor?

3    MR. COOPER:  Uh, High Ridge [ph].

4    MR. ANDERSEN:  Okay. And did High Ridge review the,

5    uh, Carfinco LOI?

6    MR. COOPER:  They did.

7    MR. ANDERSEN:  And they reviewed each iteration of

8    the Carfinco LOI?

9    MR. COOPER:  They did.

10   MR. ANDERSEN:  Um, and what about the Westlake LOI?

11   MR. COOPER:  Uh, they did review it.

12   MR. ANDERSEN:  And each -- was -- was there -- was

13   there more than one iteration of the, uh, Westlake's

14   offer or LOI?

15   MR. COOPER:  Um, I'm unclear as to that. I think

16   there's only one iteration --

17   MR. ANDERSEN:  Okay.

18   MR. COOPER:  -- uh, of that document currently.

19   MR. ANDERSEN:  Okay. Um, when was the, uh, Westlake

20   LOI received, by the way?

21   MR. COOPER:  Uh, I believe it was during the five-

22   day cure period. Um --

23   MR. ANDERSEN:  I have a vague idea when that was,

24   but it's --

25   MR. COOPER:  Okay.

1    MR. ANDERSEN:  -- this case is moving so quickly. I

2    believe that would've been about two weeks ago or so.

3    MR. COOPER:  That's about correct.

4    MR. ANDERSEN:  Or something like that.

5    MR. COOPER:  Yes.

6    MR. ANDERSEN:  Okay. Um, and under the LOI, um, uh,

7    put forth by Carfinco, uh, is there a provision for the

8    debtor to notify that it had received a -- a higher and

9    better, uh, LOI from a, uh -- a different perspective

10    purchaser?

11    MR. COOPER:  I think that the language just states

12    if we do receive an LOI that we had two days in which to

13    forward that along to Carfinco. And, uh, we complied

14    with, uh, that provision within the, uh, LOI.

15    MR. ANDERSEN:  And when you say you complied with

16    that provision, is that -- do you mean that, um, High Ri-

17    -- or that -- either the debtor itself or through High

18    Ridge or write that an opinion, um, comparing the

19    Westlake LOI to the Carfinco LOI?

20    MR. COOPER:  No. We simply -- well, uh, first of

21    all, we -- we, uh, communicated to, uh, Carfinco, I

22    believe, through, uh, Lewis and Roca of the existence of

23    the LOI.

24    MR. ANDERSEN:  Mm-hmm.

25    MR. COOPER:  In addition to that, the, uh, financial

Page 31

1    advisors that have been hired by the company did an, uh,

2    independent analysis as to, uh, the Westlake, uh, LOI.

3      MR. ANDERSEN:  Mm-hmm. And what conclusion did High

4    Ridge, um, arrive at with respect to the Westlake LOI?

5      MR. COOPER:  Um, one is that they saw it, uh, as I

6    did, as being unclear. But if they were to change what

7    they thought that Westlake was trying to impart, uh,

8    information to the company that it was inferior to the,

9    uh, Carfinco, uh, LOI.

10     MR. ANDERSEN:  So there was never a notification to

11   Car- -- Carfinco, uh, from the debtor either itself

12   through Lewis and Roca or through, um, High Ridge that

13   the, uh, Westlake LOI was in fact better than the

14   Carfinco LOI.

15     MR. ZIRZOW:  Wait. That misstates his testimony.

16     MR. COOPER:  No. That the Westlake LOI was inferior

17   to that of Carfinco. That the, uh, financial advisors

18   came back after reviewing what they interpreted the

19   Westlake to -- uh, LOI to be --

20     MR. ANDERSEN:  Mm-hmm.

21     MR. COOPER:  -- comparative to the Carfinco. And

22   their conclusion was that Carfinco's LOI was a superior

23   offer to that of Westlake.

24     MR. ANDERSEN:  Okay. I think I understand. Okay. And

25   so your -- it's your opinion still today that that, uh,

1    Carfinco LOI is a superior -- uh, represents a superior

2    transaction for the, uh, estate compared to the Westlake

3    LOI.

4    MR. COOPER:  We believe so based on the information

5    we have at this point from Westlake.

6    MR. ANDERSEN:  Okay. Thank you for clarifying that.

7    MR. COOPER:  Yes.

8    MR. ANDERSEN:  That's all that I have.

9    MR. MCDONALD:  Thank you, sir. Anybody else have

10   questions? No? All right. So -- okay. So when are you

11   going to ask for the shortened time for review of the --

12   or for the hearing on the disclosure statement?

13   Uh, I guess the reason I ask is -- so you just made

14   some revisions to sched- -- to the schedules, right?

15   People should be able to ask questions about those to see

16   if, you know, there's enough information in the

17   disclosure statement.

18   So I want to continue the hearing before the -- the

19   hearing on the disclosure statements. So are you going to

20   ask for the hearing to be next Tuesday or --

21   MR. ZIRZOW:  I'm sorry.

22   MR. MCDONALD:  Is my --

23   MR. ZIRZOW:  Hearing on the disclosure statement?

24   MR. MCDONALD:  Yeah.

25   MR. ZIRZOW:  No. We have a reserve date of the 25th

1   for that.

2    MR. MCDONALD:  Oh.

3    MR. ZIRZOW:  Yes.

4    MR. MCDONALD:  Okay. So you have a res- -- okay.

5   Sorry.

6    MR. ZIRZOW:  Yeah.

7    MR. MCDONALD:  I thought -- okay. So, uh, 21st,

8   that'll give us -- get us in and --

9    MR. ZIRZOW:  Yeah.

10    MR. MCDONALD:  -- allow us to ask. When's the

11   objection deadline?

12    MR. ZIRZOW:  Okay. We -- we have a reserve date.

13    MR. MCDONALD:  But you haven't -- the court hasn't

14   set a objection deadline --

15    MR. ZIRZOW:  Correct.

16    MR. MCDONALD:  -- yet.

17    MR. ZIRZOW:  Correct. We haven't filed a order

18   shortening time with the plan of disclosure statement. I

19   assume in that order shortening time, we will seek to put

20   the objection deadline as close to the hearing as

21   possible to give parties maximum notice.

22    But I don't have an -- an exact date today. I -- I

23   assume --

24    MR. MCDONALD:  Yeah. I understand.

25    MR. ZIRZOW:  -- it'll be several days before the

Page 34

1    actual hearing to give maximum --

2    MR. MCDONALD:  Okay. So I'll stick --

3    MR. ZIRZOW:  -- notice.

4    MR. MCDONALD:  -- with my, uh, November 21st, uh,

5    continuation. In your short -- ordering shortening time,

6    can you make note of the fact that we're continuing the

7    341 to that date so that --

8    MR. ZIRZOW:  Sure.

9    MR. MCDONALD:  -- you know, people can come and ask

10    questions? And then if they have a beef with the, uh,

11    disclosure statement, there -- they haven't -- we're not

12    passed the objection deadline by then?

13    MR. ZIRZOW:  Certainly.

14    MR. MCDONALD:  I appreciate that, Mr. Zirzow. Okay.

15    Before I continue this -- this, uh, 341 to the 21st, does

16    anybody have any questions that they want to ask that

17    they haven't had a chance to ask yet? Anybody?

18    Okay. Uh, everybody's asked the questions that they

19    wanted to ask at this hearing. Uh, everybody, uh,

20    reserves the right to ask additional questions at the

21    continued 341 meeting of creditors.

22    Ms. Christopher, you still there?

23    MS. CHRISTOPHER:  I am.

24    MR. MCDONALD:  Do you have any questions?

25    MS. CHRISTOPHER:  No. I do not.

Page 35

1

2    MR. MCDONALD:  Okay. So, uh, therefore, I'm going to

3    continue this 341 meeting of creditors in all three

4    cases; that is, Western Funding, Western Funding of

5    Nevada, and Global Track GPS to November 21, 2013 at

6    12:00 noon.

7    And until then, I'm going off the record.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

b1b77420-7e96-4874-a68b-4b076d29ab7d

1
2
3      I, Chris Naaden, a transcriber, hereby declare under
4   penalty of perjury that to the best of my ability the
5   above 35 pages contain a full, true and correct
6   transcription of the tape-recording that I received
7   regarding the event listed on the caption on page 1.
8
9      I further declare that I have no interest in the
10  event of the action.
11
12      January 3, 2014
13      Chris Naaden
14
15
16
17
18                                    X
19
20  (In Re Western Funding, Inc. continued 341a, 11/7/13)
21
22
23
24
25