LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Telephone: (702) 382-1170
Fascimile: (702) 382-1169

Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>WESTERN FUNDING INCORPORATED,<br><br>Debtor. | Case No.: BK-S-13-17588-LED<br>Chapter 11<br>(Jointly Administered) |
| In re:<br><br>WESTERN FUNDING INC. OF NEVADA,<br><br>Debtor. | Case No.: BK-S-13-17586-LED<br>Chapter 11 |
| In re:<br><br>GLOBAL TRACK GPS, LLC,<br><br>Debtor. | Case No.: BK-S-13-17589-LED<br>Chapter 11<br><br>Date: January 24, 2014<br>Time: 10:00 a.m. |

**DEBTORS' OMNIBUS OPPOSITION TO: (I) MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO APPOINT TRUSTEE UNDER 11 U.S.C. § 1104(a)(2), AND JOINDER IN MOTION OF THE UNITED STATES TRUSTEE TO APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)(1), AND (II) RELATED JOINDERS THEREIN**

Western Funding Incorporated ("WFI"), Western Funding Inc. of Nevada, and Global Track GPS, LLC (collectively, the "Debtors"), debtors and debtors in possession, hereby submit their opposition (the "Opposition") to the motion (the "Motion") [ECF No. 621] filed by the

Official Committee of Unsecured Creditors (the "Committee") seeking the appointment of a chapter 11 trustee in these bankruptcy cases pursuant to section 1104(a)(2) of title 11 of the United States Code (the "Bankruptcy Code"), and the Committee's joinder in the motion (the "UST Motion") [ECF No. 575] filed by the Office of the United States Trustee seeking to appoint of a chapter 11 trustee pursuant to section 1104(a)(1) of the Bankruptcy Code.[1]

After the Committee filed its Motion, it filed a supplement (the "Supplement") [ECF No. 643], which made an additional argument concerning the payment of interim professional fees and a related *Motion to Disgorge and Reapportion* (the "Disgorgement Motion") [ECF No. 634]. The Committee's arguments in its Supplement are similar to those raised in its Disgorgement Motion and thus Debtors will address them in their opposition to the Disgorgement Motion.[2] The Committee also filed a *Declaration of Jeanette E. McPherson* (the "McPherson Declaration") [ECF No. 664] in support of its Motion, which sought to authenticate various documents attached to the Motion. The "B Parties"[3] and Cope Family Venture filed joinders [ECF Nos. 653 and 668] to the Committee's Motion, but did not make any additional arguments of their own.

This Opposition is supported by the various declarations previously filed in these cases and as referenced in Debtors already filed opposition (the "Previous Opposition") [ECF No. 617] to the UST Motion, as well as the *Declaration of Frederick A. Cooper* (the "Cooper Declaration") and the *Declaration of Matthew C. Zirzow* (the "Zirzow Declaration") filed contemporaneously herewith.

---

[1] Pursuant to LR 9014.2, Debtors consent to the entry of final orders and judgments by the bankruptcy judge with respect to the Motion.

[2] Debtors' opposition to the Disgorgement Motion is due on January 23, 2014 [ECF No. 638].

[3] The "B Parties" consist of the following: (a) Mark Finston and James B. Hadden, in their capacity as two of the four managers, and thus a minority of the managers, of Harbor Structured Finance, LLC, a Delaware limited liability company ("Harbor"), the sole shareholder of WFI, and (b) Phillip D. Nick, Ellen H. Hardymon, the Suzanne H. Nick Irrevocable Family Trust One, the Suzanne H. Nick Irrevocable Family Trust Two, the Thomas F. Havens Irrevocable Family Trust One, and the Thomas F. Havens Irrevocable Family Trust Two, and all in their capacity, collectively, as owning either directly or indirectly 45% of the total membership interest as B members, and thus a minority of the total membership interests, in Harbor.

## I. SUMMARY OF ARGUMENT

1. The Committee first joins in the UST Motion seeking to appoint a chapter 11 trustee "for cause" pursuant to section 1104(a)(1) of the Bankruptcy Code. To the extent the Committee's Motion incorporates the arguments raised in the UST Motion, Debtors incorporate herein the arguments in their Previous Opposition. Second, the Committee's Motion seeks to appoint a chapter 11 trustee pursuant to section 1104(a)(2) of the Bankruptcy Code on the basis that "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate."

2. In support of its Motion, the Committee raises a "laundry list" of many arguments that it has previously raised in these cases—nearly all of which without success, as well as additional arguments that are incorrect, unsupported by evidence, are clearly resolvable short of the extraordinary remedy of the appointment of a chapter 11 trustee, and/or can be handled by way of the proposed Liquidating Plan already in prospect. The Committee ultimately concludes that "the interests of creditors would be better served by the appointment of a trustee under § 1104(a)(2) due to creditors' lack of confidence in the Debtors' management arising from past performance, conflicts of interest, and lack of prospects for a confirmable plan of reorganization." Motion, p. 2. As set forth herein, each of the Committee's arguments ultimately fails to establish its burden of proof for the extraordinary relief it seeks.[4]

## II. LEGAL ARGUMENT

A. **The Timing of the Committee's Filing of its Motion**

3. The timing of the Committee's filing of its Motion is rather sharp practice. The UST Motion was filed on December 19, 2013, however the Committee waited until January 10, 2014 to file its own very similar motion, which was more than three (3) weeks later and indeed after Debtors had filed their Previous Opposition to the UST Motion, and only a few business days before the original reply deadline to the UST Motion. Then, with the benefit of having

---

[4] To avoid repetition, Debtors incorporate herein their entire Statement of Facts from their Previous Opposition to the UST Motion. Further, given that many of the Committee's disputed factual allegations are really argument, Debtors address such matters in their Legal Argument section below.

Debtors' Previous Opposition in hand, the Committee sought to have its own very similar Motion heard on shortened time [ECF Nos. 622 and 623] and at the same time as the UST Motion, thus depriving Debtors of the normal time they would have otherwise had to file their opposition.

4. The Committee's application for order shortening time and declaration in support thereof do not state any reason or excuse for its delay and timing in filing its Motion and instead simply argue that the two motions present similar issues and thus hearing them together would "conserve resources." Why couldn't the Committee have filed its Motion weeks earlier than it did, especially considering the seriousness of the allegations therein, the long pending UST Motion raising similar issues, and the fact that nearly all of the Committee's arguments in its Motion are restated from prior pleadings it had previously filed in the cases and thus were already in hand? Debtors' requests for shortened time in these cases have been driven by the demands placed on the estates by the agreed upon milestones in the Cash Collateral Stipulation and the Carfino Letter of Intent and a genuine desire to bring about a sale transaction. By contrast, the Committee's delay in filing its Motion has no such justification, especially considering the timing and the facts as set forth above.

**B. Standard of Decision**

5. Section 1104(a) of the Bankruptcy Code governs the appointment of a trustee, and provides the following grounds:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

4

6.  Debtors' arguments concerning the general interpretation of section 1104(a) of the Bankruptcy Code, including the strong presumption that a debtor is entitled to remain in possession in a chapter 11 case, as well as the application of section 1104(a)(1), were discussed at length in Debtors' Previous Opposition. To avoid repetition, such arguments are incorporated herein. The Committee argues that the foregoing "presumption is not a factor in this case" because substantially all of Debtors' assets have been sold to Westlake, other sales are in process, and thus that Debtors' management is not needed to dispose of such remaining assets. The Committee fails to cite any authority for such a proposition, such an argument ignores the obvious problem that if Debtors have been able to generate such sales then it would make sense that they are qualified and should complete them, and, as hereinafter explained, the notion that existing management's historical knowledge and expertise are not needed is patently wrong.

7.  With respect to the proper interpretation and application of section 1104(a)(2) of the Bankruptcy Code, which argument was not made in the UST Motion but is raised in the Committee's Motion, Debtors agree with the general caselaw cited in the Committee's Motion on the issue, see Motion, p. 15, l. 27 to p. 28, l. 22, subject to the additional arguments herein.

8.  <u>Collier on Bankruptcy</u> discusses the proper analysis courts should undertake in determining whether to appoint a chapter 11 trustee pursuant to 1104(a)(2) of the Bankruptcy Code as follows:

> The "interests" standard may initially seem less stringent than the "cause" standard. After all, no showing of wrongful behavior on the part of management is required, as long as interested parties can show a meaningful benefit from the appointment of a trustee. However, <u>it is important to remember that the "interests" standard requires a finding that appointment of a trustee would be in the interests of essentially all interested constituencies</u>. Section 1104(a)(2) provides for the appointment of a trustee "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." <u>Use of the word "and" suggests that creditors cannot on their own obtain the appointment of a trustee under this provision in order to disenfranchise equity security holders or other interests. Instead, appointment of a trustee must be in the interests of the estate generally in order to satisfy the statutory "interests" standard</u>. Thus, when equity security holders or other ownership interests properly and in good

> faith support the debtor's current management, it will be difficult to obtain an order for the appointment of a trustee under the "interests" standard, as such an appointment will presumably not be in the interest of equity.

7 Collier on Bankruptcy ¶ 1104.02[3][d][i] (16th ed. 2013) (emphases added).

9. The "interests" standard in section 1104(a)(2) of the Bankruptcy Code provides for a "balancing of costs and benefits in determining whether the appointment of a trustee is appropriate. Such an appointment would be in the interests of the estate if the benefits to all interests of the estate to be deprived from a trustee outweigh the detriment to the estate." Id. ¶ 1104[3][d][ii] (emphasis added).

10. The court must be cognizant of the costs involved in the trustee's appointment in the case at hand. First, there is the issue of the cost of the trustee itself, including his or her commission pursuant to section 326 of the Bankruptcy Code, which could be in excess of a $100,000 or more given the existing administrative claims in excess of $1.5 million, and the several million dollars in real estate that still remain to be sold. Second, a chapter trustee will retain counsel who will likely be substantially more expensive than existing estate professionals on a going forward basis. Third, a chapter 11 trustee and its professional(s) will need to "get up to speed" thus resulting in potentially significant intangible costs of delay given the "learning curve" and "education" that will be required, as they will need to learn about the assets and the various constituencies before being able to address the underlying issues in a meaningful fashion. See id. (citing In re Petters Co., Inc., 401 B.R. 391, 413 (Bankr. D. Minn. 2009), aff'd, United States v. Ritchie Special Credit Invs., Ltd., 620 F.3d 824 (8th Cir. 2010); In re Adelphia Communs. Corp., 336 B.R. 610 (Bankr. S.D.N.Y. 2006) (delay and expense may be considered in determining whether to order the appointment of a chapter 11 trustee)); see also In re Bergeron, No. 13-02912, 2013 WL 5874571, at *9 (Bankr. E.D.N.C. Oct. 31, 2013) (denying a creditor's request for the appointment of a chapter 11 trustee pursuant to section 1104(a)(2) and finding that "There has been no showing that the benefits accompanying the appointment of a trustee outweigh the detriment to the bankruptcy estate. All of the evidence suggests, to the contrary, that the costs accompanying such an appointment would impose a substantial financial

6

burden on the debtor and the estate that exceeds any benefit").

11. Courts also carefully review a creditor's assertion that the creditor has "lost confidence" in a debtors' management for the obvious reason that such assertions could simply be an improper attempt to oust management in an effort to "short circuit" the chapter 11 process. Loss of confidence and extreme acrimony have each been held by courts to constitute elements relevant to the decision of whether it is in the best interests of creditors and others under section 1104(a)(2) to appoint a trustee. See In re Sundale, Ltd., 400 B.R. 890, 909 (Bankr. S.D. Fla. 2009) (citing In re Marvel Entm't Grp, 140 F.3d 463 (3d Cir. 1998)). As addressed in Debtors' Previous Opposition to the UST Motion, in certain extreme cases, the presence of rancor and acrimony has been found to be significant enough to constitute cause to appoint a trustee under section 1104(a)(1) of the Bankruptcy Code as well.

12. "Neither loss of confidence, however reasonable, or acrimony, however bitter, necessarily results in appointment of a trustee." Id. (citing In re Marvel Entm't Grp., 140 F.3d at 473) ("[T]here is no per se rule by which mere conflicts or acrimony between debtor and creditor mandate the appointment of a trustee."). "Loss of confidence need not arise from, or cause, acrimony. A court may find appointment of a trustee is warranted when a debtor's failure to move a case forward in the direction of a successful reorganization has caused the creditors to lose confidence that reorganization is, in fact, possible with current management at the helm." Sundale, 400 B.R. at 910 (citing In re Cardinal Indus., Inc., 109 B.R. 755, 765 (Bankr. S.D. Ohio 1990), and In re Concord Coal Corp., 11 B.R. 552 (Bankr. S.D.W.Va. 1981)).

13. As cautioned by the Court in Sundale, Ltd.:

> However, a creditor's lack of confidence must be based on some objective fact before a court should consider lack of confidence as a factor in considering appointment of a trustee. Thus, for example, if a creditor argued appointment of a trustee was warranted merely because of the creditor's personal dislike of management, then perhaps the creditor would be better served by hiring someone else to negotiate on the creditor's behalf. Management should not be replaced just because it is not liked.

400 B.R. at 910. Such caution is especially relevant in the case at hand because the Committee's

members are principally, if not solely Subordinated Debt Holders (as defined in the Omnibus Declaration) including principally the Cope family and related founders who took back paper as part of the purchase of the company by Harbor in 2010, and who have a long history of animosity toward Debtors' existing management.

C.   **The Applicable Burden of Proof**

14.   As the movant, the Committee has the burden of proving the need for the appointment of a chapter 11 trustee and regardless of whether one is sought pursuant to section 1104(a)(1) or (a)(2) of the Bankruptcy Code. To avoid repetition, Debtors hereby incorporate their authorities cited in their Previous Opposition on the appropriate burden of proof.

D.   **The Committee's Specific Arguments**

**Management Compensation**

15.   The Committee first references the previous salaries of Debtors' CEO, Frederick Cooper, and Debtors' President and Chief Operating Officer, Katherine Cooper (collectively, the "Coopers"), as well as their daughter, Taryn Cooper. See Motion, ¶ 3. There are numerous issues with the Committee's factual assertion in this regard. First, other than a passing reference to these salaries, the Committee introduces absolutely no evidence as to why any of these employees' previous salaries were in any way improper or undeserved. Second, the Committee has been provided with a market report establishing the propriety of Mr. Cooper's salary and indeed that he was substantially underpaid given his experience and duties. Third, the Committee has also been provided with copies of the longstanding employment agreements dating back to 2010 where such salaries were originally agreed to among existing owners, including the B Parties, and thus such salaries have a lengthy precedent as being in the ordinary course and appropriate. Fourth, such previous salaries are also irrelevant because, as the Committee acknowledges, in the interests of avoiding an unnecessary fight concerning such salaries as part of the proposed budget accompanying the Cash Collateral Stipulation, and even though they were under no obligation to do so, the Coopers voluntarily agreed with the Committee to reduce their salaries twenty percent (20%) during the pendency of the bankruptcy cases.

8

16.     Finally, and most importantly for purposes of considering the instant Motion, the Committee neglects to mention that as of the close of the sale to Westlake on January 6, 2014, Taryn Cooper is no longer employed by Debtors, and the Coopers have agreed to further reduce their salaries to only $1,500 per week each for the projected two (2) months remaining in these cases, which is an incredible bargain given their industry experience and historical knowledge. Indeed, the Cooper's incredibly reduced salaries going forward are so minimal that it is clear that their efforts for the remainder of the cases are substantially undercompensated.[5] Regardless, the Coopers are staying because, having come this far in the cases, they want to properly see these cases through to their natural and proper completion. There is no conceivable way a chapter 11 trustee could ever charge less than the Coopers are proposing, and any trustee would not only be far more expensive as a practical matter, but also would clearly pale in comparison to their unmatched knowledge and experience of Debtors' remaining issues.

### Mere Assertions of Potential, but Altogether Unproven Avoidable Transfers

17.     The Committee references WFI's SoFA as indicating over $2,000,000 was "paid" to the Coopers within the one year prior to the Petition Date, and then makes the odd statement that "[t]here are no further disclosures of transfers later than the one year period prior to the Petition Date." Motion, ¶¶ 4, 5 and 13, and p. 11(a). There are numerous problems with such an assertion.

18.     First, the SoFA form obviously only requests transfers to insiders within one year of the Petition Date and thus there is no obligation in that filing to go beyond such time.

19.     Second, of the approximate $2 million figure the Committee references in total transfers to or for the benefit of the Coopers listed in the SoFA, in excess of $700,000 was for payroll and car allowances pursuant to their existing and longstanding employment agreements in

---

[5] Debtors' offer in this regard was extended on January 13, 2014, and was rejected by the Committee the next day. Instead, in spite of substantial discussions and meetings, and Debtors' preparation and circulation of a proposed budget, the Committee has made it clear that notwithstanding whatever Debtors may proposed and/or whatever flexibility Debtors offer to modify the proposed Liquidating Plan to resolve any objections raised, the Committee refuses to negotiate and instead solely focused on seeking to put in place a chapter 11 trustee. See Zirzow Declaration, ¶ __.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

place since 2010, approximately $400,000 was for legal indemnification costs as also permitted by their employment agreements, the company's corporate organizational documents and applicable law, and the great majority of the remainder was paying their personal credit card, which they let the company and various employees use for financing various business expenses necessary and appropriate to the business' operations because the company could not obtain company-issued credit cards for such purpose [ECF No. 349, pp. 17-30]. In short, even a cursory glance at the actual breakdown of these alleged transfers quickly reveals their facial propriety and dispels any notion that the Committee attempts to create by vaguely referencing the mere existence of these transfers, and without any substantive discussion of the relevant specifics.

20. Third, the Committee even admits that it "does not know whether these transfers are avoidable as it has not made a full investigation of these transfers," and that it has propounded discovery on them, but further admits that it has "only conducted a basic review of the discovery produced." Motion, ¶ 5. In other words, even though it has had the relevant documents for more than a month—including documents obtained as part of its confirmation discovery that reach back far longer than the one year required by the SoFA, the Committee has been unable to identify a single potentially avoidable transfer. Given that the Committee is the movant, it is not incumbent on Debtors to "prove the negative"—that there are no avoidable transfers; rather, it is incumbent on the Committee to prove that potential avoidable transfers may exist. It is simply insufficient, after having the applicable documents for more than a month, having questioned Debtors' representative under oath numerous time at various section 341 meetings of creditors, and having a full opportunity to conduct any further discovery as may be needed to ascertain the existence of potential avoidable transfers to assert in a motion that the mere existence of transfers to management should form the basis of the appointment of a chapter 11 trustee. It is equally if not more probable in light of the disclosures already made and significant discovery already produced that there are no *bona fide* or even *prima facie* avoidance actions against management. Moreover, it is also more probable that Carfinco's intent in purchasing such potential claims was really motivated by an attempt to "buy some peace" with respect to the incessant litigation by the B Parties.

10

21. Finally, the Committee makes the readily transparent assertion that it "does not believe that the Debtors can legitimately review these transfers and claims to determine whether a complaint should be filed against insiders for the avoidance of transfers." Motion, p. 11, ll. 7-8. Debtors do not make that assertion either; rather, as provided in their proposed Liquidating Plan, any alleged avoidable transfers will be preserved for the benefit of the estates and transferred to the proposed liquidating trust for its beneficiaries, and administered by an independent trustee--a standing chapter 7 trustee in this District—and thus this last argument is an obvious red herring.

**The Alleged Lack of any "Meaningful" Fiduciary Out in the Carfinco Letter of Intent**

22. The Committee re-raises the propriety of the exclusivity or "no shop" provision in the Carfinco Letter of Intent. Such arguments are really an attempt to revisit the breakup fee and expense reimbursement order entered long ago. [ECF No. 304]. Although debtors may not necessarily like "no shop" provisions, as a practical reality and as a matter of necessity to generate and document a stalking horse offer, they generally have to accept them within reason. See Kelly K. Frazier, A Comparison Shopping Guide for 363 Sales § 5.9 (American Bankruptcy Institute 2009) (citing cases) [hereinafter, the "ABI 363 Guide").[6] Indeed, without such protection, stalking horse bidders run the risk of incurring a significant investment in documenting a potential transaction, only for another party to come in at the last minute and swipe the transaction out from under them. There are good reasons for such clauses in letters of intent and it is naïve and unrealistic not to expect some kind of limited and reasonable exclusivity provision in a deal of this nature and magnitude.

23. In dealing with "no shop" clauses, however, there may be ways to try to pare them back and limit their potentially negative impact. In the case at hand, the original no shop provision requested by Carfinco was not accepted by Debtors and was instead limited through negotiation. In this case, quite significantly, the no shop was limited as to time (in place for a few weeks and only to allow for enough time for us to get an agreement done and signed up), and

---

[6] For ease of reference, a copy of this section is attached hereto as Exhibit "1."

11

also had a "fiduciary out" clause, which allowed for consideration of better offers, if received, but just not active solicitation during the exclusivity period. Such a limited no shop provision are often used. Finally, as evidenced by the third party overbid actually received, as well as the vigorous bidding at the auction and the ultimate result, it is clear that Debtors' sale process was meaningful and did generate interest in the marketplace notwithstanding the exclusivity provision. In light of the foregoing, Debtors' decision to proceed with the Carfinco Letter of Intent, including the exclusivity provision therein, was not unreasonable and certainly is not grounds to remove Debtors' management by appointing a chapter 11 trustee.

**The Westlake Letter of Intent and the Alleged Failure to Timely Deliver it to BMO Harris**

24.     The Committee next questions Debtors' decision to proceed with a proposed transaction with Carfinco "while in possession of a more favorable offer from Westlake" and that "Debtors did not present [the Westlake offer] to BMO prior to BMO's acceptance of the Carfinco LOI and motion for approval of break-up fee and expense reimbursement." Motion, p. 11, ¶ (b). There are numerous problems with this assertion.

25.     First, the Committee fails to identify why it has standing to present an argument as to why Debtors allegedly breached its Cash Collateral Stipulation with BMO in allegedly failing to timely transmit a potential offer. If anything, that is an issue for BMO to raise, and BMO has since been paid in full its allowed claim from sale proceeds and available cash on hand.

26.     Second, and more to the point, the Committee's argument ignores the very documents it includes as exhibits to its Motion. Specifically, as noted in Exhibit "1" to the Committee's Motion, which includes an e-mail from Debtors' financial advisor at FTI Consulting, while subject to exclusivity with Carfinco pursuant to a detailed and heavily negotiated prior version of the Letter of Intent, Debtors thereafter received over the course of about a week <u>various</u> draft iterations of a proposed single page letter of intent for a transaction from Westlake. Importantly, Westlake's various versions of its offer required significant clarifications and corrections over time in order to appropriately compare them to Carfinco's existing, clearer and long-negotiated letter of intent. Additionally, such clarifications were not ultimately completed until after Debtors had executed the final Carfinco Letter of Intent and

12

proceeded with that transaction.

27. Debtors' management cannot be faulted, much less removed by way of a trustee motion, for proceeding with the only certain and clear offer it had at the time in Carfinco, and indeed, at a very precipitous time being at the end of, if not even after expiration of, the cure period for its default of the October 25, 2013 milestone in the Cash Collateral Stipulation. The Committee's implicit assertion is that Debtors should have "tempted fate" by proceeding down a relatively new path with Westlake at such a critical juncture and run the risk of BMO calling a Termination Event under the Cash Collateral Stipulation, which BMO was fully within its right to do. Such an argument would have been a gamble with potentially catastrophic risk, in spite of the Committee's dismissive assertion that Debtors' decision does not pass the "smell test." Debtors had a comfort level with Carfinco given the substantial and detailed pre-petition negotiations for a potential transaction, which negotiations were renewed post-petition. Moreover, given how close Debtors were to a final and quite detailed Letter of Intent with Carfinco in the last few days of October, it made eminent sense to focus on trying to finalize a letter of intent for that proposed transaction instead of abandoning it in favor of a potential purchaser who was relatively new on the scene. The Committee's attempt to second guess Debtors' decision making with the benefit of hindsight also ignores the other significant pressures being placed on management at the time, including the pending evidentiary hearing on the B Parties' dismissal motion in early November, which was an additional significant distraction that stole time away from transaction efforts. Finally, although Carfinco's Letter of Intent was not technically compliant with the "full payment" requirement in the Cash Collateral Stipulation with BMO, BMO still agreed to support it, subject to availing itself of its credit bid rights at any auction.

28. Third, Debtors admit that they took an advantageous position in their letter to Carfinco attached to the Committee's Motion as Exhibit "2" by asserting that the then existing iteration of Westlake's letter of intent could potentially, if consummated, result in a more favorable transaction. Such a position, however, was intended to allow Debtors to proceed with the clarifications to Westlake's offer during the last few days of October, which negotiations

13

could have only accrued to the estates' benefit in trying to generate an offer potentially competing, if not superior, to Carfinco's. Debtors' maneuvering between these two potentially interested parties was geared toward obtaining the best offer from both, and such actions should be encouraged and applauded.

### The Original Las Vegas Property Sale and Bid Procedures Motion

29.     The Committee also makes various arguments concerning Debtor's original proposed bid procedures and sale motion with respect to Debtors' Las Vegas real property [ECF No. 412], including: (a) not putting a value on the real property in its Schedule A at a time when Debtors did not have a current market value or appraisal for it; (b) not filing an amendment to Schedule A after obtaining a current appraisal of the real property; (c) filing a bid procedures motion seeking to designate Carfinco as the stalking horse purchaser in the initial amount of $500,000 after having received an appraisal indicating that the property was potentially worth substantially more; and (d) seeking to maintain the confidentiality of the real property appraisal from potential bidders. See Motion, ¶ 18, pp. 11(c).

30.     Listing a piece of property at an "unknown" value in bankruptcy schedules, especially Debtors did not have a current appraisal available at the time and such appraisal had been ordered, is not sufficient grounds for the extraordinary remedy of appointing a chapter 11 trustee.

31.     Not amending a bankruptcy schedule after receiving an appraisal, which appraisal was immediately shared with the Committee within minutes of being received, is not grounds for the appointment of a trustee. In no way did Debtors attempt to conceal this appraised value from the Committee; rather, Debtors' position to keep the appraisal confidential from proposed purchasers was only done after consultation with and on the recommendation of Debtors' commercial real estate agent, and out of concern in maximizing the interest and potential value potentially to be obtained. Specifically, Debtors were concerned that circulating an appraisal to bidders could serve as both an implicit "floor" such that potential bidders would assume that Debtors could not entertain bids below that designated amount and also as artificial "ceiling" such that potential bidders would be apprehensive to exceed that amount in their bids.

14

32. After obtaining the appraisal for the Las Vegas property, Debtors shared it with Carfinco and requested that Carfinco raise its opening stalking horse bid for the Las Vegas property, which request was refused. Debtors also shared the appraisal with the Committee within an hour of receiving it.

33. Abandoning a proposed transaction with Carfinco simply because it included what Debtors later learned a few weeks later to be a below market initial offer for the Las Vegas real property, as the Committee apparently suggests should have been done, would be the equivalent of letting the "tail wag the dog," as it would allow the sale of a $1.3 to $1.6 million piece of real property dictate whether a sale of potentially in excess of $25 million on Debtors' main loan portfolio should proceed. Why wasn't it an appropriate strategy for Debtors' at the time of entering into the Carfinco Letter of Intent, which was several weeks before they had received the real property appraisal, to accept a combined transaction that arguably may have undervalued the real estate, but still left it open to a competitive bidding process at auction? To the extent the Committee is insisting that Debtors should have instead been foolhardy and lose the overall deal is questionable bargaining strategy at best.

34. There is no caselaw requiring that an initial stalking horse offer approved as part of preliminary bid procedures must always be the absolute best offer that Debtors could obtain at the time; rather, the sufficiency of the purchase price is properly judged at the ultimate sale hearing when the sale is proposed to be approved on a final basis (and after the property has been exposed to the market and an auction process). Debtors submit that under certain circumstances it may be just as appropriate to start out with an initial stalking horse offer that may arguably be lower than desired simply to generate interest in the market place and have bidders show up at the auction to bid (or in the case at hand, because it was part of a combined bid for a much larger and more valuable asset). There must at least be some faith put in the market that the property would obtain an appropriate price at auction, especially considering the advertising and listing of the property with a competent commercial real estate agent.

35. Finally, the Committee's argument also ignores the fact that Debtors' marketing and sale efforts for the Las Vegas real property have since generated a letter of intent for a

15

stalking horse offer in excess of a net $1.3 million to the estates, which proposed letter of intent has been shared with the Committee, and which proposed transaction the Committee has approved. Debtors are continuing to work with this proposed purchaser to finalize this offer, prepare a bid procedures and sale motion, and have prepared a draft purchase agreement and circulated it to this proposed purchaser and the Committee for their review and consideration. The foregoing begs the question, however, that if Debtors' efforts since the previously denied real property sale motion last year have generated a new, higher offer that it acceptable to the Committee, then why wouldn't such management be best able to finalize such sale and why wouldn't such efforts cure and redeem any previous asserted mistake? The simple fact is that Debtors have continued their marketing and sale efforts, such efforts have proven successful, and Debtors are on the cusp of filing and proceeding to seek approval of this new, acceptable offer for the Las Vegas real property in short order.

### The Proposed Purchase of the Retained Claims Under the Previous Plan

36. The business reasons why a potential purchaser like Carfinco would seek to include certain litigation claims and avoidance actions of a bankruptcy estate as part of its purchase were discussed at length in Debtors' Previous Opposition. The UST Motion apparently argues for a *per se* rule such that any proposed sale transaction or plan that may including actions against insiders or management is a breach of fiduciary duty and improper. Such an argument runs afoul of the statutes and applicable caselaw on transactions with a corporation. See, e.g., NRS § 78.140(1)(a) ("A contract or other transaction is not void or voidable solely because: (a) The contract or transaction is between a corporation and: (1) One or more of its directors or officers; . . ."). Rather, the validity of such transactions ultimately depends on their ultimate intrinsic fairness and there is no evidence in the case at hand that such transaction was not done for a valid business justification or was unfair; rather, if anything, given the pre-petition litigation among the Harbor managers and members, such a potential escape from it was well advised.

37. The Committee argues that Debtors' Previous Plan was improper because it proposed to keep all actions against certain insiders and not transfer them to the Liquidating Trust "without paying the estate for their value." Similar to its bare allegations without any proof

of potential avoidance actions against the Coopers, however, the Committee provides no evidence regarding what such alleged claims are "worth," much less even their *prima facie* validity, and thus cannot establish whether the estates would have been prejudiced, if at all, by any loss therefrom. As the movant seeking the appointment of a chapter 11 trustee on such basis, it is the Committee's burden to provide admissible evidence in support of its assertions, not just conjecture, and it has failed to do so with respect to the Retained Claims issue.

### The Projected Distribution to Unsecured Creditors

38.  After consultation with its financial advisors, Debtors previously stated in their Sale Reply that, after paying BMO Harris off in full on its allowed claim from the sale proceeds from Westlake and available cash on hand, they anticipated having $725,465 of excess cash and all of the excluded assets available for the estate. See Sale Reply, ¶ 20. The foregoing did not state and Debtors' have never stated that such monies would be entirely or at all available for unsecured creditors, as obviously there are significant administrative claims that have been incurred to generate those recoveries. Moreover, as set forth in its asset purchase agreement with Westlake, a reconciliation process was undertaken (and remains ongoing), which is typical in any such sale of accounts, whereby certain accounts have been determined or may ultimately be determined to not be included in those purchased by Westlake and were instead pushed into the excluded or lesser and non-performing asset categories, thus reducing the total portfolio that Westlake purchased and thus also its purchase price. Prior to the Westlake sale, Debtors had approximately 5,400 accounts, and thus event to the extent a few hundred may have been misallocated is not unusual or unexpected. Although such review is ongoing and is the subject of analysis and discussion with Westlake, Debtors do now believe that there will be adjustments and reconciliations resulting in less coming into the estates as a result of the Westlake than originally projected.

### The Debtors' Liquidating Plan

39.  Finally, the Committee argues that the current proposed Liquidating Plan is not acceptable due to the fact that it proposes that both a Plan Administrator and Liquidating Trustee be appointed, and also because "it is not likely confirmable since the necessary votes on the

17

Amended Plan will likely not be obtained." Motion, ¶ 21.

40.     As noted in Debtors' Previous Opposition, the Court specifically inquired as to Debtors' "exit strategy" at the sale hearing on December 20, 2013, and Debtors advised the Court that they were planning on filing a liquidating plan shortly thereafter. Debtors did file their Liquidating Plan on January 2, 2014, which was within the exclusivity period, and no request has been made to terminate exclusivity. Debtors filed their Liquidating Plan not only because they advised the Court that they would be doing so, but also because they firmly believe it is the reasonable, responsible and indeed proper way to wind down these Chapter 11 Cases.

41.     On January 6, 2013, the Committee sent Debtors an e-mail indicating as follows: "I have not read your liquidating plan. I am not sure why you state that you constantly want to defer to the unsecured creditors because it is their interests that are at stake yet you refuse to honor the creditors request re a trustee. Whose interests are you following? Don't bother with the disclosure statement and plan as you know creditors don't want it."

42.     Debtors' counsel responded to the Committee's query in relevant part by stating that same day as follows: "With the liquidating plan, I feel like the Debtors are continuing down the responsible path in winding down these cases by filing it, and are met with constant objections and absurd conspiracy theories based on a lack of any analysis other than hatred for existing management. If unsecured creditors are going to reject a simple liquidating plan to set this up for a liquidating trustee, then I suppose that that is their right, but that is such a waste, and I can't simply shirk my fiduciary duties to do what I believe is the responsible thing in this case until then. In fact, I have told the Court what I was going to do at the Sale Hearing, and she may have approved the sale on that basis as I'm sure she wanted to know what the exit strategy was in this case before doing so, so I think I have to proceed with the path as outlined in any event." Id. at ¶ ___.

43.     On January 8, 2014, counsel for Cope Family Venture (not the Committee) inquired as to the need for both a Plan Administrator and a Liquidating Trustee as set forth in the proposed Liquidating Plan. Debtors responded that same day indicating flexibility and a willingness to amend the proposed Liquidating Plan in order to accommodate any concerns

18

raised. Neither the Committee nor Cope Family Venture responded to Debtors' offer to make revisions to the proposed Liquidating Plan to resolve the one issue identified and in spite of Debtors' expressed willingness to do so. Instead, several days later, on January 10, 2014, the Committee filed its Motion objecting to this provision in the Liquidating Plan and also arguing that it is not likely confirmable since the necessary votes will likely not be obtained.

44. In short, notwithstanding a reasonable, neutral proposed liquidating plan to wind down the case in a normal and expected fashion, the Committee initially refused to even read it, and has refused to negotiate it. It is unknown why would the Committee would reject such a proper way to conclude these Chapter 11 Cases, and it is absurd to suggest that a chapter 11 trustee would be the more economical way to wind down the remainder of these cases instead of proceeding to a liquidating plan with a liquidating trustee in a matter of a few months, especially given the limited time involved and limited salaries Debtors' management has indicated it would be willing to accept to finish out their duties in a responsible fashion. Such an argument is contrary to reality and practical experience.

45. The Committee's unwillingness to engage in any negotiations on a neutral Liquidating Plan should not be rewarded with the appointment of appointment of a chapter 11 trustee. Debtors have shown flexibility to work toward a reasonable and meaningful conclusion in these Chapter 11 Cases by modifying their proposed Liquidating Plan, and have taken the initiative to reach that result. Instead of rewarding the Committee's intransigence, the better, more practical, and indeed cheaper way to handle this situation is deny the ill-advised attempt to "knock out" Debtors' management. Debtors have already taken the laboring oar of preparing the Liquidating Plan, and instead of having all of that work be for naught, such work should be built on to bring about the correct and proper conclusion to these Chapter 11 Cases.

46. Finally, the Committee essentially asserts that there is not much left to do in the Chapter 11 Cases pending confirmation, but that is a gross oversimplification. Debtors are presently engrossed in finalizing the sale of the excluded accounts, as well as substantial negotiations with Westlake regarding various purchase price adjustments and verifications, which require the experience and knowledge of both existing management and financial advisors

19

in order to make sure the estates are adequately protected. Moreover, there is an additional basket of approximately $2,000,000 in face value of chargeoff accounts not referenced in the previous motion to sell excluded assets that will also require their participation, which will also potentially result in additional value being delivered to the estates. Second, as previously indicated, Debtors are poised to very shortly present a proposed purchase agreement for the Las Vegas property that they have generated, and they have significant knowledge of this property that is not shared by any other party. Third, Debtors also have other real properties in San Jose and Houston, and, especially with respect to the San Jose property and its current burned out condition, it will involve a complicated review involving potential insurance claims. Debtors' existing management is uniquely qualified and capable to attend to these matters given their historical knowledge of Debtors' operations. In light of the foregoing, appointment of a chapter 11 trustee is ill advised, expensive and simply not in the best interests of creditors and the estate.

### III. CONCLUSION

WHEREFORE, Debtors respectfully request that the Court deny the Committee's Motion, and grant Debtors such other and further relief as is just and proper.

DATED: January 22nd, 2014.

LARSON & ZIRZOW, LLC

By: _____
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101

Attorneys for Debtors

20