MCDONALD CARANO WILSON LLP
RYAN J. WORKS, NV Bar No. 9224
AMANDA M. PERACH, NV Bar No. 12399
2300 West Sahara Avenue, Suite 1200
Las Vegas, NV  89102
Telephone: (702) 873-4100
Facsimile: (702) 873-9966
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com
*Attorneys for Guerin Senter*

*Electronically filed on May 2, 2014*

# IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>WFI DEBTOR,<br><br>Debtor. | Case No. 13-17588-LED<br><br>Chapter 11<br>(Jointly Administered) |
| In re<br><br>WFI DEBTOR,<br><br>Debtor. | Case No. 13-17586-LED<br>Chapter 11<br><br>**APPLICATION FOR ALLOWANCE AND PAYMENT OF SUBSTANTIAL CONTRIBUTION CLAIM AND LIMITED OBJECTION TO PAYMENT OF FEE APPLICATIONS**<br><br>**Hearing Date:**<br>**Hearing Time:**<br><br>**Hearing Place: United States Bankruptcy Court, Foley Federal Building, 300 Las Vegas Boulevard South, Las Vegas, Nevada, Third Floor, Courtroom 3** |

Pursuant to 11 U.S.C § 503(b), Guerin Senter ("Senter"), by and through his counsel, McDonald Carano Wilson, LLP, hereby submits this Application for Allowance and Payment of a Substantial Contribution Claim (the "Application"). The Application is made and based on the following memorandum of points and authorities, the Declaration of Guerin Senter (the "Senter Decl.") filed concurrently herewith, all exhibits hereto, the pleadings and paper on file herein, and the arguments of counsel to be made at the hearing on this matter.

## I. JURISDICTION

1. The Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. The statutory basis for the relief sought herein arises from § 503(b) of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), including all corresponding and applicable local rules of bankruptcy procedure ("LR").

3. Venue of this proceeding and this Application is proper in this District pursuant to 28 U.S.C. § 1408 and 1409.

4. Pursuant to LR 9014.2, Senter consents to the entry of a final order or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## II. RELIEF REQUESTED

1. Pursuant to section 503(b)(3)(D) of the Bankruptcy Code, Senter seeks allowance and payment of a substantial contribution claim in this matter for, among other things, work he performed pursuant to an employment agreement between Senter and Debtor. Pursuant to the employment agreement, Senter looked for investors or funding sources sufficient to buy out certain B-class shareholders and otherwise refinance the debt owed to the Debtor's then-current senior lender, Bank of Montreal ("BMO"). Through his efforts, he located Westlake and prepared all of the necessary due diligence materials needed for further pursuing a refinance deal with Westlake. Senter stored these due diligence materials in the Debtor's "war-room." Senter Decl. at ¶ 4.

2. However, before closing any deal with Westlake, Senter was wrongfully terminated and the Debtor filed this Chapter 11 Bankruptcy. Subsequently, FTI Consulting, Inc. ("FTI") was retained by the Debtor as its financial advisor, investment banker and sales agent. [Docket No. 582]. FTI utilized the substantial work of Senter, including Senter's contact list and collection of due diligence materials, to identify Westlake and ultimately broker the sale of the Debtor's assets to Westlake through a sale under 11 U.S.C. § 363. Senter's pre-petition work

indisputably contributed to the Debtor's estate, payment of claims and confirmation of the Debtor's plan. As a result of Senter's work, the Debtor's assets were sold by overbid at a 363 sale to Westlake for a purchase price of $31,031,507.

3.  Senter's employment agreement with Debtor specifically provided that if the Westlake transaction closed, Senter was entitled to a 2% commission, which would have amounted to $540,000.00 based on the then-anticipated transaction amount of $27,000,000.00. *See* Employment Agreement, a true and accurate copy of which is attached as "**Exhibit 1**" to the Senter Decl. But for Senter's wrongful termination, he would be making a substantial fundraising bonus from the recent sale to Westlake.

4.  Under the circumstances it is both reasonable and appropriate to recognize Senter for his substantial contribution to this estate and as such he is entitled to a substantial contribution claim pursuant to 11 U.S.C. § 503(b)(3)(D).

### III. BACKGROUND

1.  The Debtor was a subprime automobile financing company owned by Harbor Structured Finance LLC for which Frederick Cooper and Katherine Cooper (collectively, the "Coopers") are the majority shareholders. Frederick served as Debtor's President and Chief Executive Office, and Katherine served as Debtor's Executive Vice President and Chief Operations Officer. *See* Senter Decl. at ¶ 6.

2.  In the middle part of 2011, the Debtor, by and through the Coopers, presented Senter with an employment package that included financial terms, as well as other benefits, that persuaded Senter to sell his successful CPA firm, Firebird Financial ("Firebird"), and take the full-time position of Director of Investment Opportunities ("DIO") of Debtor. *Id.* at ¶ 8. After negotiating the terms of the employment contract for approximately four months, on or about August 25, 2011, the Debtor and Senter executed a written employment agreement (the "2011 Employment Agreement"). *Id*. at ¶ 9.

3.  In May of 2012, Senter was promoted to Chief Investment Officer ("CIO"), and a new employment agreement (the "2012 Employment Agreement") was negotiated and executed by Senter and the Debtor. *Id*. at ¶ 10.

4. The 2012 Employment Agreement provides, *inter alia*, for the following: bonuses for funds raised in the form of subordinated debt (section 4(c)) or as equity capital (section 4(f)). *Id*. at ¶ 8 and Exhibit 1 (2012 Employment Agreement).

5. Specifically, under section 4(c), Senter was entitled to a 2% bonus based on the total amount of subordinated debt (the "Subordinated Debt Bonus"). *Id.* at ¶ 4(c). Likewise, Senter was entitled to a "Capital Raise as Equity Bonus" in the amount of 2% of the total capital raised as equity. *Id.* at 4(f).

6. Senter worked as CIO until on or about July 11, 2013, upon which time the Debtor terminated Senter. *Id*.

7. During his time as CIO, Senter performed extensive work on the company's behalf to locate a purchaser of WFI's subordinated debt and to raise capital as equity. *Id.* at ¶ 11.

8. From October 2012 through January 2013 – JP Young as investment banker representing CarFinCo ("CFN") reached out to WFI. *Id.* at ¶ 12. Senter led negotiations, received a draft and outline of the principal deal for CFN to buy WFI in January 2013, and, at some point, met investment banker Lloyd Greif to get an initial letter of intent drafted (the "LOI"). *Id.* at ¶ 13.

9. In March of 2013 Senter was terminated for the first time; however, re-hired by the Coopers because of an early termination penalty in the employment contract of which the Coopers were unaware. *Id.* at ¶ 14. Thereafter, Senter was removed from nearly all CFN negotiations except for one trip to Canada that he attended. *Id.* at ¶ 15.

10. Senter's work resulted in locating Westlake in or about June of 2013, at which point Senter made contact with Westlake's Chief Financial Officer, Paul Kerwin. *Id.* at ¶ 16.

11. Senter performed significant work which included extensive information gathering, performing all necessary due diligence, and courting Westlake who ultimately provided the Debtor with new capital for the restructuring of Debtor's subordinated debt. *Id*. at ¶ 17.

12. However, before the deal was completed, Katherine and Fred Cooper on behalf of WFI, wrongfully terminated Senter in July of 2013; this time for good. *Id.* at ¶ 18.

13.    Debtor filed for bankruptcy protection on September 4, 2013. [Docket No. 1].

14.    Subsequently, the Debtor proposed and conducted a sale of the company's stock and assets using much of what Senter did pre-petition to secure the ultimate winning bidder.

15.    On December 6, 2013, the Debtor filed an amended application to employ FTI to assist with sale transactions (the "FTI Employment Application"). [Docket No. 417].

16.    The Court entered an Order granting the application to employ FTI. [Docket No. 582]. Notably, this Order authorized the use of the proceeds from the 363 Sale to pay FTI "2% of the amount received above the stalking horse bid of Carfinco WFI Inc." *Id*.

17.    While Carfinco Financial Group ("Carfinco") was selected as the stalking horse for the purchase of the Debtor's company, Debtor later received a qualifying overbid from Westlake and the Debtor proceeded with the auction on December 18, 2013 where Westlake was the successful bidder.

18.    But for the work performed by Senter, FTI would not have identified Westlake as a potential bidder, and Westlake may not have been party to this transaction or ultimately the successful bidder at the 363 Sale. *Id*. at ¶ 19. In fact, documents filed in the bankruptcy proceeding confirm that FTI identified Westlake directly from work materials that Senter had prepared. [Docket No. 417] at Ex. A.

19.    For instance, Exhibit A to the FTI Employment Application reveals significant work performed by Senter and used by the professionals in closing the 363 Sale with Westlake. *Id*. ; *see also* Senter Decl. at ¶ 20. Throughout Exhibit A, FTI refers to the data room, which was built, populated and managed by Senter, who was the sole responsible party for the data room prior to his wrongful termination. *Id*. at ¶ 20-21.

20.    Senter selected "Sharefile" as the provider for the data room, he was the administrator of the data room, and he navigated interested investors through the data room. *Id*. Senter uploaded more than 500 documents to the data room, including all due diligence materials, schedules, financial information, and Senter updated the data room with more up-to-date materials for the benefit of potential buyers. *Id*. Westlake, FTI, the Debtor and all

professionals specifically benefitted from the data room, which was instrumental in closing the 363 Sale.

21. On January 6, 2014, the Court entered an order authorizing the sale of all of Debtor's assets, free and clear, to Westlake (with certain reservations), for a purchase price based on net finance receivables of $31,031,507. *Id.*; *see also* [Docket No. 603].

22. Senter filed his proof of claim on October 8, 2013, and amended it accordingly on December 23, 2013, December 26, 2013, and January 7, 2014. [Claim No. 11]. Senter will reduce his claim according to the amount awarded on this Application.

## IV.  LEGAL ARGUMENT

Under section 503(b)(3)(D), a creditor who makes a substantial contribution to a chapter 11 case may obtain reimbursement for an administrative expense. Specifically, Bankruptcy Code, 11 U.S.C. § 503(b) ("Section 503(b))" provides in pertinent part:

> (b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including-
> . . .
> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by-
> . . .
> (D) a creditor . . . in making a substantial contribution in a case under Chapter 9 or 11 of this title; . . .

To recover under a section 503(b) claim for substantial contribution, the claimant must fall within the categories identified in the section (here, a creditor), and must have made a "substantial contribution" to the bankruptcy plan. *Cellular 101, Inc. v. Channel Comm., Inc. (In re Cellular 101, Inc.)*, 377 F.3d 1092, 1906 (9th Cir. 2004). As detailed in *Cellular*, a "creditor" is an "entity that has a claim against the debtor." *Id.* (citing 11 U.S.C. § 101(10)). Further, a creditor's claim can be disputed or otherwise as defined in the Bankruptcy Code. *Id.* (citing 11 U.S.C. § 101(5)).

In order to prevail on a substantial contribution claim, "the claimant must show that the debt asserted to be an administrative expense (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave

consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate. *In re Santa Monica Beach Hotel, Ltd.*, 209 B.R. 722, 725 (B.A.P. 9th Cir. 1997)

### a. The Claim Asserted By Senter Arose from a Transaction with the Debtor in Possession.

In deciding whether a transaction arises from a transaction with the debtor in possession, the *Metro Fulfillment* court focused on what entity's conduct gives rise to the claim. *In re Metro Fulfillment, Inc.,* 294 B.R. 306, 309 (B.A.P. 9th Cir. 2003). When the claim (i.e., the debtor's liability) arises from the post-petition act of the Debtor, the first element of the test is satisfied. *Id*. In similar contexts the Ninth Circuit has adopted a test termed the "fair contemplation" test, for deciding whether a claim arises pre- or post-petition which considers the timing in which the claim is fairly contemplated by the claimant. *See Zilog, Inc. v. Corning* (*In re Zilog*), 450 F.3d 996, 1001-02 (9th Cir. 2006) (discussing the "fair contemplation" test of *In re Jensen*, 995 F.2d 925 (9th Cir. 1993)).

Notwithstanding the requirement that the transaction occur with the debtor in possession, courts permit creditors to recover an administrative claim for substantial contribution where the claim is grounded in a pre-petition contract so long as the claim, itself, arises post-petition. *See Gill v. Tishman Const. Corp. of Cal. (In re Santa Monica Beach Hotel, Ltd.)*, 209 B.R. 722, 725 (B.A.P. 9th Cir. 1997). Courts struggle with the "proper analysis when the contract exists prior to the bankruptcy filing, but some or all of the breached obligations were to be performed post-petition." *See* Laura B. Bartell, Straddle Obligations Under Prepetition Contracts: Prepetition Claims Post Petition Claims or Administrative Expenses, 25 Emory Bankr. Dev. J. 39, 47 (2008); *see e.g. In re Santa Monica Beach Hotel, Ltd*., 209 B.R. at 725. Payments due on pre-petition agreements can qualify as administrative expenses especially when, as here, the underlying contractual arrangement preserved value for the estate. *See In re Coastal Energy, Inc.*, 399 B.R. 805, 815-816 (stating, "the 'post petition' language from other court opinions, like the 'benefit' language, can be read as 'simply a gloss on the underlying concept of what is 'necessary'") (citing *Matter of H.L.S. Energy Co., Inc*., 151 F.3d 434, 438 (5th Cir. 1998).

Here, although Senter performed much of his work, pre-petition, the actual transaction

giving rise to his claim did not take place until after the bankruptcy petition was filed. In particular, the work he performed was not utilized until the 363 Sale was contemplated in the Bankruptcy proceeding. Similarly, under the fair contemplation test, Senter's claim was not contemplated until the 363 Sale was in prospect. Thus, despite the fact that the Employment Agreement was a pre-petition obligation, the transaction giving rise to the claim was a post-petition obligation, just as was the case in *Santa Monica Beach Hotel*. Accordingly, Senter's substantial contribution claim arose from a transaction with the Debtor in Possession, satisfying the first factor of this test.

### b. Senter's Work Directly and Substantially Benefitted the Estate.

The Ninth Circuit has recognized that in order to request payment of an administrative expense under 11 U.S.C. § 503(b)(3)(D), the principal test of substantial contribution is "'the extent of benefit to the estate.'" *Cellular*, 377 F.3d at 1096 (internal citations omitted). The benefits conferred by the claimant must be direct and not "incidental" or "minimal," and must outweigh the benefit received by the claimant. *Id.* at 1098. Further, claimant's actions must foster, rather than retard, progress of the reorganization. *Id.* at 1097.

With respect to an auction sale, where a creditor plays a critical rule in obtaining due diligence materials and its efforts results in a competitive sale yielding more than the stalking horse bid, the creditor can (and should) recover expenses incurred in conjunction with participation in the sale of the debtor's assets. *See In re Kidron, Inc.,* 278 B.R. 626, 631 (Bankr. M.D. Fla. 2002). As noted by one court, expenses should be allowed as administrative expenses under section 503(b)(3)(D), when the creditor "directly, materially, and demonstrably contrib[uted] to the process of achieving a successful sale for the benefit of the creditors generally." *Id.*

Where a creditor's actions involve the successful alternate financing which resulted in the debtor negotiating with the lender from which they ultimately obtained financing, the creditor was found to have substantially contributed to the estate. *In re FF Holdings Corp.*, 343 B.R. 84, 84- 88 (D. Del. 2006). In addition, when a creditor's participation in the confirmation dispute results in a benefit to all creditors of the estate of $3,000,000.00, the creditor is deemed to have

made a "substantial contribution". *Hall v. DP Partners, Ltd. P'ship (In re DP Partners Ltd. P'ship)*, 105 F.3d 667, 673 (5th Cir. 1997).

Here, there is no question that without Senter, Westlake would not have been identified to participate in the bidding and therefore would not have been the successful highest bidder at the auction. Without the data room, and significant pre-petition work by Senter, the 363 Sale would not have happened. As such, a number of factors weigh strongly in favor of finding that Senter made a substantial contribution to the Chapter 11 case, which provided a $3,000,000.00 direct benefit to the estate by Westlake's overbid of CFN.

First, through his position as CIO and pursuant to the 2012 Employment Agreement, Senter looked for and located Westlake for the purpose of refinancing subordinated debt and purchasing the Debtor's assets. Senter Decl. at ¶ 22. In addition, upon locating Westlake, Senter populated Debtor's data room with all necessary due diligence documents, and attempted to close a deal with Westlake. *See* Senter Decl. at ¶ 23. Before the deal could close, the Debtor filed for bankruptcy. [*See* Docket No. 1]. Subsequently, FTI was employed by Debtor to perform the same services that were performed by Senter. [Docket No. 417]. Indeed, FTI has admitted to identifying Westlake as a potential bidder at the 363 Sale directly from work materials that Senter prepared. *See* Exhibit A to FTI Fee Application. Essentially, FTI will now get compensated 2% under the terms of the order employing FTI, for the work that Senter performed, including identifying Westlake, and gathering information provided to potential lenders/investors, including Westlake, that was needed to perform necessary due diligence on Debtor. Senter Decl. at ¶ 24. FTI did not have to perform any work to locate Westlake – rather, Senter did this all pre-petition and for the exact purposes of what the 363 Sale accomplished.

Now, the Debtor has sold substantially all of its assets to Westlake and is left with simply proposing a liquidating plan. [Docket No. 738]. As a direct result of the sale proceeds from the sale to Westlake, the Debtor had sufficient funds on hand to pay its senior lender, BMO Harris, in full. *Id.* Its total allowed claim was $27,459,278.84 and a result of this sale, BMO's claim has been satisfied in full. *Id.* The 363 Sale is the basis of the Debtor's First Amended Joint Plan of Reorganization. *Id.* Senter played a critical role in the plan by locating an overbidder that paid

Page 9 of 10

more at the 363 Sale than the stalking horse. This was vital to the Debtor's proposed plan. *See id.* But for Senter facilitating the deal pre-petition and locating Westlake, the 363 Sale may not have taken place, and certainly, Westlake would not have participated in the bidding or served as the highest bidder. The fact that FTI was later retained for the same purpose, and utilized much of Senter's work, does not take away from Senter's right to be compensated under the terms of the pre-petition 2012 Employment Agreement as a substantial contributor of a benefit to the estate within this bankruptcy proceeding. The contract entitled him to 2% of the fundraising bonuses. *See* Ex. 1. As such, as a result of his direct and substantial contributions to the estate, he is entitled to payment in the amount of $540,000.00. While Senter does not expect to receive that type of compensation, he should receive an amount commensurate with his efforts that led to the Westlake deal closing. His substantial contribution claim should also be fair and equitable as to the other professionals of the estate who were also integral to the process.

### V. LIMITED OBJECTION TO PAYMENT OF FEE APPLICATIONS

Senter also requests that the Court delay payment of fee applications on file with this Court until this Substantial Contribution Application can be considered.

### VI. CONCLUSION

For the reasons set forth above, Senter believes his request for an award of substantial contribution is appropriate and should be granted. Senter further requests that an order be entered which stays any decision on any professional fee application until this Application is decided.

DATED this 2nd day of May, 2014.

MCDONALD CARANO WILSON LLP

By: /s/ *Ryan J. Works*
    Ryan J. Works, Esq., NV Bar No. 9224
    Amanda M. Perach, Esq. NV Bar No. 12399
    2300 West Sahara Avenue, Suite 1200
    Las Vegas, Nevada 89102
    rworks@mcdonaldcarano.com
    aperach@mcdonaldcarano.com
    *Attorneys for Guerin Senter*